**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HEWITT ASSOCIATES, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 cv 3634 |
| | ) | |
| v. | ) | Judge Samuel Der-Yeghiayan |
| | ) | |
| ENRON CREDITORS RECOVERY CORP., f/k/a | ) | Magistrate Judge Cole |
| ENRON CORP., an Oregon Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**EMERGENCY MOTION FOR EXTENSION OF TIME TO**
**ANSWER, MOVE OR OTHERWISE PLEAD**

Defendant, Enron Creditors Recovery Corp., formerly known as Enron Corp. ("Enron"), by its attorneys, respectfully moves the Court for an extension of time to answer, move or otherwise plead to the Complaint of Plaintiff, Hewitt Associates, L.L.C. ("Hewitt"), and in support thereof, states as follows:

1.      On June 5, 2008, Hewitt filed a Complaint for Declaratory Judgment in the Circuit Court of Lake County (the "Current Action").  A copy of the Complaint is attached hereto as Exhibit 1.  Enron was served with a copy of the Complaint on June 9, 2008.

2.      On June 25, 2008, the Current Action was removed to the United States District Court for the Northern District of Illinois.

3.      The allegations set forth in the Current Action are substantially related to and dependent upon two consolidated actions previously pending in the United States District Court for the Southern District of Texas before the Honorable Melinda Harmon, *Tittle v. Enron Corp.*, Case No. H-01-3913 (the "*Tittle* Action"), an ERISA class action brought in the wake of Enron's demise, and *Enron Corp. Savings Plan v. Hewitt Associates, L.L.C.*, Case No. 07-cv-04081 (the "Administrative Committee Action"), a case brought by the Enron Corp. Savings Plan ("Savings

Plan") and the Administrative Committee of the Enron Corp. Savings Plan ("Administrative Committee") against Hewitt seeking damages for Hewitt's failure to allocate and distribute settlement proceeds in the *Tittle* Action in accordance with Judge Harmon's prescribed methodology.

4.    In its Complaint in the Current Action, Hewitt seeks declaratory relief finding that Enron is obligated to indemnify Hewitt for purported "losses" Hewitt has allegedly incurred as a result of its own botched settlement allocation services as well as a finding that Enron is obligated to defend Hewitt in the Administrative Committee Action based on an Administrative Services Agreement (the "ASA"), as amended, between Enron and Hewitt pursuant to which Hewitt provided "information to [Enron] related to Participant data which Hewitt has maintained on its proprietary systems, to the extent Hewitt maintains such information."  (Compl. Ex. B at 1.)

5.    On the afternoon of Friday, June 13, 2008, Enron filed a Complaint for Declaratory Relief in the Southern District of Texas seeking a declaration that Hewitt's allocation services in the *Tittle* Action are not covered by the ASA and that Enron is not obligated to indemnify or defend Hewitt under the ASA or any other agreement (the "Enron Action").  Within days of the filing of Enron's Complaint, Judge Harmon, sua sponte, entered an Order of Consolidation, consolidating the Enron Action into the *Tittle* Action on Wednesday, June 18, 2008.  A copy of Judge Harmon's June 18, 2008 Order of Consolidation is attached hereto as Exhibit 2.

6.    Concurrently with the filing of this Motion for an extension of time to answer or otherwise plead, Enron has filed a Motion to Transfer the Current Action to the Southern District

of Texas, pursuant to 28 U.S.C. § 1404(a), where the consolidated *Tittle*, Administrative Committee and Enron Actions are already pending before Judge Harmon.

7.  It makes sense for a single Court to oversee the case management of all the inter-related disputes among the parties.  In consolidating the Enron Action into the *Tittle* Action, Judge Harmon has implicitly determined that the subject matter of Hewitt's Complaint in the Current Action arises from the same core of operative facts as the *Tittle* Action, over which she has continuing jurisdiction.  Given the substantial relationship between the Current Action on the one hand, and the *Tittle*, Administrative Committee and Enron Actions all pending in Texas and consolidated before Judge Harmon on the other hand (as set forth more fully in Enron's Memorandum in Support of Defendant Enron Creditors Recovery Corp.'s Motion to Transfer Pursuant to 28 U.S.C. § 1404(a)), Enron respectfully requests an extension of time to answer, move or otherwise plead to Hewitt's Complaint for Declaratory Judgment until its Motion to Transfer has been resolved.

8.  In the alternative, Enron requests thirty (30) days from the resolution of this Motion to answer, move or otherwise plead to Hewitt's Complaint for Declaratory Relief.

9.  The request of an extension of time set forth in this Motion is Enron's first request for an extension of time and is not made for purposes of delay, but solely to allow Enron sufficient time to prepare an adequate response to the Complaint, and will not cause prejudice to any party.

WHEREFORE, Defendant, Enron Creditors Recovery Corp., respectfully requests an extension of time to answer, move or otherwise plead to Plaintiff's Complaint for Declaratory Judgment until its Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) filed herewith is resolved

or, in the alternative, thirty (30) days from the resolution of this Motion to answer, move or otherwise plead.

Dated: June 26, 2008

Respectfully Submitted,

ENRON CREDITORS RECOVERY CORP.

By: _____/s/ Peter G. Rush_____
One of its Attorneys

Peter G. Rush
Paul J. Walsen
Dawn L. Johnson
Sara E. Robinson
BELL, BOYD & LLOYD LLP
70 West Madison Street
Suite 3100
Chicago, IL  60602
(312) 372-1121

# EXHIBIT 1

## IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS

HEWITT ASSOCIATES, L.L.C.                )
                                         )
      Plaintiff,                        )
                                         )          Case No.    **08 MR 643**
      v.                                )
                                         )          **DECLARATORY JUDGMENT**
ENRON CREDITORS RECOVERY                 )
CORP., f/k/a ENRON CORP.,                )
an Oregon Corporation                    )
                                         )
                                         )
      Defendant.                        )

**FILED**

**JUN 05 2008**

CIRCUIT CLERK

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Hewitt Associates L.L.C. (Hewitt), for its Complaint against Enron Creditors

Recovery Corp. f/k/a Enron Corp. (Enron), alleges as follows:

### The Parties

1.     Hewitt is a member-owned limited liability company whose sole member is Hewitt

Associates, Inc., a Delaware corporation.  Headquartered in Lincolnshire, Illinois, Hewitt is a

leading national provider of human resource and employee benefit outsourcing and consulting

services.

2.     Enron is an Oregon corporation based in Houston, Texas.  Enron Creditors

Recovery Corp. is the new name for Enron Corp., and Enron's sole purpose is to reorganize and

liquidate certain of the operations and assets of the pre-bankruptcy Enron for the benefit of

creditors.

3.     The office of Enron's President and Chairman of its board of directors is located in

Chicago, Illinois.

**Jurisdiction And Venue**

4.      This Court has jurisdiction over Hewitt's Claim pursuant to 735 ILCS 5/2-701, which vests this Court with the power to declare the rights and liabilities under the contract that is the subject of this Complaint.

5.      This Court has personal jurisdiction over Enron pursuant to the Illinois Long-Arm Statute, 735 ILCS 5/2-209, because the defendant transacted business in Illinois and entered into a contract substantially connected with the State of Illinois.

6.      Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because at least some part of the contract that is at issue was negotiated in Lake County, Illinois.

**Facts**

**Enron and Hewitt Establish a Contractual Relationship**

7.      In 2001, Enron Corp., then still thought to be a leading American energy services conglomerate, retained Hewitt to serve as the record keeper for the Enron Corp. Savings Plan and certain other employee benefit plans (Plans).

8.      On June 1, 2001, Hewitt and Enron entered into the Administrative Services Agreement (ASA).  The ASA is a contract between Hewitt and Enron (defined as "Client"), and it includes detailed provisions for the sharing and limitation of responsibility for errors and omissions in connection with work performed by Hewitt.  Under the ASA, Enron contracted with Hewitt to provide certain benefit plan administration services to the Plans and the participants.  A copy of the ASA is attached, marked Exhibit A, and made a part of this Complaint.

9.      The ASA was originally executed in contemplation of Hewitt's taking over record keeping responsibilities for the Plans, including the Enron Corp. Savings Plan.  By January 1,

2005, record keeping had been transferred away from Hewitt, largely as a result of the Plans' being integrated into successor plans of other employers.

10.    Under ASA Section 2.5(a), if Hewitt's performance under the ASA was not in compliance with its terms, Enron could require Hewitt, "at Hewitt's expense, to correct or re-perform any defective or non-conforming Services when such performance is reasonably necessary and practical under the circumstances. In addition, if Hewitt's non-compliance causes Losses to Client or the Plan(s), Hewitt will be liable to Client in accordance with Section 10."

11.    ASA Section 10 contains a limitation of liability clause. ASA Section 10.1 states: "Hewitt will furnish services at no charge to identify, correct or re-perform any defective or non-conforming Service as described in Section 2.5. In addition to its obligations under Section 2.5, if Client or the Plan(s) suffers Losses as a result of Hewitt's negligence, Hewitt will be liable for up to $1,000,000 of such Losses incurred by Client or the Plan(s) during any Agreement Year after the first $100,000 of such Losses."

12.    Under ASA Section 1.25, "Losses" are defined as "unrecoverable losses, costs, damages or expenses resulting from Hewitt's performance of the Services."

13.    Under ASA Section 10.2, the $1 million liability limitation "shall not apply to Losses arising from (a) Hewitt's gross negligence, willful, fraudulent or criminal misconduct."

14.    The ASA expressly obligates Enron to indemnify Hewitt under certain situations. Under ASA Section 10.4(b), Enron "shall indemnify, defend, and hold Hewitt harmless from and against any claims, and pay all losses and related expenses (including reasonable attorneys' fees and expenses) suffered by Hewitt: (i) arising out of any breach by Client of any of its material obligations, representations or warranties contained in this Agreement; (ii) arising from Client's

negligence, gross negligence or willful, fraudulent, or criminal misconduct . . . [or] (v) arising

from Losses for which Hewitt is not liable under this Section 10 . . . ."

15.    Under ASA Section 10.4(c), "Hewitt will defend all Claims brought against Client

or Hewitt by any third party relating to this Agreement or the Services to the extent such Claims

relate to or arise out of Losses described in Section 10.2(b)-(d).  Client will defend all other

Claims brought against Client or Hewitt by any third party relating to the Agreement or the

Services. . . . Included among third parties are the Plans, any trustees, the Participants and

affiliates of Client."  Enron's duty to defend Hewitt is thus defined to include Claims for Losses

described in Section 10.2(a):  arising from "Hewitt's gross negligence or willful, fraudulent or

criminal misconduct."

16.    Under ASA Section 17.1, the Plans are neither a party nor a third party beneficiary

to the ASA.  Nor does the ASA "create any legal relationship, interest or right whatsoever

between Hewitt and any individual, beneficiary, participant or applicant or assignee under any

Plan."

17.    Under ASA section 13.2, Hewitt is not "a fiduciary within the meaning of ERISA

or any state law with respect to any Plan" and "all discretion and control with respect to the

terms, administration, or assets of any Plan" remain exclusively with Enron or the other named

fiduciary under any such Plan.

18.    Hewitt has notified Enron that it seeks indemnification from Enron for (i) Losses

for which Hewitt is not liable under the ASA and (ii) defense of a claim brought against Hewitt

by a third party—Enron Corp. Savings Plan and the Administrative Committee of the Enron

Corp. Savings Plan—relating to the ASA.  Hewitt's claims for indemnification arise from its

provision of services to Enron under the ASA after the demise of Enron.

**The Collapse of Enron**

19.    Enron's much-publicized financial collapse spawned an onslaught of class action lawsuits. Enron sponsored a number of retirement savings plans—including the Enron Savings Plan, an employee stock ownership plan (ESOP), and a Cash Balance Plan. Several class action lawsuits were filed by individual participants on behalf of the Plans pursuant the Section 502(a) of ERISA. The class action lawsuits generally alleged that the Plan's fiduciaries, including senior officers and directors of Enron, Enron employees responsible for administering the Plan, and the Plans' outside trustees, breached their fiduciary obligations of loyalty, prudence, and diversification by permitting continued investment in Enron stock between January 21, 1998 and December 2, 2001 (when Enron filed for bankruptcy), when they knew or should have known that Enron was a financially troubled company with stock held afloat by improper accounting and financial reporting.

20.    Plaintiffs sought judgments requiring these fiduciaries to restore the Plans' financial losses pursuant to ERISA Section 409(a). These ERISA actions were consolidated in the United States District Court for the Southern District of Texas, and are generally referred to as the *Tittle* Action.

21.    In due course, the plaintiff class reached settlements with a number of defendants. Pursuant to the settlements, the defendants would pay money into a settlement trust, which would release the money (after deductible expenses) to the Plans for distribution among the Participants according to their relative investments in Enron Stock through the Plans during the class period. The allocation method was described in a Plan of Allocation agreed to and negotiated by the parties to the *Tittle* Action.

22. Hewitt was not a party to the *Tittle* Action settlements and had no role in negotiating the Plan or Allocation.

**Hewitt Provides Enron with Class Action Allocation Calculations**

23. Effective January 1, 2005, Enron terminated Hewitt's record keeping services, but their contractual relationship remained in place. On the same date, Enron and Hewitt executed an amendment to the ASA limiting and changing the scope of services to permit access to Plan data in Hewitt's possession as a result of its prior record keeping activities, and services to be performed from time to time by Hewitt at Enron's request pursuant to written work orders. A copy of this amendment is attached, marked Exhibit B, and made a part of this Complaint.

24. In late 2005, at Enron's request, Hewitt began assisting Enron in developing a settlement allocation protocol for the first tranche of the *Tittle* Settlement. Once the litigants obtained provisional approval of the settlements, they filed a Second Supplemental Amended Plan of Allocation on or about July 25, 2006.

25. At the same time, Hewitt and Enron executed a July 25, 2006 amendment to the ASA, effective July 1, 2006, extending the term of the ASA to include services Hewitt would be performing in connection with the *Tittle* allocation protocol. A copy of this amendment is attached, marked Exhibit C, and made a part of this Complaint.

26. Enron formally authorized Hewitt to proceed to complete its allocation work in accordance with a work order, the July 31, 2006 "Requirements Document." The Requirements Document was prepared as contemplated under ASA Section 2. A copy of Enron's authorization to commence work and the Requirements Document are attached, marked Exhibit D, and made a part of this Complaint.

27.    Hewitt's responsibilities under the Requirements Document required Hewitt—in close consultation with Enron—to combine the data for thousands of participants in several Enron-sponsored plans, some of which were no longer operated by Enron, to create a unified data set from which to calculate relative losses.

28.    After the first tranche of the *Tittle* settlement was distributed, Hewitt learned of a class member who questioned the accuracy of her ESOP balance used in calculating her settlement allocation.  Hewitt investigated the question and learned that the archived computer system used to calculate ESOP class member allocations contained an incorrect share value for January 1, 1998.  As a result of an archive retrieval error, incorrect information was included in that data set for certain class members.  This was not detected when the archived data set was retrieved for use in performing the allocation calculations.

29.    As a result of this incorrect share price information, the calculation assigned overly large losses to participants holding ESOP shares at the start of the class period, and they were allocated too large a share of the settlement proceeds at the expense of the other class members who received underpayments.

30.    Hewitt immediately explained the basis of the error to Enron once Hewitt became apprised of the error, and began a work process to correct the calculation error.

31.    As a result of that error, approximately $22 million was misallocated among *Tittle* participant class members.  Some of these amounts can be recovered from the accounts of overpaid participants or through offsets from additional forthcoming settlements.

32.    Under ASA Section 10.5: "Both Hewitt and Client agree to use reasonable efforts to mitigate liability, damages, and other losses suffered in connection with this Agreement, including where any damages can be mitigated by lawfully pursuing recovery from Participants

or other third parties, each of Hewitt and Client will conduct or permit diligent efforts to so recover." Enron has failed reasonably to mitigate losses in violation this Section, causing Hewitt damages.

33.    Enron is a fiduciary of the Plans with the right and ability to seek recovery of the *Tittle* allocation overpayments from participant class members. Hewitt has no such right or responsibility.

34.    Meanwhile, an interest obligation began to accrue on *Tittle* class members who received underpayments.

35.    Enron has estimated that of the amount of the overpayment (approximately $22 million ), approximately $11.2 million may not be recoverable through reversals of payments to new plan trusts and IRAs, or through offsets from additional forthcoming class action lawsuit settlement distributions. That amount includes interest that Enron agreed would be paid, now estimated to be approximately $1.5 million, on the underpayments.

36.    Enron and Hewitt executed loans to the Plan, so that *Tittle* class participants who were underpaid (or unpaid) as a result of the allocation error would be paid without awaiting recovery of overpayments. Hewitt's loan exceeded $1,000,000. To the extent that the Plan is able to recoup sufficient funds from overpaid participants (the "Recovery Amount"), it must repay the loans in equal shares to Hewitt and Enron. These loans were made with Enron and Hewitt reserving their rights under the ASA.

37.    On November, 30, 2007, the Enron Corp. Savings Plan and the Administrative Committee of the Enron Corp. Savings Plan commenced a lawsuit against Hewitt Associates, L.L.C. in the United States District Court for the Southern District of Texas, Case No. 07-cv-0481 (consolidated with Lead Case No. H-01-3913). The lawsuit remains pending and asserts

six claims against Hewitt, including various tort claims for negligence, professional negligence, and gross negligence arising from Hewitt's *Tittle* calculation work. Hewitt moved to dismiss the original complaint for lack of subject matter jurisdiction, the Plan amended, and Hewitt has moved to dismiss the amended complaint on the same ground.

38.    Hewitt has incurred attorney's fees, costs and expenses associated with its defense of the claims brought in the lawsuit pending in the Southern District of Texas.

39.    As part of confidential mediation submissions prior to the filing of this Complaint, Hewitt provided Enron with prompt written notice that it was seeking indemnification for the unrecovered balance of Hewitt's loan to the Plan—in excess of the $1 million liability limitation in any event and within the cap if caused by Enron's failure to mitigate—as required under the ASA. Hewitt also provided Enron with prompt written notice that it was seeking indemnification both for past and future expenses in defense of the Plan's lawsuit pending in the United States District Court for the Southern District of Texas.

40.    Enron refuses to honor its obligations under the ASA to indemnify Hewitt for these losses and to defend the Plan's claims.

41.    Therefore, there is an actual controversy between Hewitt and Enron regarding the interpretation of the ASA.

42.    Hewitt seeks a declaratory judgment under 735 ILCS 5/2-701 *et seq.*

WHEREFORE, Hewitt prays that the Court:

(a)    determine and adjudicate the rights and liabilities of the parties under the ASA;

(b)    find and declare that Enron is obligated to indemnify Hewitt for all Losses under the terms of the ASA, including all past and future expenses incurred in defense of the Plan's lawsuit and for the unrecovered balance of Hewitt's loan to the Plan;

- 9 -

(c)     find and declare that Enron is obligated to defend third party claims brought

against Hewitt, including the Enron Corp. Savings Plan and the Administrative

Committee of the Enron Corp. Savings Plan lawsuit pending in the Southern

District of Texas, Case No. 07-cv-0481 (consolidated with Lead Case No. H-01-

3913);

(d)     find and declare that Enron is obligated to indemnify Hewitt for damages that

Hewitt has suffered as a result of Enron's failure to mitigate damages as the ASA

requires; and

(e)     award all further relief the Court deems equitable and just, including attorneys'

fees incurred in bringing and prosecuting this action.

Dated:  June 5, 2008                          Respectfully submitted,

**HEWITT ASSOCIATES, L.L.C.**

By:_____
                One of Its Attorneys

Joel G. Chefitz
Mark J. Altschul
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Firm ID Number: 4325

Steven W. Kasten
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts 02109
Telephone: (617) 535-4000

CHI99 4983026-5.058123.0020



```
Job : 236
Date: 6/9/2008
Time: 8:27:38 AM
```

## Client Agreement System Imaging Cover Sheet

1.  **Client ID**_____02227

2.  **Client Name**_____Enron Corp.

3.  *Client Agreement ID*

4.  *CSD Agreement ID*

5.  **Evidence Type** _____ASA

6.  **Business Segment** _____Outsourcing

7.  *Service Codes*

8.  **GC Agreement Type** _____39

9.  **Effective Date** _____06/01/2001

**EXHIBIT  A**



RECEIVED SEP 2 7 2001
2227
39 &

## ADMINISTRATIVE SERVICES AGREEMENT

This Administrative Services Agreement (the "Agreement") effective the 1st day of June, 2001, by and between Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt").

**Recitals**

**Whereas,** Client is the sponsor of certain benefit Plans (as defined below); and

**Whereas,** Client has selected Hewitt to provide certain benefit plan administration services to the Plans and the Participants (as defined below) of such Plans and Hewitt is willing to provide such services upon the terms and conditions contained in this Agreement.

**Agreement**

**Now, therefore,** in consideration of the foregoing and the mutual promises and covenants contained herein, and other valuable consideration, the receipt, sufficiency and adequacy of which is hereby acknowledged, Client and Hewitt hereby agree as follows:

**Section 1:  Definitions**

As used in this Agreement, the following terms shall have the meanings set forth below:

1.1  **"Agreement Year"** means the ongoing Services implementation period (regardless of duration) and thereafter each consecutive twelve (12) month period beginning October 1, 2001.

1.2  **"Authorized Representative(s)"** means, with respect to each party, one or more persons who are duly authorized by such party to address operational issues that may arise from time to time under this Agreement.

1.3  **"Change Order"** shall have the meaning set forth in Section 2.6(c).

1.4  **"Claim"** means any claim for which an Indemnitee is entitled to indemnification or defense from an Indemnitor under Section 10.

1.5  **"Client Content"** means all images, text and other content, whether owned or licensed by Client which Client makes available to Hewitt under this Agreement, for inclusion into (a) the portion of the Hewitt Web Site used in connection with the provision of the Services or (b) other materials prepared in connection with the Services.

1.6  **"Client Direction"** shall have the meaning set forth in Section 2.7(a).

1.7  **"Client Information"** means all data or information (in whatever form or media) (a) that is owned by, or licensed by third parties to, Client or (b) which is owned by Client (including Participant Data, Client Content and Client Marks) and that either (i) is supplied to Hewitt by, or on behalf of, Client hereunder, or (ii) Client makes accessible to Hewitt as a result of the Services contracted for or provided under this Agreement.  Client Information does not include Hewitt Information.

1.8 **"Client Marks"** means collectively Client's corporate name and Client's trademarks, service marks, logos, and trade names, as such may change in appearance and/or style as Client may specify in its sole discretion, from time to time and as Client may make available to Hewitt under this Agreement for inclusion into (a) the portion of the Hewitt Web Site used in connection with the provision of the Services or (b) other materials prepared in connection with the Services.

1.9 **"Confidential Information"** shall have the meaning set forth in Section 8.1.

1.10 **"Cure Period"** shall have the meaning set forth in Section 9.4(c).

1.11 **"Default"** means the occurrence of any of the following events:

    (a) The existence of any material representation or warranty made in this Agreement by either party that was materially false when made;

    (b) Insolvency of a party; general failure of a party to pay its debts as they become due; entrance of a party into receivership or any arrangement or composition with creditors generally; filing of a voluntary or involuntary petition or other action or proceeding for bankruptcy or reorganization or dissolution or winding-up of a party; a general assignment for the benefit of creditors of a party; or a seizure or a sale of a material part of a party's property by or for the benefit of any creditor or governmental agency;

    (c) An assignment or attempted assignment by either party in violation of Section 14.2 hereof;

    (d) Payment Default; or

    (e) A failure by either party to observe and perform any other material obligation, covenant, or condition under this Agreement.

1.12 **"Default Notice"** shall have the meaning set forth in Section 9.4(b).

1.13 **"Delivery Model"** shall have the meaning set forth in the Fee Schedule.

1.14 **"Disaster Recovery Plan"** means Hewitt's disaster recovery plan, as updated from time to time. A summary of the current Disaster Recovery Plan is attached hereto as **Schedule E.**

1.15 **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder.

1.16 **"Fee Schedule"** means the service and fee schedule attached to this Agreement as **Schedule A.**

1.17 **"Hewitt Content"** means all content, whether owned or licensed by Hewitt, which Hewitt includes in the Hewitt Web Site or other materials prepared in connection with the Services.

1.18 **"Hewitt Information"** means:

(a) All tangible materials and non-tangible information, other than Participant Data, provided by Hewitt to Client in connection with this Agreement, including, but not limited to, the Requirements Document, Delivery Model, IVR Script, and Plan Reference;

(b) Hewitt Software;

(c) The Hewitt Web Site (including the portion thereof used by Hewitt in the provision of the Services) and the look and feel thereof;

(d) All data, information or material resident on Hewitt's computer servers, except to the extent such data, information or material constitutes Client Information;

(e) Hewitt Content;

(f) Hewitt's responses to Client's requests for proposal or other proposal related documentation;

(g) Hewitt's standard materials and derivatives thereof, and other material related thereto; and

(h) Hewitt's generalized practices, techniques, business processes, and know-how regardless of whether developed in connection with the Services or engagements with other Hewitt clients.

1.19    "Hewitt Software" means any software (including underlying source and object code) owned or licensed to Hewitt or embedded and installed by Hewitt on Client's computers or otherwise used in connection with the provision of the Services, including software used in the operation of the Hewitt Web Site.

1.20    "Hewitt Web Site" means Hewitt's sites on the World Wide Web through which it is performing the Services and making related information and other content available to Client and Participants, including the site located at the following URL: http://resources.hewitt.com/[Client identifier].

1.21    "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and any regulations promulgated thereunder.

1.22    "Indemnitee" shall have the meaning set forth in Section 10.4(c).

1.23    "Indemnitor" shall have the meaning set forth in Section 10.4(c).

1.24    "IVR" means Hewitt's interactive voice response system employed in the provision of the Services.

1.25    "Losses" means unrecoverable losses, costs, damages or expenses resulting from Hewitt's performance of the Services.

1.26    "Participant" or "Participants" means the individual(s) participating in, eligible to participate in, or who previously participated in, one or more of the Plans, as described more specifically in the Fee Schedule.

1.27    **"Participant Data"** means the records and information pertaining to Participants and their benefits under the Plans and supplied by Client or Participants or created by Hewitt or its permitted subcontractors in the course of providing the Services.

1.28    **"Payment Default"** means Client's failure to make a timely payment to Hewitt when due under the terms of this Agreement.

1.29    **"Plan" or "Plans"** means Client's employee benefit plans as listed in the Fee Schedule and described more specifically in the Requirements Document.

1.30    **"Plan Documents"** shall have the meaning set forth in Section 3.2

1.31    **"Privacy Policy"** means the privacy policy statement found on the Hewitt Web Site, as amended, revised and supplemented from time to time.

1.32    **"Proprietary Rights"** shall mean any and all patent rights, copyright rights, trademark rights, trade secret rights, rights of publicity, rights of privacy, moral rights or other intellectual property or proprietary rights any where in the world.

1.33    **"Records Retention Policy"** means the records retention policy to be followed by Hewitt in connection with the provision of the Services and described on **Schedule B** to this Agreement.

1.34    **"Requirements Document"** means the document(s) listing the specifications and requirements of the Services, including, but not limited to, the manner in which the Services will be provided, as such document(s) may be modified and supplemented from time to time.

1.35    **"Services"** means the benefit plan administrative services to be performed by or on behalf of Hewitt as described generally in the Fee Schedule and in more detail in the Delivery Model and the Requirements Document.

1.36    **"Termination Notice"** shall have the meaning set forth in Section 9.1.

1.37    **"Y2K Defect"** shall have the meaning set forth in Section 6.3.

## Section 2:  Services

2.1    **Services.** Hewitt shall provide the Services in accordance with the terms of this Agreement and the Requirements Document.

2.2    **Requirements Document.** The Requirements Document is prepared by Hewitt and Client and, upon mutual agreement, the Requirements Document, or portions thereof, will be incorporated by reference into this Agreement.  Amendments, updates and revisions to the Requirements Document will follow the procedure described in Section 2.6 of this Agreement.  The Requirements Document is prepared by Hewitt after consulting with Client.

**2.3    Client Information.**

    (a)    **Provision of Data.** Client will submit to Hewitt all Client Information in Client's control necessary for Hewitt to perform the Services provided for in this Agreement. Participant Data will be submitted in accordance with the specifications set forth in the Requirements Document. If such data is not submitted in accordance with such specifications, or if Hewitt detects errors or omissions in the data submitted, Hewitt will promptly return such data to Client unless Client and Hewitt agree that Hewitt is to make corrections to the data. Services performed by Hewitt in correcting data will be billed as additional Services at Hewitt's then current billing rates, as such billing rates are generally described in the Fee Schedule. Client shall be solely responsible for the accuracy and appropriateness of Client Information. Hewitt may, but shall not be required to inquire into the genuineness or correctness of any Client Information.

    (b)    **License.** During the term of this Agreement, Client grants to Hewitt a non-exclusive, royalty free, non-transferable license to use Client Information solely in connection with Hewitt's performance of its obligations and exercise of its rights under this Agreement, subject to the provisions of Section 8.2 herein regarding the use of aggregated data.

**2.4    Project Management.**

    (a)    **Authorized Representatives.** Each party shall designate an appropriate person or persons (or designated alternates) as their respective Authorized Representatives. The initial list of Authorized Representatives is attached as **Schedule F.** Each party may supplement or otherwise modify its list of Authorized Representatives from time to time by written notice to the other party. Each party's Authorized Representatives shall have authority to issue, execute, grant or provide any approvals, requests, change requests, Change Orders, notices or other communications required hereunder or requested by the other party hereto.

    (b)    **Reports.** Hewitt shall provide Client with such reports as are required by the Requirements Document.

    (c)    **Stewardship Meetings.** Client's and Hewitt's Authorized Representatives, and other representatives as appropriate, shall meet on an annual basis, or more often as mutually agreed, to discuss the parties' performance under this Agreement and the timing of any fee adjustments, as contemplated in the Fee Schedule.

**2.5    Correction of Services.**

    (a)    **Hewitt Errors.** If Hewitt's performance of the Services does not comply in any material respect with the terms of this Agreement or the Requirements Document, Client may require Hewitt, at Hewitt's expense, to correct or re-perform any defective or non-conforming Services when such re-performance is reasonably necessary and practical under the circumstances. In addition, if Hewitt's non-compliance causes Losses to Client or the Plan(s), Hewitt will be liable to Client in accordance with Section 10.

    **(b)**    **Client or Third Party Errors.** To the extent Hewitt's failure to comply is attributable to Client's or a third party's failure to perform (including providing inaccurate or incomplete data or other information or instructions and/or providing such data, information or instructions to Hewitt untimely) as required in this Agreement, then Hewitt's corrections or re-performance of any Services shall be additional Services to be billed at Hewitt's then current billing rates, as such billing rates are generally described in the Fee Schedule.

**2.6**    **Change Order Procedure.**

    **(a)**    **Changes.** The parties may revise, amend, alter, or otherwise change the nature and scope of the Services provided under this Agreement from time to time by mutual agreement, including, but not limited to, changes relating to: (i) the addition of Services or plans; (ii) the termination of certain Services or Plans; (iii) the modification of Services; (iv) adding or reducing the number of Plans in which such Participants may participate; or (v) any other changes that alter the scope of this Agreement or the nature of the Services. All such changes shall be made in accordance with the procedures set forth in this Section 2.6 and the other terms of this Agreement.

    **(b)**    **Change Requests.** Either party may, from time to time, and at any time during the term of this Agreement, request a change in accordance with this Section 2.6. The party requesting the change shall prepare, at its expense, Part I of Schedule D attached hereto (Schedule D, including Part I thereto, or such other form or format as mutually agreed upon between the parties, shall hereinafter be referred to as a "Change Order"), setting forth in reasonable detail therein the nature of the change requested. As soon as practicable, after Part I of the Change Order has been completed, the Authorized Representatives of each party shall discuss the changes and, if necessary and desirable, determine the feasibility of proceeding with such changes, which such discussions may include a discussion, in general terms, of the impact of the changes on the Services, the Requirements Document, and the fees payable hereunder.

    **(c)**    **Change Orders.** If the Authorized Representatives mutually agree to proceed with the changes or with further discussions related to such changes, Hewitt shall complete Part II of the Change Order, describing the changes and setting forth the impact of the changes on the Services, the Requirements Document, and the fees payable hereunder and present Part II of the Change Order to the Authorized Representative of Client. If both parties mutually agree to implement such changes, each Authorized Representative shall execute the Change Order. Execution by the Authorized Representatives of both parties shall constitute an amendment to this Agreement and shall be binding on both parties. Change Orders may also trigger the need to update, amend, or otherwise revise the Requirements Document as described in Section 2.2.

    **(d)**    **DeMinimis Changes.** For changes which, in the reasonable estimates of the parties' respective Authorized Representatives, involve an increase of fees of less than $1,500.00, Hewitt may commence with providing the requested change in Services, for which Client shall be obligated to pay in accordance with this Agreement, prior to the execution of the corresponding Change Order based on receipt of direction from Client's Authorized Representative.

(e)   **Fee Impact.**  A change that is not otherwise compensated under this Agreement, unless the parties agree otherwise, shall be priced using Hewitt's then current standard billing rates, as such billing rates are generally described in the Fee Schedule.

## 2.7   Client Direction.

(a)   **General.** In the course of providing the Services, Hewitt may receive written or oral instructions or directions from Client's Authorized Representatives (hereinafter collectively referred to as a "Client Direction") concerning provision of the Services which do not constitute a Change Order under Section 2.6 or which by the nature of such Client Direction, may not be documented as a Change Order under Section 2.6 in a timely way. The types of issues that may be addressed by a Client Direction include, but are not limited to: (i) issues not addressed specifically in the Requirements Document; (ii) interpretation of any provision of the Plans; (iii) instructions concerning compliance with applicable laws and regulations; (iv) instructions concerning compliance with subpoenas or other legal processes; and (v) notices concerning adjudication of Participants' claims for benefits, provided however, in no case will Hewitt be responsible for adjudicating Participant appeals from a denial of benefits.  Upon receipt of a Client Direction, Hewitt shall promptly indicate acceptance or rejection of the Client Direction and, in the event of rejection, notify Client in writing of such rejection and provide Client with a description of the reasons therefor.  Hewitt may, but shall not be required to, inquire into the genuineness or correctness of any Client Direction or require written confirmation thereof.

(b)   **Actions Based on Client and Participant Direction.** Hewitt may rely, in performing its obligations under this Agreement, upon any Client Direction or any information, data, document or instrument supplied by Client's Authorized Representatives or a Participant. If and to the extent that Hewitt, or any of its subcontractors, act or fail to act as a result of or based upon any such Client Direction or Participant direction, Hewitt shall be relieved of any liability arising therefrom and such act or failure to act shall not constitute a Default, breach or non-performance of any obligation of Hewitt contained in this Agreement; provided, however, that Hewitt shall be liable for any Claims arising out of or resulting from Hewitt's negligent, grossly negligent, fraudulent, willful or criminal acts in accordance with Section 10.  Hewitt shall be responsible for taking the initiative to resolve issues related to the Services under this Agreement in accordance with the provisions of this Agreement, but if Hewitt reasonably requests instruction or direction from Client and does not receive a Client Direction in a timely manner, Hewitt shall be protected and shall not be deemed to have breached this Agreement with respect to any act or failure to act undertaken in good faith relating to the instructions requested.

(c)   **Conflict with Agreement.** Notwithstanding any term or provision in this Agreement to the contrary, if any Client Direction is inconsistent with or conflicts with any provision of this Agreement, including the Requirements Document, the Fee Schedule or any Change Order, Hewitt may, at its discretion, require that such Client Direction be confirmed in a Change Order initiated by Client pursuant to Section 2.6.

**2.8**   **Audit Rights.** Client, at its sole cost and expense, shall have the right during the term of this Agreement with reasonable advance notice to Hewitt and during normal business hours to review and audit Hewitt's records relating to the performance by Hewitt of the Services. Such review and audit may be conducted by Client's counsel, its internal staff or by independent third parties retained by Client. Hewitt will provide up to eight (8) hours of Hewitt assistance at no charge during each Agreement Year to assist Client with any such audit. Additional assistance will be provided as additional Services and will be billed at Hewitt's then current billing rates, as such billing rates are generally described in the Fee Schedule. Client agrees that any such review or audit shall be conducted in a manner reasonably designed to protect the confidentiality of Participant Data and Hewitt Confidential Information and to avoid interfering with Hewitt's business operations. Hewitt further acknowledges that governmental authorities may have the right to review and audit Hewitt's records pursuant to applicable law. Client agrees that any third party conducting such audit shall be subject to the Confidential Information provisions of Section 8 and may be required by Hewitt to sign a confidentiality and non-disclosure agreement in form and substance acceptable to Hewitt, a form of which is attached hereto as Schedule H, and further agrees that should any independent auditor be deemed by Hewitt to be a competitor of Hewitt, the parties shall mutually agree to the review and audit procedures prior to such review and audit.

## Section 3:  Compliance with Law

**3.1**   **General.** Hewitt shall at all times during the term of this Agreement remain in material compliance with all applicable national, state and local laws and regulations, including any required licenses, permits or registrations, necessary for Hewitt to be able to perform the Services.

**3.2**   **Plan Compliance.** Client will maintain all documents relating to its association with, and Participants' participation in, the Plans (collectively "Plan Documents") in compliance with applicable law. Client represents that such documents are now in compliance with applicable law. Client agrees to notify Hewitt as soon as possible of any amendments or proposed amendments to the Plan Documents. Client will also: (a) verify that all procedures set out in the Requirements Document are consistent with the Plan Documents; and (b) interpret the Plans. The foregoing notwithstanding, Client acknowledges that the Trustee shall have no contractual relationship with Hewitt and Hewitt shall not be liable for the actions, or inactions, of such Trustee.

**3.3**   **Notice of Non-Compliance.** Hewitt shall use reasonable efforts to notify Client if Hewitt's Authorized Representatives learn that any Services do not comply with any applicable laws, rules, regulations or ordinances relating to the Services, including, but not limited to, provisions of ERISA or the Internal Revenue Code; provided, however, this Agreement shall not create any duty or liability on the part of Hewitt to seek out or discover such non-compliance, or to ensure compliance by Client or the Plans with any of the foregoing nor will Hewitt be liable for any Plan's or Client's failure to comply with such law, rule, regulation or ordinance.

**3.4**   **Changes.** Subject to Section 3.3, to the extent that any change in applicable laws, rules, regulations or ordinances relating to the Services would make a change to this Agreement (including the Requirements Document) necessary from a legal compliance standpoint, Hewitt shall notify Client thereof if, and to the extent, Hewitt's Authorized Representatives become aware of such matter. Any such changes shall be deemed made upon Client's

request or approval, subject to the Change Order provisions of Section 2 hereof. Changes to Hewitt's base system documentation and base system software resulting solely from the enactment of legislation or regulations will be considered as within the scope of the Services, provided that any such change applies generally to the services provided by Hewitt to its other clients uniformly and without customization. The base system documentation and the base system software is then made available to the Hewitt team serving the Client. In practice, most changes require further modification or tailoring at the client level based on interpretation, specific plan design, transition rules, and similar administrative and plan level characteristics. Such modifications and tailoring will be made in accordance with the Change Order provisions of Section 2. The parties agree that this Agreement will be amended, to the extent necessary, prior to the effective date of the privacy regulations promulgated under HIPAA in accordance and to comply with any and all requirements imposed by HIPAA relating to electronic data privacy and security.

## Section 4:  Compensation

**4.1**   **General.** Compensation payable to Hewitt for the Services to be provided hereunder is specified in the Fee Schedule.

**4.2**   **Additional Services.** The Change Order provisions of Section 2 may result in adjustments to Hewitt's compensation hereunder. As described in Section 3.4, base system software updates required as a result of legislative or regulatory change are included in the fees described in the Fee Schedule, but the implementation of these updates within Client's environment may result in additional implementation fees. Similarly, the ongoing fees described in the Fee Schedule may be adjusted if there is an ongoing impact on the performance of the Services as a result of such change.

**4.3**   **Invoicing, Payment and Other Compensation Terms.** The Fee Schedule also sets forth the terms under which Hewitt's compensation payable hereunder will be invoiced, paid and adjusted from time to time.

## Section 5:  Ownership of Materials and Work Product

**5.1**   **Client Information.**  Client Information will remain the property of Client. Hewitt agrees it shall not remove any copyright notices therefrom or use such materials except internally for purposes of administering the Plans as contemplated in this Agreement, subject to the provisions of Section 8.2 regarding the use of aggregated data.  Client and Client's subcontractors (with respect to proprietary property provided by such subcontractors) will have and retain all right, title and interest, including ownership of any Proprietary Rights in and to all tools, methodologies or other intellectual property (including the Client Information) that is supplied by Client or such third parties, including any enhancements, improvements or other derivative works thereof.  Client represents that the uses of the Client Information contemplated in this Agreement will not infringe the Proprietary Rights of any third party and that Client has obtained all consents of any such third party, including that of all Participants, necessary for such uses of Client Information.

**5.2**   **Hewitt Information.** All Hewitt Information will remain the property of Hewitt, and Client agrees it shall not remove any copyright notices therefrom or use such materials except internally for purposes of administering the Plans as contemplated in this Agreement. Hewitt and Hewitt's subcontractors (with respect to proprietary property provided by such

subcontractors) will have and retain all right, title and interest, including ownership of any Proprietary Rights in and to all tools, methodologies or other intellectual property (including the Hewitt Information) that is supplied by Hewitt or such third parties in the performance of the Services, including any enhancements, improvements or other derivative works thereof developed in the course of Hewitt's performance under this Agreement. Hewitt retains the right to use its knowledge, experience, and know-how (including processes, ideas, concepts and techniques developed in the course of performing the Services hereunder) in any manner in the course of providing services to other clients.

**5.3** **Hewitt Web Site.**

(a) **Hewitt Content.** The data, information, look and feel, user interface, tools, software (including Hewitt Software), trademarks, technologies, business processes, know-how and other intellectual property and proprietary information used in connection with, or displayed on, the Hewitt Web Site are the sole and exclusive property of Hewitt and its licensors, and are protected under U.S. and international copyright, trademark, other intellectual property, and related laws. In addition to Hewitt's and its licensors' Proprietary Rights in and to content elements presented within the Hewitt Web Site, Hewitt is the owner and hereby reserves all rights in and to the selection, coordination, arrangement and enhancement of such content. The terms of this Section 5.3 shall not impact Client's Proprietary Rights in Client Information, except as otherwise expressly provided in this Agreement.

(b) **Integration of Client Information.** Hewitt and Client shall work together to integrate the Client Information into the portion of the Hewitt Web Site through which Hewitt provides the Services, taking into consideration the overall look and feel of the Hewitt Web Site. Hewitt shall have sole control over the appearance and design of the Hewitt Web Site, including, without limitation, control over section titles and design pages relating to the Client Information. Client may notify Hewitt in writing if Client has a good faith objection to Hewitt's judgment in this regard and the parties will cooperate to reach a mutually acceptable resolution with respect thereto.

(c) **New Features.** Hewitt may, at any time, create new features and areas of the Hewitt Web Site (including the portion thereof used in the provision of the Services), and the operation and content of the Hewitt Web Site shall be under the sole control of Hewitt. Client shall cooperate with Hewitt in good faith to facilitate all updates and availability of all Client Information and the operation of the Hewitt Web Site.

**5.4** **Intellectual Property.** This Agreement does not grant or otherwise give either party ownership in or any other right, title or interest to use any of the other party's Proprietary Rights, except as explicitly described herein.

**Section 6: Software**

**6.1** **Non-exclusive License.** Subject to this Agreement, Hewitt grants to Client, and all of Client's wholly owned subsidiaries and wholly owned affiliates that have Participants for whom the Services are provided (including those affiliated companies, partnerships and other entities in which Client or its subsidiary or affiliated company has an ownership or equity interest and such subsidiary or affiliate adopts the Plans) a non-exclusive, non-sublicenseable, non-

transferable license to any Hewitt Software provided to Client or embedded or installed on Client's computers by Hewitt. Such license shall terminate and expire upon the termination or expiration of this Agreement. Client will not copy, and will cause any subsidiary or affiliate described above to not copy, such software, except for one copy for back-up or archival purposes (by Client only), nor will Client attempt, or permit any subsidiary or affiliate to attempt, to modify, reverse engineer, reverse compile, or disassemble such software or convert such software to another programming language. Client may not, and will cause any subsidiary or affiliated described above to not, market, distribute or transfer copies of the Hewitt Software to others. Client, nor any subsidiary or affiliate described above, may not rent, lease or loan the Hewitt Software. Client will cause any subsidiary or affiliate to be bound by the confidentiality provisions of this Agreement.

6.2    **Third Party Software.** If any third party software is separately provided by Hewitt to Client in connection with the Services, Client is responsible for complying with any supplier license terms and conditions which relate to such software. Hewitt shall not be responsible for the functionality or performance of such software.

6.3    **Year 2000 Representations.** Hewitt shall use reasonable efforts to ensure that the current and any future releases of Hewitt Software used to provide Services to the Client under this Agreement will be free of any and all critical errors or defects relating to the year 2000 ("Y2K Defect"), and further agrees to use reasonable efforts to ensure that such software will process information, data and dates for the year 2000 and subsequent years in an accurate and complete manner including, but not limited to, date recognition, calculations that accommodate same century and multi century formulas and date values, as well as date data interface values that reflect the century. Hewitt shall use reasonable efforts to correct any Y2K Defect. This Section 6.3 is enforceable only if all date data supplied to Hewitt by, or on behalf of, Client contain four (4) digit years and all other software with which Hewitt must interface, but does not provide, is also so compliant.

**Section 7:  Protection and Retention of Information**

(a)    **Security.** Hewitt will take substantially similar measures to assure the security of Client's data on its computers as Hewitt takes to assure the security of its own data of similar importance, except where the parties agree otherwise.   Client will be responsible for retaining duplicate copies of Participant Data and other Client Information it sends to Hewitt and for taking other precautions as it deems necessary in case such data or information are lost or destroyed, regardless of cause or in case reprocessing is needed for any reason.

(b)    **Disaster Recovery.** Hewitt will maintain and follow the Disaster Recovery Plan, a copy of which is attached hereto as Exhibit E, during the term of this Agreement. Hewitt will test, from time to time, the Disaster Recovery Plan, and if necessary, will implement the provisions thereof applicable to any site at which the Services contemplated by this Agreement are then being performed. Hewitt will make reasonable efforts to maintain the Disaster Recovery Plan consistent with any reasonable changes that may be required by any regulatory authority.

(c)    **Records Retention.** Participant Data and other data records of Client Information will be maintained in accordance with the Records Retention Policy, a copy of which is attached hereto as Schedule B.

(d) **Privacy Policy.** Hewitt will at all times adhere to the Privacy Policy, as described in Schedule I attached hereto.

## Section 8: Confidential Information

8.1 **Confidential Information.** For the purposes of this Agreement, "Confidential Information" includes: (a) the terms of this Agreement (including the Schedules attached hereto and other attachments to this Agreement); (b) for Client, Client Information; (c) for Hewitt, Hewitt Information; (d) oral and written information designated by a party as confidential prior to the other party obtaining access thereto; and (e) oral and written information which should reasonably be deemed confidential by the recipient whether or not such information is designated as confidential. Each party's respective Confidential Information will remain its sole and exclusive property.

8.2 **Treatment of Confidential Information.** Each party will use reasonable efforts, consistent with the terms of Section 7(a), to cause its respective agents, employees and representatives to minimize distribution and duplication, and prevent unauthorized disclosure, of the Confidential Information of the other party. Each party agrees that only its employees (and in Hewitt's case, any subcontractors through which Hewitt is performing the Services) who have a need to know the Confidential Information of the other party will receive such Confidential Information. No party will disclose the other party's Confidential Information to a third party without the prior written consent of the other party, which consent may be conditioned upon the execution of a confidentiality agreement reasonably acceptable to the owner of the Confidential Information. However, Hewitt may use aggregated Plan or Participant Data for any Hewitt purpose, provided that no data is identifiable by Participant or Client. Hewitt may also use Participant Data to the extent and for purposes authorized by the Participant whose data is being used. Client may disclose Confidential Information to a subcontractor retained by Client related to its respective Plans, provided however, that Hewitt consents in writing to any such disclosure and such consent shall not be unreasonably withheld.

8.3 **Exceptions.** Confidential Information does not include information or materials if and to the extent it:

(a) is or becomes generally available or known to the public through no fault of the receiving party;

(b) was already known by or available to the receiving party prior to the disclosure by the disclosing party;

(c) is subsequently disclosed to the receiving party by a third party who is not under any obligation of confidentiality to the disclosing party;

(d) is required by law to be disclosed as part of a judicial process, government investigation, legal proceeding or other similar process;

(e) has already been or is hereafter independently acquired or developed by the receiving party without violating any confidentiality agreement with or other obligation to the disclosing party.

For purposes of this Section 8, the "disclosing party" is the party to this Agreement (Client or Hewitt) which owns or otherwise controls the disclosed Confidential Information, and the "receiving party" is the party to this Agreement which has received the disclosing party's Confidential Information.

8.4   **Required Disclosure.** If the receiving party is required to disclose Confidential Information as part of a judicial process, government investigation, legal proceeding or other similar process, such party will give prior written notice of such requirement to the disclosing party. Reasonable efforts will be made to provide this notice in sufficient time to allow the disclosing party to seek an appropriate confidentiality agreement, protective order or modification of any disclosure and the receiving party will cooperate in such efforts.

8.5   **Return of Confidential Information.** Upon the termination or expiration of this Agreement, the parties shall return or destroy all Confidential Information pursuant to Section 9.6.

8.6   **Injunctive Relief.** Each party acknowledges that any breach of any provision of this Section 8 by either party, or its agents, employees, representatives or subcontractors, may cause immediate and irreparable injury to the other party, and in the event of such breach, the injured party may be entitled to injunctive relief, and to any and all other remedies available at law or in equity.

## Section 9:  Term and Termination

9.1   **Initial Term; Renewal.** The initial term of this Agreement commences on the effective date first stated above and will end on September 30, 2006,  unless terminated earlier as provided in this Section 9.  Upon the expiration of the initial or any renewal term, this Agreement shall automatically renew for successive one (1) year terms unless either party provides the other party with a written termination notice ("Termination Notice") at least one-hundred and eighty (180) days prior to the end of the initial term or any renewal term.

9.2   **Termination For Convenience.** Client may terminate this Agreement at any time, without cause and for its convenience, by giving Hewitt at least one hundred eighty (180) days prior written notice of such termination.  If prior to the end of the initial term, Client terminates Services (pursuant to this Section 9.2) which account for ten percent (10%) or more of the annual revenues payable under this Agreement (or Hewitt terminates this Agreement due to Client's Default under this Agreement pursuant to Section 9.4), then Client shall pay Hewitt an amount described in the Fee Schedule under the subheading "Termination for Convenience", such amount based upon the date of termination and the number of months elapsed since the Effective Date.  In the event this Agreement is renewed, Client and Hewitt agree to negotiate a new termination schedule, provided however, that if a new termination payment schedule is not agreed upon, and either the Client terminates for convenience (or Hewitt terminates due to a default as described above), and the termination of Services accounts for ten percent (10%) or more of the annual revenues payable under this Agreement during such renewal period, Client shall pay Hewitt an amount equal to the sum of fifteen percent (15%) of the average monthly revenues related to such terminated Services for each full or partial month the Services are terminated prior to the end of such renewal term.  The average monthly revenues will be determined using the twelve (12) months immediately preceding the effective date of such termination.

**9.3    Termination Prior to Commencement of Ongoing Services.** If Client terminates Services before ongoing Services commence, Client will pay for time incurred by Hewitt in implementing those Services at Hewitt's then current standard billing rates plus out-of-pocket expenses actually incurred, less any amounts already paid by Client for those implementation Services. If Client delays the commencement date of any of the Services but does not terminate the Services, applicable ongoing fees shall commence as originally scheduled. If Client delays commencement of the Services more than ninety (90) days after the date provided in the Fee Schedule, Hewitt shall be entitled to terminate this Agreement for Default under Section 9.4 upon giving the required notice, but there shall be no Cure Period.

**9.4    Termination for Default.**

   (a)    **Termination.** Upon (i) the occurrence of a Default, (ii) the delivery of a Default Notice to the defaulting party as provided in Section 9.4(b), and (iii) the defaulting party's failure to cure the Default prior to the expiration of the applicable Cure Period specified in Section 9.4(c), the non-defaulting party shall have the right to terminate this Agreement on or after the last day of the Cure Period (or on a termination date selected by the non-defaulting party if no Cure Period applies and the non-defaulting party has the right to terminate) by delivering a Termination Notice to the defaulting party, thereby triggering the termination obligations described in Section 9.6.

   (b)    **Notice of Default.** A Default shall not be deemed to have occurred unless the non-defaulting party has given written notice (a "Default Notice") to the defaulting party in accordance with the requirements of this Section 9.4(b). A Default Notice shall specify in reasonable detail the events which the non-defaulting party believes have occurred and which constitute or evidence a Default, the provisions of this Agreement (including any applicable provisions of the Requirements Document) which have not been performed or complied with, and the actions which, in the opinion of the non-defaulting party, would be required to fulfill the requirements of this Agreement and cure the Default.

   (c)    **Cure Period.** The defaulting party shall have thirty (30) days (the "Cure Period") in which to take the actions reasonably necessary to cure its breach or non-performance and, in the case of Hewitt, to satisfy its obligations under Sections 2.5 and 10. All Cure Periods commence on the date the corresponding Default Notice is received. Except in the case of a Payment Default, any Cure Period may be extended for up to ninety (90) days (or for such longer period as the parties may agree in writing) if: (i) the defaulting party is making all reasonable efforts to promptly cure the non-performance; (ii) a cure cannot practically be achieved within the applicable Cure Period; and (iii) within the first thirty (30) days of the initial Cure Period, the defaulting party gives the non-defaulting party written notice of the defaulting party's need for an extension and of the actions it is taking to cure its breach or non-performance. As used in this Section 9.4(c), the term, "reasonable efforts" shall include the application of diligence and resources reasonably necessary to cure the non-performance in a businesslike fashion with due regard to the seriousness of the Default and its impact upon the non-defaulting party and those to whom the non-defaulting party may have legal or contractual obligations.

**9.5    Termination for Insolvency.** Notwithstanding anything herein to the contrary, either party may terminate this Agreement immediately upon notice if the other party files a petition in

bankruptcy or proceedings in bankruptcy are instituted against it and not dismissed within sixty (60) days, or any court shall assume jurisdiction of such party and its assets pursuant to proceedings under any bankruptcy or reorganization act or a receiver is appointed to such party's assets and is not dismissed within sixty (60) days, or if such party shall make an assignment for the benefit of creditors.

9.6    **Obligations upon Termination.** Upon termination or expiration of this Agreement:

(a)    **Return of Client Information.** A copy of all Participant Data, whether maintained on Hewitt's computers, hard copy, or other form, will be returned to Client within sixty (60) days in Hewitt's customary format, together with instructions concerning the format to access such data at no additional charge.  At Client's request, Hewitt will return a copy of all Participant Data in such form as Client may reasonably request, subject to the change order provisions of Section 2.6 (including any additional time required as determined during the Change Order process).  Hewitt may retain an archival copy of Client Information. Furthermore, Hewitt may continue to use Participant Data (i) in aggregate form as described in Section 8.2 and (ii) to the extent and for the purposes authorized by the Participant whose data is being used.

(b)    **Return of Hewitt Information.** All Hewitt Information and other Hewitt Confidential Information, together with any copies thereof, in Client's possession or control will either be returned to Hewitt or destroyed with written certification to Hewitt of such destruction by an executive officer of Client.

(c)    **Payment Obligations.** In addition to any payments that may be due under Section 9.2, in the event of termination of this Agreement for any reason, Client shall pay Hewitt all amounts payable under this Agreement for all Services rendered up to and including the effective date of the termination.

(d)    **Transition Services.** Hewitt will use reasonable efforts to cooperate with Client to formulate and execute a transition plan as soon as termination or expiration of this Agreement is certain. At the request of Client, Hewitt will use reasonable efforts to perform additional transition services that are within Hewitt's then current capacities and capabilities, including, but not limited to, providing consulting services to Client with respect to Hewitt's data format and conversion, data interfaces with Client and providers of services to the Plans, and methods of transferring responsibility for the Services with as little interruption as practicable to Client. Hewitt's obligation to provide any transition services shall be subject to Hewitt and Client agreeing on the scope of such transition services and the other terms under which they will be provided, including compensation payable to Hewitt for such transition services.

9.7    **Fee Adjustment.** If some, but not all Services under this Agreement are terminated, Hewitt and Client shall use reasonable efforts to reach an agreement related to Hewitt's compensation for the remaining Services to be provided under this Agreement, which will include an adjustment to reflect lost economies of scale resulting from such termination.  If the parties fail to reach an agreement, the provisions of Section 11 shall apply.

## Section 10:  Liability and Indemnification

**10.1**  **Limitation of Liability.** Hewitt will furnish services at no charge to identify, correct or re-perform any defective or non-conforming Service as described in Section 2.5.  In addition to its obligations under Section 2.5, if Client or the Plan(s) suffers Losses as a result of Hewitt's negligence, Hewitt will be liable for up to $1,000,000 of such Losses incurred by Client or the Plan(s) during any Agreement Year after the first $100,000 of such Losses.

**10.2**  **Exclusions from Limitation on Liability.** Notwithstanding anything to the contrary contained herein, the limitations on Hewitt's liability contained in Section 10.1 shall not apply to Losses arising from: (a) Hewitt's gross negligence or willful, fraudulent or criminal misconduct;  (b) Hewitt's breach of the confidentiality provisions of this Agreement; (c) bodily injury, including death, or damage to tangible personal or real property arising from physical acts or omissions that constitute Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct; or (d) the infringement of the Proprietary Rights of a third party by the use of the Hewitt Information contemplated hereunder and/or Hewitt's provision of the Services.

**10.3**  **Consequential or Punitive Damages.** In no event will Hewitt or Client be liable to one another for incidental, consequential, special, punitive or special damages (including loss of profits, data, business or goodwill or government fines, penalties, taxes or filing fees) regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

**10.4**  **Indemnification.**

(a)  **By Hewitt.** Subject to Sections 10.1, 10.2 and 10.3, and 10.4(c), Hewitt shall indemnify, defend and hold Client and the Plans harmless from and against any Claims and shall pay all Losses (including reasonable attorneys' fees and expenses): (i) arising out of any breach by Hewitt of any of its material obligations, representations or warranties contained in this Agreement; (ii) arising out of Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct; (iii) arising from bodily injury, including death, or damage to tangible personal or real property arising from physical acts or omissions that constitute Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct; or (iv) arising out of the infringement of the Proprietary Rights of a third party by the use of the Hewitt Information contemplated hereunder and/or Hewitt's provision of the Services.

(b)  **By Client.** Client shall indemnify, defend and hold Hewitt harmless from and against any Claims and shall pay all losses and all related expenses (including reasonable attorneys' fees and expenses) suffered by Hewitt: (i) arising out of any breach by Client of any of its material obligations, representations or warranties contained in this Agreement; (ii) arising from Client's negligence, gross negligence or willful, fraudulent, or criminal misconduct; (iii) arising from bodily injury, including death, or damage to tangible personal or real property arising from physical acts or omissions that constitute Client's negligence, gross negligence or willful, fraudulent, or criminal misconduct; (iv) arising out of the infringement of the Proprietary Rights of a third party by the use of the Client Information provided to Hewitt hereunder; (v) arising from Losses for which Hewitt is not liable under this Section 10; or (vi)

arising from the acts or omissions of any third party provider of services to Client, the Plans and Participants.

(c)  **Defense of Third Party Claims.** Hewitt will defend all Claims brought against Client or Hewitt by any third party relating to this Agreement or the Services to the extent such Claims relate to or arise out of Losses described in Section 10.2(b)-(d). Client will defend all other Claims brought against Client or Hewitt by any third party relating to the Agreement or the Services. The party entitled to indemnification or defense under this Section 10 (an "Indemnitee") may select separate legal counsel in the event Indemnitee, in its sole discretion, deems its interests to be in conflict with those of Indemnitor. Liability for Losses and the costs of defense shall be allocated to and reimbursed by Hewitt or Client in accordance with their respective indemnification obligations under this Section 10. Included among third parties are the Plans, any trustees, the Participants and affiliates of Client. An Indemnitee may also participate at its own expense in the defense of any such third party Claims for which Indemnitee seeks defense and indemnification from the party obligated to indemnify or defend under this Section 10 (an "Indemnitor"), or an Indemnitee may assume the defense of such Claim, in which case the Indemnitor will not be liable to the Indemnitee in defending such action or Claim.

(d)  **Procedure.**

(1)  **Claims.** If an Indemnitee desires to make a Claim against an Indemnitor, the Indemnitee shall give prompt written notice to the Indemnitor of the institution of a Claim at any time instituted against or made upon the Indemnitee in connection with which the Indemnitee could claim indemnification under this Section 10 and shall advise the Indemnitor in writing, to the extent known, of the amount and circumstances surrounding the same. The failure to give such prompt written notice shall not affect the indemnification provided hereunder except to the extent that the failure to give such notice shall have actually prejudiced the Indemnitor. The Indemnitee shall cooperate and shall cause its relevant employees to cooperate with the Indemnitor in connection with the Claim at no cost to the Indemnitor.

(2)  **Settlement.** Either the Indemnitor or the Indemnitee may settle any Claim without the consent of the other only if (i) the settlement does not impose any financial or other obligation on or impair any right of the non-consenting party, and (ii) if the settling party is the Indemnitee, the Indemnitee releases the Indemnitor from any liability pursuant to this Section 10 for the settled Claim, other than for amounts paid or incurred prior to consummation of the settlement. Except as provided in the immediately preceding sentence, neither the Indemnitee (if the Indemnitor has agreed as to its responsibility to indemnify pursuant to this Section 10) nor the Indemnitor shall settle any Claim without the consent of the other.

(3)  **Cooperation in Litigation.** In the event of any third party Claims made against either or both of the parties, the parties shall cooperate reasonably with one another in the investigation and defense of such Claims.

**10.5   Mitigation Efforts.** Both Hewitt and Client agree to use reasonable efforts to mitigate liability, damages, and other losses suffered in connection with this Agreement, including where any damages can be mitigated by lawfully pursuing recovery from Participants or other third parties, each of Hewitt and Client will conduct or permit diligent efforts to so recover.

**10.6   Insurance.**

> **(a)   Coverage.** Hewitt shall maintain, at all times during the term of this Agreement and for a period of two years after termination, the following minimum insurance coverages and limits, at its sole expense:
>
> > (1)   Workers' compensation and employer's liability policy to comply with the laws of the state where the Services are performed (Workers' Compensation - Statutory; Employer's Liability -$500,000/$500,000/$500,000).
> >
> > (2)   Commercial general liability policy endorsed to provide for contractual liability, completed operations liability and broad form property damage with limits as follows: Bodily Injury and Property Damage - General Aggregate Limit--$2,000,000, Products/Completed Operations Aggregate Limit--$1,000,000, Each Occurrence Limit--$1,000,000;
> >
> > (3)   Business automobile liability policy which shall include coverage for all owned, non-owned and hired vehicles, with limits as follows: (a) Bodily Injury and Property Damage - $1,000,000 Combined Single Limit Each Occurrence
> >
> > (4)   Errors and Omissions - $1,000,000 Each Occurrence/in Aggregate;
> >
> > (5)   Hewitt shall provide Client within ten (10) business days following the date of execution of this Agreement its evidence of same on a Certificate of Insurance. Such Certificate shall provide evidence of all policies required herein. Hewitt shall also use reasonable efforts to provide Client thirty (30) days' written notice prior to the cancellation of any policies required hereunder, unless such cancellation is pursuant to the issuance of a new policy (regardless if such policy is issued by the same insurance carrier, its successor, or another carrier) complying with the provisions of this Section 10.
>
> **(b)   Best Rating.** Insurance companies affording coverage hereunder must have a B+VII or better rating, as rated in the A.M. Best Key Rating Guide for Property and Casualty Insurance Companies.

**Section 11: Dispute Resolution**

Any dispute, controversy or Claim arising out of or relating to this Agreement or the Services shall be settled in accordance with the procedures set forth in **Schedule C.**

**Section 12: Delays**

Neither party will be in breach of this Agreement as a result of, nor will either party be liable to the other party for, liabilities, damages or other losses arising out of delays in performance caused by acts of God, government authority, strike or labor disputes, fires or other loss of facilities, breaches of contract by suppliers or others, telephone system, computer downtime, and other utility outages, equipment malfunctions, Internet service providers and similar occurrences beyond the reasonable control of the delayed party as long as such party is diligently attempting to correct the cause of the delay. During any such delay in performance, the delayed party will implement reasonable work-around plans, computer system disaster recovery (in Hewitt's case, the Disaster Recovery Plan), alternate sources or other commercially reasonable means to facilitate the performance of its obligations under this Agreement until the delay is corrected.

**Section 13: Relationship of the Parties**

13.1    **Independent Contractor.** The relationship between the parties is that of independent contractors. None of the provisions of this Agreement shall be construed to create an agency, partnership or joint venture relationship between the parties or the partners, officers, members or employees of the other party by virtue of either this Agreement or actions taken pursuant to this Agreement. Hewitt personnel will remain Hewitt's employees for all purposes, including, but not limited to, determining responsibility for all payroll-related obligations. Each party agrees to hold harmless and indemnify the other from any claims pertaining to employment asserted by independent contractors and/or temporary employees of the non-indemnifying party.

13.2    **Fiduciary Status.** Client and Hewitt understand and intend that Hewitt shall not be a fiduciary within the meaning of ERISA or any state law with respect to any Plan. Hewitt shall not have any discretion with respect to the management or administration of any Plan or with respect to determining or changing the rules or policies pertaining to eligibility or entitlement of any Participant in any Plan to benefits under such Plan. Hewitt also shall not have any control or authority with respect to any assets of any Plan, including the investment or disposition thereof. All discretion and control with respect to the terms, administration or assets of any Plan shall remain with Client or with the named fiduciaries under such Plan.

**Section 14: Subcontracting and Assignment**

14.1    **Subcontracting.** Hewitt may enter into subcontracts in connection with Services provided pursuant to this Agreement. Hewitt shall be responsible for the actions of any subcontractors with which it has a subcontracting relationship and shall retain any such liability and responsibility under this Agreement as if such subcontracted activities were performed by Hewitt. Notwithstanding the foregoing to the contrary, Hewitt's use in the ordinary course of business of third party services or products not dedicated to Client that are not material to any particular function constituting a part of the Service shall not constitute a delegation or subcontracting of Hewitt's responsibilities covered by this Section 14.1. If a subcontractor qualifies as a minority-owned or woman-owned business enterprise ("MWBE"), Hewitt shall cause contractor to provide Hewitt with a copy of its certification, provided however, that Client acknowledges that subcontractor is solely responsible for ensuring that it is an MWBE by an organization that provides such certification. If the subcontractor is not an MWBE, Hewitt shall attempt to subcontract with an MWBE and shall provide Client with the name of

such MWBE. Client may contact such MWBE's directly for the sole purpose of confirming the subcontracting relationship with Hewitt.

14.2    **Assignment.** This Agreement may not be assigned by either party, in whole or in part, by operation of law or otherwise, without the prior written authorization of the other party, provided however, that Hewitt may assign this Agreement without Client's consent to an affiliate entity controlling, controlled by or under common control with Hewitt and such transfer is part of (i) an overall plan by Hewitt or its affiliates to make an offering to the public of all, or a portion, of the interest in the equity of Hewitt, and (ii) as part of such plan, Hewitt's assignment shall be all, or substantially all, of the (a) personnel and operations that are used to provide the Services, and (b) assets used to provide the Services. Any assignment in violation of the preceding sentence shall be void and of no effect. Any assignee hereof shall, as a condition of the assignment, agree in writing with the other party hereto to abide by the terms and conditions hereof. This Agreement shall be binding on and inure to the benefit of the parties and their respective permitted successors and assigns.

## Section 15: Representations

15.1    **Hewitt's Corporate Authority and Due Execution.** Hewitt represents that: (a) it has the power and authority to execute, deliver and perform this Agreement and that the execution, delivery and performance of this Agreement by Hewitt have been duly authorized by all necessary action required by its operating agreement and other charter documents; (b) this Agreement has been duly executed and delivered by Hewitt and constitutes the legal, valid and binding obligation of Hewitt enforceable against Hewitt in accordance with its terms; and (c) it is not currently a party to any agreement with any third party that is in conflict with the terms of this Agreement.

15.2    **Client's Corporate Authority and Due Execution.** Client represents that: (a) it has the corporate power and authority to execute, deliver and perform this Agreement and that the execution, delivery and performance of this Agreement by Client have been duly authorized by all necessary corporate action; (b) this Agreement has been duly executed and delivered by Client and constitutes the legal, valid and binding obligation of Client enforceable against Client in accordance with its terms; (c) it has obtained all approvals with respect to any Plan committee, named fiduciaries or other parties that may be required pursuant to the provisions of the Plans; and (d) it is currently not a party to any agreement with any third party that is in conflict with this Agreement.

## Section 16: Notices

16.1    **General.** All notices, requests, demands and other communications required to be given hereunder shall be in writing and shall be deemed given when actually received and may be given by personal delivery, telephone facsimile, overnight delivery service, or certified or registered mail, return receipt requested, to the party for whom intended at the address specified in this Section. Either party may designate an alternate address for notices by giving written notice thereof in accordance with the provisions of this Section.

Notices to Client:

Enron Corp.
1400 Smith Street

Houston, Texas 77002
Attention: Director of Benefits
Phone: 713-853-6161

Notices to Hewitt:

Hewitt Associates LLC
100 Half Day Road
Lincolnshire, Illinois 60069
Attn: General Counsel
Telephone: (847) 295-5000
Fax: (847) 771-7906

## Section 17: General Provisions

**17.1**  **No Third Party Beneficiaries.** This Agreement has been entered into for the sole benefit of the parties and their respective permitted successors and assigns. Except as specifically set forth in this Agreement, the parties do not intend the benefits of this Agreement to inure to any third party, and nothing contained herein shall be construed as creating any right, claim or cause of action in favor of any such third party against any party hereto. Furthermore, this Agreement shall not create any legal relationship, interest or right whatsoever between Hewitt and any individual, beneficiary, Participant, applicant or assignee under any Plan.

**17.2**  **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original for purposes of this Agreement.

**17.3**  **Survival of Obligations.** It is expressly understood and agreed that the parties' respective obligations under this Agreement which by their nature continue beyond the termination or expiration of this Agreement include, but are not limited to, those contained in Sections 2.7 (Client Direction), 4 (Compensation), 5 (Ownership of Materials and Work Product); 8 (Confidential Information), 9.6 (Obligations Upon Termination), 10 (Liability and Indemnification), 11 (Dispute Resolution), and 17 (General Provisions).

**17.4**  **Severability.** If any term or provision of this Agreement is held to be invalid or unenforceable, that term or provision shall be ineffective and severable to the extent of such invalidity or unenforceability and the remaining terms and provisions shall continue in full force and effect.

**17.5**  **Governing Law.** This Agreement shall be governed by and enforced in accordance with the laws of the State of Texas (excluding its conflicts of laws rules), except to the extent superceded or preempted by federal law, including, without limitation, ERISA.

**17.6**  **Attorney's Fees.** In the event of any action to construe or enforce this Agreement or any portion thereof, the prevailing party will be entitled to recover, in addition to any charges fixed by the court, its costs and expenses of suit, including reasonable attorney's fees and costs. A prevailing party shall be the party obtaining relief in respect of its Claims whether by way of final and non-appealable judgment or order, or an award or order which provides injunctive relief or an agreement to take or refrain from taking specific action.

17.7    **Entire Agreement.** Subject to the terms and conditions hereof: (a) this Agreement, together with the Schedules and other attachments, contain the entire understanding of the parties with respect to the provisions of the Services; (b) there are no expectations, restrictions, promises, warranties, covenants, or undertakings other than those expressly set forth herein; (c) this Agreement supersedes all prior agreements and understandings between the parties with respect to the Services; and (d) this Agreement unless otherwise specified herein, may be amended only by a written instrument duly executed by the parties hereto or their respective successors or assigns.

17.8    **No Contract of Insurance.** Nothing in this Agreement shall be construed as a contract of insurance.  Hewitt shall be under no obligation to pay from its own funds or insure any benefits properly payable under the Plans.

17.9    **No Waiver.** A party's failure at any time to enforce any of the provisions of this Agreement or any right with respect thereto shall not be construed to be a waiver of such provision or right nor to affect the validity of this Agreement.  The exercise or non-exercise by a party of any right under the terms or covenants herein shall not preclude or prejudice the exercising thereafter of the same or other rights under this Agreement.

17.10    **Publicity.** Each party shall submit to the other all advertising, written sales promotion, press releases, and other publicity matters relating to this Agreement in which the other party's name or mark is mentioned or language from which the connection of said name or mark may be inferred or implied, and neither party shall publish or use such advertising, sales promotion, press releases, or publicity matters without the prior written approval of the other party.  Nevertheless, Hewitt is authorized to include Client on Hewitt's client lists, proposals and other communications not intended for general distribution.

17.11    **Interpretation.** The headings and captions in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.  All references in this Agreement to Sections or Schedules shall, unless otherwise provided, refer to Sections hereof or Schedules attached hereto, all of which Schedules are incorporated herein by reference.  Words importing the singular include the plural and words importing the masculine include the feminine and vice versa where the context so requires.  Use of the words "includes" or "including" will be construed without limitation to the generality of the preceding words. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Administrative Services Agreement effective as of the date first written above.

Enron Corp.                                        Hewitt Associates LLC

By: _____          By: _____
        [Name and Title]                              C. Lawrence Connolly, III, Principal
        Vice President

CONTRACT
SUPPORT
MW

Hewitt Associates                    22                    09/2001.2227.Enron-39(7)
Confidential

## Schedule A

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

---

| **Plans Covered** | **Plan Effective Date** |
|---|---|
| Enron Corp. Savings Plan | July 1, 1999 |
| Enron Corp. Employee Stock Ownership Plan | January 1, 1999 |
| Enron Corp. 1994 Deferral Plan | |
| Enron Corp. 1998 Expatriate Plan | |

### Service Delivery Model

The fees provided in this Schedule assume Hewitt will provide the Services consistent with its Delivery Models for Defined Contribution, copies of which are attached as Exhibit A-1 (the "Delivery Model"). Certain of the Services and procedures discussed in the Delivery Model will be set out with greater specificity in the Requirements Document. If there are any conflicts between the Delivery Model and the Requirements Document, the Requirements Document will control.

| **Service Commencement Dates** | **Live Production Data Loaded** | **Benefits Center Open for Calls** |
|---|---|---|
| Defined Contribution (DC) Services | 10/31/2001 | 11/20/2001 |

### One Time Implementation Fees

| **Included Services** | **Fee Schedule** |
|---|---|
| Qualified Plan Setup | $125,000. |
| ESOP Plan Setup | $35,000. |
| Non-qualified Plan Set-up | $75,000. |
| Enron Oil & Gas Stock fund Setup | $7,500. |
| Brokerage Window Set-up | Fees waived for set-up of CSFB Brokerage Window. $50,000 if Brokerage Window set-up through Charles Schwab. |

**Implementation Fees includes:**

Requirements gathering;

TBA system set-up including Internet and IVR;

Data Conversion;

Benefit Center Training and Setup; and

and Standard Web Promotion for communicating the changes to Participants.

---

## Ongoing Fee Schedule

### Standard DC Services

| Included Services | Fee Schedule |
|---|---|
| **Qualified Plan Administration**<br>• Daily Plan processing<br>• Benefits Center Services | $60.00 per Participant per year. |
| • Loan Administration | $35.00 per new loan (charged directly to the Participant). |
| • ESOP Administration (as a separate plan) | $1.00 per Participant per month. |
| • Enron Oil and Gas Stock fund administration | $1,750 per month. |
| **Self-Directed Brokerage through:**<br>• CSFB | No per year charge. Fees charged only for trading in the Brokerage window. $20.00 per equity trade, charged directly to the Participant. |
| • Charles Schwab | $75.00 per Participant per year and fees (charged Participants directly by Charles Schwab) for trading in the brokerage window. |
| **Non-qualified Plan Administration** | $7,500 per month.<br><br>DC Participants include current and former employees with a balance in a Plan or any current or former employee eligible to participate in the Plan whose records are maintained on Hewitt's system. |

### Miscellaneous Ongoing Services-All Services

| | |
|---|---|
| • Compliance/Nondiscrimination Testing<br>• ADP/ACP nondiscrimination testing | Annual Testing and one mid-year projection testing included. Additional testing and or corrective action billed at time and materials. |
| • QDRO/QMCSO reviewed/qualified | $750 per QDRO/QMSCO reviewed or qualified assuming model orders. |
| • Signature Ready Form 5500 | $1,500 per Form 5500. |
| **Telephone Calls – All Service Areas** | |
| • Benefit Center (BC) | Included in fees for Standard Services. |

**Participant Self Service Access**

- Internet and IVR                                    Included in fees for Standard Services.

- Client Access to TBA—Not Internet Access           $500 per month per location.
                                                     $200 per month per user with access rights.

**Plan Sponsor Site**                                Included in fees for Standard Services.

## Data Management—Participants

| *Included Services* | *Fee Schedule* |
|---|---|
| • Interfacing with payroll | Included in fees for Standard Services. |
| • Applying data updates to TBA | Included in fees for Standard Services. |
| • Data Management—Former Participants | $0.40 per month per individual (former Participant) maintained on Hewitt's system. |
| • Additional data Interfaces to and from Client to support up to four separate payroll systems using the standard data interfaces | $2000 per month. |

## Data Correction, Third Party Error and Change Order Billing Rates

Hewitt's current standard billing rates are provided as an example of Hewitt's current rates for fiscal year 2001. Hewitt's standard billing rates are subject to change from time to time, at Hewitt's sole discretion.

| Category of Staff | Hourly Rates |
|---|---|
| Administrative Assistant | $80.00 per hour. |
| Benefit Center Associates | $90.00 per hour. |
| Legal Compliance Associates | $240.00 per hour. |
| Technology Associates | $210.00 per hour. |
| Business Analyst | $130.00 per hour. |
| Administrative Specialists | $110.00 per hour. |
| Project Manager | $240.00 per hour. |

**The Defined Contribution Alliance™**
Hewitt, or its affiliate, Hewitt Financial Services LLC (member NASD/SIPC) will receive fees from certain investment fund organizations ("DC Alliance Funds") for subtransfer agency, shareholder servicing, and/or distribution services. The above DC Ongoing Fees assumes that all of the funds for which the Plan trustee is directing (at the Client's direction) shall pay Hewitt either one-quarter percent (0.25%) or one-tenth percent (0.10%), and that the average daily balance invested by the Plan in such funds is no less than $315,000,000 and $76,000,000, respectively, to serve an average of 14,500 Participants. In the event these minimums are not met, the fees will be increased to

compensate Hewitt for the difference between the actual revenue received and that which Hewitt would have received had these minimums been achieved.

## Service Assumptions

- Hewitt determines its one-time and ongoing fee schedules based on estimates for the time and resources it takes to deliver the Services under consideration. The initial one-time fees do not cover Hewitt's costs and reflect an investment Hewitt makes in a long-term relationship. The ongoing fees reflect Hewitt's experiences in delivering projects similar in size and scope, and the increasing cost efficiencies and productivity gains Hewitt expects to achieve.

- The number of Participants will be determined on the first day of each calendar month.

- Employees who have not met the waiting period for benefit eligibility are considered Participants to the extent they are maintained on Hewitt's system.

- Participants who receive a final payment from a Plan remain Participants through the period, which ends six (6) months after the final governmental reporting of the final payment from the Plan.

- Conversion data is provided in Hewitt's format and provided through a single electronic file transfer (EFT).

- The implementation and ongoing fees described above do not include the costs for employee/participant communications beyond the standard system-generated statements described in the Requirements Document.

- Ongoing data is provided in Hewitt's format; four Semi-monthly EFTs from Client and four semi-monthly EFTs to Client. Each additional interface is $500 per occurrence/invoiced as additional services.

- Data is of sufficient quality that processing can be performed without human intervention. Data research and correction, exception processing, and any manual processes resulting from missing or inaccurate data that result in more than eight hours per month are billed as additional services.

- The efficiencies gained (1) in having a single point of contact for payroll/HRIS/administrative follow-up, and (2) in using a common set of administrative rules, are reflected in the fee schedule.

- Ad hoc reporting is billed as additional services.

- Hewitt will offer IRA and other investment account types to Client's current employees and departing Plan Participants through Hewitt Financial Services via CSFB*direct*.

- Fulfillment processing and other mailings (e.g., SPDs, SARs, participant statements, enrollment kits, life event kits, special mailings, etc.) are billed as additional services. Fulfillment for routine (i.e., standard 8-1/2 x 11, computer-generated, without inserts or special instructions) individual confirmations, acknowledgments and follow-up notices, is included in the base fee.

- Supporting administrative changes requested by Client (e.g., plan changes, plan amendments, new plan offerings, changes in service providers or system interfaces, work related to acquisitions and divestitures), will often result in additional one-time fees and may result in changes to ongoing fees. Such changes shall be subject to the Change Order provisions of Section 2 of this Agreement.

- Internet and IVR are available 24 hours per day, 7 days per week, except on Sundays from 12:00 a.m. until 12:00 p.m., Central Time and periods of scheduled maintenance.

- Benefits Center hours of operation are from 8:30 am until 5:00 pm. Central Time, Monday-Friday, except for Holidays recognized by Hewitt.

### Termination for Convenience Schedule

| Number of Months Elapsed Since the Effective Date | $ Amount to Be Paid Hewitt | Number of Months Elapsed Since the Effective Date | $ Amount to Be Paid to Hewitt | Number of Months Elapsed Since the Effective Date | $ Amount to Be Paid to Hewitt |
|---|---|---|---|---|---|
| 1 | 750,000 | 21 | 500,000 | 41 | 250,000 |
| 2 | 737,500 | 22 | 487,500 | 42 | 237,500 |
| 3 | 725,000 | 23 | 475,000 | 43 | 225,000 |
| 4 | 712,500 | 24 | 462,500 | 44 | 212,500 |
| 5 | 700,000 | 25 | 450,000 | 45 | 200,000 |
| 6 | 687,500 | 26 | 437,500 | 46 | 187,500 |
| 7 | 675,000 | 27 | 425,000 | 47 | 175,000 |
| 8 | 662,500 | 28 | 412,500 | 48 | 162,500 |
| 9 | 650,000 | 29 | 400,000 | 49 | 150,000 |
| 10 | 637,500 | 30 | 387,500 | 50 | 137,500 |
| 11 | 625,000 | 31 | 375,000 | 51 | 125,000 |
| 12 | 612,500 | 32 | 362,500 | 52 | 112,500 |
| 13 | 600,000 | 33 | 350,000 | 53 | 100,000 |
| 14 | 587,500 | 34 | 337,500 | 54 | 87,500 |
| 15 | 575,000 | 35 | 325,000 | 55 | 75,000 |
| 16 | 562,500 | 36 | 312,500 | 56 | 62,500 |
| 17 | 550,000 | 37 | 300,000 | 57 | 50,000 |
| 18 | 537,500 | 38 | 287,500 | 58 | 37,500 |
| 19 | 525,000 | 39 | 275,000 | 59 | 25,000 |
| 20 | 512,500 | 40 | 262,500 | 60 | 12,500 |

A termination pursuant to Section 9.2 shall result in the payment by Client of the fees indicated based upon the number of months between the Effective Date and the date of termination. By way of example, if this Agreement is terminated pursuant to 9.2 fifty-five months after the Effective Date, Client shall pay Hewitt $75,000.

## Additional Services

From time to time, Client may request Hewitt to perform additional out-of-scope services subject to Hewitt's availability. Such service charges shall be subject to the Change Order provisions contained in Section 2 of this Agreement. Additional services shall include, but are not limited to:

- Data cleanup, data entry or reconciliation in excess of the hours included in the service assumption above relating to data research and correction, exception processing and manual processing.

- Conversions of paper files into electronic format.

- Services in support of ongoing retirement plan processing prior to the live date. Any services related to additional plans.

- Items designated in the Delivery Model as optional.

- Hardware acquisition costs, ongoing line access charges and assistance with support and maintaining the connection.

- Reengineering internal processes (i.e., those processes remaining after outsourcing).

- Training support for new or remaining staff on roles/responsibilities after outsourcing.

- Updating plan documents and SPDs.

- Meeting with internal/external auditors.

## Payment

One-time implementation fees will be paid as follows: $40,001 in June 2001, the remaining to be paid in three consecutive equal monthly installments of $53,333 beginning July 2001. Standard ongoing fees for Services such as the ESOP will be paid by wire transfer or Automated Clearing House (ACH) payment on a monthly basis on or prior to the first day of each month, commencing the first of the month in which live production data is processed by Hewitt. Assets in the DC Plan are expected to transfer to Hewitt Financial Services no later than October 1, 2001.

Fees for additional services shall be invoiced to Client on the last day of the month. Adjustments, reconciliations, or credits to the standard fees paid by Client will be included on the invoice. Fees for additional services are due and payable within thirty (30) days of the invoice date. Client will promptly notify Hewitt of any questions regarding invoices so that Hewitt can expect timely payment. Interest at nine percent (9%) per year will accrue after the due date until payment is received.

In addition to fees, Client is responsible for:

(a) Travel-related expenses.

(b) Postage; outside delivery services such as shipping, express mail, and messenger services; charges for data communication and related equipment.

(c) Other outside suppliers including those used for records management, microfiche production, data telecommunications, and employee communications (e.g., designers, typesetters, printers, assemblers, and fulfillment houses). When Client requires Hewitt to make payments to such suppliers on behalf of Client, a ten percent (10%) service charge for associated administrative costs will be added to the amount due to such suppliers.

(d) Any and all taxes, however designated, that are levied or based on this Agreement or on the charges stated herein, except for taxes based on the net income of Hewitt.

# Schedule B

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

| |
|---|
| Hewitt Associates LLC<br>Records Retention Policy: Participant Outsourcing Records<br>Name of Client: Enron Corp. |

## Purpose:

The purposes of the following summary are to advise Client of Hewitt's general records retention policies with respect to Client and employee records and to provide Client with an opportunity to modify these policies.

Once approved, Hewitt will implement its retention policies to manage employee records of Client (including disposal) without soliciting further approval from Client. Client may request revisions to this policy respecting its records at any time during the course of the engagement. Such revisions, however, may necessitate additional fees.

## Basis for Hewitt's Records Retention Policy:

The Hewitt records retention policies are based on two main factors:

1.  Statutory and regulatory guidance; and

2.  Hewitt's judgment as to balancing the relative costs and benefits of maintaining specific records for its own business purposes.

Hewitt represents that it has reviewed laws concerning record retention which it understands may apply to employee records used or created in connection with the services that Hewitt has agreed to provide. Hewitt believes that its records retention policies comply with these laws. Client, however, is responsible for advising Hewitt of any special laws or other additional legal requirements applicable to its own business that may affect the records retention policies contained herein.

## Records Approach and Media for Retention:

Hewitt's general approach is to maintain employee records in electronic format. A historical record of all participant data as well as all activity affecting the data, including a record of all transactions involving any participant accounts, will be maintained electronically for the life of Hewitt's engagement with Client, at which time such records will be transferred to Client or Client's designee. Examples of the electronic media that may be used to convert or maintain these records include, but are not limited to, mainframe computer, LAN or PC hard-drive, image format, compact disc, and voice recording.

The primary reason for use of electronic media is that most of the records created during the course of the engagement will be created in this format (e.g., employee elections received telephonically over Interactive Voice Response, participant service center computer entry of elections).

Hewitt's policy recognizes that information and records used during the course of the engagement will also be received and sent in paper form. The following describes Hewitt's general retention approach with respect to paper communications:

*   Information contained in outgoing paper documents (e.g., system generated participant forms and confirmation statements) will be retained in electronic media. Paper copies of such documents will not be created, but can be produced from our electronic records.
*   Information in incoming paper documents (e.g., pre-engagement employee benefit plan records, incoming participant correspondence and forms) will be converted into an electronic record. The incoming paper document will then be destroyed.

Paper records will be maintained where legally required or where the paper original is necessary. Hewitt may also maintain records in non-electronic media (e.g., paper, fiche) in instances where retention on such media is more practical.

| Other Types of Records | Retention Policy |
|---|---|
| A.  Incoming checks, i.e., loans, buybacks, rollovers, retiree medical repayments. | A.  Maintain information on data base. Checks forwarded to third party. |
| B.  Documents processed and transmitted to third party. | B.  After processing, return paper to Client or other appropriate party. |
| C.  Benefits Center voice recordings. | C.  Destroy electronic recording after 16 months. |

| Exceptions to the Standard Retention Policy or Special Client Requirements: |
|---|
| |

# Schedule C

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

## Dispute Resolution Process

The following procedures shall be used to resolve any dispute, controversy or Claim arising out of or relating to this Agreement. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### Internal Escalation

The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between executives who have authority to settle the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Either party may give the other party written notice of any dispute not resolved in the ordinary course of business. Within fifteen (15) days after delivery of the notice, the party receiving the notice shall submit to the other a written response.

The notice and the response shall include: (1) a statement of each party's position(s) regarding the matter(s) in dispute and a summary of arguments in support thereof, and (ii) the name and title of the executive who will represent that party and any other person who will accompany that executive. Within thirty (30) days after delivery of the notice, the designated executives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other shall be honored in a timely fashion.

If the matter in dispute has not been resolved with sixty (60) days after delivery of the notice, or if the parties fail to meet within thirty (30) days, the dispute shall be referred to more senior executives who have authority to settle the dispute and who shall likewise meet in an attempt to resolve the matter in dispute. If the matter has not been resolved within thirty (30) days after it has been referred to the more senior executives, or if no meeting of such senior executives has taken place within fifteen (15) days after such referral, either party may initiate subsequent proceedings as contemplated herein.

All negotiations between the parties conducted pursuant to the dispute resolution process described herein (and any of the parties' submissions in contemplation hereof) shall be kept confidential by the parties and shall be treated by the parties and their respective representatives as compromise and settlement negotiations for purposes of the applicable court rules of evidence.

### Mediation Procedures

In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator will be designated by AAA. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted in Houston, Texas, U.S.A. as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

# Schedule D
**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

## Change Order Form

## Part I

**Control Number: YYYY-xxxx**

**Title:**

**Summary of Requested Change**
   *(include sufficient detail to analyze requested change)*

**Requested Implementation Date:**

**Change Request Submitted by:**                    **Date:**

**Change Request Submitted to:**

**Approved for Impact Analysis by:**               **Date:**

## Part II

**Impact of Change**

### What Needs to be Done (check those that apply)

( )    Manage the Implementation
( )    Update Requirements Document and Delivery Model(s)
( )    Update/Create Employee Communications
( )    Code and Test TBA Software
( )    Modify TBA Database
( )    Code and Test Workstation Tools (e.g. Workflow, etc.)
( )    Update IVR
( )    Update Internet
( )    Update Interfaces (Internal and/or External)
( )    Manually enter/process data/activities
( )    Create Reports
( )    Review SPD
( )    Review Plan Documents
( )    Update PCSs
( )    Temporarily Increase Staff
( )    Permanently Increase Staff
( )    Provide Staff Training
( )    Update Benefits Manual
( )    Amend Administrative Services Agreement

( )    Other (detail below)

**Priority of Change (high, moderate, low):**


**Timeline** *(include Client deliverables)*


**Fees**

**Implementation Fee**



**Ongoing Fee**

<u>Billing Impact</u>
When and how amounts will be billed (e.g. separate invoice, timing, etc.)

**Impact on Performance Measures**

Describe/quantify any proposed changes or suspensions, including time periods, to performance standards.

**Risk Analysis (describe what could happen if this change is or is not made)**

**Hewitt Reviewer:**                    **Date:**

**Mark One:**                    \_\_\_\_ **Approved**              \_\_\_ **Denied**

**Client Reviewer:**                    **Date:**

This Change Order is incorporated into the Requirements Document upon approval of this Change Order by Client.

## Schedule E
**Administrative Services Agreement Between**
**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

## Disaster Recovery Plan

### Information Security and Business Resumption at Hewitt

Hewitt maintains a comprehensive information security and business resumption program to meet all client service needs in the unlikely event of an unauthorized incident or catastrophic event. These programs are reviewed continuously to ensure that Hewitt provides the highest level of protection to its computer hardware, computer software and electronic data. In addition, the two programs undergo extensive auditing and the business resumption program undergoes extensive testing throughout the year.

### Physical Controls

All computing and communications equipment is located in restricted access areas. This includes enterprise and mid-range computers, peripheral and communications equipment, and local area network file servers. Restricted access is accomplished with a proximity badge reader system requiring both the possession of a photo ID card and entry of a personal identification number (PIN). Access is granted only to specific areas related to that user's job function and must be authorized by both the Information Security Manager and the Operations Services Manager.

### Information Security

The purpose of Hewitt's information security program is to protect data processing hardware, software, and computerized data from unlawful, unauthorized, or unintentional actions or events. There are two main security policies that direct the program: individual accountability and application/data ownership. Access to the Hewitt computing environment requires users to be identified with a unique user identification (userid) and authenticated with a personal password. Passwords are created and known only to their owners; are stored on the systems in an encrypted form; have an enforced minimum length; are forced to change on a regular basis; and are not reusable. The userid will be deactivated after repeated attempts to enter an incorrect password. Once access to a computer system has been established, users are only given access to the resources necessary to perform their job. All computerized information is considered restricted. Access to any system, software or data is prohibited unless specifically authorized by the application owner, who is defined as the business unit or practice leader responsible for the business functions supported by that application.

### Internet Security

Plan participants are identified by their unique participant ID and are authenticated by their personal identification number (PIN). The web servers, application servers, and Internet network components are physically located in restricted access areas. The application uses secured sockets layer (SSL) protocol to encrypt confidential information between the browser and web server. Hewitt's implementation of SSL supports both 40 and 128-bit encryption. The web server is configured such that standard search engines do not index it. The web application is designed such that each client company has a unique URL address. The web servers, application servers, business logic servers, and database servers cannot be accessed directly from the Internet. There is no participant data stored on the web server. Only transient data is stored on the application server. All production participant data is stored on an OS/390 system, in a relational database, secured by the database and the mainframe security system.

## Business Resumption

The purpose of Hewitt's business resumption program is to plan for continued processing with minimal interruption of our client computer services due to partial or complete destruction of a data processing facility.

## Backup/Recovery and Off-site Storage

The Hewitt backup/recovery program is designed to support both operational and disaster recovery. All online disk facilities are configured with real-time remote disk mirroring across two locations. Database transaction logs are simultaneously written to both locations. All application data files and operational software are backed up daily. The retention period will ensure that at least two copies of all critical files are stored on back-up media.

## Disaster Recovery

Hewitt has implemented a state-of-the art dual data center for rapid and comprehensive recovery from a disaster. These data centers are located on separate Hewitt campuses at its global headquarters in Lincolnshire, IL. Both data centers are equipped with photoelectric smoke detectors for fire detection and a pre-action dry sprinkling system for fire suppression. Both building complexes, where the data center is housed, have two separate electrical power feeds. All computing and communications equipment and the office phone systems are connected to an uninterruptable power supply (UPS) battery backup system. Hewitt's production facility also has generator backup. In the event of a power failure on the primary electrical feed, the UPS system will keep the computing and communication system operational until the system is switched to the secondary supply. In the unlikely event that both power feeds were to fail, the UPS system would keep the computing and communications systems running until the electrical generators become operational at the production facility. Voice and data communication connections can be routed through multiple or alternative paths. Any single point of failure that could cause an interruption of critical application processing is kept to a minimum. All online storage is mirrored across the two facilities in real time. Central processor and tape resources are balanced across the locations but operated as a single configuration. All major network and Internet connections are configured to both locations. Production processing recovery is estimated to be within 4 hours of the declaration of a disaster.

As part of Hewitt's business resumption program, Hewitt routinely reviews and tests all aspects of the plan. Disaster recovery teams meet on a regular basis to review and modify the plan to reflect changes in its processing environment. Hewitt systems professionals enact a data center "disaster" at least once a year. In each test Hewitt verifies that all critical application processing elements are available and the data is current and consistent with Hewitt's expectations.

The Participant Services (PS) Business Continuity Plan documents the strategies, personnel procedures and resources that Participant Services will use to respond to any long-term disruption to its essential business functions. The goal of the PS Business Continuity Plan is to resume essential business operations within targeted recovery windows.

The strategy of the PS Business Continuity Plan is to relocate an impacted Benefits Center to a useable location within 48 hours of a disaster or emergency situation being declared. In a building-specific situation and in locations where there is more than one Hewitt building, the targeted recovery space is defined as one of the other local buildings. In an area-wide situation or in those locations where there is a single Hewitt real estate presence, Lincolnshire, IL has been designated as the targeted recovery space. Hewitt would relocate approximately 30% of the normal operating team in the event relocation is necessary. Testing of the PS Business Continuity Plan takes place at least once a year.

**Schedule F**
**Administrative Services Agreement Between**

Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")

**Authorized Representatives**

Client:

Cynthia Barrow – Qualified Benefits
Chris Rahaim – Qualified Benefits
Pam Butler – Non-Qualified Benefits
Renee Ratcliff - Non-Qualified Benefits

Hewitt:

Cathy Graham
Tom Langkamp

# Schedule G

Administrative Services Agreement Between

Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")

## Performance Standards

### General

The performance standards contained in this Schedule G apply to the Benefits Delivery Services that Hewitt provides. All measures are reported monthly unless noted otherwise. All financial calculations (fees at risk and incentive payments) are calculated quarterly (unless noted otherwise) using an average of the three months during the calendar quarter. Any credits shall be applied toward outstanding fees owed by client for such quarter and, if such credits exceed outstanding fees owed, the balance shall be paid to client within 30 days following the end of such quarter. Any incentive payments due to Hewitt shall be paid by Client within 30 days following the end of such quarter.

Notwithstanding the sum of the individual performance payments calculated below, the maximum penalty assessed in any Agreement Quarter shall not exceed 10% of quarterly per participant fees tied to this Agreement. Similarly, the maximum incentive assessed in any Agreement Quarter shall not exceed 5% of quarterly fees.

### Exclusions

The performance standards are waived for periods of significant or unanticipated events impacting the Services (e.g., monthly interaction minutes in excess of 120% of projected volumes, a major movement in the stock market, force majeure and a major announcement affecting Client employees, such as a plan change, etc.). During such period, Hewitt agrees to work with Client to identify and implement appropriate measures to mitigate the impact of such events.

### Commencement of Standards

The following performance standards will commence immediately; Benefit Center Availability, Interactive Voice Response Availability, Internet Availability, Call Abandonment, and Busy Signals.

The remaining standards commence in two phases:

For an initial three month transition period after the live date, penalty and incentive payments are calculated at 25% of the full amounts.

For a subsequent three month transition period, penalty and incentive payments are calculated at 50% of the full amounts.

Thereafter, all penalty and incentive payments are calculated at 100% of the full amounts.

**Performance Standards**

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| **Channel Availability** | | | | Maximum fees at risk for this category: 2% | |
| Benefit Center Availability | Hewitt's Benefit Center is defined to be available if Benefit Center Representatives are able to take participant calls, access the TBA system, and submit transactions. | Availability is calculated as the number of hours the Benefit Center is available to receive participant calls divided by the total number of hours the Benefit Center is scheduled to be available. | The performance standard is 98%. | 0.1% of quarterly fees for each 0.1% below 98%. | N/A |
| Interactive Voice Response (IVR) System Availability | Hewitt's IVR system is defined to be available if a caller can access the IVR system, enter a valid ID, and access participant information. | IVR availability is calculated as the total number of hours Hewitt's IVR is available divided by the total number of hours it is scheduled for availability. | The performance standard is 98%. | 0.1% of quarterly fees for each 0.1% below 98%. | N/A |
| Internet Availability | Hewitt's Internet Service is defined to be available when the system is able to service requests for participant specific pages. | Internet availability is calculated as the total number of hours Hewitt's system is available divided by the total number of hours it is scheduled for availability. | The performance standard is 97%. | 0.1% of quarterly fees for each 0.1% below 97%. | N/A |

Hewitt Associates
Confidential

09/2001.2227.Enron-39(7)

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| **Channel Accessibility** | | | | **Maximum fees at risk for this category: 2%** | |
| Blocked Calls | A blocked call is defined as a call where the caller receives a busy signal from Hewitt due to insufficient phone lines. | The measure is calculated as the total number of telephone calls with busy signals divided by the total number of telephone calls. | The performance standard is less than or equal to 2%. | 0.25% of quarterly fees for each 1% above 2%. | N/A |
| Call Abandonment | An abandoned call is defined as a call disconnected by the caller after more than 20 seconds from the time the call is transferred to the Automated Call Distribution (ACD) system. | This measure is calculated as the number of abandoned calls divided by the total number of telephone calls. | The performance standard is less than or equal to 5%. | N/A | N/A |
| Wait Time | Wait time is defined as the amount of time a participant waits to speak with a Hewitt Benefit Center Representative, after the call is transferred to the ACD system. | Wait time is calculated from the time a caller requests to be transferred to a Hewitt Benefit Center Representative to the time the caller reaches a Representative.<br><br>The measure is communicated in terms of the percentage of calls that reach a live voice within 30 seconds, commonly called service level in the call center industry. | The performance standard is 80% of the calls are answered within 30 seconds. | 0.25% of quarterly fees for each 2% below 80%. | N/A |
| Internet Responsiveness | Internet responsiveness is defined as the time it takes to generate and send a participant requested page over the Hewitt controlled portion of the internet. | The measure is calculated as the number of participant requested pages generated and sent within five seconds divided by the total number of participant requested pages generated and sent. | The performance standard is 90%. | 0.10% of quarterly fees for each 1% below 90%. | |

Hewitt Associates
Confidential

09/2001.2227.Enron-39(7)

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| **Data Delivery** | | | | Maximum fees at risk for this category: 2% | |
| Timely Transmission of Third Party Interfaces | Timely processing is defined as sending electronic interfaces within the agreed upon timeframe as defined in the Requirements Document. | Timeliness is calculated as the number of feeds that were sent on time divided by the total number of feeds. Interfaces that are sent late for reasons outside of Hewitt's control are excluded from any calculation of fees at risk. | The performance standard is 95%. | 0.1% of quarterly fees for each 1% below 95%. | N/A |
| **Transaction Accuracy** | | | | Maximum fees at risk for this category: 2% | |
| Transaction Accuracy | Accurate processing is defined as Hewitt processing transactions correctly the first time. An audit methodology will be used to determine accuracy. | The measure is calculated as the number of transactions processed correctly divided by the total number of transactions audited. Transactions that are processed in error for reasons outside of Hewitt's control are excluded from any calculation of fees at risk. | The performance standard is 98%. | 0.25% of quarterly fees for each 1% below 98%. | N/A |

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| Issue Resolution | | | | Maximum fees at risk for this category: 2% | Maximum incentive payment for this category: 2% |
| First Contact Resolution | A participant's call is considered resolved on the first call when the participant is provided with information from a Benefit Center Representative without the need for follow-up. | The measure is calculated as the Hewitt reported total number of Benefit Center calls less the number of workflows started in the month divided by the total number of Benefit Center calls. | The performance standard is 90%. | 0.25% of quarterly fees for each 1% below 90%. | 0.25% of quarterly fees for each 1% above 94%. |
| Timely Close Out | A participant's issue will be considered a timely close out if the issue, including any follow-up if required, is resolved within five business days. | The measure is calculated as the number of issues with a timely close out divided by the total number of issues tracked through Hewitt's workflow system. Death workflows are excluded from the measure.<br><br>Issues that require follow-up outside Hewitt's control are excluded from any calculation of fees at risk. | The performance standard is 90%. | 0.25% of quarterly fees for each 1% below 90%. | 0.25% of quarterly fees for each 1% above 94%. |
| Final Close Out | A participant's issue will be considered a final close out if the issue, including any follow-up if required, is resolved within 30 days. | The measure is calculated as the number of issues with a final close out divided by the total number of issues tracked through Hewitt's workflow system. Death workflows are excluded from the measure.<br><br>Issues that require follow-up outside Hewitt's control are excluded from any calculation of fees at risk. | The performance standard is 98%. | 0.25% of quarterly fees for each 1% below 98%. | 0.25% of quarterly fees for each 1% above 98%. |

| Category | Description | Measure | Standard | Penalty | Incentive |
|----------|-------------|---------|----------|---------|-----------|
| Event Turnaround Time | | | | Maximum fees at risk for this category: 1% | Maximum incentive payment for this category: 1% |
| Event Turnaround Time | Event turnaround is defined as the elapsed time needed to complete key events within the Hewitt system. Targets will be set for each event and will depend on process design and delivery frequency. Key events include:<br><br>• DC Force Out and Loan Defaults<br>• DC Enrollment<br>• DC Investment Election changes<br>• DC Contribution election changes<br>• DC Loans<br>• DC Final Distribution processing | The measure is calculated as the number of participant-initiated transactions processed within established timing (defined in the Requirements Document) divided by the total number of participant-initiated transactions for the measurement period. | The performance standard will vary based on the events identified. | 0.25% of quarterly fees for each 1% below 97%. | 0.25% of quarterly fees for each 1% above x%. |
| Interaction Reliability | | | | Maximum fees at risk for this category: 1% | Maximum incentive payment for this category: 1% |
| Interaction Reliability | Interaction reliability is defined as the accuracy, completeness and quality (customer experience) of a participant interaction with the Benefit Center. | Hewitt will score the customer interaction using a standard and trained customer service coaches.<br><br>The measure is calculated as the points scored as a percentage of total points. | The performance standard is 85%. | 0.25% of quarterly fees for each 1% below 85%. | 0.25% of quarterly fees for each 1% above 90%. |

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| Customer Satisfaction | | | | Maximum fees at risk for this category: 3% | Maximum incentive payment for this category: 3% |
| Participant Satisfaction | Participant satisfaction with the Hewitt Benefit Center is measured through Hewitt's standard satisfaction survey measuring the participant's satisfaction. | Throughout the year, randomly selected participants will be surveyed utilizing Hewitt's standard customer satisfaction survey. Performance is measured through the percentage of participants' agreement that the service is of high quality. | The acceptable performance standard will be set based on the services being delivered. | The penalty for failing to meet the performance standard is 1% annually if the actual result is less than 75% but greater or equal to 65%. The penalty is 3% annually if the actual result is below 65%. | The bonus for exceeding the performance standard is 1% annually if the actual result is greater than 85% and less than 90%. The bonus is 3% annually if the actual result is 90% or greater. |

09/2001:2227.Enroe-39(7)

## Schedule H
**Administrative Services Agreement Between**
**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

---

**Form of Confidentiality Agreement**

## Confidentiality Agreement

This Confidentiality Agreement ("Agreement") is made this ___ day of _____, 200_ ("Effective Date") by and between _____ ("[Name]"), a corporation incorporated under the laws of _____ with an office at _____, and Hewitt Associates LLC ("Hewitt"), an Illinois limited liability company with an office at 100 Half Day Road, Lincolnshire, IL 60069.

As _____ provides services [describe services] to [Client's Name] ("Client") in connection with [describe project] ("Project"), _____ will be exposed to certain confidential and proprietary information of Hewitt as defined below. It is the intention of the parties to work cooperatively in providing their respective services to Client, but Hewitt wishes to protect its Confidential Information. For good and valuable consideration, the receipt and sufficiency of which is acknowledged by each party, this Agreement sets out _____'s obligations with respect to the Confidential Information.

1. **Confidential Information**
   "Confidential Information" includes the existence and terms of this Agreement and any business or technical information or processes, whether or not stored in any medium, relating to Hewitt's business (and/or those of its suppliers and customers), including, but not limited to: equipment; software; designs; technology; technical documentation; product or service specifications or strategies; marketing plans; pricing information; financial information; information relating to existing, previous, and potential suppliers, customers, and contracts; inventions; trade secrets; trademarks; intellectual property; applications; methodologies; and other know-how which is identified as confidential at the time of disclosure or that a reasonable person would consider, from the nature of the information and circumstances of disclosure, is confidential to Hewitt. Confidential Information includes original information supplied by Hewitt, as well as all paper and electronic copies.

2. **Limited Access and Use**
   (a) _____ agrees to treat the Confidential Information as confidential to and as the property of Hewitt and agrees to use an appropriate degree of care (which, in any case, will not be less than a reasonable degree of care) to prevent disclosure of the Confidential Information.

   (b) Confidential Information will be kept separate and will not be included within the general files of _____.

---

(c) Confidential Information will not be used by _____ in furthering or developing its own services or systems, except for providing services in connection with and for the sole purpose of completing the Project. If _____ acquires access to Hewitt's pricing for particular services to be provided to Client, _____ will not bid on providing such services to Client for a period of at least two (2) years after the Term (as defined herein). _____ will not disclose the Confidential Information to any third party or individual without the prior written consent of Hewitt, except _____ may disclose the Confidential Information to its employees who have a need to know such Confidential Information for the purpose of carrying out this Agreement and who have been advised of the obligations of confidentiality and are obligated to keep the Confidential Information confidential and to Client's employees who have a need to know such Confidential Information for purposes of the Project.

(d) _____ will not copy or reproduce the Confidential Information except as reasonably required for the purposes contemplated in this Agreement and will ensure that any confidentiality or other proprietary rights notices on the Confidential Information are reproduced on all copies.

(e) Information, observations, or conclusions about the Client/Hewitt relationship and terms of agreement will not be published or otherwise disclosed in any public forum by _____.

(f) Confidential Information will be returned to Hewitt by _____ or destroyed by _____ upon the request of Hewitt at any time. An authorized representative of _____, if requested by Hewitt, shall certify in writing on behalf of _____ that all such Confidential Information has been returned or destroyed, as applicable. _____ may retain one (1) copy of the Confidential Information for archival purposes or to defend its work product, provided however, such Confidential Information remains subject to the terms and conditions of this Agreement.

3. **No License**

_____ acknowledges and agrees that all rights to the Confidential Information, except for the specific rights to use the Confidential Information described herein, are reserved by Hewitt. No license, express or implied, under any trade secret right, trademark, patent, copyright, or other proprietary right or applications which are now or may hereafter be owned by Hewitt, is granted by the disclosure of Confidential Information under this Agreement. Nothing in this Agreement is to be construed as granting _____ any title, ownership, license, or other right or interest with respect to the Confidential Information.

4. **Loss of Status**

This Agreement does not apply to or restrict _____ from using or disclosing Confidential Information:

(a) which is or becomes public other than through a breach of this Agreement;
(b) already known to _____ prior to the date of this Agreement and with respect to which _____ does not have an obligation of confidentiality;
(c) which is independently developed by _____;

(d) which is disclosed to _____ by a person or entity not party to this Agreement and who is entitled to disclose such information without breaching an obligation of confidentiality; or

(e) required to be disclosed by law, whether under an order of a court, government tribunal, or other legal process. If _____ is required to disclose Confidential Information as part of a judicial process, government investigation, legal proceeding, or other similar process, _____ will give prior written notice of such requirement to Hewitt. Reasonable efforts will be made to provide this notice in sufficient time to allow Hewitt to seek an appropriate confidentiality agreement, protective order, or modification of any disclosure, and _____ will reasonably cooperate in such efforts.

## 5. Term

This Agreement shall remain effective for a period (the "Term") beginning on the Effective Date and ending the later of one year from the Effective Date or the date on which the Project is completed or terminated. Subject to Section 4, all Confidential Information disclosed during the Term shall continue to be governed by the terms and conditions of this Agreement after expiration of the Term or other termination of this Agreement.

## 6. Future Relationship

Nothing in this Agreement shall be construed as obligating any party to: (a) continue any discussions, (b) enter into a business relationship, or (c) provide any services.

## 7. Injunctive Relief

_____ acknowledges that the unauthorized use or disclosure of the Confidential Information could cause irreparable harm to Hewitt. Accordingly, _____ agrees that Hewitt has the right to obtain an immediate injunction, without bond or other security, against any breach or threatened breach of this Agreement as well as the right to pursue any and all other rights and remedies available at law or in equity for such breach or threatened breach. In addition, _____ agrees that should _____ be found by a court of law to be in breach of this Agreement, then _____ shall reimburse Hewitt for any legal or other expenses reasonably incurred by Hewitt in connection with the enforcement of Hewitt's rights under this Agreement.

## 8. Notice

Notices delivered in connection with this Agreement must be in writing and delivered to the address set out in the first paragraph of this Agreement to the attention of the individual representing each party under this Agreement or as changed by the parties by written notice delivered to each other from time to time in accordance with this Agreement.

## 9. Severability

In the event that any provision of this Agreement shall be determined illegal or otherwise unenforceable, such provision shall be severed and the balance of this Agreement shall continue in full force and effect.

## 10. Waiver

The failure of either party to enforce any rights granted under this Agreement or to take action against the other party in the event of a breach shall not be deemed a waiver by that party as to subsequent enforcement of rights or subsequent actions in the event of future breaches.

## 11. Entire Agreement and Amendments

This Agreement binds the parties and their respective successors and permitted assigns (provided that neither party may assign this Agreement without the prior written consent of the other party, such consent not to be unreasonably withheld, except Hewitt may assign this Agreement without _____'s consent in the event an assignment is necessitated by an internal business reorganization) and constitutes the entire understanding between the parties with respect to its subject matter, superseding any prior oral or written agreement or understanding relating hereto, and cannot be amended, changed, or terminated except by a written instrument executed by a duly authorized representative of each party.

## 12. Applicable Law and Jurisdiction

This Agreement is governed by the laws of the State of Illinois and applicable laws of the United States of America and the parties agree to the non-exclusive jurisdiction of the courts of the State of Illinois in relation to this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date written above.

**Hewitt Associates LLC**                              **[Name]**

By:_____            By: _____

Name:  C. Lawrence Connolly, III            Name:_____

Title:  Principal_____            Title:_____

# Schedule I

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

## Privacy Policy

The attached Privacy Policy, as described in Section 1.31, is subject to change from time to time, as Hewitt's sole discretion.

As the provider of administrative services for your program(s), Hewitt has received information such as your name, age, address, telephone number, Social Security Number, and email address from the program sponsor. Hewitt may share updates to this information with the program sponsor and/or _____. Additionally, various activities on our Site request users to give us contact and profile information. You have the opportunity to provide us with information regarding your interest in certain programs in connection with your use of tools on our Site. We may track this information provided to us in the selection tools. We will not, however, share any personally identifiable information you provide to us with any third parties unless you authorize it at the time you enter the information.

### How Secure Is My Information?

This Site takes precautions to maintain the privacy and security of your information. For example, you're required to enter a valid user ID and password (PIN) before any personal or financial information can be displayed. This Site also encrypts all of the information exchanged between its server and your browser. Also, if there's no activity on a page for an extended period of time, the Site automatically logs you off. When that happens, you need to log in again with your user ID and password (PIN).

### Why Are Cookies Important?

This Site uses a common technique called "HTTP-header cookies" to identify one page request from another. The cookies this Site creates do not contain any personal information. They inform the Site if a page request comes from someone who has already logged on. Your browser may be set up to warn you whenever a site sends your browser a cookie. If an edit message pops up asking you to accept or reject the use of cookies, you should accept it. This Site will not work without them.

### What Is Encryption?

Encryption is a mathematical process that transforms a message to conceal its meaning. Encryption is used to protect messages from eavesdropping, tampering, or forgery over the Internet.

### How Is Encryption Used By This Site?

This Site is designed to encrypt the transmission of all personal or financial information transmitted between our server and your browser. The security standard Secure Sockets Layer (SSL) is used to implement this policy. SSL is the leading standard for securing World Wide Web transmissions. It's also supported by the leading browser.

**How Can I Tell That SSL Is in Effect?**

If the URL of a secure document begins with "HTTPS://," the additional "S" on the end of the familiar HTTP indicates a secure channel to the server. Also, in Netscape Navigator 4.02 and Microsoft Internet Explorer 4, the security icon is a padlock.

**Note:** The padlock will be closed once a secure channel is established.

**How Secure Is SSL?**

SSL uses public-key encryption. This technology can use keys of various sizes. The larger the key length and the greater the number of possible keys, the more difficult the decryption challenge and the more secure the message. Browsers generally have one of 2 key sizes--40 bit or 128 bit. Messages encrypted with a 128-bit key are $3 \times 10^{24}$ (3 followed by 26 zeros) times harder to break.

This Site provides the maximum level of encryption supported by your browser. When you use the Site at work, only the browsers provided or authorized by _____ should be used. When you use the Site at home, you can maximize the security of your Web activities by obtaining a browser with 128-bit encryption. These browsers are available for downloading at home from either Netscape or Microsoft at no cost other than telephone time. US law limits the availability of these browsers to US and Canadian citizens or permanent residents only. This secure Site only accepts browsers using 128-bit encryption. When you use this Site at work, only the browsers provided or authorized by _____ should be used. When you use this Site at home, you can download browsers with 128-bit encryption from either Netscape or Microsoft at no cost other than telephone time. US law limits the availability of these browsers to US and Canadian citizens or permanent residents only.

**Why Do I Need to Use a Particular Browser?**

To maximize the privacy of your information and provide a consistent visual presentation, a relatively current and capable browser is required. For example, the browser must support JavaScript, Cookies, and Secure Sockets Layer (SSL), an encryption standard for browsers. For enhanced security, we recommend using a browser version that uses 128-bit SSL encryption.

The browser requirement for this Site is Netscape Navigator 4.02, Netscape Navigator/Communicator 4.02 and above, or Microsoft Internet Explorer 4.0 and above. Other browsers may work if they have the required browser features. However, this Site has not been tested or certified for other browsers.

**Note:** If you're an AOL user, you must use one of the minimum required browsers mentioned above.

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

This Amendment ("Amendment"), effective as of January 1, 2005, is made and entered into by and between Enron Corp. ("Client") and Hewitt Associates LLC (together with its subsidiaries and affiliates, "Hewitt").

### Recitals

**Whereas,** Client and Hewitt have previously entered into an Administrative Services Agreement effective as of June 1, 2001 (as amended, the "ASA") pursuant to which Hewitt provided certain benefits administration services to Client as described therein (the "Administrative Services");

**Whereas,** effective as of December 31, 2004, Client terminated the Administrative Services; and

**Whereas,** Client has requested and Hewitt has agreed to continue to provide ongoing maintenance and assistance to Client with respect to the Client data maintained by Hewitt on its internal systems as further described herein, upon the terms and conditions contained herein.

### Agreement

**Now, therefore,** in consideration of the foregoing and the mutual promises and covenants contained herein, and other valuable consideration, the receipt, sufficiency and adequacy of which is hereby acknowledged, Client and Hewitt hereby agree to amend the ASA as follows:

1.       Section 1.35 is deleted in its entirety and replaced with the following:

   "Services" means the services to be performed by or on behalf of Hewitt from time to time upon Client's request, primarily consisting of providing information to Client related to Participant data which Hewitt has maintained on its proprietary systems, to the extent Hewitt maintains such information."

2.       Section 2.1 of the ASA is deleted in its entirety and replaced with the following:

   "The Services shall be limited as follows:

   (a)       Upon receiving an information request from Client, Hewitt will perform the Services on a timely basis; however, depending on the circumstances, Hewitt may take up to thirty calendar days to respond to any inquiry, unless otherwise agreed upon between the parties.

   (b)       Hewitt shall respond to requests from Client's Authorized Representatives, or such other persons as the parties may agree upon from time to time, provided however, that the parties agree that Hewitt is not obligated to respond to inquiries from Participants, and the parties intend that Hewitt shall not respond to such inquiries.

   (c)       Hewitt will not maintain a call center, interactive voice response system or web site with respect to the Services, and shall not provide for any other access, except as provided for herein.

   (d)       Hewitt may, in its sole discretion, change the telephone number for inquiries and the Hewitt contact person or persons.

**EXHIBIT  B**

(e)    Hewitt's response shall be in its customary format, unless agreed otherwise agreed upon.

(f)    Hewitt will permit access by Client to Hewitt's system through an interface commonly referred to as GUI, provided that such access may result in monthly access fees as agreed by the parties.

3.    Sections 2.4(b) and (c) of the ASA are deleted in their entirety and replaced with "Intentionally Omitted."

4.    Section 4.1 of the ASA is deleted in its entirety and replaced with the following:

"**General**. Client shall pay Hewitt a base fee of $10,000 per month during the term of this Agreement. Base fees will be paid by wire transfer or Automated Clearing House (ACH) payment on a monthly basis on or prior to the first day of each month. Additional Services that exceed the reasonable ongoing support contemplated by the parties shall be billed on a time and materials basis based on Hewitt's then current billing rates. Fees for additional services shall be invoiced to Client on the last day of the month. Adjustments, reconciliations, or credits to the standard fees paid by Client will be included on the invoice. Fees for additional services are due and payable within thirty (30) days of the invoice date. Client will promptly notify Hewitt of any questions regarding invoices so that Hewitt can expect timely payment. Interest at nine percent (9%) per year will accrue after the due date until payment is received."

5.    Section 6.3 of the ASA is deleted in its entirety and replaced with "Intentionally Omitted."

6.    Section 9.1 of the ASA is deleted in its entirety and replaced with the following:

"The initial term of this Agreement commences on the effective date first stated above and will end on September 30, 2006, unless terminated earlier as provided in this Section 9. Either party may terminate this Agreement (or all or any portion of the Services) at any time, without cause and for its convenience, by giving the other party at least one hundred eighty (180) days' prior written notice of such termination. Upon the occurrence of a Default, the non-defaulting party shall have the right to terminate this Agreement on thirty (30) days notice, unless the event giving rise to the default has been cured to the satisfaction of the non-defaulting party.

7.    Terminated Services. Each party agrees that the other party's obligations with respect to the Administrative Services described in the ASA have been fullfilled, except for those that survive termination as described therein.

8.    Schedules A and G to the ASA are deleted in their entirety and replaced with "Intentionally Omitted."

9.    The provisions of the ASA not amended, revised or supplemented by this amendment will remain in full force and effect. This Amendment constitutes the entire agreement of the parties and supersedes all previous oral or written negotiations and agreements relating to the subject matter. There have been no representations or statements, oral or written, that have been relied on by any party hereto except those expressly set forth herein.

[Signature Page to Follow]

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment to Administrative Services Agreement effective as of the date first written above.

**Enron Corp.**

**Hewitt Associates LLC**

By: _____
[Name and Title]

Robert W Jones
MD, HR

By: _____
C. Lawrence Connolly, III, Secretary

# Hewitt

*2227*
*amd*

Hewitt Associates LLC
100 Half Day Road
Lincolnshire, IL 60069
Tel (847) 295-5000
Fax (847) 295-7634
www.hewitt.com

Argentina
Australia
Austria
Belgium
Brazil
Canada
Channel Islands
Chile
China
Czech Republic
France
Germany
Greece
Hong Kong
Hungary
India
Ireland
Italy
Japan
Malaysia
Mauritius
Mexico
Netherlands
Philippines
Poland
Puerto Rico
Singapore
South Africa
South Korea
Spain
Sweden
Switzerland
Thailand
United Kingdom
United States
Venezuela

July 25, 2006

Enron Corp.
1400 Smith Street
Houston, Texas 77002
Attention: Mr. Robert W. Jones

Dear Mr. Jones:

The purpose of this letter is to amend the Administrative Services Agreement between Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt") dated June 1, 2001 and the amendment between Client and Hewitt dated January 1, 2005 (collectively, "Agreement") to extend the term of the Agreement. Rather than asking you to sign a new agreement, we will incorporate the changes into the Agreement though this letter amendment. Capitalized but undefined terms will have the meanings ascribed to them in the Agreement.

1. The effective date of this amendment is July 1, 2006.

2. Section 9.1 of the ASA is deleted in its entirety and replaced with the following:

> "The initial term of this Agreement commences on the effective date first stated above and will end on September 30, 2007, unless terminated earlier as provided in this Section 9. Upon the expiration of the initial or any renewal term, this Agreement shall automatically renew for successive one-year terms unless either party provides the other party with a written termination notice ("Termination Notice") at least one hundred eighty (180) days prior to the end of the initial term or any renewal term. Upon the occurrence of a Default, the non-defaulting party shall have the right to terminate this Agreement on thirty (30) days notice, unless the event giving rise to the default has been cured to the satisfaction of the non-defaulting party."

3. The provisions of the Agreement not amended, revised or supplemented by this amendment will remain in full force and effect. The Agreement as supplemented by this letter amendment constitutes the entire agreement of the parties and supersedes all previous oral or written negotiations and agreements relating to the subject matter. There have been no representations or statements, oral or written, that have been relied on by any party hereto except those expressly set forth herein.

If the terms of this letter amendment are acceptable, please have an authorized representative sign the two (2) enclosed amendments and return one and retain the other for your files. Thank you for your cooperation.

HOU01:983998.2

**EXHIBIT C**

# Hewitt

Enron Corp.
Page 2
July 25, 2006

**IN WITNESS WHEREOF**, the parties hereto have duly executed this letter amendment effective as of the date first written above.

Hewitt Associates LLC

By: _C. L. Connolly III_

Name: C. Lawrence Connolly, III

Title: _SECRETARY_

Enron Corp.

By: _Robert W Jones_

Name: _Robert W Jones_

Title: _MD & Chief Admin Officer_

# Hewitt

Hewitt Associates LLC
100 Half Day Road, Lincolnshire
Il - West Greek CA, 77081
T.818.459.11.31.8.9456
F.818.539.457.8549
www.hewitt.com

July 28, 2006

Private and Confidential

Mr. Robert W. Jones
Enron Corp.
Post Office Box 1188
Houston, TX 77251-1188

Dear Robert:

At Enron's direction, Hewitt has been preparing since December 2005 to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other related plans based on the terms of the Second Supplemental Amended Plan of Allocation adopted and approved by counsel for plaintiffs pursuant to the partial settlement approved by the court in Tittle, et al., v. Enron, et al., Case No. H-01-CV-3913.

Enron's authorization is needed in order for Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds in accordance with the document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp.", dated July 31, 2006 and the terms of said Second Supplemental Amended Plan of Allocation. Please execute in the space provided below and send a facsimile copy to the attention of Darrel Folkert at 281-363-9049. The original copy can follow via regular mail.

Sincerely,

Hewitt Associates LLC


Robert A Dunlap

RAD:cgb
cc: Mr. Darrel Folkert, Hewitt Associates


Enron Corp. Authorization

By: _____

Name: _____Robert W. Jones_____

Title: _____Administrative Committee____

**EXHIBIT D**

# Hewitt

Hewitt Associates LLC

**Settlement Allocation(s) Plan Provisions and Requirements**

Enron Corp.

July 31, 2006

| | | | | |
|---|---|---|---|---|
| Argentina | Czech Republic | Ireland | Philippines | Switzerland |
| Australia | Dominican Republic | Italy | Poland | Thailand |
| Austria | France | Japan | Portugal | United Kingdom |
| Belgium | Germany | Korea | Puerto Rico | United States |
| Brazil | Hong Kong SAR | Malaysia | Singapore | Venezuela |
| Canada | Hungary | Mexico | Slovenia | |
| Chile | India | Netherlands | Spain | |
| China | Indonesia | New Zealand | Sweden | |

To protect the confidential and proprietary information included in this material, it may not be disclosed or provided to any third parties without the approval of your organization and Hewitt Associates LLC.

# 1. Settlement Allocation(s) Plan Provisions

## Contents

| Topic | Page |
|---|---|
| Contents | i |
| Plan Identification | 1 |
| Eligibility/Participation Requirements | 3 |
| Implementation and Processing Timeline (DRAFT) | 5 |
| Data Elements | 21 |
| Allocation Process | 26 |
| Calculation Examples (Enron Settlement) | 31 |
| Allocation Investment Options | 33 |
| Vesting | 34 |
| Direct Rollovers (In) | 35 |
| Settlements/Distributions | 36 |
| Spousal Consent | 39 |
| Beneficiaries | 40 |
| Minimum Distributions | 41 |
| Forfeitures | 42 |
| Data Requirements - Enron Settlement Sources | 43 |
| Data Requirements - Source Data Aggregation (TOTAL) | 44 |
| Data Requirements - Source Data Aggregation (EOG) | 45 |
| | 45 |
| APPENDIX A -- Distribution File Layout (Wilmington Trust) | 46 |
| APPENDIX B -- Conversion Out File (Diversified -- Enron/Prisma) | 48 |
| APPENDIX C -- Claimant Cover Letter | 49 |
| APPENDIX D -- Claimant Settlement Questions and Answers | 49 |
| APPENDIX E -- Special Tax NoticeSPECIAL TAX NOTICE REGARDING PLAN PAYMENTS | 1 |
| SPECIAL TAX NOTICE REGARDING PLAN PAYMENTS | 2 |
| APPENDIX F -- Claimant Distribution Form | 1 |
| APPENDIX G -- Contact List | 1 |
| APPENDIX H -- Hewitt Expense Estimate | 2 |
| Contents | 2 |
| Access to Services | 3 |
| Processing Center Overview | 5 |
| CS Domain Consultant (CS DC) | 5 |
| CS Client Manager (CS CM) | 6 |
| CS Client Analyst (CS CA) | 6 |
| Customer Service Representative (CSR) | 6 |
| Customer Service Representative Training | 7 |
| Workstation | 8 |

| | |
|---|---|
| Reference Tool | 8 |
| CallTracker | 8 |
| Imaging | 8 |
| Philosophy | 9 |
| Performance Monitoring | 9 |
| Abusive Customers | 10 |
| Threatening Customers | 10 |
| Mail | 12 |
| Forms Processing | 12 |
| Checks | 13 |
| Unexpected Forms/Materials | 13 |
| Referral List | 16 |
| Call Tracker Topics | 16 |
| Questions & Answers | 16 |

## Plan Identification

### Plan Name(s)

The legal names of the Plans addressed by the Settlement Allocation project are, the Enron Savings Plan, Enron ESOP and Enron Cash Balance Plan. Collectively all three plans may be referred to as the Enron Plans. Allocations applied to participants in the Enron Savings Plan and Enron ESOP may be referred throughout this document as Defined Contribution (DC) allocations. Allocations to the Enron Cash Balance Plan may be referred to as Defined Benefit (DB) allocations.

Administrative Purposes Plan Name(s):

- The Enron Savings Plan consists of The Enron Corp. Saving Plan and any and all predecessors and successors to such plan. This specifically includes The Portland General Electric Savings Plan prior to its incorporation in the Enron Savings Plan along with EOG Resources Inc. Savings Plan, which converted out of the Enron Corp. Savings Plan prior to the end of the Settlement period

- The Enron ESOP consists of the Enron Corp. Employee Stock Ownership Plan, and any and all predecessors and successors to such plan

- The Enron Cash Balance Plan consists of the Enron Corp. Cash Balance Plan, and any and all predecessors and successors to such plan

**The remainder of this chapter is a discussion of the plan provisions and allocation processes for the plans listed above.**

### Settlement Classes

The two settlements included in this allocation are the $85 million Settlement and the Enron Settlement described in the following section (Eligibility/Participation Requirements), both arising out of that certain class action entitled Tittle, etal v Enron, etal Civil No. H-01-CV-3913.

### Settlement Claimant Information

The Claimants included in the Settlement(s) are:

- **Class Representatives:** Pamela M. Tittle, Thomas O. Padgett, Gary S. Dreadin, Janice Farmer, John L. Moore, Betty J. Clark, Patrick Campbell, Fanette Perry, Charles Prestwood, Roy Rinard, Steve Lacey, Catherine Stevens, Roger W. Boyce, Wayne M. Stevens, Norman L. Young, Michael L. Mccown and Dan Shultz

- **Former Participants:** Settlement class members who are former participants in the Enron Savings Plan, and/or the Enron ESOP

- **Former Cash Balance Plan Participants:** Vested participants in the Enron Cash Balance Plan who was an active cash balance plan participant during some or all of the period January 1, 1987 to December 31, 1994 and earned a benefit from the Enron Cash Balance plan during that period. These participants did not receive a full distribution of their ESOP Retirement Account prior to January 1, 2001

- **Participants:** Settlement class members who are currently participants in the Enron Savings Plan, and/or Enron ESOP

- **Cash Balance Plan Participants:** Persons actively employed by Enron on January 1, 2001, and who were active Cash Balance Plan participants during some or all of the period January 1, 1987 to December 31, 1994 and earned a benefit from the Cash Balance Plan during that period. These participants did not receive a full distribution of their ESOP Retirement Account prior to January 1, 2001

**Effective Dates**
The Settlement Allocations will be posted to Claimant accounts on August 7th.

**Valuation Frequency**
After Settlement Allocation amounts are posted to participants accounts,

- The following requests will be processed daily and paid weekly:

  —— Payments (including direct cash payments and rollovers)

  —— Payment information will be recorded daily and paid (after valuation) each Friday

- The following requests will be processed one time, after the Settlement Allocation:

  —— Plan to plan transfer of assets to the successor plans - PGE Savings Plan, Enron/Prisma Plan and the EOG Resources, Inc. Savings Plan.

  —— Assets from the plan to plan transfers will be deposited in their respective successor plans on the evening of August 7, 2006.

- The following requests will not be processed:

  —— Loans

  —— Investment Elections

  —— Fund Transfers or Reallocations

  —— Partial Distributions

    – Partial rollovers will be processed as part of a total distribution; however, the entire balance must be taken

  —— Withdrawals (less than a total withdrawal)

## Eligibility/Participation Requirements
### $85 Million Settlement Eligibility
- The $85 million Settlement will include:

  —— Any person who was at any time a participant in any of the Enron Plans during the period
  starting January 1, 1995 through and including [INSERT EFFECTVE DATE OF
  SETTLEMENT ONCE IT HAS BEEN DETERMINED] – this will be referred to as the
  Settlement Period; and

  —— Beneficiaries, alternate payees, Representatives and Successor-In-Interest of those people who
  were participants as described above

Note: During the project Enron was informed that the $85 Million Settlement is being appealed.
Therefore, allocation of this settlement will be delayed for a subsequent iteration so processing of the
Enron Settlement can proceed without delay.

- The $85 million Settlement will not include:

  —— Defendants in the Tittle Action (as described in the Settlement Agreement) and any of their
  immediate family members, beneficiaries, alternate payees, Representatives or Successors-In-
  Interest, except for spouses and immediate family members who themselves are or were
  Participants in any Enron Plan

  —— Defendant Releasees who were Administrative Committee Members or Enron Officers of
  Directors during the class period and any of their immediate family members, beneficiaries,
  alternate payees, Representatives or Successors-In-Interest , except for spouses and immediate
  family members who themselves are or were Participants in any Enron Plan

### Enron Settlement Eligibility
- The Enron Settlement will include:

  —— Any person who was at any time a participant in any of the Enron Plans during the period
  starting January 1, 1998 through and including December 2, 2001*—this will be referred to as
  the Settlement Period; and

  —— Beneficiaries, alternate payees (including spouses of deceased persons who were Enron
  participants), representatives and successor-in-interest of those people who were participants as
  described above

*NOTE: December 2, 2001 is a Sunday. We will use values as of end of business on November 30,
2001.

- The Enron Settlement will not include:

  —— Any defendant in the Tittle Action, or any of their immediate family, their beneficiaries,
  alternate payees (including spouses of deceased persons who were Enron Plan participants),

representatives or successors-in-interest, ,except for spouses and immediate family members who themselves are or were participants in any of the Enron Plans

– These individuals will be removed from the total loss value used in the overall calculation; and
– Their individual losses will not be used in any part of the calculation

## Implementation and Processing Timeline (DRAFT)

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 1) Develop requirements document. | 1/1/2006 | 7/26/2006 | Hewitt | Enron | Final requirements must be signed before allocations are calculated and information is sent to participants. |
| 1a) Define data extracts for allocation:<br>- NTRC<br>- Hewitt TBA<br>- PGE (microfiche)<br>- EOG (paper)<br>(COMPLETE) | 1/1/2006 | 4/30/2006 | Hewitt | Enron | Identify all data and sources needed to complete allocation. Document data formats ensure data integrity. |
| 1b) Develop participant communication piece:<br>- Include distribution form for those eligible<br>(COMPLETE) | 2/1/2006 | 7/1/2006 | Enron/ Hewitt (input) | Enron | Participant communication will be created at Hewitt and include data from the allocation calculation. |
| 1c) Create processing documentation/procedures:<br>- Forms processing<br>- Returned Mail<br>- Unsolicited Mail<br>- Returned Check Processing<br>(COMPLETE) | 3/1/2006 | 7/20/2006 | Hewitt/ WTC (checks) | Enron | Create documentation for processing of returned participant distribution forms. |
| 1d) Establish Customer Service procedures and operations:<br>- Authentication Process/Security Procedures<br>- FAQ document<br>- CSA scripting<br>- Training documentation<br>- Toll Free Number<br>- Telephony and routing software<br>- CSA imaging access | 2/15/2006 | 7/26/2006 | Hewitt | Enron | Enron will need to sign off of the FAQ document and the level of information to be shared with participants without full authentication. Enron will also review participant training materials. Hewitt will need to determine |

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 1e) Establish dispute procedures:<br>- Determine where unsolicited mail is returned<br><br>(COMPLETE) | 3/15/2006 | 6/30/2006 | Hewitt/Enron | Enron | Enron will provide contact information or mailing address for participants who dispute claim information or processes. |
| 1f) Establish imaging procedures:<br>- Outgoing Mail<br>- Incoming/Returned Mail<br>- Bar coding<br>(COMPLETE) | 3/1/2006 | 6/15/2006 | Hewitt | Enron | Enron to confirm procedures for returned unsolicited mail and data retention. |
| 1g) Establish fulfillment procedures:<br>- Mailing envelope (#10)<br>- Return Envelope creation/stock (#9)<br>- Stuffing and mailing procedures for outgoing mail<br>(COMPLETE) | 3/1/2006 | 6/15/2006 | Hewitt | Enron | Enron to approve return mail envelope and approve Zip Code extension for Enron specific mail. 2-3 weeks needed for production of envelopes. |

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 1h) Establish Trustee procedures:<br>- Fund selection<br>- Fund NAV generation and frequency<br>- Distribution processes<br>  o check cutting<br>  o government reporting and year-end processing activities<br>- Returned check procedures<br>- Stop Pay/Reissue procedures<br>- Disbursement Account reconciliation<br>- Trust level reporting requirements | 2/1/2006 | 7/31/2006 | Hewitt/ WTC | Enron | Enron to approve fund used to store Claimant balances and define reporting requirements. Hewitt to confirm data layouts for distribution file transmission. Hewitt to confirm process for receipt and confirmation of NAVs based on established frequency. |
| 1i) Establish auto forceout rollover processing procedures:<br>- Distribution file requirements from Wilmington | 4/15/2006 | 7/31/2006 | Hewitt/ Enron/ Mercer | Enron | Enron to confirm provider of auto forceout rollover provider. Hewitt to confirm with provider file layout needed for transmission of participant data. |

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 1k) Plan administration tool requirements and analysis (based on specifications above). | 3/7/2006 | 7/31/2006 | Hewitt | | Establish requirements and perform system analysis for recordkeeping system for allocation posting, mailings and payment processing. |
| 2) Digitize PGE microfiche. (COMPLETE) | 3/2/2006 | 3/9/2006 | Lason/Hewitt | | Third party will convert PGE microfiche into usable .tif format and store on DVD. Hewitt will transfer data into usable format to be pulled into allocation calculations. |
| 2a) Convert PGE .tif data into usable electronic format. (COMPLETE) | 3/10/2006 | 4/4/2006 | Hewitt | Enron | Convert .tif files into usable data format (excel or MS Database). |
| 2b) Confirm PGE data elements required to be converted to electronic format. (COMPLETE) | 3/9/2006 | 3/10/2006 | Hewitt/ PGE/ Enron | PGE/ Enron | PGE and Enron to confirm the data elements pulled from the PGE microfiche. Hewitt will outline the fields they feel appropriate to complete the allocation calculation. |

1.8

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 2c) Establish data entry procedures for PGE data. (COMPLETE) | 3/10/2006 | 3/13/2006 | Hewitt | | Confirm output format of data entered from PGE microfiche. |
| 2d) Key data elements: - Initial PGE Data Entry - Re-key of PGE Data Entry (quality procedures) (COMPLETE) | 3/13/2006 | 4/4/2006 | Hewitt | | Hewitt's Data Transfer group to handle. |
| 2e) Confirm sample of PGE data entered. (COMPLETE) | 3/16/2006 | 3/16/2006 | Hewitt | | Confirm data is entered as expected and is in format for master data source. |
| 2f) Send copies of DVDs to Enron and PGE - 1 copy to Enron - 2 to PGE  (and original fiche) - Hewitt will keep the final copy until all allocations are complete | 5/15/2006 | 9/15/2006 | Hewitt | | Confirm all participant mailings have been made before sending DVDs currently being used by the data transfer group to PGE and Enron. |
| 2g) Convert EOG quarterly statement date into usable electronic format. (COMPLETE) | 4/24/2006 | 5/2/2006 | Hewitt | | Convert paper statements into usable data format (excel or MS Database). |
| 2h) Confirm EOG data elements required to be converted to electronic format. (COMPLETE) | 4/24/2006 | 4/24/2006 | Hewitt/ EOG/ Enron | EOG/ Enron/ | EOG and Enron to confirm the data elements pulled from the EOG statements.  Hewitt will outline the fields they feel appropriate to complete the allocation calculation. |
| 2i) Establish data entry procedures for EOG data entry (COMPLETE) | 4/25/2006 | 4/25/2006 | Hewitt | | |

*I. Plan Provisions*

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 2j) Key data elements:<br>- Initial EOG Data Entry<br>- Re-key of EOG Data Entry (quality procedures)<br>(COMPLETE) | 4/25/2006 | 5/2/2006 | Hewitt | | Hewitt's Data Transfer Group. |
| 2k) Confirm sample of EOG data entered.<br>(COMPLETE) | 4/27/2006 | 4/24/2006 | Hewitt | | Confirm data is entered as expected and is in format for master data source. |
| 3) Consolidate allocation data sources to produce master data source:<br>- Hewitt TBA data (DC)<br>- NTRC Data (DC)<br>- PGE Data (DC)<br>- EOG Data (DC)<br>- EDS data (DB) – DB portion will be completed separately.<br>Code and test allocation process and conversion information.<br>(COMPLETE) | 5/3/2006 | 7/20/2006 | Hewitt | | Combine data sets to produce master set of data – or confirm data set layout for SAS programming. Master data set(s) of DC data will be used for the allocation calculation. DB data will be used in separate allocation calculations and performed separately. |
| 3a) Quality Check consolidated master data sources:<br>- Likely stored as separate fixed length datasets<br>(COMPLETE) | 5/8/2006 | 5/9/2006 | Hewitt | | Balance closing – ensure data aligns by designated file format. |
| 3b) Develop requirements for spreadsheet used for DC allocation (loss and settlement) calculations. | 3/21/2006 | 7/26/2006 | Hewitt | | Define data sources (file names and formats) that will be used in the settlement allocation. |

*1. Plan Provisions*

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 3c) Review calculations for Claimant class. | 5/1/2006 | 7/31/2006 | Hewitt/Enron | Enron | Confirm allocation calculations are correct for sample example populations of Claimants. Sample methodology will be included in plan provisions. |
| 3d) Code spreadsheet to pull data sources and calculate settlement allocation amounts. | 5/1/2006 | 7/26/2006 | Hewitt | | Spreadsheet will pull master data sources, calculate loss amounts using agreed upon calculations and allocate a settlement amount based on Claimant losses and total claim amount. |
| 3e) Code SAS job to create conversion transactions for Claimant balances converted to PGE. | 5/15/2006 | 7/31/2006 | Hewitt | | Transactions will need to be converted into TBA data format to apply to participants' accounts. |
| 3f) Test conversion file of PGE participants (using sample data). | 7/31/2006 | 8/2/2006 | Hewitt | | Confirm data posts successfully to TBA. |
| 4) Calculate DC and DB loss amounts using master data source and EDS data and load to Administration Tool. | 6/30/2006 | 7/26/2006 | Hewitt | | Determine dates for DB portion of allocation – at a later date. |
| 4a) Receive data from EDS. | (TBD) | (TBD) | EDS | | Determine dates for DB portion of allocation. |

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 4b) Load EDS data and test reasonability. | (TBD) | (TBD) | Hewitt | Enron | Hewitt review data provided by EDS. Enron confirms the final assumptions to be used in the calculations. Determine dates for DB allocation. |
| 4c) Confirm final total allocation amount. | 7/26/2006 | 7/26/2006 | Enron | Enron | Enron to confirm the final amount to be used in the Claimant allocation calculation. Amount will be net of fees from all providers. |
| 4d) Split final settlement amount between DC and DB allocations (6/7th to DC and 1/7th to DB). | 7/26/2006 | 7/26/2006 | Enron | Enron | Enron will confirm amounts to be allocated to DC and to DB. |
| 4e) Run initial DC participant loss and settlement calculations. | 7/26/2006 | 7/26/2006 | Hewitt | | Hewitt will run initial DC settlement calculations using agreed upon amounts listed above. |
| 4f) Calculate Present Values (DB). | (TBD) | (TBD) | Hewitt | | Assumes EDS provides data as anticipated and data is usable. Determine dates for DB portion of allocation. |
| 4g) Review participant loss and settlement calculation amounts. | 7/27/2006 | 7/27/2006 | Hewitt/Enron | Enron | Enron to confirm sample of participant's loss calculations |

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 4h) Review Present Value calculations (approve calculations). | (TBD) | (TBD) | Enron | Enron | Enron to confirm sample of calculations and signoff. Determine dates for DB portion of allocation. |
| 4i) Net settlement amount wired to WTC. (COMPLETE) | 4/25/2006 | 4/25/2006 | Enron/WTC | Enron | Settlement was wired to WTC on 4/28/06 and 5/1/2006, Fund will be unitized on 8/1/2006 |
| 4j) Remove Claimants with allocation settlements less than $25.00: <br> - Create list for Benefits Center to confirm those that are part of the class with de minimus balances | 7/26/2006 | 7/26/2006 | Hewitt | | We will need to maintain a separate listing of those participants with a de minimus amounts. |
| 4k) Rerun DC allocation calculations. | 7/26/2006 | 7/26/2006 | Hewitt | | Rerun the calculation using only participants with balances greater than $25.00. Remove de minimus amounts from participants and apply to those with balances > $25.00 |
| 4l) Review calculations of final Claimant balances (DB and DC). <br><br> DB portion will be reviewed after completion (separately) | 7/26/2006 | 7/28/2006 | Hewitt/Enron | Enron | Confirm allocation calculations are correct for sample populations of Claimants. These balances will be used in the participant mailing. |

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 4m) Assign unique identifier to use in indexing of Claimant information and to add to participant return mail forms (in lieu of SSN) | 7/31/2006 | 7/31/2006 | Hewitt | | Hewitt's best practice is to not include a SSN on any outgoing participant mailings. Unique identifier will be used to input payment information. |
| 4n) Confirm all Claimants have unique identifier created. | 7/31/2006 | 7/31/2006 | Hewitt | | Compare DC and DB allocation lists and ensure all participants have a single unique identifier. |
| 4o) Send file to Enron to assign address and birth date information. | 7/26/2006 | 7/26/2006 | Hewitt | Enron | Data will be delivered to Enron to assign address and birth date information. |
| 4p) Enron assigns address information and birthdays to Claimants that will be receiving a settlement amount (using master address files) | 7/27/2006 | 7/31/2006 | Enron | | Enron will return the completed file with address and birth date information assigned. |
| 4q) Configure Administration Tool to house data and generate forms and extract files. | 8/1/2006 | 8/1/2006 | Hewitt | | |
| 4r) Load allocation results and indicative data to Administration Tool (DB and DC).  DB allocation amounts TBD. | 8/4/2006 | 8/4/2006 | Hewitt | | Use NAV from as of day funds are loaded to the system (in this case August 4*). |

*I. Plan Provisions*

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 5) Consolidate Claimant mailing address information. | ------------ | ------------ | Enron | Enron | Enron will coordinate the collection and final set of address information that will be used on the recordkeeping system. These addresses will be used for mailing of initial letters and mailing of Claimant checks. |
| 5a) Provide NTRC address information (with SSNs) to Enron. (COMPLETE) | 2/15/2006 | 3/1/2006 | Hewitt | | Enron will use NTRC recordkeeping data to assist in confirming addresses for participants missing from current master address list or for those with common surnames. Confirm Plaintiff Counsel has identified all participants who have had address changes or updates since they began tracking these changes. Hewitt will need to know that all addresses are confirmed. |

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 5b) Identify population to convert to Diversified (Enron/Prisma), Schwab (EOG) and Hewitt TBA (PGE): <br> - Compare list of current population to allocation population <br> - Identify participants that are no longer on successor plan recordkeeping system | 8/1/2006 | 8/1/2006 | Hewitt/ DIA/ Schwab | | Claimants that are no longer participants in the successor plans will be consolidated with Claimants that have a balance less than $200 or greater than or equal to $200. |
| 6) Identify Claimant distribution populations: <br> - Participants in Enron/Prisma Plan <br> - Participants in PGE Plan <br> - Participants in EOG Plan <br> - Claimants with balances less than $200 <br> - Claimants with balances greater than or equal to $200 (distribution form) <br> - Claimants with hold indicators (set indicator to hold payment) | 8/1/2006 | 8/1/2006 | Hewitt | | Sort Claimant population into the distribution groups and assign unique identifier (to be used in the mail merge and on the recordkeeping system). The final allocation must be completed in order to complete this step. |
| 6a) Create conversion files for PGE, Enron/Prisma and EOG participants. <br><br> Send conversion file to DIA and Schwab (internally to PGE team) | 8/1/2006 | 8/1/2006 | Hewitt | | Set timing and confirmation of receipt for both DIA and Schwab. Need to ensure information is passed as agreed upon. |

*I. Plan Provisions*

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|----------|-----------|----------|-------|----------|----------|
| 7) Produce Claimant letters. | 8/2/2006 | 8/4/2006 | Hewitt | | |
| 7a) Mail merge allocation calculation with template Word document:<br>- Create four letters based on Claimant balances and successor plan participation | 8/2/2006 | 8/2/2006 | Hewitt | | Using rules established in requirements to determine which letter each Claimant will receive. |
| 7b) Print Claimant letters:<br>- Quality Check<br>- Confirm pull list if necessary (address changes) | 8/2/2006 | 8/2/2006 | Hewitt | | Current estimate is in printing will be in excess of 40,000 physical pages. |
| 7c) Image outgoing mail:<br>- Image and index all outgoing mail<br>- Imaging will be completed in Lincolnshire | 8/4/2006 | 8/7/2006 | Hewitt | | Imaging outgoing mail will allow the Benefits Center to address specific questions about the mailings sent. It will also provide record of all mail sent to Claimants. |
| 7d) Create participant mailing packages (Fulfillment):<br>- Mail letters | 6/5/2006 | 6/9/2006 | Hewitt | | Hewitt fulfillment will stuff and mail the participant mailings. Mailings may be made over a period of 2 days. |

*1. Plan Provisions*

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 8) Process Trust to Trust transfers:<br>- PGE<br>- Enron/Prisma<br>- EOG | 8/7/2006 | 8/7/2006 | Hewitt/<br>WTC/<br>DIA/<br>Schwab | | Provide conversion file to DIA for Enron/Prisma population and to Schwab for the EOG population. |
| 8a) Provide wire instructions to Wilmington for each successor plan. | 8/4/2006 | 8/7/2006 | Hewitt/<br>WTC | | Wire amount for PGE, Enron/Prisma and EOG Claimants |
| 9) Process $200 force-out. | 8/11/2006 | 8/11/2006 | Hewitt | | Assuming settlement has been invested we will need the most recent NAV for valuation.  Use 8/11/2006 NAV.  Coordinate sell instruction to WTC. |
| 9a) Provide Wilmington single file of participants receiving less than $200. | 8/11/2006 | 8/11/2006 | Hewitt/<br>WTC | | Checks are likely cut and mailed on August 14th |
| 10) Confirm telephony is functional for Call Center:<br>- Test call routing<br>- Test CSA access | 8/4/2006 | 8/4/2006 | Hewitt | | |

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| 10a) Complete Call Center Training. | 7/20/2006 | 7/25/2006 | Hewitt | | Hold one week for Call Center training. CSA hiring process will begin 30 days prior to their live phone date. |
| 11) Call Center open and available for Claimant calls | 8/7/2006 | (Confirm) | Hewitt | | This will coincide with the mailing date of Claimant letters. Confirm date that the call center will stop taking calls. This is dependent on start and stop dates for the DB portion of the allocation. |
| 12) Participant election period:<br>- Participant elections received with correct information will be entered and pended to process. | 8/7/2006 | 9/8/2006 | Hewitt | | Participants may return forms at any point over this 30 + day period. Elections received prior to the period end day will likely be processed weekly on Friday. |
| 13) Process payments. | 8/8/2006 | 9/8/2006 | Hewitt | | File of payments for participants with forms completed correctly sent to Wilmington Trust. Value using 9/8/2006 NAV. |
| 13a) Process payments for Claimants who have not returned forms. | 9/15/2006 | 9/15/2006 | Hewitt | | Payment of force-out rollovers for participant with no returned form. Value using 9/15/2006. A later date could be used for trailing forms if |

*I. Plan Provisions*

| Activity | Start Date | End Date | Party | Sign-off | Comments |
|---|---|---|---|---|---|
| | | | | | necessary. |

## Data Elements
### Required Recordkeeping Data Elements
The Following data elements will be necessary to store and value claimant accounts on the recordkeeping system:

| Field | Excel Col. | Label | Valid Values | Optional/ Required | Comments |
|---|---|---|---|---|---|
| 1 | A | Social Security Number | | Required | Will need this for all claimants for tax reporting purposes. |
| 2 | B | First Name | | Required | |
| 3 | C | Middle Initial | | Optional | |
| 4 | D | Last Name | | Required | |
| 5 | E | Suffix | | Optional | |
| 6 | F | Claimant Class | Participant, Former Participant, Beneficiary, Alternate Payee, Successor Plan | Required | Determine from allocation based on selection criteria. Non-participant information may need to come from a secondary source. [Only if available, this information will not be used] |
| 7 | G | Address Line 1 | | Required | Address to which payment will be mailed. This will need to be a permanent address on our system. |
| 8 | H | Address Line 2 | | Optional | (Store if available) |
| 9 | I | Address Line 3 | | Optional | (If available – this won't write to the Distribution File, as only two address fields are available) |
| 10 | J | City | | Required | |
| 11 | K | State | | Required | |

*I. Plan Provisions*

| Field | Excel Col. | Label | Valid Values | Optional/ Required | Comments |
|---|---|---|---|---|---|
| 12 | L | Zip Code | Zip + 4 | Required | Must keep leading zeroes. |
| 13 | M | Birth Date | | Required | Authenticator, used on the Distribution file for Category of Distribution Code Field. |
| 14 | N | Hire Date | | Optional | Hire date will not be stored or used in the allocation process. |
| 15 | O | Fund Net Asset Value (NAV) | | Required | The NAV will be updated weekly. We will need to store the historical NAVs as well. The current populated NAV will be used to determine the value of the participants account. |
| 16 | P | DC Allocation Balance (Unit Position) | | Required | As applicable |
| 17 | Q | DC Allocation Value | | Required | Based on Fund NAV for that day and allocation balance in units. |
| 18 | R | DB Allocation Balance (Unit Position) | | Required | As applicable |
| 19 | S | DB Allocation Value | | Required | Based on Fund NAV for that day and allocation balances in units. |
| 20 | T | Successor Plan | Enron/Prisma, PGE, EOG or [Blank] | Required | Use to generate proper form for payment options or to indicate rollover to PGE, Enron/Prisma or EOG. |

| Field | Excel Col. | Label | Valid Values | Optional/ Required | Comments |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| 21 |  | Payment Request | Cash, Rollover, [Blank] | Required | Rollover and Successor Plan together indicate rollover to PGE, Enron Prisma or EOG. |
| 22 |  | Payment Date |  | Required | Date to value and pay participant request. Populate when payment is made to participant, rollover institution or successor plan |
| 23 |  | Gross Payment Amount |  | Required | Indicates gross amount of payment made in cash or rolled over if rollover is indicated in Payment Request field. |
| 24 |  | Withholding Amount |  | Required | This will be 20% of the gross payment amount |
| 25 |  | Net Payment Amount |  | Required | Gross payment amount -- Withholding amount. This will apply to either rollover amounts or cash amounts. |
| 26 |  | Distribution Code | 1, 2, 7, G | Required | 1 – Early Distribution 10% penalty applies

2 – Early Distribution 10% penalty does not apply (May only be used for QDRO payments).

7 – Distribution without penalty

G – Rollover to either a qualified plan or IRA |

*1. Plan Provisions*

| Field | Excel Col. | Label | Valid Values | Optional/ Required | Comments |
|-------|-----------|-------|--------------|--------------------|----------|
| 31 | V | Other Hold Indicator | Yes, Blank | Optional | Payments cannot be processed for these individuals until the hold indicator is removed. |
| 32 | W | RMD Indicator | Yes, Blank | Optional | Used to identify all Claimants that are or will be age 70.5 at the time of the settlement allocation. This field will not be used for the Enron Allocation. |
| 33 | X | Location | Enron, PGE, EOG | Required | Used to determine which client contacts can access the data. |

## Allocation Process

### General

Allocations to claimants will be made according to the Settlement Agreement. Claimants will receive a portion of each settlement ($85 Million or Enron) based on criteria outlined in the agreement (and as summarized below). Separate allocations will be made for the $85 Million and the Enron Settlement. The DC and DB allocations will be completed outside of the recordkeeping system (DB Calc) and loaded once the final results are reviewed and approved by Enron. DC and DB allocation amounts will be stored separately, although the combined settlement amount may be aggregated into one account (one for DC and one for DB) on DB Calc.

### DC Allocation

The DC allocation will determine the approximate loss for each member of the Settlement Class using amounts invested or liqudated in the Enron Stock Fund during the Settlement Period. Claimants will receive a share of each allocation in proportion to the total loss incurred by the settlement class.

### Enron Settlement Allocation Amount

The amount available to allocate to claimants included in the Enron Settlement will be determined after deducting administrative expenses from the Claim Settlement Amount. The DC portion will be 6/7 of the net Settlement amount; the DB portion will be the remaining 1/7 of the net amount.

The Administrative Committee (Wade Cline and Robert Jones) for the Enron Plans and David Heald, Independent Fiduciary for the Enron Plans will take the responsibility for providing Hewitt with the final net amount (after the Hewitt expenses are deducted) to be allocated. Hewitt will also need the corresponding unit position for the value of the allocation (units will be posted on the recordkeeping system) along with the NAV used to value these units.

## Data Elements

The following data elements will be required to complete the Settlement allocation(s).

| Label | Description | Source | Comments |
|-------|-------------|--------|----------|
| A | First Day Value (FDV) | NTRC Recordkeeping system or PGE (microfiche) data. | This is the value (in dollars) of the Claimant's account in the Enron Stock Fund as of the first day of the Settlement Period. |
| B | Investments (INV) | NTRC Recordkeeping system; PGE (microfiche) data, EOG (quarterly statement) data and Hewitt's TBA System. | This is the value (in dollars) of the Claimant's investments (or purchases) in the Enron Stock Fund during the Settlement Period. Each investment will be valued as of the day the recordkeeping system accounted for the purchase. |
| C | Liquidations (LIQ) | NTRC Recordkeeping system; PGE (microfiche) data, EOG (quarterly statement) data and Hewitt's TBA System. | This is the value (in dollars) of the Claimant's liquidations (or sales) in the Enron Stock Fund during the Settlement Period. Each liquidation will be valued as of the day the recordkeeping system accounted for the sale. |
| D | Last Day Value LDV) | NTRC Recordkeeping system; or Hewitt's TBA System. | This is the value (in dollars) of the Claimant's account in the Enron Stock Fund as of the last day of the Settlement Period. |

## Claimant Loss Determination

The approximate loss for each participant will be determined as follows (this is as directed in the settlement agreement):

Loss* = First Day Value (A) + Investments (B) – Liquidations (C) – Last Day Value (D)

Sources and descriptions of each are described in the table above.

\* Participant Loss

Note: During the trial run of the initial allocation in early July, several anomalies were identified that required special treatment within the data set in preparation for the actual allocation calculations.

1. In-Kind, or Share Distributions: Although the Settlement Agreement did not anticipate the impact of participants taking plan withdrawals in shares as opposed to liquidation prior to cash distributions, special consideration must be given to these in-kind distributions. Each of the A, B, C, and D elements in the formula assumed a cash basis. However, this approach skewed losses to appear greater than they actually were when closing balances no longer reflected the value of shares distributed directly to participants. Enron and the Independent fiduciary agreed with

Hewitt's suggestion to identify these events in the data, value the distributions as of the then most current share price at distributions, and treat them as sales when determining participant losses.

2. Beneficiaries of Deceased Participants, Alternate Payees due to QDRO's: Similar to 1. above, the transfer of actual shares into beneficiary's or alternate payee's accounts were reviewed and adjusted as appropriate to ensure that the value of share transfers were captured properly and not treated as losses when this value was not included in the participant's closing balance.

3. Enron Savings Plan NTRC Conversion of Enron Stock Fund to EOG Plan: It was discovered that the closing balances on the NTRC system were approximately 1.5% higher that the opening balances available from the EOG paper statements. Since this discrepancy could not be traced to actual events, Enron instructed Hewitt to ignore both transactions in the allocation calculation versus treating one as a sale and the other as a purchase of slightly different value.

   – Conversion out balances from NTRC will be removed from the total NTRC Purchase amount

   – Conversion in balances from the EOG (quarterly statement) data will be removed from the Transfer amount

   – Participants that do not show a difference of 1.5% (as noted above) will have both NTRC conversion out and EOG conversion in amounts removed.

       a. It will be assumed that these participants had additional transfer activity during the first quarter on the Paine Webber system.

       b. It will also be assumed that the amount converted out of NTRC equals the amount converted in to the EOG plan.

       c. After removing the converted in amount (as assumed in b. above) from the EOG transfer balance (from the first quarter), the remaining amount will be the actual transfer amount for that participant.

   Below is a summary of our approach for the participants that converted balances from NTRC to Paine Webber (EOG). As we pointed out in our meeting last Wednesday, the conversion out balances from the NTRC data do not match the EOG conversion in balances. EOG noted the conversion in amounts as transfers in on their Quarterly Statements. In all cases, the balances showing as transfers in the EOG data differ from the conversion out file numbers provided from NTRC.

   Additional detail (from the summary provided on July 20, 2006)

   As an example:

**Participant 1:**

Shows a conversion out amount of $1,000 (from the NTRC data) and a transfer amount (in the EOG 1st quarter statement data) of $984.47;  A difference of  $15.53.

As was discussed we believe the difference may be a result of their balances being out of the market for a short period of time - before being reinvested/credited at the new trust.

Participants that don't have any other activity in the first quarter at EOG all show a difference in balances of just over 1.5% (from NTRC to EOG).

For participants in this situation we will subtract the conversion out numbers from the total NTRC sales numbers and disregarding the transfer balance from the EOG statements for the first quarter. For Participant 1 (above) we will remove the $1,000 sale amount from the NTRC data and remove the $984.47 transfer amount from the EOG data.   In doing so, we will also remove the difference (that currently shows as a loss of $15.53) for that participant. In short, we are changing the conversion in amounts to equal the conversion out values.

The remaining participants (roughly 90) appear to have other activity in the first quarter. Each of these individuals has a difference in NTRC conversion out and EOG transfer balances of greater than 1.5%.

As an example:

**Participant 2:**

Shows a conversion out amount of $1,000 (from the NTRC data) and a transfer amount (in the EOG 1st quarter statement data) of $125;  A difference of $875 (or 87.5%).

We are assuming that all of these individuals transferred money from the Enron Stock fund in the EOG plan during the first quarter.  Because no new purchases of Enron Stock were allowed in the EOG plan, we know that all of the transfer activity was out of the fund.

We don't have any way (without researching with EOG activity for the first quarter) of separating the exact conversion in amount from the transfer activity for these participants. However, if we assume that the conversion in and out amounts should be the same (as we did above), the difference between the conversion in amount and the transfer amount noted on the 1st quarter statement should be the transfer activity.  For Participant 2 it means that the $875 difference is due to transfer out activity.

Transfers (as shown in the 1st quarter statement data)  = $1,000 (conversion in ) - $875 (transfer out) = $125

For participants that show a difference of greater than 1.5% we will (just as we did with the first group) subtract the conversion out numbers from the total NTRC sales numbers and disregard the transfer balance for that quarter from the EOG statements.  However, we will consider the difference between the conversion out amounts from NTRC and the EOG

*I. Plan Provisions*

transfer balance to be transfer out activity.   Using the numbers for Participant 2 (above) we will show a net sale of $875 for that participant during the first quarter.

**Claimant Allocation Amount**
The allocation amount for each Claimant will be determined using the individual losses calculated above for each Settlement.  Amounts less than $25.00 will be deemed de minimus and not deposited to the Claimant's account:

DC Participant Allocation = Participant Loss (PL)/ Total Plan Loss (TPL) x DC Amount Allocable (DCA)

Where:

    —— **Loss** is the individual Claimant Loss described above
    —— **Total Plan Loss** is the sum of all Claimant Losses
    —— **DC Amount Allocable** is the amount available for the DC portion of the allocation

**Ineligible Employees/Participants**

  The following employees will not be eligible to receive an allocation for either the Enron Settlement:

| | | | |
|---|---|---|---|
| Philip J. Bazelides | Robert Belfer | Keith Crane | Joe H. Foy |
| William J. Gulyassy | Kenneth Harrison | Rod Hayslett | Mary K. Joyce |
| Sheila Knudsen-Armsworth | Tod A. Lindholm | Rebecca P. Mark-Jusbasche | Cindy K. Olson |
| James S. Prentice | Paula Rieker | Estate of David Shields | Loretta Shields |

**De Minimus Allocation Amounts**
Participants who have allocation amounts calculated at less than $25.00 will not have that money deposited in their accounts.  The sum of those amounts less than $25.00 (de minimus amounts) will be totaled and added to the original amount available for allocation.  The losses for participants with de minimus amounts will be removed from the Total Loss amount used in the allocation.  The DC Allocation will then be run a second time removing those participants from the eligible claimant group (including their losses) and allocating the additional amount of the total de minimus amounts to the remaining Claimants.

## Calculation Examples (Enron Settlement)

**Participant A: Total Distribution within the Enron Settlement Period (no losses recorded)**
Stock Fund Opening Balance (1/1/1998): $125,000.00

Stock Fund Activity:

| Date | Contribution(s) | Loans | Loan Pay(s) | Transfer(s) In/Out | Payments |
|------|-----------------|-------|-------------|--------------------|----------|
| 1/2/1998 | $150.00 | | | | |
| 1/9/1998 | $150.00 | | | | |
| 1/16/1998 | $150.00 | | | | |
| 1/23/1998 | $150.00 | $(10,000.00) | | | |
| 1/30/1998 | $150.00 | | | | |
| 2/6/1998 | $150.00 | | | | |
| 2/13/1998 | $150.00 | | | $20,000.00 | |
| 2/20/1998 | $150.00 | | | | |
| 2/27/1998 | $150.00 | | | | |
| 3/6/1998 | $150.00 | | $50.00 | | |
| 3/13/1998 | $150.00 | | $50.00 | | |
| 3/20/1998 | $150.00 | | $50.00 | | |
| 3/27/1998 | $150.00 | | $50.00 | | |
| 4/6/1998 | | | | | $(139,000.00) |

12/2/2001 Closing Balance: $0.00

Loss = $125,000.00 (FDV) + $22,150.00 (INV) − $149,000.00 (LIQ) - $0.00 (LDV) = $(1,850.00)

RESULT: No loss reported.  Participant will not be included in the allocation.

*I. Plan Provisions*

**Participant B:  Total Distribution within the Enron Settlement Period (loss recorded)**
Stock Fund Opening Balance (1/1/1998):  $100,000.00

Stock Fund Contributions (1/1/1998 – 10/31/2001):  $10,000.00

Stock Fund Net Transfers (1/1/1998 – 10/31/2001):  $7,000.00

Stock Fund Loans (1/1/1998 – 10/31/2001):  $5,000.00

Stock Fund Loan Payments (1/1/1998 – 10/31/2001):  $8,500.00

Stock Fund Payments (1/1/1998 – 10/31/2001):  $0.00

| Date | Contribution(s) | Loans | Loan Pay(s) | Transfer(s) In/Out | Payments |
|------|-----------------|-------|-------------|--------------------|----------|
| 11/2/2001 | $100.00 | | $75.00 | | |
| 11/9/2001 | $100.00 | | $75.00 | | |
| 11/16/2001 | $100.00 | | $75.00 | | |
| 11/23/2001 | $100.00 | | $75.00 | ($1,000) | |
| 11/30/2001 | $0.00 | | $0.00 | | |
| 12/2/2001 | $0.00 | | $0.00 | | |

12/2/2001 Closing Balance: $10,500.00

Loss = $100,000.00 (FDV) + $21,200.00 (INV) – $1,000.00 (LIQ) - $10,500.00 (LDV) = $109,700.00

RESULT: Loss of $109,700.00.  Participant will be included in the allocation.   Participant's calculated loss of $109,700.00 represents a portion of the total class settlement loss.

ALLOCATION:

- Assume Total Plan Loss (TPL) of $1,000,000,000.00

- Assume total DC Settlement Amount Allocable (after expenses) of  $90,000,000.00

Participant allocation = $109,700.00 (PL)/$1,000,000,000.00 (TPL) x $90,000,000.00 = $9,873.00

## Allocation Investment Options

### Investment Choices

Participant allocation amounts will be invested in the Wilmington Prime Money Market Account

### Investment Fund/Account Summary

The following chart summarizes the investment funds and accounts for the Settlement Allocation. A "✓" indicates a fund/account combination in which participant monies can be invested.

| Accounts | Wilmington Prime Money Market Account |
|---|---|
| DC Allocation Amount | ✓ |
| DB Allocation Amount | ✓ |

### Accounting Method

- The Wilmington Prime Money Market Account will be valued using unit accounting.

- Net asset values (NAVs) are calculated and provided weekly by Wilmington Trust.

- NAVs in the Wilmington Prime Money Market account will be first calculated on August 1, 2006.

## Vesting
Settlement Allocation balances are always 100 percent vested.

### Direct Rollovers (In)

Claimants may not directly roll over money into the Settlement Account.  No additional money will be contributed to a Claimant's account beyond the amount calculated in the allocation process.

*I. Plan Provisions*

## Settlements/Distributions

### General

- Only total distributions of Claimant accounts will be made.

- All payments will be mailed to the permanent address currently on file.

  —— Payments will not be mailed to an IRA address or to a temporary address.

**Claimants will have their balances paid to them as follows:**

- If the Claimant has an Enron Plan balance converted to a successor plan (either the Enron/Prisma plan, PGE Savings Plan or EOG Resources, Inc. Savings Plan), the balance of their allocation will be converted to the plan in which they currently maintain an account; or

- If the balance in their DC account is less than $200, the Claimant will receive a cash payment. Payment will be made in their name and sent to the address on file; or

- If the balance in their DC account is great than or equal to $200 but less than $500 and the Claimant was not in the Enron/Prisma plan, the PGE Savings Plan or EOG Resources, Inc. Savings Plan the participant may make an election to receive their full account balance in cash or have it rolled to an IRA or qualified plan; or

- If the balance in their DC account is greater than or equal to $500 and the Claimant was not in the Enron/Prisma plan, the PGE Savings Plan or EOG Resources, Inc. Savings Plan the participant may make an election to receive their full account balance in cash or have all or part of their settlement rolled to an IRA or qualified plan. If the Claimant chooses to roll over part of their Settlement amount, the remainder of their Settlement balance will be paid in cash. The minimum amount that can be rolled over is $500.00.

  —— The election period for participants with balances greater than or equal to $200 and not in a successor plan will be from August 7, 2006 to Noon Central Time on September 6, 2006. These elections will be made by form and must be returned by the end of the election period.

  —— Those participants that do not make an election by form by the end of the election period will have their balances rolled to the Wilmington Trust IRA (as selected by Enron).

- Distributions are paid weekly:

  —— Payment request forms will be recorded daily and will processed each Friday.

  —— The payment will be processed that night using the NAV for the Wilmington Prime Money Market Account for that day.

  —— Payment forms must be received by Noon on Thursday to be effective for that Friday's processing.

  —— Payment forms must be complete and accurate for the Claimant's request to be processed.

—— Incomplete or inaccurate forms will be returned to the Claimant to be corrected and resubmitted.

– Incomplete/inaccurate forms must be resubmitted by September 6, 2006 to be processed as requested.

– Incomplete/inaccurate forms received after Noon Central Time on September 6, 2006 will not be processed and the Claimant's balance will be paid to the Wilmington Trust IRA.

## Payment Options
- Claimants (who are eligible) may request payment in cash or elect to roll over all or part of their settlement balances.

- Claimants (if eligible) must request payment of their entire DC settlement balance.

  —— No partial distribution requests will be processed.

- Withholding will be taken at 20% for all Claimants who elect to receive their balances in cash unless ;

  —— The Claimant elects to roll over all of their Settlement Allocation; and

  —— The Claimant has a settlement payment less than $200.

- State withholding will not be calculated or taken for Claimant payments.

- Claimants requesting a rollover of their balances will have balances paid to the rollover institution or qualified plan they designate for the benefit of (FBO) the Claimant.

  —— Partial rollovers will only be allowed for Claimants who have a settlement balance (at the time the settlement is calculated) greater than or equal to $500.

  —— The check will be mailed to the Claimant's permanent address; unless the Claimant notes on their distribution form that the address listed is incorrect.  If the address listed is incorrect, the address the Claimant writes in on the Distribution Election form will be used.

## Deferral
- Claimants may not defer payment of their DC balance beyond the election period.

- Claimants that have incomplete or bad address information on file or are otherwise restricted from receiving payment (e.g., QDRO Claimants) will have balances maintained on the recordkeeping system after the election period ends.

  —— Hewitt will work with Enron to determine how to make payments to those Claimants with bad addresses.

— Hewitt will also work with Enron to determine to make payments to those with QDRO or other hold indicators.

*I. Plan Provisions*

**Spousal Consent**
Spousal consent is not required for settlement payments and will not be collected in any form.

*I. Plan Provisions*

## Beneficiaries
### General
- Beneficiary elections will not be maintained by Hewitt.

- If information is provided that a Claimant with a settlement balance is deceased, Hewitt will work with Enron to determine who should receive the Claimant's balance.

    -- In these instances, a hold will be placed on the Claimant's account and processing of the deceased Claimant's account will be coordinated with Enron.

- Notice of a Claimants death must be provided by the Claimant to Enron.

## Minimum Distributions

Claimants that are age 70.5 or older at the point their distribution processes will be treated as all other Claimants. No additional measures will be taken for these participants.

## Forfeitures
All Claimant balances are 100% vested.  No forfeitures will be processed.

*I. Plan Provisions*

## Data Requirements—Enron Settlement Sources
### General
- Data will be acquired from 5 different sources:

  —— NTRC Recordkeeping system (Non ESOP Sources)
  —— NTRC Recordkeeing system (ESOP Sources)
  —— EOG Resources, Inc. Savings Plan Quarterly Statements
  —— Portland General Holdings Retirement Savings Plan
  —— Hewitt Associates TBA Recordkeeping System

**Data information for each source is listed below:**

| Data Source | Format | Time Period | Contact/Owner |
|---|---|---|---|
| NTRC NON ESOP | Electronic (Excel) | 1/1/1998 – 11/30/2001 | Andrew Ross. Hewitt |
| NTRC ESOP | Electronic (Excel) | 1/1/1998 – 11/30/2001 | Andrew Ross, Hewitt |
| EOG Resources | Paper (Quarterly Statements) | 1/26/2000 – 11/30/2001 | Teresa Kaplan, EOG |
| Portland General | Microfiche (Monthly Statements) | 1/1/1998 – 6/30/1999 | Dale Ritter, PGE |
| Hewitt Associates | Electronic (Excel) | 11/1/2001 – 11/30/2001 | Doug Lyles, Hewitt |

*I. Plan Provisions*

## Data Requirements—Source Data Aggregation (TOTAL)

The data flow of all Enron Settlement Data sources referenced on the prior page is represented below:



Where A represents the opening balance at the beginning of the settlement period

Where B represents value of purchases during the settlement period

Where C represents the value of sales during the settlement period

Where D represents the closing balance at the end of the settlement period

*1. Plan Provisions*

## Data Requirements—Source Data Aggregation (EOG)



- The opening balance (A) from NTRC includes data from the settlement period begin date up through the conversion of EOG participants to Paine Webber

- The Conversion balance to Paine Webber (labeled FMV of shares February 2000) (B) was provided by EOG. We will confirm that the conversion of balances from NTRC do not show a net purchase or sale for this activity. As detailed earlier, we will adjust out the NTRC conversion out balances and the EOG conversion in balances (shown as transfers).

- The Final Settlement balance for EOG (C) was also provided by EOG (labeled FMV of Shares 11/30/2001). This balance will be used as the closing settlement period balance for EOG participants. The participant statement data (paper data) reflects a balance as of December 31, 2001 - which is incorrect.

- The last quarter's activity prior to the end of the settlement (D) was provided by EOG. EOG reported Enron Stock Fund activity from October 1, 2001 to December 2, 2001 only. The participant statement date includes all activity for the quarter ending on December 31, 2001.

*I. Plan Provisions*

# APPENDIX A—Distribution File Layout (Wilmington Trust)

This is the data file layout for distributions sent to Wilmington Trust. Fields marked with a Y in the "Use?" field may be required for the distribution to process successfully.

| Description | Format/Valid Values | Use? |
|---|---|---|
| Account # | Please enter trust account number WITHOUT the "-0" | Y |
| Social Security # (#########) | Please enter social security number WITHHOLD dashes. 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 will NOT accept on our system. | Y |
| Name (Last, First) | USING ALL CAPS, PLEASE USE FORMULA "LAST, FIRST" TO ENTER PARTICIPANT NAME | Y |
| Address 1 | | Y |
| Address 2 | | Y |
| City | | Y |
| State | Enter 2 digit State code | Y |
| Zip | ZIP CODE MUST BE 5 CHARACTERS OR CONTAIN THE 4 DIGIT EXTENSION. IF LEADING NUMBER IS ZERO, COLUMN MUST BE FORMATTED AS TEXT TO RETAIN THE LEADING ZERO. | Y |
| Birthdate (xx/xx/xxxx) | OPTIONAL FIELD, IF ENTERED, MUST BE IN FORMAT mm/dd/yyyy | Y |
| Gross Amount | Gross amount of distribution entered here. No amount may exceed this amount | Y |
| Federal Tax | Amount to be held for federal tax | Y |
| State Tax | Amount to be held for state tax. | N |
| X Kind (Stock) | Market value of shares distributed | N |
| Loan Default | Amount of any loan being repaid. | N |
| Loan Fee Amount | Amount of loan fee | N |
| Net Amount | | Y |
| Employee Contribution. | THERE IS AN INTERNAL SYSTEM EDIT, WHEREBY THE GROSS AMOUNT MUST EQUAL THE EMPLOYEE CONTRIBUTIONS PLUS THE TAXABLE AMOUNT. | N |
| Taxable Income | | Y |
| Distribution Type (S,W,L) [only] | [For the Enron Settlement all values will be coded 'S'] S = Lump Sum Distribution | Y |
| Distribution Code (1,2,7,G,) [ONLY] | | Y |

*1. Plan Provisions*

| Description | Format/Valid Values | Use? |
|---|---|---|
| **Rollover Amount** | Enter amount of distribution that is being rolled over | Y |
| **Rollover Distribution Category (repeated, same as "T")** | This field represents the category of distribution for rollovers. | Y |
| **Rollover Account Number** | If known, enter rollover account number | N |
| **Rollover Institution Name** | [This should match that entered in Section 2. of the Distribution Form] | Y |
| **Rollover FBO Name** | | Y |
| **Address of Where Rollover Check to be Mailed** | [For the Enron Settlement this will be populated with the participants permanent address information] | Y |
| **City of Where Rollover Check to be Mailed** | [For the Enron Settlement this will be populated with the participants permanent address information] | Y |
| **State of Where Rollover Check to be mailed** | [For the Enron Settlement this will be populated with the participants permanent address information]. | Y |
| **Zip Code of Where Rollover Check to be mailed** | [For the Enron Settlement this will be populated with the participants permanent address information] ZIP CODE MUST BE 5 CHARACTERS OR CONTAIN THE 4 DIGIT EXTENSION.  IF LEADING NUMBER IS ZERO, COLUMN MUST BE FORMATTED AS TEXT TO RETAIN THE LEADING ZERO. | Y |
| **Bank Routing #** | 9 digit routing number is entered here.  Leading zeros MUST be present. | N |
| **Bank** | Bank Name - Optional Field | N |
| **Account Number** | Account number | N |
| **Checking or Saving (C or S only)** | C OR S for checking or savings account | N |
| **Must enter D if ACH Payment** | a "D" must be entered in this field to send payment via ACH. | N |
| **Tax Reporting Only - ENTER "X"** | For items where no check or ACH is to be sent, please enter "X" in this field for tax reporting only. | N |

## APPENDIX B—Conversion Out File (Diversified – Enron/Prisma)

The conversion file sent to DIA for Enron/Prisma, Schwab for EOG and internally to the Hewitt PGE team will contain the following data elements:

| Field | Label | Comments |
|-------|-------|----------|
| 1 | Social Security Number | Provide if DIA uses SSN as a unique identifier |
| 2 | First Name | |
| 3 | Last Name | |
| 4 | Settlement Balance | The balance will reflect the value as of the day each file is sent to each successor plan. |

# APPENDIX C—Claimant Cover Letter

SEQ/ID #
Name
Address
City, ST ZIP



June xx, 2006

To Former and Current Employees of Enron:

We are pleased to confirm that, after lengthy negotiations, Enron Corp. ("Enron" or "Company") has reached an agreement to settle *Pamela A. Tittle, et al. v. Enron Corp., et al.* (the "Tittle Action") and *Elaine L. Chao v. Enron Corp., et al.* (the "DOL Action"). As a result, settlement dollars will begin to be distributed to eligible class action participants on Jxxx XX, 2006. Details of how and to whom funds will be distributed are outlined below.

As you may recall, the Tittle Action was a class action lawsuit brought on behalf of former and current employees against Enron and others, and alleged, among other things, certain breaches of fiduciary duty with respect to the Enron Corp. Savings Plan (the "Savings Plan"), the Enron Corp. Employee Stock Ownership Plan (the "ESOP"), and the Enron Corp. Cash Balance Plan (the "Cash Balance Plan"). The DOL Action was a lawsuit that alleged certain breaches of fiduciary duty with respect to the Savings Plan and the ESOP.

The settlement agreement with Enron, which has been approved by the United States Bankruptcy Court for the Southern District of New York and the United States District Court for the Southern District of Texas, provides that Enron make available to the plaintiffs an allowed claim in the Enron bankruptcy to resolve these actions against the Company. There may be additional settlements in the future depending on how other parties named in the actions elect to resolve their interests in the lawsuits. The settlement agreement can be viewed at www.enronerisa.com.

In conjunction with the agreement, and as authorized by the Court, representatives for the plaintiffs in the Tittle and DOL Actions and the Independent Fiduciary elected to sell the Enron bankruptcy claim to Bear Stearns, an investment bank. The sale of such claims is not unusual in cases such as this, and it allows class members to receive their allocations quicker than they would through the normal course of a bankruptcy and without the risk that the claim might lose value. The proceeds of the sale of the Enron claim (and the distributions on the claim before the sale) total $133.9 million. This amount, less payments to class representatives and authorized professional and administrative fees stipulated in the settlement agreement, will be allocated among the eligible class action suit participants.

- **If you are a class action participant who lost value attributable to Enron stock in the Savings Plan,** which includes any and all predecessor and successor plans including the ESOP, the Portland General Holdings, Inc. Retirement Savings Plan (the "PGE Retirement Plan"), the Enron/Prisma Energy Savings Plan (the "Enron/Prisma Plan"), the Portland General Electric Company 401(k) Plan (the "PGE Plan"), and the EOG Resources, Inc. Savings Plan (the "EOG Plan"), during the covered period of January 1, 1998 to December 2, 2001, you are automatically eligible to receive a settlement allocation under the Savings Plan portion of the settlement based on your loss relative to other participants.

  **Your Savings Plan settlement allocation has been calculated at $XXX.00.** The amount of your distribution may vary from this amount due to accrued earnings on the settlement proceeds at the time the distribution is made. The method of distribution for this allocation is outlined in the table below.

- **If you are a Cash Balance Plan participant who had an ESOP offset and did not take a full distribution of your ESOP Retirement account holdings prior to January 1, 2001,** you are eligible for an allocation under the Cash Balance Plan portion of the settlement.

  Settlement allocations for the Cash Balance Plan portion, however, will require additional data and time to calculate. Therefore, those allocations will not be made at this time. We anticipate calculations for the Cash Balance Plan portion of the settlement to be completed in several months and those allocations distributed later this year.

## DISTRIBUTION INFORMATION

| ALLOCATION GROUPS | METHOD OF DISTRIBUTION | NEXT STEPS | CONTACT INFORMATION |
|---|---|---|---|
| Active Enron, Prisma, PGE or EOG employees enrolled in one of the Savings Plan successor plans (e.g. Enron/Prisma Plan, PGE Plan or EOG Plan) | Proceeds automatically transferred directly to current successor plan account | No action required. Proceeds to be automatically transferred on DATE. | Enron/Prisma: www.divinvest.com; 800-332-7979<br><br>PGE: http://resources.hewitt.com/pge; 877-874-5687<br><br>EOG: www.Schwabplan.com; 800-724-7526 |
| Active Enron, Prisma, PGE or EOG employees NOT enrolled in one of the successor plans (see above) | Proceeds deposited to an account created for the employee in the appropriate successor plan | No action required. Proceeds to be automatically transferred on DATE. | |
| Former employees with an account balance in one of the successor plans (see above) | Proceeds automatically transferred directly to current successor plan account | No action required. Proceeds to be automatically transferred on DATE. | |

*Distributions due the above groups will be handled through a direct trust-to-trust transfer i.e. via conversion files passed from the Savings Plan record keeper to the successor plan record keepers. Proceeds will be distributed into accounts based on each recipient's existing investment election. No participant elections will be taken. For active employees not participating in the successor plan or former employees without a current investment election, proceeds will be invested in the successor plan's default funds.*

| | | | |
|---|---|---|---|
| Former employees who have closed out or rolled over their Savings Plan account (e.g. Enron/Prisma Plan, PGE Plan, or EOG Plan) and whose settlement allocation is under $200 | Settlement allocations above $25 but under $200 will be paid via checks mailed directly to the former employee. Federal withholding is not required on distributions under $200. Please see the enclosed "Special Tax Notice Regarding Plan Payments." Allocations of $25 or less are not paid pursuant to the terms of the settlement because the cost of administering them would be unreasonable. | Checks will be mailed on DATE.<br><br>Individuals may independently roll their allocation from this distribution into a retirement account. | N/A |
| Former employees who have closed out or rolled over their Savings Plan account (e.g. Enron/Prisma Plan, PGE Plan, or EOG Plan) and whose settlement allocation is $200 or more | Individuals have 30 days to elect to rollover all or part of their settlement allocation to an existing IRA or to another qualified plan or to elect a direct payment. If no election is received within 30 days, an IRA rollover account will be established with Wilmington Trust Company, which will then be subject to the control of the employee within the rules applicable to that IRA. | Individuals with allocations of $200 or more must elect how they wish to direct the transfer of their allocation by DATE. Election forms are attached. | Wilmington Trust IRA Department: 800-215-4960 |

- *It is especially important to note that any direct payments of settlement allocations are subject to mandatory federal income tax withholding of 20 percent and may also result in an additional 10 percent penalty assessed on your 2006 federal income tax return. State withholding taxes will not be taken. Please refer to the enclosed "Special Tax Notice Regarding Plan Payments" for additional information regarding your election options and the federal tax impact of your election and consult your tax advisor with regard to your specific income tax situation.*
- *Alternate Payees (non-employee participants whose accounts were established as a result of a divorce action) are not subject to the additional 10 percent penalty referenced above.*
- *Non-spouse beneficiaries are not eligible to elect a rollover of their allocation.*

*1. Plan Provisions*

We have attached a brief Question & Answer document to address remaining questions you may have about the settlement and allocation process.  If you have additional questions about the distribution process, a Hewitt Service Center has been set up to handle your questions regarding the completion of the "Participant Distribution Election" forms, verification of receipt of your election form and the status of your distribution.  The domestic toll-free number is 1-866-745-4522.  International participants may call 1-281-882-7503.

Hewitt Service Center representatives are not qualified to answer questions about the settlement agreement. If you have questions about that issue, please contact the plaintiffs' attorneys toll free at 1-866-560-4043.

Regards,


Enron Corp. Benefits Department

*1. Plan Provisions*

## APPENDIX D—Claimant Settlement Questions and Answers

### Tittle/DOL Settlement Allocation
### Questions and Answers

**1. Q. With various ongoing Enron-related lawsuits, which are the Tittle/DOL Actions?**

A. *Pamela A. Tittle, et al. v. Enron Corp., et al.* (the "Tittle Action") is a class action lawsuit brought on behalf of former and current employees against Enron, a number of Enron's officers and employees (including Ken Lay and Jeff Skilling), The Northern Trust Company and Arthur Andersen LLP. The Tittle Action alleged, among other things, certain breaches of fiduciary duty with respect to the Enron Corp. Savings Plan (the "Savings Plan"), the Enron Corp. Employee Stock Ownership Plan (the "ESOP"), and the Enron Corp. Cash Balance Plan (the "Cash Balance Plan") including claims regarding the continued availability of Enron Corp. stock as an investment under the Savings Plan and ESOP. You can learn more about the Tittle Action at www.enronerisa.com.

*Elaine L. Chao v. Enron Corp., et al.* (the "DOL Action") is a lawsuit that alleged, among other things, certain breaches of fiduciary duty with respect to the Savings Plan and ESOP. The DOL Action does not involve the Cash Balance Plan. For more about the DOL action, see http://www.dol.gov/_sec/media/announcements/enron.htm

Both the Tittle Action and the DOL Action were consolidated in the U.S. District Court for the Southern District of Texas, Houston Division (the "District Court"), before Judge Melinda Harmon.

**2. Q. What are the terms of the settlement agreement?**

A. The settlement allowed a claim in Enron's bankruptcy proceedings in the amount of $356.25 million. The terms of the settlement agreement are detailed in the "Notice of Proposed Partial Class Action Settlement" document released to class members on August 5, 2005 by Keller Rohrback and Hagens Berman Sobol Shapiro, lead counsel to the plaintiffs. The notice is available at the Keller Rohrback website for this matter, www.enronerisa.com, the Hagens Berman website for this matter, www.hbsslaw.com/enron lawsuit, or you may call toll free 1-866-560-4043 for more information.

**3. Q. Has this settlement been approved by all the appropriate parties?**

A. Yes. The settlement has been agreed to by the plaintiff's attorneys in the Tittle Action as well as the Department of Labor and the Independent Fiduciary to the Plans and approved by the United States Bankruptcy Court and the District Court.

**4. Q. If the Tittle/DOL actions were settled for $356.25 million dollars, why was the settlement claim sold to Bear Stearns for $133.9 million?**

A. In a bankruptcy, any settlement amount to be paid by a debtor is paid based on the amount of creditor recovery. The recovery rate on this claim is estimated to be 17.4%, although the recovery rate may be higher or lower. As the determination of such recovery can take years and the ultimate amount claimants will be paid by the bankruptcy estate is uncertain, many claimants will sell their claims to receive a fixed amount more quickly. Therefore, the sale of settlement claims is a rather standard practice. In our case, the DOL and lead counsel for the plaintiffs and the Independent Fiduciary for the Plans agreed to explore whether the settlement claim should be sold at a reasonable price, went through considerable due diligence concerning a fair price, and the District Court ultimately approved its sale to Bear Stearns. Large financial institutions, such as Bear Stearns, have the financial ability to purchase claims for Amounts that they believe are less than they may eventually be paid through the bankruptcy. There is no assurance that Bear Stearns will collect more than it paid to purchase the claim.

**5. Q. Who is eligible to receive proceeds from the settlement?**

A. Class action participants who lost value attributable to Enron stock in the Savings Plan, which includes any and all predecessor and successor plans (including the ESOP, the Portland General Holdings, Inc. Retirement Savings Plan (the "PGE Retirement Plan"), the Enron/Prisma Energy Savings Plan (the "Enron/Prisma Plan"), the Portland General ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plan"), and the EOG Resources, Inc. Savings Plan (the "EOG

Plan"), during the period of January 1, 1998 to December 2, 2001, are automatically eligible to receive proceeds from the settlement. Recipients also include the Alternate Payees, Surviving Spouses or non-spousal beneficiaries of Savings Plan participants.

In addition, Cash Balance Plan participants who had an ESOP offset and did not take a full distribution of their ESOP Retirement account holdings prior to January 1, 2001 are also eligible to receive proceeds from the settlement.

**6. Q. What is the significance of the covered period, January 1, 1998 through December 2, 2001?**

A. The period of the settlement was defined by the class action lawsuit and generally, participants in the Enron Plans (including the Savings Plan, the ESOP and the Cash Balance Plan) during the period January 1, 1998 through December 2, 2001, are members of the settlement class to which this allocation relates.

**7. Q. How were settlement allocations calculated?**

A. Specifically, your settlement allocation, as approved by the District Court, was determined by comparing your loss to the total plan loss of all members of the settlement class. In general terms, your loss was calculated by taking the dollar value of Enron stock in your account on January 1, 1998; adding the dollar value of Enron stock purchased in your account between January 1, 1998 and December 1, 2001; subtracting the dollar value of Enron stock sold between January 1, 1998 and December 1, 2001; and subtracting the dollar value of Enron stock remaining in your account, if any, on December 2, 2001. Then, your loss was aggregated with the loss of each member of the settlement class to determine the total loss for the period January 1, 1998 through December 2, 2001. Your loss was then converted to a percentage of the total plan loss. Your settlement allocation is the same percentage of the settlement fund as your percentage loss relative to the total loss of all members of the settlement class.

For reference purposes, the January 1, 1998 Enron stock price is based on the December 31, 1997 closing price of $41.56 per share because the stock market was closed on January 1, 1998. The December 2, 2001 Enron stock price is based on the November 30, 2001 closing price of $.26 per share because the stock market was closed on Sunday, December 2, 2001. It is important to remember that the calculation of your loss considers not only the January 1, 1998 and December 2, 2001 value of your Enron stock holdings, but also includes the total value of your Enron stock purchase and sale transactions during this period relative to the total plan loss.

**8. Q. How will the settlement allocations be distributed?**

A. Methods of distribution vary depending on the allocation group of which you are a member. Generally, those allocation groups are based on whether you continue to maintain an active account in the Plans or, if not, are based on the amount of the cash distribution to which you are entitled. Thus, depending on your allocation group, your settlement allocation will be distributed 1.) by an automatic transfer to a successor plan (the Enron/Prisma Plan, the PGE Plan or the EOG Plan account); 2.) via direct payment, less required tax withholding of 20 percent if applicable; or 3.) through a direct rollover of all or a portion of the funds to an elected independent IRA account, an eligible employer qualified plan account or to the default IRA account at Wilmington Trust. The Distribution Information table included in the enclosed letter outlines in detail the method for distribution for each allocation group. Please refer to that table to determine your allocation group and method of distribution.

**9. Q. When can I expect my allocation?**

A. Because the method of distribution is different for each allocation group, the timing of distribution varies as well. Please refer to the Distribution Information table included in the enclosed letter for details related to the timing of your distribution.

**10. Q. If my allocation proceeds are transferred directly to a successor plan or the Wilmington Trust IRA, where will they be invested?**

A.  If you are currently enrolled in one of the successor plans, your allocation will be invested according to your investment allocation.  If you do not have an investment allocation on file, the allocation will be deposited into the successor plan's default fund.  For the Enron/Prisma Plan, the default fund is the Stable Pooled Fund; for the PGE Plan, the default fund is the Fidelity Freedom 2010 fund; for the EOG Plan, the default fund is Charles Schwab Stable Value Fund.  If your allocation is transferred to the Wilmington Trust IRA, it will be invested in the Wilmington Prime Money Market Fund, a fund selected to comply with the Department of Labor safe harbor rules to preserve principal and provide a reasonable rate of return.

**11.  Q. What are the tax implications of receiving a cash distribution?**

A. It is important to note that, if applicable, 20 percent of your cash distribution will be withheld for tax purposes. If you prefer, you may roll over all or a part of your distribution to another eligible employer-sponsored plan or to an individual retirement account if you are eligible to do so.  A partial rollover must be in an amount of at least $500.    You may wish to consult a tax advisor to fully understand the potential tax implications associated with this distribution.

**12.  Q. Does my settlement allocation qualify to be rolled over?**

A. Generally, unless you are a non-spouse beneficiary, you may roll over your entire allocation as it constitutes an eligible rollover distribution. If your allocation is $200 or more, you may elect to rollover all or a part of the allocation in a direct trust to trust transfer to an employer-sponsored plan or to an IRA.  A partial rollover must be in an amount of at least $500.  If you choose an employer-sponsored plan, check with the plan administrator to ensure that the receiving plan accepts this type of rollover.

**13.  Q. If I am over age 70 ½, how much of my distribution may I roll over?**

A. Because you did not have an account balance in this Plan on December 31, 2005, there are no required minimum distributions for this settlement allocation.  Consequently, if your allocation is $200 or more, you may elect to rollover all or a part of the allocation in a direct trust to trust transfer to an employer-sponsored plan or to an IRA.  A partial rollover must in an amount of at least $500.  If you choose an employer-sponsored plan, check with the plan administrator to ensure that the receiving plan accepts this type of rollover.

**14.  Q. I was never an Enron employee – my account was established due to a divorce action or I am the beneficiary of a deceased participant.  How will my allocation be distributed?**

A. Your account will be handled in the same manner as those of former employees.  Please refer to the Distribution Information table included with this communication.

**15.  Q. What happens if I do not return the participant distribution election by the required deadline?**

A. If we do not receive your election form by the required deadline, your settlement allocation will automatically be transferred to an IRA rollover account set up on your behalf with Wilmington Trust.

**16.  Q. Can I make a change to my distribution election after it has been submitted for processing?**

A. You will not be able to change your distribution election once your election form has been submitted for processing.  Accordingly, please be sure that your election form accurately reflects your distribution decision before returning it for processing.

**17.  Q. If my settlement allocation is transferred to Wilmington Trust, how can I access my account?**

A. Contact Wilmington Trust at 800-215-4960 for information about or access to your transferred account.

**18.  Q. Why are Cash Balance Plan allocations not being distributed right away?**

A. The settlement allocation for the Cash Balance Plan requires that additional information be collected to determine all eligible beneficiaries.  We are in the process of compiling that data now, but it is a time intensive endeavor and additional work is needed before we will be ready to calculate allocation settlements and distribute those allocations.

**19.  Q. Where can I go for more information?**

A.  A Hewitt Service Center has been set up to handle your questions about the distribution process and the plans/funds to which your allocation is being transferred.  Additionally, representatives can provide assistance regarding the completion of the "Participant Distribution Election" form, verification of receipt of your election form and the status of your distribution.  You may contact service center representatives Monday through Friday from 8:00 AM to 4:30 pm Central Standard Time.  The domestic toll free number is 1-866-745-4522.  International participants may call 1-281-882-7503.

Hewitt Service Center representatives are not qualified to answer questions about the settlement agreement.  If you have additional questions about that issue, please contact the plaintiffs' attorneys toll free at 1-866-560-4043.

*1. Plan Provisions*

## APPENDIX E—Special Tax Notice

*I. Plan Provisions*

# SPECIAL TAX NOTICE REGARDING PLAN PAYMENTS

This notice explains how you can continue to defer federal income tax on your retirement savings in the Enron Corp. Savings Plan (the "Plan") and contains important information you will need before you decide how to receive your Plan benefits.

This notice is provided to you by Enron Corp. Savings Plan Administrative Committee (your "Plan Administrator") because all or part of the payment that you will soon receive from the Plan may be eligible for rollover by you or your Plan Administrator to a traditional IRA or an eligible employer plan. A rollover is a payment by you or the Plan Administrator of all or part of your benefit to another plan or IRA that allows you to postpone taxation of that benefit until it is paid to you. Your payment cannot be rolled over to a Roth IRA, a SIMPLE IRA, or a Coverdell Education Savings Account (formerly known as an education IRA). An "eligible employer plan" includes a plan qualified under section 401(a) of the Internal Revenue Code, including a 401(k) plan, profit-sharing plan, defined benefit plan, stock bonus plan, and money purchase plan; a section 403(a) annuity plan; a section 403(b) tax-sheltered annuity; and an eligible section 457(b) plan maintained by a governmental employer (governmental 457 plan).

An eligible employer plan is not legally required to accept a rollover. Before you decide to roll over your payment to another employer plan, you should find out whether the plan accepts rollovers and, if so, the types of distributions it accepts as a rollover. You should also find out about any documents that are required to be completed before the receiving plan will accept a rollover. Even if a plan accepts rollovers, it might not accept rollovers of certain types of distributions. If an employer plan accepts your rollover, the plan may restrict subsequent distributions of the rollover amount or may require your spouse's consent for any subsequent distribution. A subsequent distribution from the plan that accepts your rollover may also be subject to different tax treatment than distributions from this Plan. Check with the administrator of the plan that is to receive your rollover prior to making the rollover.

If you have additional questions after reading this notice, you can contact your Plan Administrator at Enron Corp. Savings Plan, P. O. Box 1188, Houston, TX 77251-1188, 1-866-745-4522.

## SUMMARY

There are two ways you may be able to receive a Plan payment that is eligible for rollover:

1.  Certain payments can be made directly to a traditional IRA that you establish or to an eligible employer plan that will accept it and hold it for your benefit ("DIRECT ROLLOVER"); or
2.  The payment can be PAID TO YOU.

### *If you choose a DIRECT ROLLOVER:*

*   Your payment will not be taxed in the current year and no income tax will be withheld.
*   You choose whether your payment will be made directly to your traditional IRA or to an eligible employer plan that accepts your rollover. Your payment cannot be rolled over to a Roth IRA, a SIMPLE IRA, or a Coverdell Education Savings Account because these are not traditional IRAs.
*   The taxable portion of your payment will be taxed later when you take it out of the traditional IRA or the eligible employer plan. Depending on the type of plan, the later distribution may be subject to different tax treatment than it would be if you received a taxable distribution from this Plan.

### *If you choose to have a Plan payment that is eligible for rollover PAID TO YOU:*

*   You will receive only 80% of the taxable amount of the payment, because the Plan Administrator is required to withhold 20% of that amount and send it to the IRS as income tax withholding to be credited against your taxes.
*   The taxable amount of your payment will be taxed in the current year unless you roll it over. Under limited circumstances, you may be able to use special tax rules that could reduce the tax you owe. However, if you receive the payment before age 59 1/2, you may have to pay an additional 10% tax.
*   You can roll over all or part of the payment by paying it to your traditional IRA or to an eligible employer plan that accepts your rollover within 60 days after you receive the payment. The amount rolled over will not be taxed until you take it out of the traditional IRA or the eligible employer plan.
    —— If you want to roll over 100% of the payment to a traditional IRA or an eligible employer plan, you must find other money to replace the 20% of the taxable portion that was withheld. If you roll over only the 80% that you received, you will be taxed on the 20% that was withheld and that is not rolled over.

**Your Right to Waive the 30-Day Notice Period.** Generally, neither a direct rollover nor a payment can be made from the Plan until at least 30 days after your receipt of this notice. Thus, after receiving this notice, you have at least 30 days to consider whether or not to have your distribution directly rolled over. If you do not wish to wait until this 30-day notice period ends before your election is processed, you may waive the notice period by making an affirmative election indicating whether or not you wish to make a direct rollover. Your distribution will then be processed in accordance with your election as soon as practical after it is received by the Plan Administrator.

**MORE INFORMATION**
I.   PAYMENTS THAT CAN AND CANNOT BE ROLLED OVER – See Page 2
II.  DIRECT ROLLOVER – See Page 2
III. PAYMENT PAID TO YOU – See Page 2
IV.  SURVIVING SPOUSES, ALTERNATE PAYEES, AND OTHER BENEFICIARIES - See Page 3

## I. PAYMENTS THAT CAN AND CANNOT BE ROLLED OVER

Payments from the Plan may be "eligible rollover distributions." This means that they can be rolled over to a traditional IRA or to an eligible employer plan that accepts rollovers. Payments from a plan cannot be rolled over to a Roth IRA, a SIMPLE IRA, or a Coverdell Education Savings Account. Your Plan Administrator should be able to tell you what portion of your payment is an eligible rollover distribution.

The following types of payments cannot be rolled over:
Required Minimum Payments. Beginning when you reach age 70 1/2 or retire, whichever is later, a certain portion of your payment cannot be rolled over because it is a "required minimum payment" that must be paid to you. Special rules apply if you own more than 5% of your employer.

The Plan Administrator of this Plan should be able to tell you if your payment includes amounts which cannot be rolled over.

## II. DIRECT ROLLOVER

A DIRECT ROLLOVER is a direct payment of the amount of your Plan benefits to a traditional IRA or an eligible employer plan that will accept it. You can choose a DIRECT ROLLOVER of all or any portion of your payment that is an eligible rollover distribution, as described in Part I above. You are not taxed on any taxable portion of your payment for which you choose a DIRECT ROLLOVER until you later take it out of the traditional IRA or eligible employer plan. In addition, no income tax withholding is required for any taxable portion of your Plan benefits for which you choose a DIRECT ROLLOVER. This Plan does not let you choose a DIRECT ROLLOVER if your distributions for the year are less than $200.

DIRECT ROLLOVER to a Traditional IRA. You can open a traditional IRA to receive the direct rollover. If you choose to have your payment made directly to a traditional IRA, contact an IRA sponsor (usually a financial institution) to find out how to have your payment made in a direct rollover to a traditional IRA at that institution. If you are unsure of how to invest your money, you can temporarily establish a traditional IRA to receive the payment. However, in choosing a traditional IRA, you may wish to make sure that the traditional IRA you choose will allow you to move all or a part of your payment to another traditional IRA at a later date, without penalties or other limitations. See IRS Publication 590, Individual Retirement Arrangements, for more information on traditional IRAs (including limits on how often you can roll over between IRAs).

DIRECT ROLLOVER to a Plan. If you are employed by a new employer that has an eligible employer plan, and you want a direct rollover to that plan, ask the plan administrator of that plan whether it will accept your rollover. An eligible employer plan is not legally required to accept a rollover. Even if your new employer's plan does not accept a rollover, you can choose a DIRECT ROLLOVER to a traditional IRA. If the employer plan accepts your rollover, the plan may provide restrictions on the circumstances under which you may later receive a distribution of the rollover amount or may require spousal consent to any subsequent distribution. Check with the administrator of that plan before making your decision.

Change in Tax Treatment Resulting from a DIRECT ROLLOVER. The tax treatment of any payment from the eligible employer plan or traditional IRA receiving your DIRECT ROLLOVER might be different than if you received your benefit in a taxable distribution directly from the Plan. For example, if you were born before January 1, 1936, you might be entitled to ten-year averaging or capital gain treatment, as explained below. However, if you have your benefit rolled over to a section 403(b) tax-sheltered annuity, a governmental 457 plan, or a traditional IRA in a DIRECT ROLLOVER, your benefit will no longer be

*I. Plan Provisions*

eligible for that special treatment. See the sections below entitled "Additional 10% Tax if You Are under Age 59 1/2" and "Special Tax Treatment if You Were Born before January 1, 1936."

## III. PAYMENT PAID TO YOU

If your payment can be rolled over (see Part I above) and the payment is made to you in cash, it is subject to 20% federal income tax withholding on the taxable portion (state tax withholding may also apply). The payment is taxed in the year you receive it unless you roll it over within 60 days to a traditional IRA or an eligible employer plan that accepts rollovers. If you do not roll it over, special tax rules may apply.

### Income Tax Withholding

**Mandatory Withholding** -- If any portion of your payment can be rolled over under Part I above and you do not elect to make a DIRECT ROLLOVER, the Plan is required by law to withhold 20% of the taxable amount. This amount is sent to the IRS as federal income tax withholding. For example, if you can roll over a taxable payment of $10,000, only $8,000 will be paid to you because the Plan must withhold $2,000 as income tax. However, when you prepare your income tax return for the year, unless you make a rollover within 60 days (see "Sixty-Day Rollover Option" below), you must report the full $10,000 as a taxable payment from the Plan. You must report the $2,000 as tax withheld, and it will be credited against any income tax you owe for the year. There will be no income tax withholding if your payments for the year are less than $200.

**Voluntary Withholding for Participants age 70½ or older as of December 31, 2005** -- If any portion of your payment is taxable but cannot be rolled over under Part I above, the mandatory withholding rules described above do not apply. In this case, you may elect not to have withholding apply to that portion. If you do nothing, an amount will be taken out of this portion of your payment for federal income tax withholding. To elect out of withholding, complete and return the enclosed election form.

**Sixty-Day Rollover Option** -- If you receive a payment that can be rolled over under Part I above, you can still decide to roll over all or part of it to a traditional IRA or to an eligible employer plan that accepts rollovers. If you decide to roll over, you must contribute the amount of the payment you received to a traditional IRA or eligible employer plan within 60 days after you receive the payment. The portion of your payment that is rolled over will not be taxed until you take it out of the traditional IRA or the eligible employer plan.

You can roll over up to 100% of your payment that can be rolled over under Part I above, including an amount equal to the 20% of the taxable portion that was withheld. If you choose to roll over 100%, you must find other money within the 60-day period to contribute to the traditional IRA or the eligible employer plan, to replace the 20% that was withheld. On the other hand, if you roll over only the 80% of the taxable portion that you received, you will be taxed on the 20% that was withheld.

Example: The taxable portion of your payment that can be rolled over under Part I above is $10,000, and you choose to have it paid to you. You will receive $8,000, and $2,000 will be sent to the IRS as income tax withholding. Within 60 days after receiving the $8,000, you may roll over the entire $10,000 to a traditional IRA or an eligible employer plan. To do this, you roll over the $8,000 you received from the Plan, and you will have to find $2,000 from other sources (your savings, a loan, etc.). In this case, the entire $10,000 is not taxed until you take it out of the traditional IRA or an eligible employer plan. If you roll over the entire $10,000, when you file your income tax return you may get a refund of part or all of the $2,000 withheld.

If, on the other hand, you roll over only $8,000, the $2,000 you did not roll over is taxed in the year it was withheld. When you file your income tax return, you may get a refund of part of the $2,000 withheld. (However, any refund is likely to be larger if you roll over the entire $10,000.)

**Additional 10% Tax If You Are under Age 59 1/2** -- If you receive a payment before you reach age 59 1/2 and you do not roll it over, then, in addition to the regular income tax, you may have to pay an extra tax equal to 10% of the taxable portion of the payment. The additional 10% tax generally does not apply to (1) payments that are paid after you separate from service with your employer during or after the year you reach age 55, (2) payments that are paid because you retire due to disability, (3) payments that are paid as equal (or almost equal) payments over your life or life expectancy (or your and your beneficiary's lives or life expectancies), (4) dividends paid with respect to stock by an employee stock ownership plan (ESOP) as described in Code section 404(k), (5) payments that are paid directly to the government to satisfy a federal tax levy, (6) payments that are paid to an alternate payee under a qualified domestic relations order, or (7) payments that do not exceed the amount of your deductible medical expenses. See IRS Form 5329 for more information on the additional 10% tax.

*I. Plan Provisions*

**Special Tax Treatment If You Were Born before January 1, 1936** – If you receive a payment from a plan qualified under section 401(a) or a section 403(a) annuity plan that can be rolled over under Part I and you do not roll it over to a traditional IRA or an eligible employer plan, the payment will be taxed in the year you receive it. However, if the payment qualifies as a "lump sum distribution," it may be eligible for special tax treatment. A lump sum distribution is a payment, within one year, of your entire balance under the Plan (and certain other similar plans of the employer) that is payable to you after you have reached age 59 1/2 or because you have separated from service with your employer (or, in the case of a self-employed individual, after you have reached age 59 1/2 or have become disabled). For a payment to be treated as a lump sum distribution, you must have been a participant in the plan for at least five years before the year in which you received the distribution. The special tax treatment for lump sum distributions that may be available to you is described below.

**Ten-Year Averaging** – If you receive a lump sum distribution and you were born before January 1, 1936, you can make a one-time election to figure the tax on the payment by using "10-year averaging" (using 1986 tax rates). Ten-year averaging often reduces the tax you owe.

**Capital Gain Treatment** – If you receive a lump sum distribution and you were born before January 1, 1936, and you were a participant in the Plan before 1974, you may elect to have the part of your payment that is attributable to your pre-1974 participation in the Plan taxed as long-term capital gain at a rate of 20%.

There are other limits on the special tax treatment for lump sum distributions. For example, you can generally elect this special tax treatment only once in your lifetime, and the election applies to all lump sum distributions that you receive in that same year. You may not elect this special tax treatment if you rolled amounts into this Plan from a 403(b) tax-sheltered annuity contract, a governmental 457 plan, or from an IRA not originally attributable to a qualified employer plan. If you have previously rolled over a distribution from this Plan (or certain other similar plans of the employer), you cannot use this special averaging treatment for later payments from the Plan. If you roll over your payment to a traditional IRA, governmental 457 plan, or 403(b) tax-sheltered annuity, you will not be able to use special tax treatment for later payments from that IRA, plan, or annuity. Also, if you roll over only a portion of your payment to a traditional IRA, governmental 457 plan, or 403(b) tax-sheltered annuity, this special tax treatment is not available for the rest of the payment. See IRS Form 4972 for additional information on lump sum distributions and how you elect the special tax treatment.

*J. Plan Provisions*

## IV. SURVIVING SPOUSES, ALTERNATE PAYEES, AND OTHER BENEFICIARIES

In general, the rules summarized above that apply to payments to employees also apply to payments to surviving spouses of employees and to spouses or former spouses who are "alternate payees." You are an alternate payee if your interest in the Plan results from a "qualified domestic relations order," which is an order issued by a court, usually in connection with a divorce or legal separation.

If you are a surviving spouse or an alternate payee, you may choose to have a payment that can be rolled over, as described in Part I above, paid in a DIRECT ROLLOVER to a traditional IRA or to an eligible employer plan or paid to you. If you have the payment paid to you, you can keep it or roll it over yourself to a traditional IRA or to an eligible employer plan. Thus, you have the same choices as the employee.

If you are a beneficiary other than a surviving spouse or an alternate payee, you cannot choose a direct rollover, and you cannot roll over the payment yourself.

If you are a surviving spouse, an alternate payee, or another beneficiary, your payment is generally not subject to the additional 10% tax described in Part III above, even if you are younger than age 59 1/2.

If you are a surviving spouse, an alternate payee, or another beneficiary, you may be able to use the special tax treatment for lump sum distributions, as described in Part III. If you receive a payment because of the employee's death, you may be able to treat the payment as a lump sum distribution if the employee met the appropriate age requirements, whether or not the employee had 5 years of participation in the Plan.

### HOW TO OBTAIN ADDITIONAL INFORMATION

This notice summarizes only the federal (not state or local) tax rules that might apply to your payment. The rules described above are complex and contain many conditions and exceptions that are not included in this notice. Therefore, you may want to consult with the Plan Administrator or a professional tax advisor before you take a payment of your benefits from your Plan. Also, you can find more specific information on the tax treatment of payments from qualified employer plans in IRS Publication 575, Pension and Annuity Income, and IRS Publication 590, Individual Retirement Arrangements. These publications are available from your local IRS office, on the IRS's Internet Web Site at www.irs.gov, or by calling 1-800-TAX-FORMS.

**APPENDIX F—Claimant Distribution Form**

Page 1 of 2

## PARTICIPANT DISTRIBUTION ELECTION
### Tittle and DOL Settlement Allocation
Relative to the Enron Corp. Savings and Employee Stock Ownership Plans

To the Plan Administrator of the <u>Enron Corp. Savings Plan</u> (the "Savings Plan")

Re:    Hewitt to preprint participant name
       Hewitt to preprint participant street address
       Hewitt to preprint participant city, state and zip code

**Settlement Allocation Amount: $XXXXXX**

**Distribution Election Deadline: XXXXXXXXXXXXX, 2006**

**If your address has changed from that which is printed above, please check this box ☐ and provide your updated address on the reverse side of this form.**

I have reviewed the tax information provided in the "Special Tax Notice Regarding Plan Payments" and understand the impact of my election. I have also been notified to discuss the tax implications of my election with my personal tax advisor.

**1. Election.** After reading the "Special Tax Notice Regarding Plan Payments," I, the undersigned Participant, make the following distribution election: (*Circle (a), (b), or (c).*)

☐    (a)    A direct rollover of my entire settlement allocation to the IRA or eligible employer plan designated below in Section 2.

☐    (b)    A direct rollover of the following portion of my settlement allocation to the IRA or eligible employer plan designated below in Section 2: $_____ (not less than $500). Issue a direct payment to me at the address noted above for the balance in a lump sum, less 20% mandatory federal income tax withholding.

         *[Note: If your settlement allocation is less than $500, you cannot elect (b)].*

☐    (c)    A lump sum payment of my entire settlement allocation, less 20% mandatory federal income tax withholding.

**2. Information for Direct Rollover.** [*Do not complete unless you checked Section 1 (a) or Section 1 (b)*] Please designate whether your Direct Rollover is to ☐ a traditional IRA, or ☐ an eligible employer plan.

         I represent that the IRA or plan designated below is a proper recipient plan for a direct rollover.

         Check should be made payable to:

         _____

**I understand that the distribution rollover check will be made payable to the designated financial institution but mailed to me at the address indicated above.**

**I understand that I must forward the distribution check to my designated financial institution in order for the rollover to be completed.**

**3. Waiver of minimum notice period.** I consent to an immediate distribution ... .... ......... ..........  ..... affirmatively waive any unexpired portion of the minimum 30-day notice period during which I may consent to a distribution from the Savings Plan.

**4. Execution.** Dated this _____ day of _____, 200_____.

_____          _____
Participant's Signature                                      Daytime Telephone Number

_____
Last 4 Digits of Your Social Security Number

**Once you have completed and signed this election form, please submit it using the enclosed return envelope.**

*Note: If you complete and return this form before the distribution election deadline noted on the prior page, your distribution will be processed according to your election. If you have not completed and returned this form by the distribution election deadline, the Savings Plan will transfer your settlement allocation directly into an IRA Rollover Account with Wilmington Trust on your behalf. You will have full access to your settlement allocation once that transfer is completed by contacting Wilmington Trust directly at 1-800-215-4960.*

IMPORTANT NOTICE:

**If your address has changed from that which is noted on the prior page, *please print or type* your new address in the space below:**

_____

_____

**Your new address will replace that which is printed on the prior page and your new address will be used for purposes of this Settlement Allocation.**

**In order to insure that you receive future communications from Enron, you must also update your address with Enron by one of the following methods:**

- Log on to www.enron.com. Click on the "For Current and Former Employees" and update your address directly via the "Benefit Address Changes" link.

- Email your updated address information to hrsystems@enron.com, providing your full name, current address, Enron employer, and one of the following identifying items: Month/Year of birth; Employment Dates; last 4 digits of your Social Security Number.

- Call 713-853-4777 and speak with a representative to update your address.

**APPENDIX G—Contact List**

## APPENDIX H—Hewitt Expense Estimate

| Role or Service Description | Key Consultants | Fee Basis | Estimated Hours or Minutes | Average Billing Rate | Estimated Project Fee | Fees thru June | Hours thru June |
|---|---|---|---|---|---|---|---|
| Leadership and Oversight | Dunlap | Hourly Rate | 140 | $400 | $56,000 | $36,800 | 92 |
| Project Management | Folkert | Hourly Rate | 160 | $306 | 48,960 | 36,720 | 120 |
| Requirements, Data Review & Consolidation, Programming, Quality Assurance, CS Hotline Setup | Folkert, Lyles, Ross, McKnight, Wollenberg, Schneider, Sider | Hourly Rate | 825 | $254 | 209,600 | 182,926 | 725 |
| Customer Service On-Line Support & Forms Tool Development | Hemandez, Jadid | Hourly Rate | 72 | $212 | 15,270 | 11,670 | 59 |
| Non-electronic Data Acquisition and Conversion to Electronic Format* | Data Disposition Services | Product Fees, Outside Supplier | NA | NA | 110,000 | 100,365 | NA |
| Customer Service Hotline Staffing (9 CSAs for 6 weeks + 1 week in training, CS Management) | Siders, Wollenberg, CSAs | Hourly Rate | 2,758 | $128 | 332,860 | 0 | 0 |
| Call Minutes | NA | $0.38 per minute toll-free usage rate | 54,450 | NA | 20,691 | 0 | 0 |
| Non-English Translation Services | NA | $1.19 per minute | 1,633 | NA | 1,943 | 0 | 0 |
| Communications Printing and Assembly | Fulfillment Services | Outside Supplier | NA | NA | 21,000 | 0 | 0 |
| Postage (21,000 @ $0.87) | US Mail | Outside Supplier | NA | NA | 18,270 | 0 | 0 |
| Data Entry of Returned Election Forms (15,000 forms) | various | Hourly Rate | 1,250 | $60 | 75,000 | 0 | 0 |
| Custom Process and Audit to Keep Original Forms and Forward to Enron | various | Hourly Rate | 85 | $72 | 6,120 | 0 | 0 |
| Plan-to-Plan Transfers and Payments Administration | Lyles, Schneider | Hourly Rate | 190 | $213 | 40,440 | 0 | 0 |
| Admin Assistance, Miscellaneous Project Consulting and Support | various | Hourly Rate | 150 | $180 | 27,000 | 15,954 | 79.5 |
| Total Estimated Fees | | | | | $983,154 | | |
| Fees Accumulated through June 2006 | | | | | $384,435 | | |

| Role or Service Description | Key Consultants | Fee Basis | Estimated Hours or Minutes | Average Billing Rate | Estimated Project Fee | Fees thru June | Hours thru June |
|---|---|---|---|---|---|---|---|
| Estimated Fees Remaining | | | | | $598,719 | | |

* Data Disposition Services Supplier Detail:

| | | |
|---|---|---|
| Data Exchange Center Inc. | $94,833.64 | Conversion of PGE data from DVD |
| Data Exchange Center Inc. | 3,120.04 | Conversion of EOG data from binders |
| Lason Inc. | 2,411.69 | Conversion of PGE microfiche to DVD |
| Total through June | $100,365.37 | |

**APPENDIX I—Settlement Processing Center Educational Document**

# Settlement Processing Center Educational Document

This document defines Enron Settlement Processing Center procedures and requirements.

## Contents

| Topic | Page |
|---|---|
| General | 3 |
| Access to Services | 3 |
| Customer Service Roles and Responsibilities | 5 |
| Processing Center Overview | 5 |
| CS Domain Consultant (CS DC) | 5 |
| CS Client Manager (CS CM) | 6 |
| CS Client Analyst | 6 |
| Customer Service Representative (CSR) | 6 |
| Training and Development | 7 |
| Customer Service Representative Training | 7 |
| Tools and Technology | 8 |
| Workstation | 8 |
| Reference Tool | 8 |
| CallTracker | 8 |
| Imaging | 8 |
| Quality Assurance | 9 |
| Philosophy | 9 |
| Performance Monitoring | 9 |
| Abusive or Threatening Customers | 10 |
| Abusive Customers | 10 |
| Threatening Customers | 10 |
| Paper Handling | 12 |
| Mail | 12 |
| Forms Processing | 12 |
| Special Handling | 13 |
| Checks | 13 |
| Unexpected Forms/Materials | 13 |
| Overview of Escalation Process | 14 |
| Client Escalation Process | 15 |
| Appendix | 16 |
| Referral List | 17 |
| Call Tracker Topics | 19 |
| Questions and Answers | 20 |
| Tittle/DOL Settlement Allocation (May 15, 2006 Draft) | |

# General

---

## Access to Services
### Telephone Numbers
*Toll-Free*
1-866-745-4522

*International*
1-281-882-7503

### Postal Address
Enron Settlement Processing Center
100 Half Day Road
Post Office Box 1485
Lincolnshire, IL 60069-1485

### Days/Hours
Beginning July 27, 2006 (subject to change), Enron Settlement Processing Center representatives will be available Monday through Friday 8 a.m. to 4:30 p.m., Central time, except the following Hewitt Associates designated holidays:

- New Year's Day[1]
- Memorial Day
- Independence Day[1]
- Labor Day
- Thanksgiving
- Christmas Day[1]

### Rotary/Touch-Tone Callers
Both rotary and touch-tone callers use the same toll-free number to call the Enron Settlement Processing Center.

Rotary and touch–tone callers are transferred to the Enron Settlement Processing Center directly.

### Enron Settlement Processing Center Transfer Messages
Callers will hear different messages depending upon the circumstances when the Enron Settlement Processing Center is closed during non-business hours or due to special circumstances (e.g., inclement weather),

---

[1] If the holiday falls on a weekend, it will be observed the business day prior to, or following the weekend.

Callers who transfer to the Enron Settlement Processing Center and are not immediately connected to a Customer Service Representative hear recorded messages while waiting in queue. They also hear "classy," but not classical music between recorded messages.

Callers may not leave messages for Customer Service Representatives when the Enron Settlement Processing Center is not open.

**Hearing-Impaired Callers**
Hearing-impaired callers have access to an Enron Settlement Processing Center representative via an industr

y-standard relay service.

Customers are required to call a local relay service and communicate their needs to the relay service Representative. The relay service calls the Enron Settlement Processing Center and speaks with an Enron Settlement Processing Center representative. The Enron Settlement Processing Center also uses the relay service to call the participant. For quality monitoring purposes, all calls may be monitored and/or recorded.

**Non-English Speaking Language Support**
Hewitt Associates will arrange the use of an interpreter service.

The interpreter service will be used any time a customer, who prefers to speak a language other than English, calls the Customer Processing Center.

The interpreter service is strictly a verbal translator service. The translators do not have benefits knowledge and are not familiar with Hewitt Associates or the client. The interpreter service does not record the calls (Hewitt Associates does) and the translators do not take notes.

The interpreter service's translators are bound by a Code of Ethics Agreement they must sign with their employer.

**Call Recording**
All calls with an Enron Settlement Processing Center representative are recorded for quality assurance purposes. Prior to speaking to an Enron Settlement Processing Center representative, callers hear the following prerecorded message:

"Your call may be monitored and/or recorded for quality-assurance purposes."

Hewitt Associates retains call recordings for 16 months.

In the event of a dispute or appeal, an Enron Settlement Processing Center representative will listen to the recorded call and report back to the participant or to Enron.

# Customer Service Roles and Responsibilities

## Processing Center Overview

The role of the Customer Service team is to:

- Educate participants and provide information based on the frequently asked questions document provided;

- Document requests for additional communication materials, including temporary address information;

- Document participant concerns about their allocation check (i.e., non receipt, incorrect name, etc.)

- Provide high-touch empathy;

- Aim to answer questions completely on the first call; and,

- Assist in referrals to third parties as appropriate.

The role of the Processing Center is *not* to:

- Interpret the settlement provisions or allocation calculations;

- Replace consultative conversations between participants, managers, and legal counsel;

- Provide substantive advice or recommendations to participants; or,

- Process transactions by the Customer Service Representatives.

## CS Domain Consultant (CS DC)
- Processing Center Implementation Manager

- Creates and manages Processing Center project plan

- Develops client-specific Processing Center and Security Requirements documents

- Accountable for implementing appropriate CS technology solutions (legacy, performance support, and desktop tools)

- Educates broader implementation team on customer service preferred approaches and ensures their application, as appropriate

- Oversees client-specific training development

- Initiates staffing model and is responsible for modifications, prior to live date, that are based on knowledge gained from due diligence

## CS Client Manager (CS CM)
- Ongoing Processing Center Client Manager

- Leverages knowledge sharing from CS DC to CS CM which enables the CS CM to become a client SME to Processing Center

- Serves as the main Processing Center client contact for a defined group of clients

- Supports Benefits team in client communication, relationship, and issue escalations

- Drives quality through CS tools and processes by assuring all CS Performance and Desktop Tools are current

- Manages CS Client Analysts for a defined client or group of clients

## CS Client Analyst (CS CA)
- Ongoing Processing Center Project Manager

- Supports CS Client Manager for a defined client or group of clients

- Executes Processing Center tasks assigned by CS Client Manager

- Develops training plan, training materials, and facilitates training

- Maintains CS Desktop tools and CS Performance Tools including Reference Tool and ensures tools remain current

- Serves as On-Floor Supervisor and answers escalated customer calls

## Customer Service Representative (CSR)
- Provides customer service support

- Interacts with employees and managers regarding policies, programs, and procedures

# Training and Development

## Customer Service Representative Training

Enron Settlement Processing Center representatives are provided with structured training regarding:

- Enron-specific plan provisions as pertaining to the class action suits;
- Enron background;
- General benefit concepts;
- Legislation as pertaining to the class action suits;
- Workstation Tools;
- Customer service skills; and
- Customer Processing Center operations.

# Tools and Technology

## Workstation

Customer Service Representatives use a workstation that is designed to integrate customer service with information sharing. The workstations are equipped with several online tools to aid in administration and customer service.

## Reference Tool

The Reference Tool is an on online reference tool which provides information on provisions, Questions & Answers document[1] and administrative procedures pertaining to the class action suits. The Reference Tool is also for urgent, late-breaking, and recent updates regarding plan provisions, impacts to call volume, and reminders. It ensures accuracy and consistency across all Customer Service Representatives serving customers.

## CallTracker

CallTracker tracks popular/frequent topics that the Customer Service Representatives discuss with customers during a call. This information is available to be reported to clients, informing them of the topics which are of greatest concern to their employees.

## Imaging

Correspondence received in the Enron Settlement Processing Center is electronically scanned or "imaged" to give all Customer Service Representatives instant online access to the documents. Images are routed to an electronic file folder for the customer, and each document is placed in a work list in the folder for future processing.

---

[1] The Questions & Answers document is located in the Appendix of this document.

# Quality Assurance

## Philosophy

The Enron Settlement Processing Center strives to excel in its quality and delivery of service, while constantly moving forward, measuring, and anticipating our customers' needs.

From the initial contact with a customer to the end of the project or request, we are committed to the following:

- Providing the highest quality of service to our customers;
- Exceeding our customers' expectations; and
- Treating others as we like to be treated.

## Performance Monitoring

Performance monitoring is critical to the Customer Processing Center continuous improvement process. Call monitoring (i.e., the accuracy, completeness, and overall quality of customer interaction) is closely tracked to monitor the overall quality of service provided to customers.

# Abusive or Threatening Customers

On occasion, a representative may encounter a situation where communication with the customer is challenging. There are standard approaches defined for these situations.

## Abusive Customers

If a customer is using abusive language or behavior and it is not possible to continue a productive conversation, the call may go through an escalation process:

- The representative transfers the call to a Processing Center manager.

- If the behavior continues, the manager informs the customer that the call will be ended and states the reason.

- If the behavior continues, the manager disconnects the call and logs the information.

- If a customer shows a pattern of abuse, the client will be contacted.

## Threatening Customers

A threatening customer situation refers to when a customer is directly or indirectly threatening physical harm to the firm, an associate, others, or him- or herself. A threatening customer can also be anyone who is displaying extreme irrational behavior that would lead an associate to believe he or she could be a physical threat to the firm, associates, others, or him- or herself.

If the customer is threatening the firm, specific associates, or others:

- The representative acknowledges the threat. The representative informs the customer that if the threats continue, the call will be disconnected and follow-up will be performed with appropriate parties.

- If the representative is uncomfortable acknowledging the threat, the representative transfers the customer to a Processing Center manager. However, all threats will be reported to a Processing Center manager once the call has ended.

- If the behavior continues, the Processing Center manager informs the customer that the call will be ended and the appropriate follow-up will occur.

If the customer is threatening harm to him/herself:

- The representative acknowledges the threat, talks to the customer about what he or she has said, and informs the customer that he or she cares about the customer's welfare.

- The representative encourages the customer to seek help and talks to the customer long enough to feel comfortable ending the call.

- If necessary, the representative transfers the call to a Processing Center manager.

# Paper Handling

## Mail

### Incoming Mail

- Information is forwarded to Enron Settlement Processing Center via regular mail or other mail service, as appropriate.

- C.O.D. mailings are not accepted.

- Customer documents will not be accepted when hand-delivered to Hewitt Associates locations.

- Copies of all customer correspondence are imaged, and then forwarded to Enron Corp, Attn: Barbara Power, for record retention.

- For purposes of tracking, the date the mail is scanned is considered the date of receipt.

### Outgoing Mail

All information is sent to a customer's home address via first-class mail. On rare exceptions, next-day delivery is used at the participant's request and expense.

Copies of all correspondence that are **not** system-generated are imaged, and then forwarded to Enron Corp, Attn: Barbara Power, for record retention.

### Returned Mail

When a customer's mail is returned due to an incorrect address, it will be returned directly to Enron. Addresses are not maintained by the Enron Settlement Processing Center.

## Forms Processing

When the Enron Settlement Processing Center receives forms, the following procedures occur:

- The forms are imaged, giving the Enron Settlement Processing Center representatives online access to the documents;

- The imaged versions are verified for completeness and validity of information within 48 business hours of receipt; and

- Original documents are forwarded to Enron Corp, Attn: Barbara Power, for record retention.

# Special Handling

## Checks

### Returned Checks

If a check is returned, it will be returned directly to the trustee/check writer to be handled according to the returned check requirements.

### Non-Receipt of Checks

If a customer notifies the Enron Settlement Processing Center that no check was received, the following procedures occur:

- The Enron Settlement Processing Center representative will record the information and it will be sent directly to the trustee/check writer and Enron;

- The trustee/check writer will fully investigate the details to determine the legitimacy of the non-receipt allegation; and,

- The trustee/check writer will re-issue the check or notify Enron with instructions to contact the customer with an explanation of findings.

### Check Forgeries

If a customer notifies the Enron Settlement Processing Center of a possible forgery, the following procedures occur:

- The Enron Settlement Processing Center representative will record the information and it will be sent directly to the trustee/check writer and Enron;

- An Affidavit of Forgery is mailed to the customer by the trustee/check writer. The form must be completed, signed, notarized, and returned to the trustee/check writer;

- The trustee/check writer will fully investigate the details to determine the legitimacy of the forgery complaint; and

- After a 14- to 16-week (as defined by the trustee/check writer) waiting period, the trustee/check writer will notify Enron of its findings to contact the customer.

## Unexpected Forms/Materials

When the Enron Settlement Processing Center receives unexpected forms or materials from customers, the materials will be forwarded to Enron.

## Overview of Escalation Process

Any contact that cannot be immediately resolved in the Processing Center must be escalated to a Processing Center manager. Questions are escalated to the Processing Center managers if:

- A customer asks to speak to a manager;
- A customer has called multiple times regarding the same issue;
- A customer states that he or she is going to contact Enron about the situation; or
- A customer is frustrated and unable to understand or accept the current explanation.

Any contact escalated within the Processing Center will be documented by the Processing Center and routed, as needed, for additional follow-up and resolution. The initiation of the escalation process may begin from the Processing Center. Escalations initiated in the Processing Center (customer's issue unable to be resolved on the call) may be initiated by a customer, or manager on behalf of a customer.

# Client Escalation Process

Below is a brief overview of the process for handling escalated issues.

- A customer calls Enron contact or submits a written request.

- The Enron contact probes to learn whether the customer has called the Enron Settlement Processing Center

    — If no, the Enron contact instructs the customer to call the Enron Settlement Processing Center

    — If yes, the Enron contact notifies the Enron Settlement Processing Center contact via telephone call or e-mail and provides details of the information needed.

The Enron Settlement Processing Center contact will:

- Receive initial notification of the escalated request via telephone call or e-mail;

- Contact the Enron contact by the end of the business day to notify them that the request has been received;

- Ensure necessary information is compiled; and

- Provide a response with the information requested to the client via e-mail or telephone call

# Appendix

---

**Referral List**

**Call Tracker Topics**

**Questions & Answers**

# Referral List

| Call Topic | Referral Name/Company | Referral Phone Number |
|---|---|---|
| Access IRA Account | Wilmington Trust Company | 800-215-4960 |
| Address Changes | Enron (in addition to updating address on election form if applicable) | Web: www.enron.com<br><br>E-mail: hrsystems@enron.com<br><br>Phone: 713-853-4777 |
| Appeals | Enron (will only accept written requests) | U. S. Mail:<br>Enron Corp. Benefits Department<br>Post Office Box 1188<br>Houston, TX 77251-1188<br><br>Overnight Delivery:<br>Enron Corp. Benefits Department<br>1221 Lamar, Suite 1600<br>Houston, TX 77012<br><br>E-mail:<br>corporate.benefits@enron.com |
| Reprint of Communication Materials/Election Form | Enron Settlement Processing Center | 1-866-745-4522 |
| *Elaine L. Chao v. Enron Corp., et al.* (the "DOL Action") Settlement Particulars | Keller Rohrback (plaintiffs' attorneys) | 1-866-560-4043<br>http://www.dol.gov/_sec/media/<br>announcements/enron.htm |
| *Pamela A. Tittle, et al. v. Enron Corp., et al.* (the "Title Action") Settlement Particulars | Keller Rohrback (plaintiffs' attorneys) | 1-866-560-4043<br>www.enronerisa.com |
| Settlement Calculation Questions | Keller Rohrback (plaintiffs' attorneys) | 1-866-560-4043 |

| Call Topic | Referral Name/Company | Referral Phone Number |
|---|---|---|
| Taxation Questions | IRS or tax advisor of their choice | **IRS Live Telephone Assistance** Call 1-800-829-1040  **IRS Live Telephone Assistance for people with hearing impairments** 1-800-829-4059 (TDD)  http://www.irs.gov |
| Verify Transfer Deposit for Actives with balance in successor plan | **Enron/Prisma:**  **PGE:**  **EOG:** | www.divinvest.com  800-332-7979  http://resources.hewitt.com/pge; 877-874-5687  www.Schwabplan.com; 800-724-7526 |

# Call Tracker Topics

| Topic | Sub-Topic |
|---|---|
| Abandoned Call (required) | |
| Access (required) | • Authorization |
| Common | • Address/Phone<br>• Appeals/Claims<br>• Beneficiaries<br>• Death<br>• Minimum Distribution<br>• Legal Guardianship<br>• POA (Power of Attorney)<br>• Stop Pay/Reissue<br>• Subpoena<br>• Taxation |
| Communications Materials (required) | • Client Initiated Mailing<br>• Reprint |
| Customer Service (required) | • Benefits Center (required) |
| Data Issues (required) | • Indicative Data |
| Distributions/Allocations | • Balances/Amounts Avail<br>• Distributions/Withdrawals<br>• Eligibility<br>• Plan Provisions<br>• Rollover |
| Referral—External (required) | • Plaintiffs' Attorneys<br>• Clients Benefits Center<br>• Conference Call (required)<br>• Language Line<br>• Legal/Tax/Financial Planner<br>• Trustee<br>• Other (enter details)—required |
| Transferee Not Available (required) | |
| Transfers—Internal (required) | • Client Analyst<br>• Team Member (required) |

# Questions and Answers

## Tittle/DOL Settlement Allocation
### Questions and Answers

**1. Q. With various ongoing Enron-related lawsuits, which are the Tittle/DOL Actions?**

A. *Pamela A. Tittle, et al. v. Enron Corp., et al.* (the "Tittle Action") is a class action lawsuit brought on behalf of former and current employees against Enron, a number of Enron's officers and employees (including Ken Lay and Jeff Skilling), The Northern Trust Company and Arthur Andersen LLP. The Tittle Action alleged, among other things, certain breaches of fiduciary duty with respect to the Enron Corp. Savings Plan (the "Savings Plan"), the Enron Corp. Employee Stock Ownership Plan (the "ESOP"), and the Enron Corp. Cash Balance Plan (the "Cash Balance Plan") including claims regarding the continued availability of Enron Corp. stock as an investment under the Savings Plan and ESOP. You can learn more about the Tittle Action at www.enronerisa.com.

*Elaine L. Chao v. Enron Corp., et al.* (the "DOL Action") is a lawsuit that alleged, among other things, certain breaches of fiduciary duty with respect to the Savings Plan and ESOP. The DOL Action does not involve the Cash Balance Plan. For more about the DOL action, see http://www.dol.gov/_sec/media/announcements/enron.htm

Both the Tittle Action and the DOL Action were consolidated in the U.S. District Court for the Southern District of Texas, Houston Division (the "District Court"), before Judge Melinda Harmon.

**2. Q. What are the terms of the settlement agreement?**

A. The settlement allowed a claim in Enron's bankruptcy proceedings in the amount of $356.25 million. The terms of the settlement agreement are detailed in the "Notice of Proposed Partial Class Action Settlement" document released to class members on August 5, 2005 by Keller Rohrback and Hagens Berman Sobol Shapiro, lead counsel to the plaintiffs. The notice is available at the Keller Rohrback website for this matter, www.enronerisa.com, the Hagens Berman website for this matter, www.hbsslaw.com/enron lawsuit, or you may call toll free 1-866-560-4043 for more information.

**3. Q. Has this settlement been approved by all the appropriate parties?**

A. Yes. The settlement has been agreed to by the plaintiff's attorneys in the Tittle Action as well as the Department of Labor and the Independent Fiduciary to the Plans and approved by the United States Bankruptcy Court and the District Court.

**4. Q. If the Tittle/DOL actions were settled for $356.25 million dollars, why was the settlement claim sold to Bear Stearns for $133.9 million?**

A. In a bankruptcy, any settlement amount to be paid by a debtor is paid based on the amount of creditor recovery. The recovery rate on this claim is estimated to be 17.4%, although the recovery rate may be higher or lower. As the determination of such recovery can take years and the ultimate amount claimants will be paid by the bankruptcy estate is uncertain, many claimants will sell their claims to receive a fixed amount more quickly. Therefore, the sale of settlement claims is a rather standard practice. In our case, the DOL and lead counsel for the plaintiffs and the Independent Fiduciary for the Plans agreed to explore whether the settlement claim should be sold at a reasonable price, went through considerable due diligence concerning a fair price, and the District Court ultimately approved its sale to Bear Stearns. Large financial institutions, such as Bear Stearns, have the financial ability to purchase claims for Amounts that they believe are less than they may eventually be paid through the bankruptcy. There is no assurance that Bear Stearns will collect more than it paid to purchase the claim.

**5. Q. Who is eligible to receive proceeds from the settlement?**

A. Class action participants who lost value attributable to Enron stock in the Savings Plan, which includes any and all predecessor and successor plans (including the ESOP, the Portland General Holdings, Inc. Retirement Savings Plan (the "PGE Retirement Plan"), the Enron/Prisma Energy Savings Plan (the "Enron/Prisma Plan"), the Portland General Electric Company 401(k) Plan (the

"PGE Plan"), and the EOG Resources, Inc. Savings Plan (the "EOG Plan"), during the period of January 1, 1998 to December 2, 2001, are automatically eligible to receive proceeds from the settlement. Recipients also include the Alternate Payees, Surviving Spouses or non-spousal beneficiaries of Savings Plan participants.

In addition, Cash Balance Plan participants who had an ESOP offset and did not take a full distribution of their ESOP Retirement account holdings prior to January 1, 2001 are also eligible to receive proceeds from the settlement.

**6. Q. What is the significance of the covered period, January 1, 1998 through December 2, 2001?**

A. The period of the settlement was defined by the class action lawsuit and generally, participants in the Enron Plans (including the Savings Plan, the ESOP and the Cash Balance Plan) during the period January 1, 1998 through December 2, 2001, are members of the settlement class to which this allocation relates.

**7. Q. How were settlement allocations calculated?**

A. Specifically, your settlement allocation, as approved by the District Court, was determined by comparing your loss to the total plan loss of all members of the settlement class. In general terms, your loss was calculated by taking the dollar value of Enron stock in your account on January 1, 1998; adding the dollar value of Enron stock purchased in your account between January 1, 1998 and December 1, 2001; subtracting the dollar value of Enron stock sold between January 1, 1998 and December 1, 2001; and subtracting the dollar value of Enron stock remaining in your account, if any, on December 2, 2001. Then, your loss was aggregated with the loss of each member of the settlement class to determine the total loss for the period January 1, 1998 through December 2, 2001. Your loss was then converted to a percentage of the total plan loss. Your settlement allocation is the same percentage of the settlement fund as your percentage loss relative to the total loss of all members of the settlement class.

For reference purposes, the January 1, 1998 Enron stock price is based on the December 31, 1997 closing price of $41.56 per share because the stock market was closed on January 1, 1998. The December 2, 2001 Enron stock price is based on the November 30, 2001 closing price of $.26 per share because the stock market was closed on Sunday, December 2, 2001. It is important to remember that the calculation of your loss considers not only the January 1, 1998 and December 2, 2001 value of your Enron stock holdings, but also includes the total value of your Enron stock purchase and sale transactions during this period relative to the total plan loss.

**8. Q. How will the settlement allocations be distributed?**

A. Methods of distribution vary depending on the allocation group of which you are a member. Generally, those allocation groups are based on whether you continue to maintain an active account in the Plans or, if not, are based on the amount of the cash distribution to which you are entitled. Thus, depending on your allocation group, your settlement allocation will be distributed 1.) by an automatic transfer to a successor plan (the Enron/Prisma Plan, the PGE Plan or the EOG Plan account); 2.) via direct payment, less required tax withholding of 20 percent if applicable; or 3.) through a direct rollover of all or a portion of the funds to an elected independent IRA account, an eligible employer qualified plan account or to the default IRA account at Wilmington Trust. The Distribution Information table included in the enclosed letter outlines in detail the method for distribution for each allocation group. Please refer to that table to determine your allocation group and method of distribution.

**9. Q. When can I expect my allocation?**

A. Because the method of distribution is different for each allocation group, the timing of distribution varies as well. Please refer to the Distribution Information table included in the enclosed letter for details related to the timing of your distribution.

**10. Q. If my allocation proceeds are transferred directly to a successor plan or the Wilmington Trust IRA, where will they be invested?**

A. If you are currently enrolled in one of the successor plans, your allocation will be invested according to your investment allocation. If you do not have an investment allocation on file, the allocation will be deposited into the successor plan's default fund. For the Enron/Prisma Plan, the default fund is the Stable Pooled Fund; for the PGE Plan, the default fund is the Fidelity Freedom 2010 fund; for the EOG Plan, the default fund is Charles Schwab Stable Value Fund. If your allocation is transferred to the Wilmington Trust IRA, it will be invested in the Wilmington Prime Money Market Fund, a fund selected to comply with the Department of Labor safe harbor rules to preserve principal and provide a reasonable rate of return.

---

**11. Q. What are the tax implications of receiving a cash distribution?**

A. It is important to note that, if applicable, 20 percent of your cash distribution will be withheld for tax purposes. If you prefer, you may roll over all or a part of your distribution to another eligible employer-sponsored plan or to an individual retirement account if you are eligible to do so. A partial rollover must be in an amount of at least $500. You may wish to consult a tax advisor to fully understand the potential tax implications associated with this distribution.

**12. Q. Does my settlement allocation qualify to be rolled over?**

A. Generally, unless you are a non-spouse beneficiary, you may roll over your entire allocation as it constitutes an eligible rollover distribution. If your allocation is $200 or more, you may elect to rollover all or a part of the allocation in a direct trust-trust transfer to an employer-sponsored plan or to an IRA. A partial rollover must be in an amount of at least $500. If you choose an employer-sponsored plan, check with the plan administrator to ensure that the receiving plan accepts this type of rollover.

**13. Q. If I am over age 70 ½, how much of my distribution may I roll over?**

A. Because you did not have an account balance in this Plan on December 31, 2005, there are no required minimum distributions for this settlement allocation. Consequently, if your allocation is $200 or more, you may elect to rollover all or a part of the allocation in a direct trust-trust transfer to an employer-sponsored plan or to an IRA. A partial rollover must be in an amount of at least $500. If you choose an employer-sponsored plan, check with the plan administrator to ensure that the receiving plan accepts this type of rollover.

**14. Q. I was never an Enron employee – my account was established due to a divorce action or I am the beneficiary of a deceased participant. How will my allocation be distributed?**

A. Your account will be handled in the same manner as those of former employees. Please refer to the Distribution Information table included with this communication.

**15. Q. What happens if I do not return the participant distribution election by the required deadline?**

A. If we do not receive your election form by the required deadline, your settlement allocation will automatically be transferred to an IRA rollover account set up on your behalf with Wilmington Trust.

**17. Q. Can I make a change to my distribution election after it has been submitted for processing?**

A. You will not be able to change your distribution election once your election form has been submitted for processing. Accordingly, please be sure that your election form accurately reflects your distribution decision before returning it for processing.

**17. Q. If my settlement allocation is transferred to Wilmington Trust, how can I access my account?**

A. Contact Wilmington Trust at 800-215-4960 for information about or access to your transferred account.

**18. Q. Why are Cash Balance Plan allocations not being distributed right away?**

A. The settlement allocation for the Cash Balance Plan requires that additional information be collected to determine all eligible beneficiaries. We are in the process of compiling that data now, but it is a time intensive endeavor and additional work is needed before we will be ready to calculate allocation settlements and distribute those allocations.

**19. Q. Where can I go for more information?**

A. A Hewitt Service Center has been set up to handle your questions about the distribution process and the plans/funds to which your allocation is being transferred. Additionally, representative can provide assistance regarding the completion of the "Participant Distribution Election" form, verification of receipt of your election form and the status of your distribution. You may contact service center representatives Monday through Friday from 8:00 AM to 4:30 pm Central Standard Time. The domestic toll free number is 1-866-745-4522. International participants may call 1-281-882-7503.

Hewitt Service Center representatives are not qualified to answer questions about the settlement agreement. If you have additional questions about that issue, please contact the plaintiffs' attorneys toll free at 1-866-560-4043

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION, | §<br>§<br>§ | MDL 1446 |

| | | |
|---|---|---|
| PAMELA M. TITTLE, on behalf of herself and a class of persons similarly situated, ET AL.,<br><br>                    Plaintiffs<br><br>VS.<br><br>ENRON CORP., an Oregon Corporation, ET AL.,<br><br>                    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-01-3913<br>CONSOLIDATED & COORDINATED CASES<br>(H-01-4060; H-01-4063; H-01-4089;<br>H-01-4108; H-01-4125; H-01-4128;<br>H-01-4208; H-01-4209; H-01-4299;<br>H-01-4326; H-01-0267; H-02-0851;<br>H-02-1058; H-02-2160; H-02-3754;<br>H-02-3942; H-03-2257) |

| | | |
|---|---|---|
| ENRON CREDITORS RECOVERY CORP., formerly known as Enron Corp. an Oregon Corp.,<br><br>                    Plaintiff,<br><br>VS.<br><br>HEWITT ASSOCIATES, LLC,<br><br>                    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-08-1894 |

## ORDER OF CONSOLIDATION

Pursuant to the order of consolidation entered in lead case H-01-3913, *Tittle et al. v. Enron et al.*, on December 12, 2001 (instrument #10), the Court

ORDERS that the above referenced case, *Enron Creditors Recovery Corp. v. Hewitt Associates LLC*, H-08-1894, is hereby

TRANSFERRED to the undersigned judge and CONSOLIDATED into H-01-3913.

**SIGNED** at Houston, Texas, this _18th_ day of June, 2008.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE

- 2 -