**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HEWITT ASSOCIATES, L.L.C.,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | No. 08 cv 3634 |
| v.  ) | |
| ) | Judge Der-Yeghiayan |
| ENRON CREDITORS RECOVERY CORP., f/k/a  ) | |
| ENRON CORP., an Oregon Corporation,  ) | Magistrate Judge Cole |
| ) | |
| Defendant.  ) | |

**REVISED MEMORANDUM IN SUPPORT OF DEFENDANT ENRON CREDITORS
RECOVERY CORP.'S MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)**

Defendant, Enron Creditors Recovery Corp., formerly known as Enron Corp. ("Enron"), by its attorneys, respectfully submits this revised memorandum in support of its motion pursuant to Title 28, United States Code, Section 1404, to transfer the above-captioned proceeding to the United States District Court for the Southern District of Texas, Houston Division.

**Preliminary Statement**

On June 18, 2008, the United States District Court for the Southern District of Texas *sua sponte* "TRANSFERRED" the mirror of this action and "CONSOLIDATED" the action "into" a pre-existing lawsuit that has been pending (and actively litigated) there for almost seven years. (*See* June 18, 2008 Order of Consolidation, attached hereto as Exhibit 1.)  Hence, the precise issues raised in this action are already being litigated as part of a substantial prior pending action in the Southern District of Texas, before a federal judge who is intimately familiar with the background of this case, and before whom the parties have already appeared multiple times regarding the underlying facts.  Enron requests that this Court transfer this action to the Southern District of Texas in order that it be consolidated with the other, related cases already pending there, in which the identical issues and parties are involved.

This narrow declaratory judgment action is an interrelated offshoot of massive litigation arising out of the collapse of Enron in 2001. Plaintiff Hewitt Associates, L.L.C. ("Hewitt") served as the "Fund Administrator" to allocate settlement proceeds of an ERISA class action, *Tittle v. Enron Corp.*, Case No. H-01-3913 (the "*Tittle* Litigation"), adjudicated before the Honorable Melinda Harmon in the Southern District of Texas. As Hewitt has already admitted to Judge Harmon, it botched the allocation, causing a shortfall to settlement participants, all former Enron employees, of millions of dollars. (*See* Tr. of July 27, 2007 Proceedings,[1] attached hereto as Exhibit 2, at 18, 19; Decl. of Robert W. Jones, attached hereto as Ex. 3, ¶¶ 30-31.) In November 2007, in the Southern District of Texas, the Enron Corp. Savings Plan and Administrative Committee sued Hewitt to recover the shortfall (the "Administrative Committee Action"). (*See* Plaintiffs' Original Complaint (without exhibits), attached hereto as Exhibit 4.) The Southern District of Texas *sua sponte* consolidated the Administrative Committee Action into the *Tittle* Litigation. (*See Tittle* Litigation Docket No. 1338.)

Hewitt, presumably dissatisfied with the various proceedings before Judge Harmon, initiated this action in Lake County, Illinois. But the exact legal and factual issues raised by Hewitt here are now being litigated in the Southern District of Texas before Judge Harmon, and have been before her since June 18, 2008. On June 13, 2008, Enron filed a Complaint for Declaratory Relief against Hewitt in the Southern District of Texas (the "Enron Action"). (*See* Complaint for Declaratory Relief, attached hereto as Exhibit 5 (without exhibits)). In that action, Enron seeks a declaration on essentially all the issues raised by the Complaint filed by Hewitt in Lake County. Three business days after the Enron Action was filed, the Southern District of

---

[1] The Court can take judicial notice of filings in related proceedings in considering a motion to transfer venue. *See, e.g., Caufield v. Colgate-Palmolive Co. Employees' Retirement Income Plan*, No. 07-cv-16-SEB-WGH, 2008 WL 846598, at *1 (S.D. Ill. Mar. 26, 2008).

Texas *sua sponte* transferred the case to Judge Harmon and consolidated it into the *Tittle* Litigation. (*See* Ex. 1.)

Transfer of this case to the Southern District of Texas for consolidation with the Enron Action into the *Tittle* Litigation is particularly appropriate because virtually every aspect of this declaratory judgment action is centered in Texas. Enron's principal place of business is in Houston, Texas. The settlement fund Hewitt bollixed as Fund Administrator is part of a settlement still actively administered by Judge Harmon, and Judge Harmon has explicitly retained jurisdiction over that settlement. The services Hewitt claims to have provided under the Administrative Services Agreement ("ASA"), one of the contracts at issue in this case, as well as Hewitt's allocation services performed under the Second Amended Supplemental Plan of Allocation entered by Judge Harmon (referenced in Hewitt's Complaint), were primarily performed in Texas, by employees based in Hewitt's massive facility in The Woodlands, Texas, a community 30 miles north of Houston. The overwhelming majority of witnesses are located in Texas, including third parties beyond the subpoena power of this Court. The Administrative Committee Action for which Hewitt seeks indemnification in this case has been pending in the Southern District of Texas for more than seven months. Even the law applicable to the ASA upon which Hewitt rests its case is Texas law. Indeed, other than the incidental fact that Hewitt claims Illinois as its principal place of business, virtually no nexus to Illinois exists. There is simply no reason to open a second litigation front.

Hewitt has been appearing before Judge Harmon with respect to its allocation work which forms the factual predicate for this case for almost a year. In July of 2007, Hewitt appeared before Judge Harmon and confessed, "we're all here this afternoon because of a mistake that my client [Hewitt] made. There's no doubt about that. . . . A mistake was made. It

was our mistake.  We should do the work to fix the mistake."  (Ex. 2, at 18, 19.)  Prior to filing

its complaint here, Hewitt had made no less than 20 filings in Judge Harmon's court and

physically appeared before her twice—most recently in connection with a contempt motion filed

against Hewitt by the Department of Labor alleging Hewitt's non compliance with prior Judge

Harmon orders.   More than a month ago, at Hewitt's demand and under Judge Harmon's

oversight, all the parties mediated this very dispute in Houston just a few blocks from Judge

Harmon's court.  With all this history, one can only conclude Hewitt filed this Lake County

action to produce confusion and delay, with the hopes of obtaining different rulings from a

different court.

## **Background**

### I.      **Pending Litigation Before Judge Harmon Spawned this Action**

In late 2001, Enron filed for bankruptcy, and numerous class action lawsuits related to its

demise were filed.  In early 2002, many of these cases were administratively consolidated before

Judge Harmon.  She has presided over consolidated securities class action lawsuits, derivative

cases, and the consolidated *Tittle* Litigation.  The docket reports for these three consolidated

actions collectively span more than 1,200 pages.  The docket in the *Tittle* Litigation alone

reflects more than 1,300 filings.

The plaintiffs in the *Tittle* Litigation settled their claims against various defendants,

resulting in eight separate settlements, including the "Enron Settlement."  (Ex. 3, ¶ 6.)  In

separate orders approving each of the settlements, Judge Harmon always included language

retaining "continuing jurisdiction over: (a) implementation of the Settlement; (b) any award or

distribution of the Settlement Trust, including interest earned thereon; and (c) all other

proceedings related to the implementation and enforcement of the terms of the Agreement."

(*See*, *e.g.*, *Tittle* Litigation Docket No. 987 ¶ 28; Docket No. 1075 ¶ 30; Docket No. 1132 ¶ 25;

Docket No. 1219 ¶ 25; Docket No. 1303 ¶ 19.)

Hewitt appeared before Judge Harmon after its misallocation of *Tittle* Litigation settlement proceeds. (*See*, *e.g.*, Ex. 2.) In July 2007, Judge Harmon granted a motion seeking modification of the Court-approved Second Supplemental Amended Plan of Allocation (the "Allocation Plan"). (*See* Order Granting Motion for Approval of Modifications to Second Supplemental Amended Plan of Allocation, attached hereto as Exhibit 6, ¶ 5.) Judge Harmon ruled that Hewitt "acted as Fund Administrator pursuant to, and as defined in, the Allocation Plan," a finding which Hewitt vigorously opposed with evidence and in oral argument. (*Id.*; Ex. 2 at 22-25.) Judge Harmon ordered Hewitt to provide corrected allocations within 30 days (*i.e.*, by August 26, 2007), together with a certification that it had used its best efforts to identify and correct all flaws in its original allocation of the settlement proceeds. (Ex. 6 ¶ 9.)

Robert Dunlap, from Hewitt's The Woodlands facility, met on multiple occasions with the Administrative Committee in Houston throughout 2007 in connection with Hewitt's efforts to obtain corrected allocation figures. (Ex. 3 ¶¶ 33-34.) Additional mistakes by Hewitt were uncovered. (Ex. 3 ¶ 35.) Despite representing to Judge Harmon it would "fix" its mistakes, Hewitt consistently refused to address the financial shortfall created by its misallocation. The United States Department of Labor filed a motion with Judge Harmon for a show cause order to hold Hewitt in contempt and seeking a penalty of $10,000 per day until Hewitt provided a non-recourse loan to the Savings Plan in an amount sufficient to cover the shortfall. (*See* Secretary of Labor's Mot. For an Order to Show Cause Why Hewitt Should Not be Held in Civil Contempt (without exhibits), attached hereto as Exhibit 7, at 17-18.) On the eve of the contempt hearing, Hewitt agreed to loan funds to the Savings Plan, but demanded that the Savings Plan, the Administrative Committee and Enron mediate all disputes with it, and that Judge Harmon stay

the Administrative Committee Action pending the mediation. (Ex. 3 ¶ 36.) In May, 2008, the Hewitt-requested mediation including principals from all of the parties was conducted just blocks from Judge Harmon's court in Houston, Texas. (*Id.* ¶ 37.)

Hewitt revealed the existence of its Lake County declaratory judgment action to Judge Harmon on June 11, 2008 by disclosing it in a joint discovery/case management plan filed in the Administrative Committee Action. (Joint Discovery/Case Management Plan Pursuant to Federal Rule of Civil Procedure 26(f), attached as Exhibit 8 hereto, at 2.) Enron filed the Enron Action on June 13, 2008, seeking declarations that mirror those sought by Hewitt in this case. (Ex. 5) Three days after the Enron Action was filed, the Southern District of Texas *sua sponte* transferred the case to Judge Harmon and consolidated it with the *Tittle* Litigation. (Ex. 1.)

## II.    The ASA

A contractual relationship between Enron and Hewitt was formed to provide certain benefit plan administration services under the ASA. (Compl. Ex. A at 1, 4, 23.) The ASA was negotiated for Enron by Mary Joyce, Cynthia Barrow and Mikie Rath in Houston, Texas. (Ex. 3 ¶ 7; Compl. Ex. A at 1, 22.) During these negotiations, Hewitt hosted a site visit at The Woodlands. (Ex. 3 ¶ 7) Joyce and Barrow executed the ASA for Enron in Houston, and C. Lawrence Connolly, III executed the ASA for Hewitt. (Ex. 3 ¶ 7; Compl. Ex. A at 23.) Joyce, Barrow and Rath no longer work for Enron, but do reside within the subpoena power of the transferee court. (Ex. 3 ¶ 8.)

Enron terminated the ASA, and the parties entered into an Amendment to Administrative Services Agreement ("Amendment I"), effective January 1, 2005. (Compl. Ex. B.) C. Lawrence Connolly, III signed Amendment I for Hewitt, but did not negotiate Amendment I and had no dealings with the people who negotiated for Enron. (Ex. 3 ¶ 15.) Rather, Robert Jones and other Houston-based Enron personnel negotiated the terms of Amendment I with Hewitt's Robert

Dunlap of The Woodlands, and Dunlap sent Amendment I to Enron.  (*Id.* ¶¶ 14, 15.)  Robert Jones signed Amendment I in Houston, as Enron's Managing Director of Human Resources.  (*Id.* ¶ 14.)  Amendment I was scheduled to terminate on September 30, 2006.  (Compl. Ex. B § 6.)

Effective July 1, 2006, Enron and Hewitt entered into a second amendment to the ASA ("Amendment II") (Compl. Ex. C), extending the Services provided by Hewitt to Enron under Amendment I through September 30, 2007.  Amendment II was negotiated between Robert Dunlap at Hewitt and Enron personnel in Houston.  (Ex. 3 ¶ 18.)  Robert Jones executed the Hewitt-drafted Amendment II in Houston on behalf of Enron.  (*Id.* ¶ 19.)

### III.   Hewitt's Services in Connection With the Settlement Funds in the *Tittle* Litigation

Separate and apart from the data maintenance services Hewitt was providing for Enron, Hewitt was also engaged by the Administrative Committee to perform allocation work in the *Tittle* Litigation.  It is Hewitt's allocation services rendered in the *Tittle* Litigation that are the subject of Hewitt's complaint.  (Compl. ¶¶ 21, 25.)  The proceeds of the Enron Settlement and other settlements were to be allocated in accordance with the Allocation Plan approved by Judge Harmon on July 24, 2006.  (*See* Second Supplemental Amended Plan of Allocation, attached hereto as Exhibit 9, § III; *Tittle* Litigation Docket No. 1219 ¶ 10.)  Under the Allocation Plan, the settlements were to be allocated by the Fund Administrator, defined as the "person or entity appointed or retained by the Enron Plans who shall administer the [Allocation Plan] and the distribution of the funds within the Plans set forth herein."  (Ex. 9 § I ¶ 19.)

Hewitt prepared a new agreement to be signed by the Administrative Committee to proceed with the allocation work under the Allocation Plan (the "Letter Agreement").  (Ex. 3 ¶ 20 & Ex. A thereto.)  The Letter Agreement states, among other things, that Hewitt is "to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other related plans based on the terms of the Second Supplemental Amended Plan of

Allocation adopted and approved by counsel for plaintiffs pursuant to the partial settlement approved by the court in *Tittle, et al. v. Enron et al.,* Case No. H-01-CV-3913."[2]  (*Id.*)  Hewitt prepared the Letter Agreement over Robert Dunlap's signature.  (*Id.*)  Robert Jones signed the document in Houston on behalf of the Administrative Committee and the Enron Corp. Savings Plan ("the Savings Plan"), in his capacity as Chairman of the Administrative Committee of the Savings Plan, as expressly reflected on the Letter Agreement.  (*Id.* ¶¶ 20, 22.)

The Administrative Committee thus retained Hewitt to serve as the Fund Administrator. (*Id.* ¶¶ 20-22.)  As the Fund Administrator in the *Tittle* Litigation, Hewitt calculated each Claimant's share of the Enron Settlement proceeds, purportedly in accordance with the Allocation Plan, and thereafter submitted to the Administrative Committee its calculated allocations to be distributed to individual Claimants.  (*Id.* ¶ 28.)  The primary Hewitt employees performing the work were almost exclusively from The Woodlands.  (*Id.* ¶ 23.)  On or about July 12, 2006, Dunlap and Folkert hosted a meeting at The Woodlands during which they presented a final overview of the work performed, and to be performed, by Hewitt.  (*Id.* ¶ 27.)  The records and data compiled and prepared by Hewitt in conjunction with the allocation work were also located primarily at either The Woodlands offices or in Atlanta, Georgia.  (*Id.* ¶ 26.)

Relying on Hewitt's representations that the calculations complied with the Allocation Plan, distributions to more than 20,000 Claimants commenced in mid-August 2006 (the "Initial Allocation").  (*Id.* ¶ 28.)  Hewitt operated a call center at The Woodlands to respond to Claimant inquiries about the Initial Allocation.  (*Id.* ¶ 29.)

In late January, 2007, Hewitt determined virtually all of its allocations were incorrect. (*Id.* ¶ 30.)  A Hewitt team in The Woodlands, headed by Dunlap and including Folkert reviewed

---

[2]      Given the June 18, 2008 *sua sponte* order of the Southern District of Texas, the same action before this Court is now "CONSOLIDATED" into H-01-3913.

the allocations to determine the extent of the problems.  (*Id.* ¶ 33.)  On or about January 30, 2007, Folkert reported to Enron that Hewitt's miscalculations directly resulted in the misallocation of $21,849,788.29 of the total $89 million Initial Allocation, approximately 25% of the total funds distributed.  (*Id.* ¶ 30-31 & Ex. B thereto.)  Hewitt also determined that approximately 7,700 Claimants were over-allocated, and approximately 12,600 Claimants were under-allocated, resulting in virtually no Claimants receiving a correct allocation.  (*Id.* ¶ 31.)  Over 45% of the Claimants who received under-allocations and 54% of the Claimants who received over-allocations have Texas addresses.  (*Id.* ¶ 32.)

## ARGUMENT

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  The purpose of Section 1404(a) is to avoid "waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).  A motion to transfer is within the broad discretion of the district court, and "less of a showing of inconvenience is needed for a § 1404(a) transfer than for a *forum non conveniens* dismissal."  *Conseco Life Ins. Co. v. Reliance Ins. Co.*, No. 99 C 5020, 2001 U.S. Dist. LEXIS 21475, at *3 (N.D. Ill. December 14, 2001).  Transfer is appropriate when: (1) venue is proper in the transferor district; (2) venue and jurisdiction are proper in the transferee district; and (3) the transfer will serve the convenience of the parties, the convenience of the witnesses, and the interest of justice.  *General Accident Ins. Co. v. Travelers Corp.*, 666 F. Supp. 1203, 1206 (N.D. Ill. 1987).

## I.    Venue and Jurisdiction Are Proper in this District and in the Transferee District

Venue is proper and indeed preferable in the Southern District of Texas because the

substantial majority of facts giving rise to this action occurred (and indeed continue to occur and develop) there. All Enron personnel who negotiated the ASA and the Amendments did so in Houston. (Ex. 3 ¶¶ 7, 14, 15, 18.) The Hewitt personnel who negotiated with Enron were based in The Woodlands. (*Id*. ¶ 7, 15, 18.) Furthermore, Enron's headquarters are in the Southern District, and the case arises out of Hewitt's misallocation of settlement proceeds in the *Tittle* Litigation over which the Southern District retains continuing jurisdiction.

Hewitt contends it is a limited liability company whose sole member, Hewitt Associates, Inc., is Delaware corporation. (Compl. ¶ 1.) Hewitt alleges its principal place of business is in Lincolnshire, Illinois, but it maintains a substantial facility in The Woodlands, Texas[3] and voluntarily chose to enter Texas and do business there. Enron is a corporation organized and existing under the laws of the State of Oregon with its principal place of business in Texas. (Compl. ¶ 2.) The matter in controversy exceeds the sum or value of $75,000.00. (Compl. ¶¶ 31, 39; Ex. 4 ¶ 73.) Because there is complete diversity of citizenship, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, the federal courts have jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

Moreover, the core dispute arises out of the implementation of the *Tittle* settlement and the role Hewitt played as Fund Administrator under Judge Harmon's order. Judge Harmon specifically retained jurisdiction to preside over "any and all disputes" arising out of the implementation of the Allocation Plan in the *Tittle* Litigation. (*See*, *e.g.*, *Tittle* Litigation Docket No. 987 ¶ 28; Docket No. 1075 ¶ 30; Docket No. 1132 ¶ 25; Docket No. 1219 ¶ 25; Docket No. 1303 ¶ 19.) The Southern District of Texas therefore also has jurisdiction over this matter

---

[3]     Hewitt's facility at The Woodlands is no thinly-staffed outpost; rather Hewitt occupies four separate buildings in that location. (*See* Exhibit 10 hereto, "Where We Work – The Woodlands," printed from Hewitt's website, *available at* http://www.hewittassociates.com/Intl/NA/en-US/WorldwideOffices.aspx#alpha_u.) A photo of one of Hewitt's buildings at The Woodlands is attached as Exhibit 11 hereto.

pursuant to the doctrine of ancillary jurisdiction and the All Writs Act.  28 U.S.C. § 1651.

## II.     The Convenience of the Parties and Witnesses Favor Transfer

All but one of the current and former Enron employees with knowledge of the negotiation of the ASA, the Amendments, and the Letter Agreement reside in or near Houston.  (Ex. 3 ¶¶ 7, 8, 14, 15, 18, 20-22.)  Moreover, these current and former Enron employees dealt almost entirely with Hewitt employees based in The Woodlands.  (*Id.*)  No current or former Enron employees – or officers – with such involvement reside in Illinois. [4]

The Hewitt office that was responsible for providing services to Enron, as well as allocation services to the Administrative Committee is located in The Woodlands, roughly 30 miles north of Houston.  (*Id.* ¶¶ 10, 23.)  The Hewitt employees primarily dedicated to the allocation services were based there, as were the Hewitt employees who determined the source and extent of the misallocation "mistake" from which Hewitt's alleged losses derive.  (*Id.* ¶¶ 10, 23, 27, 33.)  Thus, both the Enron employees and the Hewitt employees with relevant knowledge are almost exclusively located in Texas, rendering Texas the more convenient forum for resolution of the parties' disputes.  *See Paul v. Lands' End, Inc.*, 742 F. Supp. 512, 514 (N.D. Ill. 1990) (forum more convenient where defendants were headquartered, majority of their employees and potential witnesses resided, and majority of evidence was located; in contrast, parties and witnesses had "relative insignificant contacts" with transferor).

Courts stress the importance of being able to compel the attendance of third party witnesses at trial.  *See*, *e.g.*, *FUL Inc. v. Unified Sch. Dist. No. 204*, 839 F. Supp. 1307, 1312 (N.D. Ill. 1993).  There are many former Enron employees who were involved in the negotiation

---

[4]     Hewitt alleges that John Ray, the President and Chairman of the Board of Directors of Enron, is located in Illinois, but Mr. Ray was not involved with the negotiation of the ASA or the amendments to ASA, nor was he involved with Hewitt's alleged performance under those agreements.  (*See* Ex. 3 ¶¶ 7, 8, 14, 15, 18.)

and execution of the original ASA, the amendments and the Letter Agreement as well as day-to-day interaction with Hewitt on all aspects of the various services performed who continue to reside in Texas. (Ex. 3 ¶¶ 8, 12.) None live in Illinois. (*Id*.) That a limited few, if any, Hewitt employees who may have been involved in these events reside in Illinois is not of concern here, since Hewitt has control over its employees. *FUL Inc.*, 839 F. Supp. at 1311-1312.

The efficiency of resolving Hewitt's claims in conjunction with the already-pending Administrative Committee Action and the Enron Action – both now consolidated with the *Tittle* Litigation[5] – also renders transfer to the Southern District of Texas more convenient for the witnesses. Transfer and consolidation before Judge Harmon would eliminate simultaneous discovery proceedings in two separate forums as well as eliminate the unnecessary financial burden of coordinating litigation in two separate forums. *See Goggins v. Alliance Capital Mgmt., L.P.*, 279 F. Supp. 2d 228, 233 (S.D.N.Y. 2003); *Volkswagen Aktiengesellschaft v. Dee Eng'g, Inc.*, No. 02 CV 1669, 2003 U.S. Dist. LEXIS 3550, at *8 (S.D. Ind. Mar. 4, 2003).

## III.     The Interest of Justice Strongly Favors Transfer

The "interest of justice" component "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Conseco Life Ins.*

---

[5]     Hewitt cannot rely on the so-called "first to file" rule to avoid transfer and consolidation of this action with the Enron Action and the Administrative Committee Action into the *Tittle* Litigation. Hewitt was *not* the first party to file in this case. Rather, the present action is directly related to both the *Tittle* Litigation and the Administrative Committee Action already pending in the Southern District of Texas. The Southern District of Texas is the far more convenient forum for resolution of this dispute. The transfer of the Enron Action into Judge Harmon's courtroom and its consolidation with the *Tittle* Litigation and the Administrative Committee Action proves the point. (Ex. 1.) Hewitt's claim for declaratory relief is a thinly-veiled attempt to have its claims for defense and indemnification in connection with the Administrative Committee Action heard anywhere but the Southern District of Texas, where these parties have already been litigating for nearly one year over Hewitt's misallocation. *See Schwarz v. Nat'l Van Lines, Inc.*, 317 F. Supp. 2d 829, 833 (N.D. Ill. 2004) ("Courts refuse to enforce the first to file rule where forum shopping motivated the first-filed action or the first-filed action constitutes an 'improper anticipatory filing' made under threat of an imminent suit and asserting the mirror-image of that suit in another district."); *S.J.G. Enterprises, Ltd. v. Eikenberry & Assoc., Inc.*, 2004 U.S. Dist. LEXIS 15186 (N.D. Ill. Aug. 5, 2004) (first to file rule "cannot be permitted to allow a potential defendant to dictate the forum by filing 'mirror image' declaratory judgment actions brought in the face of clear threats of suit and seeking determinations that no liability exists.").

*Co.*, 2001 U.S. Dist. LEXIS 21475, at *8.  This is particularly the case when the "interest" to be served is consolidation of related cases.  *Van Dusen*, 376 U.S. at 643-46.  The interest of justice analysis relates to the efficient functioning of the courts, not the merits of the underlying dispute. *F & G Scrolling Mouse, L.L.C. v. Microsoft, Inc.*, 56 F. Supp. 2d 1005, 1009 (N.D. Ill. 1999).

The interest of justice dictates transfer to the Southern District of Texas for consolidation with the Administrative Committee Action and the Enron Action, both of which are already "CONSOLIDATED into" the *Tittle* Litigation.  (*See* Ex. 1; *Tittle* Litigation Docket No. 1338.) The mirror Enron Action raises the very same factual and legal issues raised by Hewitt in this case.  The Administrative Committee Action raises legal and factual issues that are also elemental to the indemnification and defense issues raised in this case.  Also, in the Administrative Committee Action, the Savings Plan and the Administrative Committee have alleged that Hewitt and the Administrative Committee—not Enron—entered into a contract separate and apart from the ASA to perform allocation services in the *Tittle* Litigation.  If the Administrative Committee succeeds in its contractual theory, then Hewitt's defense and indemnification claims will be moot, as the ASA provisions relate to Hewitt's services performed under the ASA and not services provided under other agreements.  Moreover, Hewitt is not entitled to any indemnification if Judge Harmon determines Hewitt was grossly negligent in the Administrative Committee Action.

Furthermore, given the identical legal and factual issues raised in this case and the litigation pending in Texas, there is a "significant risk that the separate trial of these two cases could lead to inconsistent results and inconsistent decrees" if this case is not transferred and consolidated with the Enron Action and Administrative Committee Action into the *Tittle* Litigation.  *Solaia Technology, Inc. v. Rockwell Automation, Inc.*, No. 03 C 566, 2003 U.S. Dist.

LEXIS 15285, *9 (N.D. Ill. Sept. 2, 2003).  The risk of inconsistent determinations strongly favors transfer of this action.  *See id.* at *9; *Conseco Life Ins.*, U.S. Dist. LEXIS 21475, at *12; *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 243 n.7 (1981).  Courts repeatedly recognize the important role consolidation plays in preventing inconsistent decisions.  *See Solaia*, 2003 U.S. Dist. LEXIS 15285, at *9; *Wilk v. American Med. Assoc.*, 635 F.2d 1295, 1297 n.3 (7th Cir. 1991).  Transfer to the Southern District of Texas for consolidation into the *Tittle* Litigation with the Enron Action will completely eliminate the possibility of inconsistent determinations.

Judge Harmon is already intimately familiar with the allocation process, including, specifically, Hewitt's misallocation and has issued orders related to the actions which Hewitt now seeks to litigate in another forum.  Thus, the interest of judicial economy greatly favors the resolution of the related issues raised in this case by the Southern District of Texas.  *See Zurich Ins. Co. v. Raymark Indus.*, 672 F. Supp. 1102, 1104 (N.D. Ill. 1987) ("transfer of this action to a district which is already thoroughly familiar and experienced with the facts and law relevant to this action will promote judicial economy").  Moreover, federal judges in the Southern District of Texas are more familiar with Texas law, which governs the ASA upon which Hewitt's claim is based (Compl. Ex. A § 17.5).  *See General Accident Ins. Co.*, 666 F. Supp. at 1207 (interest of justice best served by transfer to Texas where judges were more familiar with law to be applied).

"Another related 'interest of justice' factor is the prevention of forum shopping."  *Wireless Consumers Alliance, Inc. v. T-Mobile USA, Inc.*, No. C 03-3711 MHP, 2003 WL 22387598, at *5 (N.D. Cal. Oct. 14, 2003).  Hewitt's tactical decision to sue in Lake County, Illinois, despite litigating before Judge Harmon on identical issues for nearly a year, strongly suggests forum shopping.  Hewitt is likely searching for a new forum in the hopes of "starting over."  Such tactics strongly favor transfer of this action to the Southern District of Texas.  *See*

*id.* ("evidence of plaintiff's attempt to avoid a particular precedent from a particular judge weighs heavily . . . and would often make the transfer of venue proper"); *O'Hopp v. Contifinancial Corp.*, 88 F. Supp. 2d 31, 35 (E.D.N.Y. 2000) ("[E]fforts to select one district to avoid or obtain specific rulings of another district court should be disfavored and discouraged").

Finally, the interest of justice analysis often examines the comparative congestion of the dockets in the two federal districts. *See Zurich Ins. Co.*, 672 F. Supp. at 1104. As reported in the Federal Court Management Statistics Report for the twelve months ended September 30, 2007,[6] the median time from filing to trial in Southern District of Texas is roughly 65% percent of that reported for the Northern District of Illinois (20.3 months as opposed to 29.7 months). Similarly, the Southern District of Texas reports only 4.1% of its civil cases as more than three years old, compared to the Northern District of Illinois' 6.5%. Such statistics suggest that transfer to the Southern District of Texas may yield the added benefit of a more expedited resolution of the parties' disputes.

## Conclusion

For the reasons set forth above, the Defendant Enron Creditors Recovery Corp. respectfully requests that this Court grant its motion to transfer this proceeding to the United States District Court for the Southern District of Texas.

Dated: July 8, 2008

> Respectfully submitted,
>
> ENRON CREDITORS RECOVERY CORP.
>
> By: _____/s/ Peter G. Rush_____
> One of its Attorneys

---

[6]    Copies of the Judicial Caseload Profiles for the Northern District of Illinois and the Southern District of Texas are attached hereto as Exhibit 12.

Peter G. Rush
Paul J. Walsen
Dawn L. Johnson
Sara E. Robinson
BELL, BOYD & LLOYD LLP
70 West Madison Street, Suite 3100
Chicago, IL  60602
(312) 372-1121

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION, | § § § | MDL 1446 |

| | | |
|---|---|---|
| PAMELA M. TITTLE, on behalf of herself and a class of persons similarly situated, ET AL., | § § § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3913 CONSOLIDATED & COORDINATED CASES |
| ENRON CORP., an Oregon Corporation, ET AL., | § § § | (H-01-4060; H-01-4063; H-01-4089; H-01-4108; H-01-4125; H-01-4128; H-01-4208; H-01-4209; H-01-4299; |
| Defendants. | § § § | H-01-4326; H-01-0267; H-02-0851; H-02-1058; H-02-2160; H-02-3754; H-02-3942; H-03-2257) |

| | | |
|---|---|---|
| ENRON CREDITORS RECOVERY CORP., formerly known as Enron Corp. an Oregon Corp., | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-08-1894 |
| HEWITT ASSOCIATES, LLC, | § § | |
| Defendant. | § § | |

## ORDER OF CONSOLIDATION

Pursuant to the order of consolidation entered in lead case H-01-3913, *Tittle et al. v. Enron et al.*, on December 12, 2001 (instrument #10), the Court

ORDERS that the above referenced case, *Enron Creditors Recovery Corp. v. Hewitt Associates LLC*, H-08-1894, is hereby

TRANSFERRED to the undersigned judge and CONSOLIDATED into H-01-3913.

**SIGNED** at Houston, Texas, this _18 th_ day of June, 2008.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE

# EXHIBIT 2

```
 1                    UNITED STATES DISTRICT COURT

 2                    SOUTHERN DISTRICT OF TEXAS

 3                         HOUSTON DIVISION

 4   PAMELA TITTLE, et. al.,          .
                                      .
 5                   Plaintiffs,      .
                                      .     Civil Action
 6   VS.                              .     No. H-01-CV-3913
                                      .
 7   ENRON CORPORATION, et. al,       .     Houston, Texas
                                      .     July 27, 2007
 8                   Defendants.      .     1:36 p.m.
                                      .
 9   . . . . . . . . . . . . . . . . .

10                     TRANSCRIPT OF PROCEEDINGS

11              BEFORE THE HONORABLE MELINDA HARMON

12                            HEARING

13
     APPEARANCES:
14
     FOR THE TITTLE CLASS PLAINTIFFS:
15
                 Mr. Lynn Lincoln Sarko
16               KELLER ROHRBACK, LLP
                 1201 Third Ave
17               Suite 3200
                 Seattle, WA 98101-3052
18               206-623-1900

19               Mr. Robin L. Harrison
                 CAMPBELL, HARRISON & DAGLEY
20               Two Houston Center
                 909 Fannin
21               Suite 4000
                 Houston, TX 77010
22               713-752-2332

23

24          PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
       TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
25
```

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1                               APPEARANCES

2                               (CONTINUED)

3   FOR ENRON:
            Mr. John B. Strasburger
4           WEIL, GOTSHAL & MANGES
            700 Louisiana
5           Suite 1600
            Houston, TX 77002-2754
6           713-651-5102

7           Mr. Peter G. Rush
            Ms. Maureen Ward Kirby
8           BELL, BOYD & LLOYD
            70 West Madison
9           Suite 3000
            Chicago, IL 60602
10          312-807-4352

11          Mr. John E. Neslage
            Mr. Ty Buthod
12          BAKER BOTTS, LLP
            One Shell plaza
13          910 Louisiana Street
            Houston, Texas  77002
14          713.229.1342

15  FOR HEWITT ASSOCIATES, LLC:
            Mr. Bill Boies
16          MC DERMOTT, WILL & EMERY
            227 West Monroe Street
17          Chicago, IL  60606
            312.984.7686
18
            Mr. Gregory J. Casas
19          GREENBERG TRAURING, LLP
            1000 Louisiana St
20          Suite 1800
            Houston, TX 77002
21          713-374-3561

22  FOR THE UNITED STATES DEPARTMENT OF LABOR:
            Ms. Robin Springberg Parry
23          UNITED STATES DEPARTMENT OF LABOR
            Office of the Solicitor
24          PO Box 1914
            Washington, DC 20013
25          202-693-5614


            Gayle Dye, CSR, RDR, CRR - 713.250.5582

1                              APPEARANCES

2                             (CONTINUED)

3  FOR CONSULTING FIDUCIARIES, INC.:

4          Ms. Sara R. Pikofsky
           THELEN, REID, BROWN, RAYSMAN & STEINER, LLP
5          701 Eighth Street NW
           Washington, DC 20001
6          202-508-4000

7

8

9
   COURT REPORTER:
10
           GAYLE L. DYE, CSR, RDR, CRR
11         515 Rusk, Room 8016
           Houston, Texas   77002
12         713.250.5582

13

14

15

16

17

18

19

20

21

22

23

24

25

4

|  |  |  |
|--|--|--|
| | 1 | PROCEEDINGS |
| | 2 | July 27, 2007 |
| | 3 | THE COURT: Well, this afternoon we're going to have a |
| | 4 | hearing on Enron's motion for approval of modification to second |
| 00:00:06 | 5 | supplemental amended plan of allocation in Pamela Tittle versus |
| | 6 | Enron Corporation and Enron supplement, the modification to that |
| | 7 | motion. It's Civil Action H-01-3913. |
| | 8 | Ready to proceed? |
| | 9 | MR. STRASBURGER: Yes, Your Honor. |
| 00:00:23 | 10 | THE COURT: All right, proceed. |
| | 11 | MR. STRASBURGER: Good afternoon, Judge. I'm John |
| | 12 | Strasburger from Weil, Gotshal & Manges here on behalf of Enron |
| | 13 | Creditors Recovery Corp., formerly known as Enron Corp. If I |
| | 14 | could just briefly take care of one quick housekeeping matter -- |
| 00:00:32 | 15 | THE COURT: All right. |
| | 16 | MR. STRASBURGER: -- before we get into the substance. |
| | 17 | The Court recently signed a couple of pro hac |
| | 18 | vice orders, and I just wanted to introduce the two counsel the |
| | 19 | Court admitted also on behalf of Enron: Pete Rush and Maureen |
| 00:00:45 | 20 | Ward Kirby. |
| | 21 | MS. KIRBY: Good afternoon, Your Honor. |
| | 22 | THE COURT: Good afternoon. |
| | 23 | MR. STRASBURGER: Your Honor, we are well aware -- |
| | 24 | THE COURT: I think we have more introductions, |
| 00:00:57 | 25 | perhaps. |

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1           MR. CASAS:  I apologize.  And as I walked in here, I

2    realized that we have yet to file our pro hac motions for

3    Mr. Boies.  Mr. Boies from McDermott, Will & Emery, is national

4    counsel for Hewitt; and although I could speak to these issues

00:01:10    5    today, Mr. Boies can do it much better and much quicker.

6           THE COURT:  All right, that's fine.  You may do so.

7           MR. BOIES:  Good afternoon, Your Honor

8           THE COURT:  Good afternoon.

9           MR. STRASBURGER:  Your Honor, we are well aware that

00:01:19    10    the Court has received a number of filings on the issue that

11    we're here about today.  It's not our intention -- there's a

12    fair amount of detail in there as well.  It's not our intention

13    at the hearing to go through all the details because I think

14    they're laid out fairly clearly.

00:01:34    15           Enron's position is simple:  We, essentially, are

16    at the point where we need the Court's help to sign an order to

17    get us into the situation where Hewitt is able to fix the

18    mistakes that it made in the allocation.  And what we're asking

19    the Court to do is sign something that is in substantially

00:01:59    20    similar form to the amended allocation order that we presented

21    the Court.

22           Hewitt is -- we went through the problems in our

23    papers.  Hewitt is the fund administrator, and they were charged

24    with the responsibility of making the calculations, coming up

00:02:14    25    with a way to allocate the first tranche of the Tittle

```
 1   settlement, and we learned some time ago from claimants that
 2   there was a problem with the way it was done.
 3                   And indeed, after talking to Hewitt, looking into
 4   it, it became clear to us that, apparently, $22 million of the
 5   $85 million settlement, the first tranche, was -- virtually all
 6   of it was misallocated.  Of the claimants, I guess about 7700
 7   got too much money and about 12,800 or so got too little money.
 8                   So here we are now, almost about six years after
 9   the fall of Enron, and Hewitt has added insult to the claimants'
10   injury by botching the allocation.  Enron has proposed a fix,
11   and this is in the order that we filed with the Court.  And I
12   will note that remarkably I think the fix has been completely
13   agreed upon by class counsel, the Department of Labor, the
14   independent fiduciary, as well as Enron; and there are
15   representatives from all of those entities here today; and they
16   can address whatever concerns they have.  But our fix is in the
17   order.
18                   Essentially, what we have suggested is that the
19   Court amend the allocation order and provide a mechanism whereby
20   Hewitt is required to give us a revised corrected allocation for
21   each claimant, and we suggest doing so within 30 days of the
22   date the order is signed.  We would like a -- because we have
23   continued to have problems getting data from Hewitt, we would
24   like a certification from Hewitt that it's used its best efforts
25   to fix the misallocation problem that it caused.
```

1    We suggest in the order setting forth a procedure

2  for claimants, once they get notice of the new allocation, to

3  have a time period to dispute it; and if there is a dispute, we

4  suggest that the Court appoint a special master, which would be

00:04:17    5  at Enron's expense, to reconcile any dispute what an individual

6  claimant thinks he or she has or had in the account versus what

7  the Hewitt numbers ultimately show.  Again, I think everybody,

8  with the possible exception of Hewitt, is on board with the

9  procedure that we have suggested in the amended order.

00:04:37  10    Let me briefly give the Court a sense of what

11  Hewitt's response -- and I think this becomes clear -- or comes

12  through in the papers -- but Hewitt's response to the problem

13  has been from our standpoint, and I guess it's a situation of

14  there's good news and there's bad news.

00:04:52  15    The good news is that there has not been, from

16  what I can tell, at least, any denial on the part of Hewitt that

17  there's a problem; and I think they fully recognize that there

18  is a problem.  Mr. Boies can certainly speak to this; but from

19  what I can tell, there has also not been a denial on the part of

00:05:12  20  Hewitt that the problem was caused by the conduct of Hewitt.  So

21  that's the good news.

22    The bad news is the way that they have dealt with

23  this or not dealt with this problem.  It started out with them

24  filing papers in this court saying that there's no jurisdiction.

00:05:29  25  We briefed that back and forth.  I think that there is -- there

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  can be no credible claim that they're not subject to the Court's

2  jurisdiction for a variety of reasons, not the least of which

3  they have an active office in The Woodlands, they -- Hewitt is

4  down here dealing with Enron; and even putting aside the whole

5  issue of the Court retaining jurisdiction over the settlement, I

6  think Hewitt is four square in this court in this jurisdiction;

7  and they certainly appear here today.

8          They also say -- and this may be the most

9  significant hang-up that we have.  I think they've agreed to a

10  number of points in our proposed order; but as I understand it,

11  they also say that they are not the fund administrator.  Again,

12  looking at the evidence that we presented and the papers filed

13  with the Court, I don't think that is a claim that carries today

14  for them as well.

15          They have certainly been acting throughout this

16  process as the fund administrator; and if they're not the fund

17  administrator, I hope they tell us today who is because we

18  certainly have always thought they were the fund administrator;

19  and the over $1 million Enron paid them to administer the fund

20  and to get the right money to the right people at the right time

21  was given to them to be the fund administrator.  So if not

22  Hewitt, we have no idea who the fund administrator is.

23          It is important to us to have the Court formally

24  recognize what the situation is in its order, and that is, that

25  Hewitt is the fund administrator; and we're asking for this for

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  a really simple reason, and that is, without that recognition,

2  we have zero hope that Hewitt is going to take care of this

3  situation.

4            We first became aware of the misallocation back

00:07:20   5  in January of 2007.  Again, it is not because Hewitt came and

6  told us, it was because we were contacted by claimants who said,

7  "You know, the numbers that I'm getting don't match up with my

8  records of what I thought I had in the savings plans."

9            So we -- at that point, we started asking Hewitt

00:07:42   10 to figure out what the story was, figure out -- give us the

11 data, show us the problems, figure out how to fix it.  Well, we

12 were stonewalled, quite frankly -- there was a fair amount of

13 back and forth.  We were stonewalled to the point where we filed

14 our motion that we're here on today in May with this Court.

00:08:03   15            During that process, we continued to talk to

16 Hewitt.  We continued to try to get them to give us data.  We

17 stand here today still waiting for certain key data, still

18 waiting for assurances that they're going to take care of this

19 problem, still waiting for assurances that they are going to do

00:08:21   20 the right thing.

21            It's now the end of July, and we feel like

22 without the Court's assistance we're not going to advance the

23 ball.  We feel very specifically that, without the Court's

24 recognition of their status as fund administrator, they're going

00:08:36   25 to try to continue to wiggle out of their obligations.

1          Your Honor, this -- we think the only way this is

2     going to get done is with an order that is in substantially the

3     same form as the one submitted to you.  We spent a lot of time

4     talking to the Department of Labor, class counsel, and the

00:09:00  5     independent fiduciary to come up with that order; and in fact,

6     we even made some changes to the order that we originally filed

7     with the Court.

8          They're now happy with it, as I understand it,

9     and we would ask that the Court consider that order and enter it

00:09:15  10    so we can get on about fixing this problem.  We're tired of

11    hearing, "The check's in the mail."  And I think the Enron

12    claimants wish the check were in the mail; and Hewitt,

13    unfortunately, is the only person, the only entity, that's in a

14    position to fix this problem.  We don't have the information.

00:09:29  15    We can't do it.  We need their help.

16          I think Mr. Sarko has a few comments and may want

17    to add to this.

18          MR. RUSH:  Your Honor, Pete Rush, I'm sorry.  I just

19    got to make one refinement on what Mr. Strasburger said.  It is

00:09:43  20    important within the second supplemental -- amended supplemental

21    plan of allocation that there was one entity and one entity only

22    that was allowed to be paid out of fund assets for its work in

23    administering the fund.

24          And the fact of the matter is there is only one

00:09:58  25    entity that got paid approximately a million dollars out of fund

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1 assets to administer the fund, and their invoices recite that.
2 That entity is Hewitt

3         THE COURT:  Okay.  Mr. Sarko.

4         MR. SARKO:  Your Honor, I'm actually going to wait and

00:10:13  5 suggest that counsel for the independent fiduciary go next.

6         THE COURT:  Okay.

7         MS. PIKOFSKY:  Good afternoon, Your Honor.  Sara

8 Pikofsky, Thelen, Reid, Brown, Raysman & Steiner -- that's a

9 mouthful -- on behalf of Consulting Fiduciaries, the independent

00:10:32  10 fiduciary; and I will mention as well, Your Honor, that Dave

11 Heald, principal of Consulting Fiduciaries, is in the courtroom

12 today.

13         As I know Your Honor knows, the independent

14 fiduciary is tasked with protecting the interests of the plan

00:10:44  15 and the participants, sort of a different role from the parties

16 that I know you've seen at these tables for many months on end.

17         We certainly agree with the fix proposed by Enron

18 and, as Mr. Strasburger mentioned, participated in the amended

19 proposed order that was submitted to this Court in June.  And

00:11:00  20 the independent fiduciary's always understood that Hewitt was

21 acting as the fund administrator.

22         As you know, the second amended supplemental plan

23 of allocation describes the tasks to be performed by the fund

24 administrator.  As Hewitt acknowledged in one of their

00:11:17  25 communications dated July 28, 2006, that's appended to the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    filings that were made with this Court over the past two months.

2        The second amended supplemental plan of

3    allocation details, among other things, that the fund

4    administrator will submit expenses for approval to the

00:11:31    5    independent fiduciary.  My client signed off on expenses that

6    were submitted for approval by Hewitt.  And it dictates that the

7    fund administrator will communicate with plan participants.

8        There have been communications, both written and

9    call centers set up by Hewitt for communications with the plan

00:11:49    10    participants.  Again, the second supplemental -- second amended

11    supplemental plan of allocation sets this forth as a task to be

12    done by the fund administrator.

13        Finally, and perhaps most importantly, the second

14    supplemental amended plan of allocation describes the allocation

00:12:03    15    process in Section 3.  Every single task in that allocation

16    process that's attributed to the fund administrator was, in

17    fact, performed by Hewitt.

18        So to the extent that Hewitt now comes and says

19    they're not the fund administrator, I echo Mr. Strasburger's

00:12:20    20    question, which is, "Well, then who is?"  Hewitt was the one

21    that was paid over a million dollars to do this work.  Hewitt,

22    from everything the independent fiduciary has seen, did the

23    tasks described as the tasks to be done by the fund

24    administrator.  And we're left scratching our heads wondering

00:12:37    25    "What's going on here?  Why can't this be done?"  So that begs

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    the question why are we here today?

2            We share Enron's concern, and I shouldn't speak

3    for them but, likely, the concerns of class counsel and

4    Department of Labor, that the participants in these plans get

5    their money, they get it now, and they get the right amounts.

6    And that's one of the things that Your Honor is being asked to

7    order in the proposed order before you today.

8            Secondly, we want to ensure that none of the

9    costs of rectifying the problems that were described in Enron's

10   papers are borne by the settlement fund, the plans, the plan

11   participants.  That's of utmost importance to the independent

12   fiduciary in this.

13           Now, the bottom line, essentially, Your Honor, is

14   that my client and I don't understand why it's taking so long to

15   fix these problems.  As Mr. Strasburger indicated, Enron became

16   aware of this and made Hewitt aware of this in late January.

17   The independent fiduciary was made aware of it in late January,

18   early February.  It's now the end of July.  As far as we know,

19   this problem hasn't been fixed.

20           The plan participants are entitled to the money,

21   they're entitled to the accurate amounts, and they're entitled

22   to it at least six months ago, most likely over a year ago when

23   the initial allocations were done.

24           Now, one would hope that this would have been

25   accomplished back in February or March; but apparently, it

 1  hasn't.  And so we're left with the only possible solution it
 2  appears; and as Mr. Strasburger indicated, this is an unusual
 3  situation where you have the agreement of both the class counsel
 4  and Enron and the DOL and the independent fiduciary but we need
 5  a Court order in order to accomplish the corrections that need
 6  to be made to the allocation so that the participants can be
 7  made whole in an accurate and timely manner.
 8              And so we ask that, based on the events of the
 9  past six months, that the Court enter an order, as
10  Mr. Strasburger requested, in, essentially, the exact format
11  that was presented to this Court in June demanding that all
12  these things be completed as quickly as possible.
13              Thank you.
14          THE COURT:  Thank you.
15          MS. PARRY:  Your Honor, Robin Springberg Parry for the
16  US Department of Labor.
17              Your Honor, as described by both the Enron and
18  counsel for the independent fiduciary, Hewitt took on the
19  responsibility to carry out the functions of the fund
20  administrator as described in the plan of allocation for the
21  plans.
22              Hewitt carried out these functions in what seems
23  to be a grossly negligent fashion.  They used a stock price that
24  was more than twice the actual --
25          THE COURT:  Slow down just a little bit.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1        MS. PARRY:  Sure.  Sorry.  East coast fast talker.

2            They carried out the functions in what seems to

3    us to be a grossly negligent fashion using a stock price that

4    was more than twice the actual stock price.

00:15:21    5            And now, Hewitt is trying to duck the

6    responsibility of correcting its errors and, most outrageously,

7    trying to inflict the cost of fixing this on the participants

8    and beneficiaries.  In its June 8th statement to Enron, Hewitt

9    specifically excludes the necessary services to correct their

00:15:40    10    error and says should Enron request that Hewitt perform these

11    services and should Hewitt choose to propose performing them,

12    Hewitt will only do them for additional fees.

13            This is Exhibit A to Enron's reply in support of

14    their motion to strike.  It was filed July 25th.  And the

00:15:57    15    services that they list as being excluded except for additional

16    fees include any use of additional Hewitt resources to

17    recalculate the allocation amount and it includes any cost for

18    communications to participants about the corrections and several

19    other services.

00:16:12    20            And that would leave the cost of correcting this

21    gross negligence to come from the Enron plans and, therefore,

22    directly out of the pockets of the participants and

23    beneficiaries, and this is unacceptable.

24            The Department joins the concern of the

00:16:25    25    independent fiduciary and class counsel, as I -- not to put

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   words in his mouth but I believe he is about to speak -- and
2   Enron concerning the fact that none of this money should come
3   out of the participants' and beneficiaries' pockets.

4               THE COURT:   Thank you.

00:16:42    5          Mr. Sarko.

6          MR. SARKO:   Thank you, Your Honor.   Lynn Sarko on
7   behalf of the class Plaintiffs.

8               Your Honor, I think there's a couple of things.
9   What we need to do today and what I would ask the Court to keep
00:16:51   10   in mind is, one, we need to have the problem fixed; and I think
11   it is clear that we and everyone have heard from class members
12   who don't understand what's taking so long and what the problem
13   is.

14               And I would say, perhaps, recriminations can come
00:17:08   15   later but at this point we need to have a plan to say what will
16   be fixed, when will it be fixed, if there's access to data that
17   needs to be had that it is turned over, and that any warring
18   parties put that aside themselves and get on with fixing it.

19               The proposed order that I -- it is true that we
00:17:31   20   agreed to.   Originally, there was a proposed order presented by
21   Enron.   Both the independent fiduciary, the Department of Labor,
22   and class counsel had some issues with that.   We suggested
23   changes, which they agreed to.   Specifically, Paragraph 19 of
24   the order says that none -- none of the expenses involved in
00:17:55   25   fixing this problem -- and I'm paraphrasing -- shall be paid by

17

1    the plan or out of any of the settlement funds.

2           And I think there's agreement -- and I don't want

3    to speak for people -- by everyone, including Hewitt, that that

4    is what should happen.  I also think -- and I may differ with

00:18:11    5    Hewitt on this.  I think this Court has jurisdiction over all of

6    this.  This is this settlement.  The money being dealt with here

7    came from the registry of the Court in part, is dealing with a

8    settlement under jurisdiction of this Court.

9           The funds for paying to have this work done came

00:18:31   10    out of the settlement funds.  If this Court doesn't have

11    jurisdiction, I don't know who does.  And I would say in order

12    to get the job done, I would ask the Court to please use its

13    power to try to get to the end of the road and get this problem

14    fixed quickly.

00:18:46   15           As far as who is the fund administrator, you

16    know, I have to say that, if you look at the definition,

17    perhaps, people are reading more into it than I think needs to

18    be read, and that is, it says "appoint or retain."  I mean, I

19    say that because I wrote it.  It's "or."

00:19:05   20           And I think that it's clear that Hewitt was

21    retained.  Certainly, the independent fiduciary and other people

22    thought that it was the fund administrator, and I'm not sure

23    what the wiggling is going on to why that's such a bad thing.

24    And I would say this:  What is being asked in the order I think

00:19:28   25    is the recognition of what's already happened in the past.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          Going forward, people can resign, people can

2 quit, lots of things happen; and what I would ask is that we

3 have a resolution today that says how's the problem going to be

4 fixed, how quickly is it going to be fixed; and at least the

5 proposed order is something that to the rest of us I think is

6 acceptable.

7          And I'm going to hold any of my other comments to

8 hear what Hewitt has to say.

9          MR. BOIES:  Good afternoon, Your Honor.

10          THE COURT:  Good afternoon.

11          MR. BOIES:  My name is Bill Boies, and I do represent

12 Hewitt.  And I have to tell the Court that I regret that we're

13 all here this afternoon for two reasons:  One of them is we're

14 all here this afternoon because of a mistake that my client

15 made.  There's no doubt about that.  And secondly, I regret that

16 we're all here because I wish that counsel would have been able

17 to give you a completely agreed order to go ahead with the

18 correction process.

19          Let me tell you three things very quickly and

20 then I'll go back over them in a little more detail because I

21 think you're entitled to the detail.  We're here because of a

22 Hewitt mistake.

23          Hewitt is prepared to do the work to correct the

24 mistake and the followup work that goes with that.  Every single

25 paragraph of the order prepared by Enron as amended by other

 1  counsel is acceptable to us with respect to everything that they
 2  have said that Hewitt should do.  There is no issue before you
 3  about whether we will do the work proposed in their order.
 4           Third, we have submitted our own alternative
 5  order because we had suggested to them to simply pull out of
 6  their order proposed findings that Hewitt is the fund
 7  administrator.  We take issue with that.  And if I could double
 8  back to that in a minute, I'd appreciate the chance to tell the
 9  Court why as a matter of what actually happened we do take issue
10  with that.
11           But those are our three positions:  A mistake was
12  made.  It was our mistake.  We should do the work to fix the
13  mistake.  We're not the fund administrator but we'll do the
14  work.  And that's where we would like to come out of this
15  hearing.
16           Now, let me just very briefly tell you about the
17  mistake and the correction work.  The mistake was this:  For the
18  calculations for the class members with respect to the period
19  that would count for who would get what money out of this
20  settlement, there was a January 1, 1998, stock price involved.
21  That was one of the factors in the calculations.
22           What happened was that Hewitt's computer system
23  -- there was a flaw in old software; and rather than using the
24  actual market price on January 1, 1998, the defect in the system
25  took that price to what computer people call a default price,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   Your Honor.  It's not the actual price.  It goes to -- in this
2   case I think it was $100 price, which is a plug figure.  Defect
3   in the system.  Our mistake.  We accept the responsibility for
4   that.

00:22:47   5        More than that, Your Honor, I have to tell you
6   that Hewitt feels a lot of concern about what has happened here.
7   The work was being done by Hewitt staff largely here in Houston.
8   It's not something that we're outsiders to.  The people working
9   on this have friends and relatives who worked at Enron and are
00:23:09  10  affected by the distribution.  So everybody feels badly about
11  what happened and wants to straighten it out.
12        I will tell you that we have been at work on a
13  process -- Hewitt has been at work on a process of doing
14  recalculations and verification of those recalculations and a
00:23:29  15  certification to explain exactly what we have done in that
16  process.
17        I will tell you that it's not a simple process
18  because of the software we're working with and so forth.  And
19  it's been delayed and extended because a number of questions
00:23:44  20  have come up raised by Enron and their other consultants about,
21  perhaps, collateral issues, but we've dealt with them.
22        I'll give you a simple example.  Somebody raised
23  a question after our first distribution about people with QDROs,
24  you know, the divorce orders, and exactly who's the participant
00:24:04  25  under a QDRO.  Well, we've gone back and looked at that kind of

1   thing.

2         I will tell you that we've been reporting to

3   Enron.  I will tell you that none of those issues -- we've run

4   down a bunch of them.  None of them are going to change the

00:24:14   5   actual practical distribution at the end of the day.  They're

6   pennies, not dollars in the big picture; and of course, the

7   money -- the amount of money is, essentially, a closed universe.

8   Some people got paid too much; some too little.  But in doing

9   the adjustment, we're looking at these other details.  But I

00:24:30   10   will tell you they take time.  They're not going to change the

11   outcome significantly.

12         The whole process of corrections and sending new

13   materials to the participants, I want to be completely clear

14   with the Court -- and I have been clear with all counsel who

00:24:45   15   would talk to me about it -- we're prepared to do the work.  We

16   couldn't seem to communicate very well privately.  So that's why

17   we filed a proposed order that took every one of their

18   paragraphs about the work that Hewitt would do and accepted

19   every word of it save one, Your Honor.  And the word was

00:25:04   20   "postcards."

21         And the reason for that is because one of their

22   mailings contemplated doing the mailings with postcards.  The

23   way Hewitt works and we're all set up, this is what Hewitt does

24   is back office stuff.  It's their business, and they're all set

00:25:19   25   up to do it.  They're not set up to do it with postcards.  We

1  suggested that would have to be with a mailing envelope.  Other

2  than that, all the substantive work that they want us to do

3  Hewitt is prepared to do.

4            There are separate findings that they're asking

00:25:34  5  you to make that Hewitt is the fund administrator, and I'll get

6  to that a minute.

7            As to the order, Mr. Sarko mentioned the

8  additional paragraph providing that participants should not bear

9  the costs of the correction work.  We agree with that.  We have

00:25:54  10  no problem with that whatsoever.  I heard the comments from the

11  Department of Labor counsel to the effect that we're insisting

12  on getting paid for this work.

13            Your Honor, I'll tell the Court -- I don't want

14  to go into the contents of negotiations that I've been involved

00:26:12  15  in with -- by opposing counsel and I'm sure they won't do the

16  same.  I'll just cut through it.  We'll do the work.  If it's in

17  the order, we won't charge a dime.  That's a false issue.

18            Timing?  Their proposal is that -- in their order

19  that we would do the recalculations, our certification and come

00:26:36  20  up with revised statements within 30 days.  That's fine.  We'll

21  do that.  Again, we didn't take issue with any of those

22  provisions in the order at all.

23            Let me turn to their proposed findings that

24  Hewitt is the fund administrator.  What seems to be happening

00:26:55  25  here, Your Honor, in my perception, is that we have a fight

1  about the work that Hewitt has done -- I think we've been able

2  to privately resolve that fight, and the order that everybody

3  agrees you should enter would take care of getting the rest of

4  the work done -- and a fight about who gets to wear this fund

00:27:15   5  administrator hat, which I perceive has to do in part with who's

6  responsible for making decisions about dealing with the plan

7  participants and who gets what.

8          Let me briefly describe -- and our papers reflect

9  this -- Hewitt's business.  Hewitt handles benefit plan records.

00:27:31  10  We're not a bank.  We're not a corporate trustee.  We're not a

11  -- the type of trustee that I represent from time to time, oh,

12  State Street Bank.  You've seen the Northern Trust in your

13  courtroom.  They act as corporate trustee, a plan fiduciary, and

14  so forth.

00:27:40  15          Hewitt has a different business.  Hewitt is a

16  record keeper and a manager for benefit plans and other things.

17  And with respect to a settlement distribution, what Hewitt does

18  is akin to what this Court will have seen in other large class

19  action settlements.  I suspect in the Enron Securities

00:28:05  20  litigation, the grunt work on handing out the money was done by

21  either Gilardi or Garden City.  They're the ones who people

22  usually hire who do that kind of recordkeeping and distribution

23  work.

24          Hewitt does some of that as well.  We have a

00:28:20  25  written contract for work that we would do for Enron.  It

1    predates this project.  It's called an Administrative Services

2    Agreement, and we attached it to our brief we filed on June

3    18th.  And with respect to the work -- and it's nuts and bolts

4    back office work, Your Honor.

00:28:40    5        With respect to the work that has to do with the

6    plan of allocation and the distribution of the settlement that

7    you approved, we also provided the Court with the work order

8    that we entered into.  It was signed by Enron and Hewitt for

9    that particular work.  That is Exhibit B to our brief that was

00:28:58    10    filed on June 18.

11        And we gave you not only the short work order but

12    the so-called requirements document that lists all of the work

13    that's behind it.  It's a lot of the work for the distribution.

14    It also reflects the extent of the work that we agreed to do.

00:29:16    15    That work order signed by both sides doesn't set us up to be the

16    fund administrator.  That word never appears.  In fact, the fund

17    -- the plan of allocation is not even an exhibit to that

18    agreement between Hewitt and Enron.

19        The work that was done is reflected in actually

00:29:41    20    documents that Enron filed.  Their brief of June 27 has attached

21    to it Exhibit A, a set of minutes; and in those minutes at Tab

22    6, you'll see the minutes of a group called the Enron Advisory

23    Committee, which is Enron people and counsel and others, lawyers

24    outside counsel, inside counsel. Hewitt is there.  Everybody is

00:30:01    25    there.

1       And the essence of what I'm saying is that those
2   minutes reflect what actually happened.  The plan of allocation
3   that they signed talked about appointing or retaining a fund
4   administrator.  For whatever reason, Hewitt did some of that
00:30:20   5   work.  Hewitt signed some of that out and we agreed to do some
6   of that work.
7       But we didn't agree to become their fund
8   administrator with general responsibilities to make future
9   decisions, and there may be some coming down the road, and we're
00:30:35   10  saying that Enron should be making them.
11      Going forward, let me emphasize we're prepared to
12  do all of the work called for by the order.  The only change we
13  made in their language in the proposed order that we submitted
14  to you substitutes an envelope mailing for a postcard mailing.
00:30:54   15  But everything they want, the calculations correction, the
16  certification to go with that, working on the followup mailings
17  to participants, right through -- I think the last thing on
18  their list was working with a special master if you choose to
19  appoint one.  We're prepared to do that.
00:31:15   20      What we're asking is that the Court need not, and
21  in fact, given the record, should not, enter an order finding
22  that we're the fund administrator.  Frankly, we think that's
23  trying to offload possible decision-making in the future that
24  Enron -- it's their plans.  They should be making those
00:31:32   25  decisions.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

 1          We -- and I'll add just one thing, Your Honor, if
 2    I may, because I don't think we should have been here and I
 3    suspect -- oh, no, I'm going to give you an example.  There was
 4    a filing with the Court -- the last filing by Enron,
 5    essentially, said that our filings saying we're ready to do the
 6    work weren't true.

 7          They said they weren't true because they attached
 8    a scope of work document that had been exchanged between the
 9    parties that we prepared which describes the scope of work under
10    our work order that I told you about, then describes additional
11    scope of work that was outside of that work order and would be
12    called for by your order.

13          And our scope of work document points out the
14    difference between the two.  It's been filed with the suggestion
15    with, "Well, that's our real secret position that we won't do
16    the work."  Your Honor, I want to tell you that was a document
17    that was prepared on the 8th of June.  It reflected the
18    difference between the work we had already agreed to do and new
19    work that would be called for by your order.

20          At that point we didn't have any agreement with
21    them about what to do.  We didn't have orders in front of us, as
22    I recall.  What I'm telling you is that, as of now -- that's not
23    evidence that we're intending to do less work.  I'm not crazy
24    enough to stand up in front of this Court on behalf of a company
25    like Hewitt and tell you we agree to the order and we're going

1 to do the work and have some secret plan that we're not going to

2 do it.

3            That document filed was simply an earlier stage

4 in discussions.  There's been a lot of unfortunate, let's call

00:33:13    5 it, confusion, if not animosity, built up here; and the last

6 thing that I would suggest is, at the end of this hearing, in

7 addition to everything else you're going to do, Your Honor, if

8 you're going to appoint a special master, you may want to

9 consider having the special master deal with any further work

00:33:30    10 disputes between Hewitt and Enron.

11            Our contract provides for a way to do that.  Our

12 contract provides that we would have, I'm sorry, executive

13 conferences.  We've had them.  They've been somewhat useful.

14 We're still here today, which is unfortunate.  It has a

00:33:48    15 mediation provision, but I'm not so sure this is mediator stuff.

16            And so what I'm telling you is we'd ask you to

17 enter the order as revised by us, not a word changed except the

18 "postcard" word.  On the substantive work, I'm committing to the

19 Court that we will do that work.  I'm committing to the Court we

00:34:08    20 will not charge for that work.  We see no basis in the factual

21 record, in the documents in front of you, to put the fund

22 administrator hat on this.  It doesn't matter in terms of the

23 work that we will do.  We'll get it done.

24            And frankly, if you feel like we've wasted your

00:34:23    25 time by being here, I would ask you to consider, perhaps, if we

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  need to come back.  If you appoint a special master, if we have

2  future fights, I'd be happy to just straighten out details in

3  front of a special master.

4          If the Court has any questions for me, I'd be

00:34:33  5  glad to answer them.

6      THE COURT:  So your -- is your position there really

7  is no fund administrator?

8      MR. BOIES:  It's my position, Your Honor, that they

9  use the term "fund administrator" and they really didn't select

00:34:45  10  an entity to do it.  They didn't really do it all themselves.

11  They could have.  They didn't really hire someone to do it.

12  They could have hired a corporate trustee to do that.

13          It's my position that they've -- they've

14  performed some of the functions themselves and farmed some of

00:34:58  15  them out.  And I am not in any way trying to be critical of

16  doing that.  It's perfectly functional.  You know, one of the

17  people at Hewitt explaining this business to me said, "You know,

18  companies make the big decisions and we act as their arms and

19  legs to do the things."

00:35:17  20          That's what's reflected in the record.  They made

21  the big decisions.  We've been acting as their arms and legs,

22  and we're perfectly prepared to keep acting as their arms and

23  legs to get the job done.

24      THE COURT:  Okay.  Thank you, sir.

00:35:30  25      MR. STRASBURGER:  One of the big decisions we made was

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    to hire Hewitt as the fund administrator.  The two things -- the

2    first two things that I heard is "We, Hewitt, have been hard at

3    work on verification" and secondly, "It's Enron's fault that

4    it's not done because they're asking too many questions" and

00:35:49    5    then, third, you know, "We can't communicate privately."

6    Your Honor, we have been communicating privately

7    with them since January.  We have gotten nowhere.  That's why

8    we're here.  We tried for four months before we filed anything.

9    The Hewitt papers and the Hewitt speeches in Court belie what's

00:36:10    10    really going, and that is, they're telling us behind the scenes

11    that they don't want to do this, they're not getting paid for

12    that, they're unwilling to take on responsibilities that we

13    think they've already agreed to take on and we still don't have

14    the data.

00:36:19    15    I cannot understand why they will not acknowledge

16    that they're the fund administrator when everyone else in the

17    free world thinks they're the fund administrator.  If it walks

18    like a duck and quacks like a duck, it is a duck.

19    And the final thing is there are big companies

00:36:36    20    involved and, yes, there's big decisions being made; but I don't

21    want anyone to forget that there are consequences for people who

22    are not big companies.  15 minutes before I walked over here, I

23    pulled out of my mailbox a handwritten letter to me from a

24    70-year-old plan participant asking where her money is.

00:36:54    25    There are real people out there that this is a

1　real problem for.  Without the Court's help in recognizing the

2　reality that Hewitt is the fund administrator, they're going to

3　continue what they've been doing since January which is to try

4　to wiggle away from their responsibilities; and we're asking the

5　Court to please don't let them do that, help us get this matter

6　settled and fixed.

7　　　　THE COURT:  The two orders that have been proposed,

8　your order and then Hewitt's order, counsel indicates that

9　they're basically the same order except for this finding of fact

10　that they're the fund administrator.  My first question is is

11　that -- is that your -- the way you look at it?  And number two,

12　if that's the way you look at it, why is the -- their being

13　declared fund administrator so important?

14　　　　MR. STRASBURGER:  Let me answer that first.  Because

15　our history of dealing with them shows that without -- without

16　the recognition that they are -- and we're not asking for

17　something that we don't think already exists.  We just are,

18　basically, asking the Court to acknowledge in this order what we

19　think the situation is, and that's they're the fund

20　administrator.

21　　　　　　Without that, they're going to do, in our view --

22　and we've had six months of dealing with them trying to get this

23　information; and without that, they're going to try to continue

24　to make this our problem.  You know, they say they're happy to

25　give us data.  We've been asking for the data since January.

1        We're here for a reason, and that's because we

2  have not -- without the Court's help, we have not been able to

3  get them to comply with their obligations.

4        In terms of the differences between the order, I

00:38:26   5  think that -- if I'm -- if I'm not wrong, Mr. Boies wanted a

6  change regarding notice -- postcard notice.

7        Or am I wrong?

8        MR. BOIES:  Yeah.  If I could clarify, Your Honor, we,

9  in fact, provided the Court yesterday with a redlined copy of

00:38:41  10  our proposed order; and Mr. Strasburger's correct.  In answer to

11  your question, the two differences are that --

12        John, do you want a copy?  I got it here.

13        MR. STRASBURGER:  We don't have a copy of the

14  redlined.  Do you have a copy?

00:38:55  15        MR. BOIES:  Yes, we got a copy.

16        The two differences are that we propose

17  withdrawing their comments about fund administrator and we

18  changed the word "postcard" to, I think, prepaid envelope.

19        MR. STRASBURGER:  You've looked at this.  Mr. Rush,

00:39:12  20  why don't you address that.

21        MR. RUSH:  Yes, Your Honor, if I might --

22        THE COURT:  Surely.

23        MR. RUSH:  -- on behalf of Enron a couple of points.

24  In answer to your question why do we think we need the

00:39:18  25  declaration of fund administrator, because, Your Honor, it is my

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1 firm belief that what's outlined in the order will not

2 completely correct the problem that we face.  I expect future

3 problems.  I expect future issues.  I think everyone in the

4 court does.  This isn't the end.  This may be the beginning.

5 Without recognition, a cognition of their

6 historical state as the fund administrator and their payment, my

7 fear is we won't be able to get them to follow through and stay

8 with us until the end.  And the fact of the matter, Your Honor,

9 is with regard to the initial allocation and with regard to the

10 revised allocation, there is only one entity on earth in a

11 position to stay with this process through the correction phase;

12 and that's Hewitt.

13 Recognition of their status as fund administrator

14 means they have to see this work through, the work in which the

15 fund paid them a million dollars.  They have to see it through

16 to the end.  And that's the concern we have here today.  That's

17 why we need that label.  That's why they're fighting it.  That's

18 what the issue is.  That's why it needs to be in there.

19 Secondly, with regard to this language, we

20 believe there is more substantive language in here.  In

21 Paragraph 4 they insert a new sentence which changes the tone of

22 it and indicates that they were acting as simply a service

23 provider to Enron.

24 And the fact of the matter, Your Honor, is if

25 Enron Corporation had full control of Hewitt and could tell

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   Hewitt what to do and Hewitt did what it told them to do -- what
2   Enron told them to do, we wouldn't be here.  We asked for this
3   information.  We asked for it in March.  We asked for it in
4   June.  We've asked for it several times.

00:41:03  5       Just this week -- I do need to make two more
6   comments.  Number one, with regard to Exhibit B, Mr. Boies
7   represented to the Court that the second supplemental amended
8   plan of allocation was not an exhibit to it.  Hewitt wrote
9   Exhibit B.  They mentioned the second supplemental amended plan
00:41:21 10  of allocation twice, and they undertook the responsibility of
11  allocating the proceeds in accordance with it.

12       Secondly, with regard to the scope of services
13  document, just this week I received a letter from Mr. Boies, and
14  I'm not going to go into the details of it except to say that it
00:41:36 15  incorporated by specific reference and page numbers the June 8th
16  scope of services document.  I asked for a letter of
17  clarification with respect to the use of that document.  I've
18  not received it yet.  I just sent him the letter yesterday, Your
19  Honor.  I do not want to get into that.

00:41:54 20       But the fact of the matter is there are more
21  issues to come.  There are more letters to come to
22  Mr. Strasburger.  There are several more issues.  We can't do it
23  without Hewitt.  If we could do it without Hewitt, believe me,
24  we would.

00:42:07 25       Thank you, Your Honor.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1      MS. PIKOFSKY:  Your Honor, if I might just add a

2  slightly different gloss to this --

3      THE COURT:  Yes.

4      MS. PIKOFSKY:  -- first of all, one of the things that

00:42:16   5  Mr. Boies said was that the fear of becoming fund administrator

6  has something to do with thereby accepting the general

7  responsibility to make decisions.

8          Now, I've been through the second supplemental

9  amended plan of allocation several times.  I don't see anything

00:42:32  10  in that document that ties fund administrator to general

11  responsibility to make decisions, and I think that's just a red

12  herring that's been thrown out here for reasons that are beyond

13  my ability to comprehend.

14          If you look at what the second supplemental

00:42:49  15  amended plan of allocation requires, it requires the fund

16  administrator to do several tasks, the most important of which

17  is "shall calculate the claimants' settlement claims based on

18  information described in Section 2 and according to the

19  following Court-approved methodology."  I'm reading from Page 11

00:43:05  20  of that document.

21          And the reason that it's become apparent that

22  it's so important to have Hewitt declared the fund administrator

23  is because Hewitt has performed these tasks to date.  What's

24  being asked for here is for Hewitt to completely, finally, and

00:43:23  25  accurately do what it was asked to do as the fund administrator

1   since it was the one that was performing the activities required

2   by the fund administrator to the satisfaction of the plan

3   participants and everybody else involved.

4              And as Mr. Rush and Mr. Strasburger indicated,

00:43:38   5   part of the concern is that the $100 stock price mistake may

6   just be the tip of the iceberg.  It's the view of the

7   independent fiduciary that what the fund administrator has to do

8   is complete all of the tasks that Hewitt has started that are

9   assigned to the fund administrator in the second amended

00:43:56  10   supplemental plan of allocation.  And that's why that finding is

11   so critical to what's being asked of Your Honor today.

12              THE COURT:  All right.  We've got the Department of

13   Labor who's next.

14              MR. SARKO:  Okay.

00:44:11  15              MS. PARRY:  Your Honor, Hewitt has now said that

16   they're going to -- they're prepared to do the work and not

17   charge an additional dime.  That has not been their position

18   previously in the process.  I'm glad to hear it now.  But what

19   we had in the June 8th filing was in response -- June 8th letter

00:44:27  20   that went to Enron referred to the proposed order that Enron had

21   filed and a motion that Enron had filed at the end of May with

22   this Court, the motion for approval of modifications.

23              So it was in response to that, to Enron saying,

24   "We need these corrections," that Hewitt sent them a statement

00:44:45  25   of services saying, "Well, it will cost extra to do these

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  particular things as outlined in your motion." And that's why

2  we're here, to see that it does not cost extra to the

3  participants and beneficiaries when that happens.

4          THE COURT: Mr. Sarko.

00:45:01  5          MR. SARKO: Your Honor, after hearing everything, I'm

6  going to be blunt. The plan of allocation requires there to be

7  a fund administrator. It was the understanding and expectation

8  of the independent fiduciary, the Department of Labor, us that

9  Hewitt was hired to administer the plan of allocation and

00:45:22  10  undertake certain things.

11          Now, it seems to me not to sound like people are

12  quibbling but the issue about what was within their scope of

13  services or not within their scope of services and whether they

14  get paid more or less seems to be a different issue. I got to

00:45:38  15  say that I'm troubled if someone says that this car was

16  operating without a driver. It needed to have a fund

17  administrator who was retained to administer the program, to do

18  the calculations, to do all of the things.

19          If it isn't Hewitt, we have a big problem here

00:45:53  20  because it clearly was. They got paid a million dollars. And

21  so I guess when I first stood up, I'm not sure I understood what

22  the big problem was with the agreed order. Now, there will be a

23  later time as to when they figure out who got overpaid and who

24  got short and how many millions of dollars we're short in this

00:46:14  25  thing because certain people got overpaid and they can't get the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

37

1    money back.

2              That's for another day.  And I will tell you that

3    I'm interpreting paragraph -- the last paragraph in your order

4    to say it isn't the plan and it's not the participants, it's one

5    of the other people; and that can be had; and I also think you

6    have jurisdiction over that issue to make sure this is done

7    right.

8              My guess is that if you -- if you sign the order

9    on the facts you have, of which you have everyone involved who

10   was sitting there dealing with the fund administrator saying it

11   was Hewitt, this will go more simply.

12             Now, as to the issue at the end, if there's a

13   shortage, who pays for it, that can be dealt with another day;

14   and I hope that, you know, calmer heads will prevail and it will

15   be worked out.  But as I say that when you have the evidence in

16   front of you which the independent fiduciary who was involved in

17   this and approved the bills and the Department of Labor and us

18   and the plan and Enron who all thought the reason Hewitt was

19   operating was that it wasn't just a bunch of legs but there was

20   a body there and that body was the fund administrator.

21             Now, I will be the first to say I don't think

22   that answers the questions later as to who of the guilty parties

23   will have to make up the difference.  I do know it isn't the

24   participants and it isn't the plans.  So I would say that I

25   guess I join on the people on that table.  I tried to sit in the

1  middle.  And I think that the order proposed as amended at our

2  comments is the right order.

3          THE COURT:  What about the postcards?

4          MR. SARKO:  Well, the postcard I would say this:  that

00:48:04  5  I would have to look at what's on it because if it has Social

6  Security numbers, et cetera, it should be in an envelope and if

7  it isn't, it shouldn't.  But I would suspect that's something

8  that the independent fiduciary can pass on; and if it's fine

9  with the independent fiduciary, it's fine with me.

00:48:21  10          But I'm happy to look at it.  But I think that

11  postcard/envelope thing, with all due respect, is probably like,

12  if you got this big issue on who the fund administrator is that

13  you want the judge to sort of think there are other issues,

14  maybe you argue whether it says postcard or envelope; but I

00:48:37  15  think they can deal with that.

16          MR. STRASBURGER:  Your Honor, I think we can probably

17  agree on the postcard issue.  I mean, I don't -- that is not the

18  hang-up here, and we're certainly willing to go with the

19  suggestion on that.  The hang-up here -- and we shouldn't waste

00:48:52  20  the Court's time with minor issues.  The big issue is the fund

21  administrator issue which we feel very strongly about.  We can

22  live without the postcard issue.  That doesn't matter.

23          THE COURT:  All right.

24          Anybody else want to say anything about this?

00:49:03  25  (No response.)


          Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    THE COURT:  Okay.  You'll have a ruling by Monday.

2    MR. STRASBURGER:  Your Honor, I don't know if the

3    Court wants an electronic copy of the order.

4    THE COURT:  Yes, please.

5    MR. STRASBURGER:  I'll hand that up.

6    MR. SARKO:  Thank you, Your Honor.

7    THE COURT:  Thank you.

8    MR. STRASBURGER:  Thank you.

9    (Proceedings concluded at 2:25 p.m.)

10

11

12

13

14

15

16

17                  C E R T I F I C A T E

18

19        I certify that the foregoing is a correct transcript

20    from the record of proceedings in the above-entitled matter, to

21    the best of my ability.

22

23    _____          9/13/07

24    Gayle L. Dye, CSR, RDR, CRR          Date

25

Gayle Dye, CSR, RDR, CRR - 713.250.5582

# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HEWITT ASSOCIATES, L.L.C.,     ) | |
|     ) | |
|     Plaintiff,     ) | |
|     ) | |
| v.     ) | No. |
|     ) | |
| ENRON CREDITORS RECOVERY CORP., f/k/a     ) | |
| ENRON CORP., an Oregon Corporation,     ) | |
|     ) | |
|     Defendant.     ) | |

## DECLARATION OF ROBERT W. JONES

I, Robert W. Jones, under penalty of perjury, do solemnly swear that I am over 21 years of age, that the following statements are true and correct, and that I can testify to the following facts based on my personal knowledge, my review of Enron's records or my consultation with current and former Enron employees:

1.    I am employed by Enron Creditors Recovery Corp., formerly Enron Corp. ("Enron") as Managing Director and Chief Administrative Officer. I have served in this capacity from September 16, 2005 to the present. I am also Chairman of the Administrative Committee (the "Administrative Committee") for the Enron Corp. Savings Plan (the "Savings Plan"). I have served as Chairman of the Administrative Committee from April 13, 2005 to the present.

2.    I am authorized to make this Declaration, which is submitted in support of Defendant Enron Creditors Recovery Corp.'s Motion to Transfer Pursuant to 28 U.S.C. § 1404(a);

3.    Enron Creditors Recovery Corp. is incorporated under the laws of the State of Oregon, and its principal place of business is located at 1331 Lamar Street, Suite 1600, Houston, Texas, 77010. My office is located at this address, and I reside in Houston, Texas.

4.     On November 13, 2001, a class action lawsuit was filed against Enron and numerous other defendants in the United States District Court for the Southern District of Texas, Houston Division, asserting claims for alleged breach of fiduciary duty in a case captioned *Tittle v. Enron Corp.*, Case No. H-01-3913 (the "*Tittle* Litigation"). The *Tittle* Litigation was assigned to the Honorable Melinda Harmon.

5.     On December 2, 2001, Enron filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code with the United States Bankruptcy Court for Southern District of New York. Since that time, Enron has primarily directed its resources to bankruptcy and other litigation matters and winding up its business.

6.     The plaintiff class in the *Tittle* Litigation (the "Claimants") entered into eight separate settlements resolving their claims against various defendants:  a settlement with Andersen Worldwide Societe Cooperative dated August 29, 2002, $3.75 million of which was subsequently allocated to the *Tittle* Litigation; a settlement with various officers, directors, and Enron benefits plan administrative committee members dated May 26, 2004, for $85 million; a settlement with Enron dated July 6, 2005, for a $356.25 million allowed claim in the bankruptcy proceedings (the "Enron Settlement"); a settlement with the United States Department of Labor ("DOL") dated July 6, 2005, for $1.85 million; a settlement with Arthur Andersen dated July 27, 2005, for $1.25 million; a settlement with Northern Trust Company dated April 13, 2006, for $37.5 million; a settlement with the Estate of Kenneth Lay dated October 19, 2006, for a $12 million allowed claim in the probate proceedings; and a settlement with Jeffrey Skilling dated November 27, 2006, for $2.5 million.  In February 2006, the Claimants sold their bankruptcy claim obtained in the Enron Settlement and, in combination with a disbursement received in the bankruptcy, grossed total proceeds of just under $134 million from the claim.

7.    The Administrative Services Agreement (the "ASA") attached as Exhibit A to the Complaint filed by Hewitt Associates, L.L.C. ("Hewitt") herein was negotiated on behalf of Enron by Mary Joyce, Cynthia Barrow, and Mikie Rath in Houston, Texas. In connection with those negotiations, Hewitt hosted a site visit at its offices in The Woodlands, Texas. On or about September 26, 2001, Joyce and Barrow executed the ASA on behalf of Enron at Enron's offices in Houston.

8.    Ms. Joyce, Ms. Barrow and Ms. Rath are no longer employed by, or otherwise under the control of, Enron. Ms. Joyce currently resides in Sugar Land, Texas. Ms. Barrow currently resides in Cypress, Texas. Ms. Rath currently resides in Houston, Texas.

9.    As set forth in the ASA, Enron retained Hewitt in 2001 to provide certain benefit plan administration services for the Enron Corp. Savings Plan, the Enron Corp. Employee Stock Ownership Plan, the Enron Corp. 1994 Deferral Plan and the Enron Corp. 1998 Expatriate Plan.

10.    Enron's interactions with Hewitt during the course of Hewitt's performance of these plan administration services was almost entirely with employees based in Hewitt's facilities in The Woodlands, Texas. Robert Dunlap, who was based in The Woodlands, served as Hewitt's account manager for the plan administration work performed by Hewitt for Enron. Darrel Folkert, Thomas Singletary, Jason Mills, Carrin Stewart, Doug Lyles, and Cathy Graham, all based in The Woodlands, handled the bulk of the day-to-day work involved in the plan administration services rendered to Enron at various times. Debbie Schneider, who was located in Austin, Texas, also handled the day-to-day work for Hewitt.

11.    The foregoing Hewitt employees worked primarily with some or all of the following Enron employees in performing the plan administration services at various times during the business relationship: Dinah Sultanik, Chris Rahaim, Sheri Jordan, Karla Dobbs,

Mikie Rath, Mary Joyce and Cynthia Barrow, all in Enron's Houston headquarters. I also had periodic communications with Hewitt in connection with their plan administration services for Enron, which consisted principally of communications with Robert Dunlap and Darrel Folkert. To a lesser extent, I had infrequent dealings with Debbie Schneider.

12.    Dinah Sultanik, Chris Rahaim, Sheri Jordan and Karla Dobbs are no longer employed by, or otherwise under the control of, Enron. Ms. Sultanik is currently employed by Mercer Human Resources Consulting and continues to office at 1331 Lamar Street in Houston, Texas. Ms. Sultanik also resides in Houston, Texas. Mr. Rahaim does not reside in Texas or Illinois. Ms. Jordan resides in Houston, Texas. Ms. Dobbs is now employed by Hewitt at its The Woodlands offices.

13.    Enron terminated the ASA effective December 31, 2004, and the parties entered into an Amendment to Administrative Services Agreement ("Amendment I," attached as Exhibit B to the Complaint herein), effective January 1, 2005, pursuant to which Hewitt agreed to provide limited ongoing maintenance and assistance in connection with Enron data contained on Hewitt's systems.

14.    I negotiated and executed Amendment I in Houston, Texas on behalf of Enron as its Managing Director of Human Resources. Sharon Butcher and Chris Rahaim, who were Enron employees based in Houston, Texas at the time, also negotiated Amendment I on behalf of Enron. Sharon Butcher is no longer employed by, or otherwise under the control of, Enron. Ms. Butcher currently resides in Arkansas.

15.    While Amendment I was executed by C. Lawrence Connolly, III, on behalf of Hewitt, Mr. Connolly was not involved in negotiating Amendment I. Sharon Butcher, Chris Rahaim and I negotiated Amendment I with Robert Dunlap. I have never met or spoken with

Mr. Connolly, and I am not aware of any past or present Enron employee who has met with or spoken to Mr. Connolly. The Amendment I document I received to be executed on behalf of Enron, which was prepared by Hewitt, was sent to me by Robert Dunlap.

16.    Amendment I redefined the "Services" to be rendered to Enron by Hewitt as "primarily consisting of providing information to [Enron] related to Participant data which Hewitt has maintained on its proprietary systems, to the extent Hewitt maintains such information." In this respect, Amendment I reflected Hewitt's more limited service role by Hewitt than did the ASA, a role commensurate with Enron's reduced operations as an ongoing entity at that time. Amendment I was scheduled to terminate on September 30, 2006.

17.    By letter dated July 25, 2006, Enron and Hewitt entered into a second amendment to the ASA, effective July 1, 2006 ("Amendment II," attached as Exhibit C to the Complaint herein), extending the Services provided by Hewitt to Enron under Amendment I for an additional year, through September 30, 2007.

18.    As with Amendment I, Sharon Butcher and I negotiated Amendment II on behalf of Enron. As with Amendment I, Mr. Connolly was not involved in negotiating Amendment II. Sharon Butcher and I negotiated Amendment II with Robert Dunlap. The Amendment II document I received to be executed on behalf of Enron, which was prepared by Hewitt, was sent to me by Robert Dunlap.

19.    I executed Amendment II in Houston, Texas on behalf of Enron, as its Managing Director and Chief Administrative Officer.

20.    On July 28, 2006, Hewitt submitted a letter agreement it had prepared to be executed on behalf of only the Administrative Committee covering the work Hewitt was to perform under the Second Supplemental Amended Plan of Allocation entered by Judge Harmon

and the *Tittle* Settlement (the "Letter Agreement").  A true and correct copy of the Letter

Agreement is attached hereto as Exhibit A.  The Letter Agreement was prepared for signature by

Robert Dunlap, a Hewitt Account Executive, and issued from Hewitt's The Woodlands, Texas

office.

21.     According to the terms of the Letter Agreement:

> Hewitt has been preparing since December 2005 to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other related plans based on the terms of the Second Supplemental Amended Plan of Allocation adopted and approved by counsel for plaintiffs pursuant to the partial settlement approved by the court in Tittle, et al., v. Enron, et al., Case No. H-01-CV-3913.

> Enron's authorization is needed in order for Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds in accordance with the document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp.", dated July 31, 2006 and the terms of said Second Supplemental Amended Plan of Allocation.  Please execute in the space provided below and send a facsimile copy to the attention of Darrel Folkert at 281-363-9049.

22.     Hewitt prepared the Letter Agreement in its entirety, including the typed notation

in signature block for me including typing in my "Title" as "Administrative Committee."  I

signed the July 28, 2006 Letter Agreement in Houston, Texas in my capacity as the Chairman of

the Administrative Committee of the Savings Plan.

23.     Robert Dunlap oversaw the team of Hewitt employees who performed the

allocation work under the Second Supplemental Amended Plan of Allocation in connection with

the *Tittle* Litigation.  The Hewitt team who performed the allocation work under the Second

Supplemental Amended Plan of Allocation primarily consisted of Darrel Folkert, Debbie

Schneider, Andrew Ross, Carrin Stewart, Doug Lyles, Doug McKnight, Debi Wollenberg, David

Sneed, Stephanie David, Lois Brown, Tini Siders, Eric Sickman and Faye Riehl.  Mr. Ross was

based in Atlanta, Georgia.  Mr. Folkert, Ms. Stewart, Mr. Lyles, Mr. McKnight, Ms. Brown, Mr.

Siekman and Ms. Riehl were based in The Woodlands. Ms. Stewart was based in Austin, Texas. I am not aware of where Ms. Wollenberg, Mr. Sneed, Ms. David or Ms. Siders were based, but Enron's dealings with these individuals were from Enron headquarters in Houston.

24.    The Hewitt team referenced in paragraph 23, above, worked principally with the Administrative Committee, consisting of myself and K. Wade Cline, and several Enron employees, including Pam Butler, Dinah Sultanik and Sharon Butcher.

25.    Mr. Cline and Ms. Butler were at all relevant times and continue to be employed by Enron at its offices in Houston, Texas.

26.    The data Hewitt compiled to perform the allocation work under the Second Supplemental Amended Plan of Allocation was collected primarily in two Hewitt facilities located in Atlanta, Georgia and The Woodlands, Texas.

27.    On or about July 12, 2006, in connection with the allocation work under the Second Supplemental Amended Plan of Allocation, Robert Dunlap and Darrel Folkert made a presentation at Hewitt's offices in The Woodlands to me, Pam Butler, Dinah Sultanik, Sharon Butcher, the Administrative Committee's Houston counsel, John Neslage, the Independent Fiduciary of the Savings Plan, David Heald, and the Independent Fiduciary's counsel, Sara Pikofsky. Mr. Dunlap's and Mr. Folkert's presentation overviewed Hewitt's allocation work under the Second Supplemental Amended Plan of Allocation .

28.    Relying on Hewitt's representations that the calculations complied with the Second Supplemental Amended Plan of Allocation, the Administrative Committee authorized distribution of the Enron Settlement proceeds in accordance with Hewitt's calculations, and distributions commenced in mid-August 2006 (the "Initial Allocation"). In total, approximately

$89 million in total settlement proceeds were allocated to more than 20,000 Claimants in the Initial Allocation.

29.     Hewitt established and maintained a call center in The Woodlands when the Initial Allocation was made to answer any questions from Claimants regarding the Initial Allocation.

30.     By late January 2007, Hewitt became aware that virtually all of the distributions made to Claimants in the Initial Allocation were incorrect. By email dated January 30, 2007, sent from Hewitt's The Woodlands, Texas office, Darrel Folkert provided me, Pam Butler, and Dinah Sultanik in Houston, Texas with an initial assessment of the source of the misallocation and preliminary corrective calculations. A true and correct copy of Mr. Folkert's January 30, 2007 email is attached hereto as Exhibit B. As Mr. Folkert explained,

> ESOP opening balance amounts used to do the original calculation were misstated as a result of closing share price stored in the NTRC record – keeping the system for December 31, 1997. The closing price for that day was incorrectly set on the share price table to a default value of $100.00. It appears (although not yet confirmed) that through the archival process, some of the older share prices stored on the system (including the December 31, 1997 price) were removed and a default price was used.

31.     According to information provided by Hewitt, its miscalculations directly resulted in the misallocation of $21,849,788.29 of the approximately $89 million Initial Allocation, roughly 25% of the total funds distributed. (*See* Ex. B at 3.) Hewitt also determined that virtually no Claimants received a correct allocation in the Initial Allocation, and that approximately 7,700 Claimants had received over-allocations while approximately 12,600 Claimants had received under-allocations.

32.     Over 43% of the Claimants who received under-allocations and 54% of the Claimants who received over-allocations in the Initial Allocation had Texas addresses.

33.    Robert Dunlap and Darrel Folkert were assigned responsibility at Hewitt for evaluating and correcting mistakes contained in Hewitt's Initial Allocation.

34.    Throughout 2007, Mr. Dunlap and Mr. Folkert met with Wade Cline, Pam Butler, Dinah Sultanik and/or me on multiple occasions in Houston, Texas and in The Woodlands, Texas in connection with Hewitt's efforts to obtain corrected allocation figures.

35.    During the course of reviewing Hewitt's work on the Initial Allocation, additional mistakes in Hewitt's allocation calculations were uncovered, including: incorrect treatment of forfeitures of non-vested shares as sales of shares; incorrect methodology to account for transfers of value from participant accounts to alternate payee accounts; incorrect methodology for accounting for transfers of value from deceased participants' accounts to beneficiary accounts; double-counting of 1999 contributions by participants in the PGE Plan; failure to account for approximately 800 participants who should have been included in the original allocation; assignment of negative opening balances to 71 participants; incorrect assignment of social security numbers to many Claimants; incorrect treatment of certain defaulted loans as sales of stock; and incorrect treatment of certain rollovers as sales of stock.

36.    On March 12, 2008, the evening before a scheduled hearing on a motion filed by the United States Department of Labor to hold Hewitt in contempt of Court in the *Tittle Litigation*, Hewitt agreed to loan to the Savings Plan a portion of the funds necessary to cover supplemental allocations to previously under-allocated Claimants. As part of that agreement, Hewitt demanded that the Savings Plan, the Administrative Committee and Enron submit to mediation with Hewitt, and that the Administrative Committee Action be stayed pending the mediation. The federal court in Houston acceded to Hewitt's requests.

37.    Counsel and representatives from Hewitt, the Administrative Committee and Enron participated in the Hewitt-requested mediation on May 13, 2008. The mediation was held at the offices of Baker Botts, LLP, in Houston, Texas. The mediation did not result in resolution of any of the parties' disputes.

Signed under the pains and penalties of perjury of the laws of the United States this 25th day of June, 2008.

_____
Robert W. Jones

# JONES DECL.
# EXHIBIT A

# Hewitt

Hewitt Associates LLC
[address lines illegible]

Argentina
Australia
Austria
Belgium
Brazil
Canada
Channel Islands
Chile
China
Czech Republic
France
Germany
Greece
Hong Kong
Hungary
India
Ireland
Italy
Japan
Malaysia
Mexico
Netherlands
Philippines
Poland
Puerto Rico
Singapore
South Africa
South Korea
Spain
Sweden
Switzerland
Thailand
United Kingdom
United States
Venezuela

July 28, 2006

Private and Confidential

Mr. Robert W. Jones
Enron Corp.
Post Office Box 1188
Houston, TX 77251-1188

Dear Robert:

At Enron's direction, Hewitt has been preparing since December 2005 to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other related plans based on the terms of the Second Supplemental Amended Plan of Allocation adopted and approved by counsel for plaintiffs pursuant to the partial settlement approved by the court in Tittle, et al., v. Enron, et al., Case No. H-01-CV-3913.

Enron's authorization is needed in order for Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds in accordance with the document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp.", dated July 31, 2006 and the terms of said Second Supplemental Amended Plan of Allocation. Please execute in the space provided below and send a facsimile copy to the attention of Darrel Folkert at 281-363-9049. The original copy can follow via regular mail.

Sincerely,

Hewitt Associates LLC


Robert A Dunlap

RAD:cgb
cc: Mr. Darrel Folkert, Hewitt Associates


Enron Corp. Authorization

By: _____

Name: _____Robert W. Jones_____

Title: _____Administrative Committee_____

# JONES DECL.
# EXHIBIT B

**'>nes, Robert W.**

| | |
|---|---|
| **From:** | Darrel Folkert [darrel.folkert@hewitt.com] |
| **Sent:** | Tuesday, January 30, 2007 10:37 PM |
| **To:** | Jones, Robert W.; Butler, Pam; Sultanik, Dinah |
| **Cc:** | Bob Dunlap; Debbie Schneider; Steve Reynolds; Andrew Ross |
| **Subject:** | Allocation Correction Summary and Analysis |

Attached is the analysis of Claimants impacted by the correction required in the Tittle Settlement.   Corrected allocation amounts have been calculated for each Claimant based on new opening balance amounts for participants that held shares in the ESOP Plan as of the first day of the settlement period. The ESOP opening balance amounts used to do the original calculation were misstated as a result of closing share price information stored in the  NTRC recordkeeping system for December 31, 1997. The closing price for that day was incorrectly set on the share price table to a default value of $100.00.  It appears (although not yet confirmed) that through an archiving process, some of the older share prices stored on the system (including the December 31, 1997 price) were removed and a default price was used.  The opening balance for the first day of the allocation period (January 1, 1998) was calculated using the participant's share position as of that morning multiplied by the previous night's closing value (the December 31, 1997 share price).  As such the opening balances for all participants with an ESOP balance as of January 1, 1998 · used in the original allocation calculation were overstated.  The prices used to calculate individual transaction level values (e.g., transfers and payments) in the ESOP plan were not impacted by this price table. As such, we believe the balances calculated for all other ESOP activity to be correct.  This issue appears to be isolated to the ESOP opening balance numbers used in the original allocation calculation.

The spreadsheet contains data only for those Claimants that received a payment amount greater then the amount they would have received if the ESOP opening balances had been properly stated.  The Claimants are divided into 5 primary groups based on the form of payment they received.  The final group of the 5 (labeled No Election) includes those Claimants that have yet to r[  ]st (or have paid) their original settlement amount. The other 4 groups are defined as follows:

- Cash Payment (Cash payments mailed directly to a Claimant at their designated address)
- Rollover (Payments of settlement balances rolled directly to an IRA or Qualified Plan other than the WTC IRA or Successor Plans)
- WTC IRA (Allocation principal amounts of less than $5,000 deposited in IRAs at WTC )
- Successor Plans (Assets directly transferred to one of the qualified successor plans)

Additional comments are included in the heading of most of the columns in the spreadsheet to provide additional details on the data included in that column.

Please let me know if you have any additional questions.

-Darrel

Darrel Folkert
Hewitt Associates
Phone: (281)/882-6763
Fax: (281)/363-9049
darrel.folkert@hewitt.com
http://www.hewitt.com

3/14/2007

T⁻ ~ information contained in this e-mail and any accompanying documents may contain information that is confidential or otherwise protected · · disclosure. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message, including any attachments. Any dissemination, distribution or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

(

3/14/2007

| | PFTs | Original Allocation | Corrected Allocation | Difference (Overpaid) | % of Total PFTs |
|---|---|---|---|---|---|
| Cash Payment | 2,275 | $7,961,693.21 | $3,508,429.42 | $4,453,463.79 | 29.5% |
| Rollover | 1,914 | $20,718,236.86 | $12,751,560.66 | $7,966,676.20 | 24.8% |
| WTC IRA | 1,942 | $3,063,740.34 | $808,066.62 | $2,255,673.72 | 25.1% |
| Successor Plans | 658 | $8,583,226.75 | $5,931,040.01 | $2,652,186.74 | 8.5% |
| No Election | 935 | $10,824,267.81 | $6,302,279.97 | $4,521,787.84 | 12.1% |
| | 7,724 | $51,151,164.97 | $29,301,376.68 | $21,849,788.29 | 100.0% |

| | PFTs | Received Full Payment in Error | Max. Full Pay Over Amount | Received Partial Payment in Error | Max. Partial Pay Over Amount |
|---|---|---|---|---|---|
| Cash Payment | 2,275 | 1,453 | $40,937.35 | 822 | $26,836.61 |
| Rollover | 1,914 | 630 | $77,971.53 | 1,284 | $44,991.36 |
| WTC IRA | 1,942 | 1,298 | $4,927.30 | 644 | $4,371.32 |
| Successor Plans | 658 | 184 | $44,021.90 | 474 | $4,879.28 |
| No Election | 935 | 284 | $41,525.26 | 651 | $23,777.11 |
| | 7,724 | 3,849 | | 3,875 | |

| | PFTs | Full Payment $ to Recover | Partial Payment $ to Recover | TOTAL Recovery |
|---|---|---|---|---|
| Cash Payment | 2,275 | $2,706,209.75 | $1,747,254.04 | $4,453,463.79 |
| Rollover | 1,914 | $3,144,966.95 | $4,821,709.25 | $7,966,676.20 |
| WTC IRA | 1,942 | $1,824,078.68 | $431,595.04 | $2,255,673.72 |
| Successor Plans | 658 | $913,097.37 | $1,739,089.37 | $2,652,186.74 |
| No Election | 935 | $1,996,482.50 | $2,525,305.34 | $4,521,787.84 |
| | 7,724 | $10,584,835.25 | $11,264,953.04 | $21,849,788.29 |

| | PFTs | Approximate SSSM Allocation Amount | Recoverable in Next Allocation |
|---|---|---|---|
| Cash Payment | 822 | $3,508,429.42 | $1,219,014.43 |
| Rollover | 1,284 | $12,751,560.66 | $3,519,994.29 |
| WTC IRA | 644 | $808,066.62 | $281,983.49 |
| Successor Plans | 474 | $5,931,040.01 | $1,333,895.07 |
| No Election | 651 | $6,302,279.97 | $1,942,282.47 |
| | 3,875 | $29,301,376.68 | $8,297,169.75 |

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ENRON CORP. SAVINGS PLAN and the | § | |
| ADMINISTRATIVE COMMITTEE OF | § | |
| ENRON CORP. SAVINGS PLAN | § | |
| | § | NO. _____ |
| vs. | § | |
| | § | |
| HEWITT ASSOCIATES, L.L.C | § | |
| | § | JURY TRIAL DEMANDED |

### PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Enron Corp. Savings Plan (the "Plan") and the Administrative Committee of the Enron Corp. Savings Plan (the "Administrative Committee") bring this action for negligent misrepresentation, grossly negligent misrepresentation, negligence, gross negligence, professional negligence and gross negligence, and breach of contract against Defendant Hewitt Associates, L.L.C. ("Hewitt").[1]

In support of these causes of action, Plaintiffs respectfully state the following:

### INTRODUCTION

1.     In this action, Plaintiffs seek to recover losses they suffered as a direct result of Hewitt's breaches, including its gross negligence in providing grossly and admittedly erroneous calculations to Plaintiffs that caused the misallocation of almost $22 million in Plan assets and property. Although Hewitt's grossly negligent actions have jeopardized the retirement assets of thousands of current and former Enron employees, Hewitt has refused to pay even one penny to cover the shortfall it caused to the Plan. Plaintiffs seek to require Hewitt to compensate

---

[1]     Hewitt Associates, L.L.C. is the wholly-owned subsidiary of Hewitt Associates, Inc. As reported in both Hewitt Associates, Inc.'s 2006 and 2007 10-Ks, "Hewitt associates, Inc. is a Delaware corporation with no material assets other than its ownership interest in Hewitt Associates LLC, an Illinois limited liability company that serves as Hewitt's operating entity in the U.S. and also holds ownership interests in the Company's subsidiaries."

the Plan for these losses and other damages in order to ensure that no Plan participant is shortchanged by Hewitt's actions.

**PARTIES**

2.     The Plan is a tax-qualified defined contribution plan established by Enron Corp. ("Enron") that held the retirement assets of thousands of current and former employees of Enron and related entities.    The Plan is a citizen of Delaware because the Plan's trustee, Wilmington Trust Corporation ("Wilmington Trust"), is a Delaware corporation that has its principal place of business in Wilmington, Delaware.[2]

3.     The Plan is directed and administered by the Administrative Committee, which authorizes this action on behalf of the Plan.  The Administrative Committee maintains its legal place of business at 1331 Lamar Street, Suite 1600, Houston, Texas.  Its current members are K. Wade Cline ("Cline") and Robert W. Jones ("Jones"), both of whom reside in Houston, Texas.[3]

4.     Hewitt is a human resources consulting firm that holds itself out as the "world's foremost provider of human resources outsourcing and consulting services."[4]  Hewitt specializes in providing consulting services, including benefits calculations, to benefit plans worldwide.  Hewitt urges its clients to "depend on us to . . . process millions of HR customer interactions, free them to focus on their core business" and "trust us with the issues that affect the performance and lives of their employees."[5]

---

[2]     The Plan's trustee is a directed trustee that has no authority to make decisions for the Plan.

[3]     While Enron Creditors Recovery Corp., formerly Enron, is the Plan sponsor, the Administrative Committee has administrative and supervisory responsibilities for the Plan and is a legally separate entity from Enron Creditors Recovery Corp.

[4]     Hewitt made this statement on its website, http://www.hewittassociates.com.

[5]     *Id.*

5.      Hewitt is an Illinois limited liability company with its principal place of business in Lincolnshire, Illinois.  Hewitt conducts business in Texas and may be served with process by serving its registered agent in Texas, CT Corporation, at 350 North St. Paul Street, Dallas, Texas 75201.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that this controversy is between citizens of different states and the amount in controversy exceeds $75,000.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district and this case arises out of the distribution of settlement proceeds in the *Tittle* litigation over which this Court retained continuing jurisdiction.

### NATURE OF THE ACTION

8.      Hewitt acted as Fund Administrator for almost $89 million in Plan assets that were part of a settlement fund (the "Settlement Fund") for the Plan, which was approved by this Court in the consolidated cases of *Tittle, et al. v. Enron, et al.*, Case No. H-01-3913 and *Elaine L. Chao v. Enron Corp.*, No. H-03-2257 (collectively, the "*Tittle* litigation").   The Settlement Fund was intended to compensate Plan participants for pension losses they sustained because of the collapse and bankruptcy of Enron.  In its capacity as Fund Administrator, Hewitt was responsible for accurately calculating settlement distributions to individual participants ("Claimants") from the Settlement Fund in accordance with the Second Supplemental Amended Plan of Allocation (the "Plan of Allocation") approved by this Court.[6]

---

[6]      *Tittle* Action, Docket No. 1213 (attached as Exhibit 1).

9.    In a July 28, 2006 written agreement and on other occasions, Hewitt promised Plaintiffs that it would follow the Plan of Allocation. In return for its services, Hewitt collected approximately $900,000 in fees that would otherwise have been distributed to Claimants.[7]

10.    In August 2006, Hewitt completed the calculations of settlement distributions and provided the results of those calculations to Plaintiffs. Through gross negligence and in direct violation of the terms of the Plan of Allocation, Hewitt used the wrong number as the starting point for certain of its calculations and miscalculated a large percentage of the distributions. Plaintiffs reasonably relied on Hewitt's calculations in allocating settlement funds to Claimants. Hewitt's actions caused Plaintiffs to lose almost $22 million in assets and property through misallocations.

11.    On July 27, 2007, at a hearing before this Court, Hewitt purported to accept full responsibility for the misallocations and promised to correct the errors in its calculations at no cost to Plaintiffs or Claimants. At the hearing, Hewitt's counsel stated: "[W]e're all here this afternoon because of a mistake my client [Hewitt] made. . . Our mistake. We accept the responsibility for that."[8]

12.    Hewitt explained that it was solely to blame for the miscalculations and resulting losses to Plaintiffs and Claimants:

> What happened was that Hewitt's computer system — there was a flaw in old software; and rather than using the actual market price on January 1, 1998, the defect in the system took that price to what computer people call a default price, Your Honor. It's not the actual price. It goes — in this

---

[7]    To date, the Plan has paid approximately $781,000 to Hewitt out of the Settlement Fund. In addition, Hewitt collected approximately $119,000 in fees from Enron Creditors Recovery Corp. for work related to the Enron Settlement allocation, which the Plan expects to have to reimburse. During the time period of the allocation, Enron Corp. Savings Plan also paid another $280,000 for records maintenance.

[8]    Transcript of Proceedings, July 27, 2007 (attached as Exhibit 2), at pp. 18 – 20.

case I think it was $100 price, which is a plug figure. Defect in the system. Our mistake. We accept the responsibility for that.[9]

Hewitt's counsel summarized: "A mistake was made. It was our mistake. We should do the work to fix the mistake." [10]

13.    Four months later Hewitt has not kept the promises it made to this Court and the *Tittle* parties. Far from correcting its errors, Hewitt has not even complied with the minimum requirements of the Court's July 27, 2007 order to provide accurate revised calculations and — by its own admission — Hewitt's current calculations still contain errors. Further, Hewitt flatly refuses — despite repeated requests from all parties to the Tittle litigation, including the U.S. Department of Labor — to fund any portion of the shortfall or to make Claimants whole.

14.    Accordingly, Plaintiffs bring this action in order to hold Hewitt responsible for the losses Hewitt caused and to ensure that no Claimant is shortchanged by Hewitt's actions.

## FACTUAL BACKGROUND

### A.    This Court Approves the Plan of Allocation for the *Tittle* Settlement Fund

15.    In the *Tittle* litigation, Claimants sought damages against several defendants for the losses they sustained on retirement investments in Enron stock as a result of the collapse and bankruptcy of Enron. Between May 24, 2005, and July 24, 2006, this Court approved four partial settlements in the *Tittle* litigation that resulted in settlement monies being paid into the Plan.[11] These settlements are known as the "$85 Million Settlement," the "Enron

---

[9]    *Id.*

[10]    *Id.*

[11]    These settlements are the "$85 Million Settlement," the "Enron Settlement," the "Arthur Anderson LLP/David Duncan Settlement," and the "Northern Trust Settlement and Arthur Anderson Worldwide Settlement." *See* Docket Nos. 987, 1075, 1132, and 1219.

Settlement," the "Arthur Anderson LLP/David Duncan Settlement," and the "Northern Trust Settlement and Arthur Anderson Worldwide Settlement."

16.     Of these settlements, the Enron Settlement netted more than $89 million for distribution to Claimants. The funds from the Enron Settlement were paid into the Plan, became the Settlement Fund, and were to be distributed to Plan participants in the fourth quarter of 2006. Because the Enron settlement was designed to compensate Claimants for losses they sustained in Enron stock investments during the time period between January 1, 1998, and Enron's bankruptcy on December 2, 2001, the Plan of Allocation set forth a formula by which Enron Settlement funds were to be distributed in order to accomplish that purpose.

17.     The Plan of Allocation was filed with this Court on July 25, 2006.[12] This Court approved the methodology set forth therein as "fair, reasonable and adequate."

18.     The Plan of Allocation provided that a Fund Administrator "appointed or retained by the Enron Plans" would "administer the Plan of Allocation and the distribution of funds within the Plans" as set forth in the Plan of Allocation.[13] The Plan of Allocation required that the Fund Administrator "shall calculate the Claimants Settlement Claims . . . according to the . . . Court approved methodology,"[14] and provided that the approved expenses of the Fund Administrator "shall be deemed appropriate as a Plan expense and shall be paid from the [Settlement Fund]."[15]

**B.     Hewitt Is Selected as Fund Administrator**

19.     Based on Hewitt's representations about its capabilities and experience in handling benefits allocations, Hewitt was retained as the Fund Administrator responsible for

---

[12]     Docket No. 1220.

[13]     Exhibit 1 at ¶ 19.

[14]     *Id.* at § III.

[15]     *Id.* at § II.B.

calculating settlement distributions from the Settlement Fund. Under the formula specified in the Plan of Allocation, Hewitt was to calculate distributions based on the amount of value that each Claimant lost on retirement investments in Enron stock during the class period.[16]  Each Claimant was to receive a *pro rata* share of the Settlement Fund based on the amount of his or her loss in comparison to the total losses of all Claimants.[17]  Because of the mathematical nature of this type of allocation, any over-allocation to one Claimant would necessarily result in an under-allocation to other Claimants.

20.    As set forth in Section III.A of the Plan of Allocation, the critical starting point for determining the amount of each Claimant's loss was the per-share price of Enron stock as of January 1, 1998, the first date of the class period for the Enron Settlement.  Because January 1, 1998 was a stock trading holiday, the stock price to be used by the Fund Administrator was $41.56, or the closing Enron stock price as of December 31, 1997.

**C.    Hewitt Promises to Follow the Plan of Allocation**

21.    On or about July 13, 2006, Hewitt met with Plaintiffs to discuss the upcoming allocation of the Enron Settlement.  At the meeting, Hewitt prepared and presented a 34-page PowerPoint entitled DC Data Aggregation Loss & Allocation Project Blueprint (the "PowerPoint") to the attendees.[18]  In the PowerPoint, Hewitt represented that it would use the "12/31/97 Closing Stock Price" as the starting point for its calculations.[19]  Hewitt provided a copy of the PowerPoint to the chair of the Administrative Committee and the Independent Fiduciary, expecting that the Administrative Committee, the Independent Fiduciary, and the Plan

---

[16]    *Id.* at § III.A.

[17]    *Id.* at § III.D and III.E.

[18]    The PowerPoint is attached as Exhibit 3.

[19]    *Id.* at Slide 14.

would rely on the representations in the PowerPoint in assessing whether Hewitt's approach complied with the Plan of Allocation.

22.    On July 28, 2006, following the meeting, Plaintiffs executed a written agreement drafted by Hewitt. In that agreement, Hewitt promised to calculate distributions in accordance with the terms of the Court-ordered Plan of Allocation:

> At Enron's direction, Hewitt has been preparing since December 2005 to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other related plans based on the terms of the Second Supplemental Amended Plan of Allocation adopted and approved by counsel for plaintiffs pursuant to the partial settlement approved by the court in *Tittle, et al., v. Enron, et al.*, Case No. H-01-CV-3913.
>
> Enron's authorization is needed in order for Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds in accordance with the document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp.", dated July 31, 2006 and the terms of said Second Supplemental Amended Plan of Allocation. Please execute in the space provided below and send a facsimile copy to the attention of Darrel Folkert at 281-363-9049. The original copy can follow via regular mail.[20]

23.    On or about July 28, 2006, Robert Jones signed this Hewitt-drafted agreement on behalf of the Plaintiff Administrative Committee in reliance on Hewitt's representation that it was capable of following — and would follow — the Court-ordered formula.

24.    Moreover, Hewitt acknowledged that it was performing the distribution calculations for Plaintiffs. For example, Hewitt's Settlement Allocation(s) Plan Provisions and Requirements, dated July 31, 2006 (the "Hewitt Allocation Requirements"), opened with the recognition that Hewitt was performing distribution calculations for the Plan. "[T]he legal names of the Plans addressed by the Settlement Allocation project are the Enron Savings Plan,

---

[20]    The Authorization Letter is attached as Exhibit 4.

Enron ESOP and Enron Cash Balance Plans. Collectively all three plans may be referred to as the Enron Plans."[21]

25.    Hewitt also understood that Plaintiffs were paying for its services with monies out of the Settlement Fund that otherwise would have been distributed to Claimants. The Hewitt Allocation Requirements stated that:

> The amount available to Claimants included in the Enron Settlement will be determined after deducting administrative expenses from the Claim Settlement Amount . . .
>
> The Administrative Committee (Wade Cline and Robert Jones) for the Enron Plans and David Heald, Independent Fiduciary for the Enron Plans will take responsibility for providing Hewitt with the final net amount (after Hewitt expenses are deducted) to be allocated.[22]

26.    Thus, a contract was formed between the Plaintiffs and Hewitt that required Hewitt to execute the "first" *Tittle* litigation allocation in compliance with the terms of the Plan of Allocation in exchange for payments out of the Settlement Fund.

**D.    Hewitt Miscalculates Thousands of Participant Distributions**

27.    The Hewitt Allocation Requirements again confirmed that Hewitt would calculate participant losses beginning with a calculation of the participant's dollar value of Enron stock in the participant's account on January 1, 1998, and further clarified Hewitt's understanding that "the January 1, 1998 Enron stock price is based on the December 31, 1997 closing price of $41.56 per share because the stock market was closed on January 1, 1998."[23]

28.    Although the December 31, 1997 closing price of Enron stock was $41.56 per share, Hewitt incorrectly valued Enron stock as of January 1, 1998 at $100 per share and

---

[21]    Hewitt Allocation Requirements (attached as Ex. 5) at § 1.1. The Enron ESOP Plan identified in the passage quoted above was merged into the Enron Savings Plan.

[22]    *Id.* at § 1.26.

[23]    Ex. 5, Appendix D, No. 7.

used this erroneous number as the starting value for certain of its calculations of Settlement Fund distributions. As a result, Hewitt systematically overvalued the losses of thousands of Claimants while systematically undervaluing the losses of thousands of other Claimants.

29.    Hewitt represented to Plaintiffs that its calculations complied with the formula in the Court-ordered Plan of Allocation. Hewitt knew that Plaintiffs intended to direct Wilmington Trust to distribute the net settlement proceeds to Claimants based on its calculations. To facilitate the distribution, Hewitt provided a spreadsheet containing the results of its calculations directly to Wilmington Trust in August 2006. In justifiable reliance on Hewitt's calculations, Plaintiffs directed Wilmington Trust to allocate more than $89 million to Claimants, which occurred between August 14, 2006, and October 6, 2006, for most of the distributions.

**E.    Hewitt Collects Approximately $900,000 in Fees from the Plan**

30.    Hewitt collected approximately $900,000 in fees for its work on the Enron Settlement allocation. Hewitt provided the Independent Fiduciary, CFI, with an itemization of its expenses.[24] Hewitt charged Plaintiffs on a monthly basis for what it described in its invoices as "Administrative Service Fees - Enron Savings Plan" for "Settlement Plan of Allocation Support."[25] Hewitt was paid for its administrative services in accordance with the invoices, reducing the amount of the Settlement Fund available for allocation to the Claimants by approximately $900,000.

**F.    Hewitt's Actions Demonstrate Conscious Indifference to an Extreme Degree of Risk**

31.    In providing erroneous calculations to Plaintiffs based on an erroneous starting value of $100 per share, Hewitt acted with gross negligence. At the time it performed its calculations, Hewitt knew that Enron was a publicly traded company as of January 1, 1998, that

---

[24]    The itemization is attached as Exhibit 6.

[25]    Representative Hewitt invoices are attached as Exhibit 7.

its stock price for the prior trading date (December 21, 1997) was easily verifiable, that the price of Enron's stock on December 31, 1997, was $41.56 per share, and that Enron stock never traded as high as $100 per share.

32.    Moreover, Hewitt was conscious that it had taken shortcuts in its work that posed an extreme degree of risk of error. Yet Hewitt provided the results of its calculations without taking minimal steps to ensure accuracy.

33.    First, Hewitt consciously elected to maintain the vast majority of the Plan data on an obsolete OS/2 operating system throughout the relevant time period. Hewitt knew that using this system entailed a high level of risk, but deliberately chose not to replace the system or convert the data to a reliable system. Hewitt elected to employ an old software program for data extraction that only one person at Hewitt was trained to use. With conscious indifference to this risk, Hewitt did not test its computer system adequately, utilize appropriate safeguards, or reconcile its results against easily obtainable records for accuracy.

34.    Hewitt also chose to forego basic quality control measures customarily used by benefits consultants when performing similar calculations. By Hewitt's own admission, it never compared any of its distribution calculations with publicly available information such as Internal Revenue Service Forms 5500 (i.e., the Plan's Annual Reports) and external audit reports for the Plan. These public documents are routinely used by benefits consultants for the purpose of verifying distribution calculations. In this case, checking even one calculation against these documents would likely have prevented the error.

35.    In addition, Hewitt knew from past experience that its computer system was prone to errors and sometimes substituted random defaults for actual inputs. Nevertheless, Hewitt did not check the $100 starting value for its calculations against Enron's December 31,

-11-

1997 trading price of $41.56 per-share, despite the fact that the price was known to Hewitt and was public information, easily verifiable by anyone with access to the internet or a telephone.

36.     Furthermore, Hewitt understood the gravity of the risks it was taking. Hewitt knew that it alone had access to the data and was responsible for ensuring accuracy in its calculations and that no other party was in a position to double-check or verify those calculations. Hewitt was aware that any error in the basic formula used to calculate distributions would likely affect the accuracy of all distributions from the Settlement Fund.

37.     Hewitt also knew that a miscalculation that affected the distribution of more than $89 million in Settlement Funds would jeopardize the assets of thousands of current and former Enron employees. Hewitt was aware that many over-distributions, once made, would be impossible to reverse and very difficult to recover from the Claimants who received them. Hewitt also knew that over-distributions would expose individual Claimants to unexpected tax penalties for which they were unprepared.

38.     Thus, Hewitt knew that it was extremely risky not to confirm the accuracy of the number used as the starting point for its calculations, but consciously disregarded that risk.

**G.     Hewitt Admits Responsibility for the Miscalculations**

39.     Hewitt claims that it was oblivious to its mistakes until late January 2007, when one Plan participant came forward to question her allocation. On January 30, 2007, Hewitt first admitted the miscalculations to Enron and provided the following explanation:

> ESOP opening balance amounts used to do the original calculation were misstated as a result of closing share price stored in the NTRC record-keeping system for December 31, 1997. The closing price for that day was incorrectly set on the share price table to a default value of $100.00. It appears (although not yet confirmed) that through the archival process, some of the older share prices stored on the system (including the

December 31, 1997 price) were removed and a default price was used.[26]

On the same day, Hewitt also provided Plaintiffs with a summary spreadsheet acknowledging that its error had created a shortfall of $21,849,788.[27] By then, it was too late to reverse most of these distributions.

40.    Two weeks later, Hewitt vowed to "work to help resolve this matter quickly and in the best interests of the Plan's participants and beneficiaries."[28] Hewitt further claimed that it was "focused on ensuring that all of the Plan's participants receive their fair allocation of the Settlement Funds."[29]

41.    These promises went unfulfilled.   Weeks turned into months without Hewitt providing Plaintiffs with accurate calculations or making any effort to ensure that Plan participants received a "fair allocation of Settlement Funds."   Hewitt also did not provide Claimants who received under-allocations with their fair allocation of the Settlement Fund.

42.    In the ensuing months, further investigation uncovered a host of other problems with Hewitt's calculations and found additional defects with the software and hardware Hewitt used to perform the original allocation.   In one notable instance, Hewitt admitted that even its preliminary corrective calculations "lost" 800 Claimants overnight.   Hewitt dubbed these disappearing Claimants the "Lost 800."[30]

**H.    Hewitt Fails to Comply with This Court's July 27, 2007 Order**

43.    Ultimately, a Motion for Approval of Modifications to Second Supplemental Amended Plan of Allocation was filed in the *Tittle* litigation in May 2007.   The

---

[26]    January 30, 2007 email from Darrel Folkert to Robert Jones (attached as Exhibit 8).

[27]    *Id.*

[28]    February 16, 2007 letter from Rohail Khan of Hewitt (attached as Exhibit 9).

[29]    *Id.*

[30]    May 8, 2007 email from Bob Dunlap to Robert Jones (attached as Exhibit 10).

Department of Labor, the Independent Fiduciary, and Plaintiffs' Class Counsel supported the Motion.

44.    The Motion requested that the Court modify the Plan of Allocation to require Hewitt, as Fund Administrator, to provide revised, corrective allocation calculations for each Claimant and a certification that its revised calculations were accurate so that a fair and orderly corrected allocation could proceed.[31]

45.    Hewitt appeared and filed papers challenging aspects of the Motion and Proposed Order. Hewitt tendered evidence, including a sworn declaration, regarding its status as the Fund Administrator within the meaning of the Plan of Allocation.

46.    On July 27, 2007, Hewitt appeared before the Court in the *Tittle* litigation and reaffirmed its responsibility for the miscalculations:

> [W]e're all here this afternoon because of a mistake my client [Hewitt] made.
>
> *         *         *
>
> Our mistake. We accept the responsibility for that.
>
> *         *         *
>
> A mistake was made. It was our mistake. We should do the work to fix the mistake.[32]

47.    Hewitt explained the reason for the miscalculations as follows:

> What happened was that Hewitt's computer system — there was a flaw in old software; and rather than using the actual market price on January 1, 1998, the defect in the system took that price to what computer people call a default price, Your Honor. It's not the actual price. It goes — in this

---

[31]    Docket No. 1309.

[32]    Exhibit 2, pages 18-20.

case I think it was $100 price, which is a plug figure. Defect in the system. Our mistake. We accept the responsibility for that.[33]

48.    In Court papers, the Secretary of Labor stated that "Hewitt's 'mistake' of using a default stock price when the actual stock price was available (and less than half of the default price) amounts to gross negligence."[34]  The Secretary reiterated that position at the hearing:

> Hewitt took on the responsibility to carry out the functions of the fund administrator as described in the plan of allocation for the plans.
>
> Hewitt carried out these functions in what seems to be a grossly negligent fashion. They used a stock price that was more than twice the actual . . ..
>
> \*      \*      \*
>
> They carried out the functions in what seems to be a grossly negligent fashion using a stock price that was more than twice the actual stock price.
>
> And now, Hewitt is trying to duck the responsibility of correcting its errors and, most outrageously, trying to inflict the cost of fixing this on the participants and beneficiaries.
>
> \*      \*      \*
>
> And that would leave the cost of correcting this gross negligence to come from the Enron Plan and, therefore, directly out of the pockets of the participants and beneficiaries, and this is unacceptable.[35]

49.    On July 27, 2007, in open Court, Hewitt promised "to fix [its] mistake."[36] Hewitt's counsel further acknowledged: "The *whole process* of corrections and sending new materials to the participants, I want to be completely clear with the Court . . . we're prepared to

---

[33]    *Id.*

[34]    *Tittle* Action, Docket No. 1326, p. 6, n. 4.

[35]    Exhibit 2 at pages 14-16.

[36]    *Id.* at 19.

do the work."[37] Hewitt's counsel went on to explain: "I am committing to the Court we will not charge for that work."[38] Hewitt assured the Court: "[w]e'll get it done."[39]

50.    Following the hearing, the Court entered an Order (the "Order") in the *Tittle* litigation finding that Hewitt "acted as Fund Administrator pursuant to, and as defined in, the Allocation Plan."[40] The Court further ordered that by August 27, 2007: (1) Hewitt "shall" provide "a statement showing the revised, corrected allocation for each Claimant who received any type of distribution or allocation pursuant to the Enron Settlement ("Revised Allocation Statement ..."); and (2) that "Hewitt shall certify that it has used its best efforts to identify and rectify all flaws in its Initial Allocation, that Hewitt has used its best efforts to provide an accurate Revised Allocation Statement to each Claimant, and that Hewitt considers its Revised Allocation Statements true and correct." The Order also required Hewitt to mail the Revised Allocation Statements to all Claimants who received an allocation from the Enron Settlement.[41]

51.    Four months have passed since the hearing and three months have passed since the Court-ordered deadline. Yet despite all its promises before this Court, Hewitt has not complied with the Order. While Hewitt did provide revised calculations by the August 27, 2007 date in the Order, those revised calculations are still incorrect. In addition, Hewitt has not certified that it has used its best efforts to identify and rectify flaws in its initial allocation, as required by the Order. Hewitt also refuses to provide any funding to cover the shortfall in the Plan that its actions caused, even though Hewitt generated almost $3 billion in revenue last year.

---

[37]    *Id.* at 21 (emphasis added).

[38]    *Id.* at 27.

[39]    *Id.*

[40]    *Tittle* Action, Docket No. 1334, ¶ 5.

[41]    *Id.*, ¶¶ 8-10.

CAUSES OF ACTION

**A.    Negligent Misrepresentation**

52.    Plaintiffs incorporate the above paragraphs by reference as if fully set forth here.

53.    As alleged above, Hewitt negligently provided erroneous distribution calculations to Plaintiffs. Hewitt expected and intended for Plaintiffs to rely on the accuracy of those calculations in distributing assets and property. Plaintiffs reasonably and justifiably relied on Hewitt's erroneous calculations in distributing assets and property and suffered millions of dollars in losses as a direct result of Hewitt's negligent misrepresentations.

54.    Further, Hewitt negligently made additional misrepresentations to Plaintiffs, including but not limited to the following: (a) that Hewitt would use the closing stock price on December 31, 1997 ($41.56) to perform distribution calculations; (b) that Hewitt had the resources, systems, experience and knowledge to perform accurate distribution calculations; (c) that Hewitt's calculations properly determined the amount each Claimant was entitled to receive under the Plan of Allocation; (d) that Hewitt would allocate distributions from the Settlement Fund in accordance with the Plan of Allocation; and (e) that the calculations delivered to Plaintiffs conformed to the Plan of Allocation.

55.    Hewitt intended and expected that Plaintiffs would rely on those representations in assessing whether Hewitt's work complied with the Court-ordered Plan of Allocation and in distributing Plan assets and property. Plaintiffs reasonably and justifiably relied on these misrepresentations in distributing assets and property and suffered millions of dollars in losses as a direct result of them.

56.    Accordingly, Plaintiffs seek damages for Hewitt's negligent misrepresentations.

B.     **Grossly Negligent Misrepresentation**

57.     Plaintiffs incorporate the above paragraphs by reference as if fully set forth here.

58.     Hewitt made each of the above misrepresentations with conscious indifference to a high degree of risk that its statements were untrue.

59.     By way of illustration and without limitation, Hewitt knew that the $100 value it used as the starting point for its calculations was wrong.  Further, Hewitt was conscious that any errors in the basic formula used to calculate *Tittle* litigation distributions would jeopardize the assets due to thousands of people.  Hewitt knew that its computer system was prone to substituting random defaults for actual numbers, that its OS/2 hardware was unreliable and obsolete, that its software contained errors, that it had not properly trained its staff to use the hardware and software Hewitt used for the allocation, and that it had taken no steps to verify or check the results of its calculations.

60.     Hewitt knew that these failures, among others, posed an extreme degree of risk of erroneous calculations.

61.     Accordingly, Plaintiffs seek actual and punitive damages for Hewitt's grossly negligent misrepresentations.

C.     **Negligence**

62.     Plaintiffs incorporate the above paragraphs by reference as if fully set forth here.

63.     Hewitt had a duty to Plaintiffs to use reasonable care in calculating distributions for Plan participants and providing those calculations to Plaintiffs.  Hewitt failed to exercise reasonable care in performing that duty and thereby caused the Plan to lose millions of dollars in Plan assets and property.

64.    Accordingly, Plaintiffs seek damages for Hewitt's negligence.

**D.    Gross Negligence**

65.    Plaintiffs incorporate the above paragraphs by reference as if fully set forth here.

66.    In performing erroneous distribution calculations and providing them to Plaintiffs, Hewitt acted with conscious indifference to an extreme degree of risk of error.

67.    Plaintiffs seek actual and punitive damages for Hewitt's gross negligence.

**E.    Professional Gross Negligence and Negligence**

68.    Plaintiffs incorporate the above paragraphs by reference as if fully set forth here.

69.    Hewitt was in privity of contract with Plaintiffs. In performing erroneous distribution calculations and providing them to Plaintiffs, Hewitt breached the standard of care required of benefits consultants and acted with conscious indifference to an extreme degree of risk of error.

70.    Plaintiffs seek actual and punitive damages for Hewitt's professional negligence and gross negligence.

**F.    Breach of Contract**

71.    Plaintiffs incorporate the above paragraphs by reference as if fully set forth here.

72.    Hewitt promised in a written agreement to allocate the calculated distributions in accordance with the terms of the court-ordered Plan of Allocation. In exchange for that promise, Plaintiffs agreed to pay Hewitt out of the Settlement Fund to perform that allocation. The contract was supported by consideration from the Plan, and Plaintiffs have fully complied with and fulfilled all of their duties and obligations under the contract.

73.    Hewitt breached its contract with Plaintiffs by its failure to allocate the Settlement Fund in conformance with the terms of the Plan of Allocation.  As a direct and proximate result of Hewitt's breach of contract, Plaintiffs lost almost $22 million dollars in Plan assets and property and paid Hewitt approximately $900,000 for work that did not conform to the parties' agreement.  Plaintiffs also incurred substantial attorneys' fees and other costs and expenses relating to Hewitt's defective work.

74.    Plaintiffs seek to recover the damages they have suffered as a direct result of Hewitt's breach including, but not limited to all losses to the Plan and all the attorneys' fees, professional fees, costs and expenses Plaintiffs have incurred because of Hewitt's breach of contract.  Plaintiffs also seek to recover all professional fees paid to Hewitt, as well as such other and further relief as the Court may deem proper, including the costs and disbursements of this action.

### PRAYER

Plaintiffs respectfully request that Hewitt be cited to appear and answer, that upon trial hereof Plaintiffs have judgment against Hewitt for actual damages and punitive damages, costs of court, attorney's fees, prejudgment and post-judgment interest, and for such other and further relief, both general and special, legal and equitable, to which Plaintiffs may be justly entitled.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

Respectfully submitted,

/s/ Tynan Buthod
Tynan Buthod
S.D. Tx. No. 14036
State Bar No. 03513500
BAKER BOTTS L.L.P.
One Shell Plaza
Houston, Texas  77002-4995
(713) 229-1912
(713) 229-2712 (Fax)

ATTORNEY-IN-CHARGE FOR PLAINTIFFS
ENRON CORP. SAVINGS PLAN AND THE
ADMINISTRATIVE COMMITTEE OF ENRON
CORP. SAVINGS PLAN

OF COUNSEL:

John E. Neslage
S.D. Tx. No. 17243
State Bar No. 14923500
Steven J. Mitby
S.D. Tx. No. 33591
State Bar No. 24037123
BAKER BOTTS L.L.P.
One Shell Plaza
Houston, Texas  77002-4995
(713) 229-1234
(713) 229-1522 (Fax)

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ENRON CREDITORS RECOVERY CORP., f/k/a ENRON CORP., an Oregon Corporation | § § § § | |
| Plaintiff, | § § | Case No. _____ |
| v. | § § | |
| HEWITT ASSOCIATES, LLC | § § | |
| Defendant. | § § | |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff Enron Creditors Recovery Corp., f/k/a Enron Corp. ("Enron"), files its Complaint for Declaratory Relief against Hewitt Associates, L.L.C. ("Hewitt"), and respectfully shows the Court the following:

### SUMMARY OF COMPLAINT

1.    Hewitt served as Fund Administrator pursuant to the Second Supplemental Amended Allocation Plan (the "Allocation Plan") for the Enron Corp. Savings Plan (the "Plan") for approximately $89 million that became part of a settlement fund (the "Settlement Fund") which was approved by the Court in the consolidated cases of *Tittle, et al. v. Enron, et al.*, Case No. H-01-3913 and *Elaine L. Chao v. Enron Corp.*, Case No. H-03-2257 (collectively, the "*Tittle* Actions"). The Settlement Fund was created to compensate the members of the plaintiff class who were individual participants in the Plan ("Claimants") for retirement account losses they sustained as a result of Enron's collapse. As Fund Administrator, Hewitt was responsible for accurately calculating settlement distributions to Claimants from the Settlement Fund pursuant to the Second Supplemental Amended Plan of Allocation (the "Allocation Plan") approved by Judge Melinda Harmon, United States District Judge for the Southern District of Texas.

2.      Hewitt grossly neglected and breached its responsibilities.  As a direct result of Hewitt's gross negligence and utter failure to properly perform its duties, including its provision of grossly and admittedly erroneous calculations to the Plan that caused the misallocation of almost $22 million of the Settlement Fund, the Plan suffered substantial losses.  Accordingly, in 2007, the Plan and the Administrative Committee of the Enron Corp. Savings Plan (the "Administrative Committee") filed suit against Hewitt in the United States District Court for the Southern District of Texas to recover losses sustained as a result of Hewitt's gross negligence and breaches of its responsibilities to the Plan (Docket No. 1353).  Although Hewitt's own gross negligence and breaches of duties jeopardized the Settlement Fund owed to thousands of Claimants who are current and former Enron employees, Hewitt initially refused to pay anything to cover the shortfall that it alone created.  Now, having contributed to a loan to the Plan to cover the shortfall, Hewitt has the unmitigated gall to assert that Enron should indemnify it for Hewitt's own negligent—and grossly negligent—conduct.

3.      Enron, therefore, requests that the Court enter a declaratory judgment that Enron has no duty to indemnify Hewitt for any of the damage that Hewitt has caused by its own conduct, and that Enron has no duty to indemnify Hewitt against any claims brought against Hewitt for its own negligence, gross negligence, and breaches of its responsibilities to the Plan.

## THE PARTIES

4.      Enron is an Oregon corporation with its principal place of business in Houston, Texas.

5.      Hewitt is an Illinois limited liability corporation whose sole member is Hewitt Associates, Inc., a Delaware corporation.  Hewitt conducts business in Texas and may be served with process by serving its registered agent in Texas, CT Corporation, at 350 North St. Paul

2

Street, Dallas, Texas 75201. Additionally, Hewitt has appeared in this Court on matters related to the Settlement Fund.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that this controversy is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     In addition, the core dispute in this case arises out of the implementation of the *Tittle* settlement and the role Hewitt played as Fund Administrator. Judge Harmon specifically retained jurisdiction to preside over "any and all disputes" arising out of the implementation of the settlement agreements reached in the *Tittle* Actions and in connection with the Allocation Plan. (Docket No. 987 ¶30; Docket No. 1075 ¶31) Therefore, this Court also has jurisdiction over this matter pursuant to the doctrine of ancillary jurisdiction and the All Writs Act. 28 U.S.C. § 1651.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to Plaintiff's claim occurred in this judicial district and this case arises out of the distribution of settlement proceeds in the *Tittle* Actions over which this Court retained continuing jurisdiction.

## FACTS

### The Court Approves the Allocation Plan for the *Tittle* Settlement Fund

9.     In the *Tittle* Actions, Claimants sought damages from several defendants for losses they sustained on retirement savings invested in Enron stock as a result of the collapse of Enron. Between May 24, 2005 and July 24, 2006, this Court approved four partial settlements in the *Tittle* Actions that resulted in settlement monies being paid into the Plan. (Docket Nos. 987, 1075, 1132, and 1219).

10.    One of these settlements, the Claimants' settlement with Enron and certain related entities, netted more than $89 million for distribution to Claimants. The funds from the Enron Settlement were paid over into the care of Class Counsel for the Claimants, became the Settlement Fund, and were to be distributed to Claimants in the fourth quarter of 2006. Because the Settlement Fund was designed to compensate Claimants for losses they sustained in Enron stock investments during the time period between January 1, 1998, and Enron's bankruptcy on December 2, 2001, the Allocation Plan set forth a formula by which the Settlement Funds were to be distributed in order to accomplish that purpose.

11.    The Allocation Plan was filed with this Court on July 25, 2006. (Docket No. 1220). This Court approved the methodology set forth in the Allocation Plan as fair, reasonable and adequate. The Allocation Plan provided that a Fund Administrator retained by the Plans would administer the Allocation Plan and the distribution of the Settlement Funds, and further required the Fund Administrator to calculate the Claimants' individual distributions from the Settlement Fund according to the Court-approved methodology.

**Hewitt Is Retained by the Plan as Fund Administrator**

12.    Based on Hewitt's representations about its capabilities and experience in handling benefits allocations, the Plan retained Hewitt as the Fund Administrator responsible for calculating settlement distributions from the Settlement Fund. Under the formula specified in the Allocation Plan, Hewitt was to calculate distributions based on the amount of value that each Claimant lost on retirement investments in Enron stock during the class period. Each Claimant was to receive a *pro rata* share of the Settlement Fund based on the amount of his or her loss in comparison to the total losses of all Claimants. Because of the proportioned nature of this type of allocation, any over-allocation to one Claimant would necessarily result in an under-allocation to other Claimants.

4

13.    The critical starting point for determining the amount of each Claimant's loss was the per-share price of Enron stock as of January 1, 1998, the first day of the class period for the Enron Settlement. Because January 1, 1998 was a stock trading holiday, the stock price to be used by the Fund Administrator was $41.56, the closing Enron stock price as of December 31, 1997.

**Hewitt Agrees and Promises to Follow the Allocation Plan**

14.    On or about July 13, 2006, Hewitt met with representatives of the Plan and the Administrative Committee to discuss the upcoming allocation of the Enron Settlement. At the meeting, Hewitt presented a 34-page PowerPoint entitled DC Data Aggregation Loss & Allocation Project Blueprint (the "PowerPoint") to the attendees. In the PowerPoint, Hewitt represented that it would use the "12/31/97 Closing Stock Price" as the starting point for its calculations. Hewitt provided a copy of the PowerPoint to the chair of the Administrative Committee and the Independent Fiduciary to the Plan.

15.    On July 28, 2006, following the meeting, the Plan and the Administrative Committee executed a written agreement drafted by Hewitt. In that agreement, Hewitt promised to calculate distributions in accordance with the terms of the Court-ordered Allocation Plan.

16.    On or about July 28, 2006, Robert Jones signed this Hewitt-drafted agreement on behalf of the Administrative Committee.

17.    Moreover, Hewitt acknowledged that it was performing the distribution calculations for the Plan and the Administrative Committee. For example, Hewitt's Settlement Allocation(s) Plan Provisions and Requirements, dated July 31, 2006 (the "Hewitt Allocation Plan Process"), opened with the recognition that Hewitt was performing distribution calculations for the Plan.

5

18.    Hewitt also understood that the Plan was paying for its services with monies out of the Settlement Fund that otherwise would have been distributed to Claimants. The Hewitt Allocation Plan Process stated that:

> The amount available to Claimants included in the Enron Settlement will be determined after deducting administrative expenses from the Claim Settlement Amount...

> The Administrative Committee (Wade Cline and Robert Jones) for the Enron Plans and David Heald, Independent Fiduciary for the Enron Plans will take responsibility for providing Hewitt with the final net amount (after Hewitt expenses are deducted) to be allocated.

19.    Thus, a contract was formed between the Plan and the Administrative Committee, on the one hand, and Hewitt, on the other hand, to which Enron was never a party. Moreover, nowhere in the Hewitt-drafted agreement is there any reference to indemnification by Enron. Pursuant to the Hewitt-drafted agreement, Hewitt was required to perform the "first" *Tittle* Actions allocation in compliance with the terms of the Allocation Plan in exchange for payments out of the Settlement Fund.

**Hewitt Miscalculates Thousands of Claimant Distributions**

20.    The Hewitt Allocation Plan Process again confirmed that Hewitt would calculate Claimant losses beginning with a calculation of the Claimant's dollar value of Enron stock in the Claimant's account on January 1, 1998, and further clarified Hewitt's understanding that "the January 1, 1998 Enron stock price is based on the December 31, 1997 closing price of $41.56 per share because the stock market was closed on January 1, 1998."

21.    Although the December 31, 1997 closing price of Enron stock was $41.56 per share, Hewitt incorrectly declared the Enron stock price as of January 1, 1998 to be $100 per share and used this erroneous number as the starting value for certain of its calculations of

6

Settlement Fund distributions. As a result, Hewitt systematically overvalued the losses of thousands of Claimants while undervaluing the losses of thousands of other Claimants.

**Hewitt's Actions Demonstrate Gross Negligence**

22. In providing erroneous calculations to the Plan based on an erroneous starting value of $100 per share, Hewitt acted with gross negligence. When it performed its calculations, Hewitt knew that Enron was a publicly traded company as of January 1, 1998, that its stock price for the prior trading date (December 21, 1997) was easily verifiable, that the price of Enron's stock on December 31, 1997, was $41.56 per share, and that Enron stock never traded as high as $100 per share.

23. Moreover, Hewitt consciously took shortcuts in its work that posed an extreme degree of risk of error. Yet, Hewitt provided the results of its calculations without taking minimal steps to ensure accuracy.

**Hewitt Bills and Collects Approximately $900,000 in Fees from the Plan**

24. Hewitt collected approximately $900,000 in fees from the Settlement Fund for its work on the Settlement Fund allocation. Hewitt was paid these amounts out of the Settlement Fund. Enron did not pay Hewitt these amounts. Hewitt provided to the Plan's Independent Fiduciary, CFI, its itemization of expenses. Hewitt charged the Plan on a monthly basis for its services and Hewitt was paid by out of the Settlement Fund thereby reducing the amount of the Settlement Fund available for allocation to the Claimants by approximately $900,000.

**Hewitt Admits Responsibility for Its Miscalculations**

25. Hewitt claims that it was oblivious to its mistakes until late January 2007, when a Claimant came forward to question her allocation. On January 30, 2007, Hewitt first admitted the miscalculations resulted from its use of the erroneous share price. On the same day, Hewitt

7

also provided the Plan with a summary spreadsheet acknowledging that its error had created a shortfall of $21,849,788. By then, it was too late to reverse most of the distributions.

26.    Two weeks later, Hewitt vowed to "work to help resolve this matter quickly and in the best interests of the Plan's participants and beneficiaries." Hewitt further claimed that it was "focused on ensuring that all of the Plan's participants receive their fair allocation of the Settlement Funds." These promises went unfulfilled. Weeks turned into months without Hewitt providing accurate calculations or making any effort to ensure that Claimants received a "fair allocation of Settlement Funds." Hewitt also did not provide Claimants who received under-allocations with their fair allocation of the Settlement Fund.

**Hewitt Fails to Comply with Court Order on the Misallocation**

27.    Ultimately, a Motion for Approval of Modifications to Second Supplemental Amended Plan of Allocation was filed in the *Tittle* Actions in May 2007, requesting that the Court modify the Allocation Plan to require Hewitt, as Fund Administrator, to provide revised, corrected allocation calculations for each Claimant and a certification that its revised calculations were accurate so that a fair and orderly corrected allocation could proceed. (Docket No. 1309).

28.    Hewitt filed papers in this Court challenging aspects of the Motion and proposed Order. Hewitt tendered evidence, including a sworn declaration, regarding its status as the Fund Administrator within the meaning of the Allocation. Plan

29.    On July 27, 2007, Hewitt appeared before Judge Harmon in the *Tittle* Actions and reaffirmed its responsibility for the miscalculations. Following the hearing, the Court entered an Order (the "Order") in the *Tittle* Actions finding that Hewitt acted as Fund Administrator pursuant to, and as defined in, the Allocation Plan, and further ordered that by August 27, 2007, Hewitt was required to provide a statement showing the revised, corrected allocation for each Claimant who received any type of distribution or allocation from the Settlement Fund. Months

passed and Hewitt still failed to comply with the Order and failed to agree to provide any funding to cover the shortfall in the Plan that its grossly negligent actions caused.

**Hewitt Demands Indemnification from Enron**

30.    On November 30, 2007, the Plan and the Administrative Committee filed suit against Hewitt in this Court for, among other claims, negligence and gross negligence arising from Hewitt's misallocations as Fund Administrator.    After the suit was filed, and after the Department of Labor initiated investigations into Hewitt's conduct and sought to have this Court hold Hewitt in contempt, Hewitt eventually agreed to participate with Enron in making a loan to the Plan sufficient to pay Claimants who were underpaid or unpaid as a result of Hewitt's misallocations.    To the extent the Plan recovers sufficient funds from overpaid Claimants, such funds will be repaid to Hewitt and Enron in equal shares.    To the extent the Plan recovers on its claim against Hewitt, Enron will be repaid for its loan.

31.    In the meantime, Hewitt has demanded indemnification from Enron both for any unrecovered balance of Hewitt's loan to the Plan and for all expenses in defense of the Plan's lawsuit arising out of Hewitt's violations of its duties to the Plan, as well as its negligence and gross negligence in misallocating the Plan's assets. The stated basis for Hewitt's indemnification claims against Enron is a 2001 Administrative Services Agreement ("ASA") between Hewitt and Enron pursuant to which Hewitt was retained as a record keeper for certain Enron retirement plans.    Although the ASA included provisions for certain limitations of liability and cost recoveries, the ASA has nothing to do with Hewitt's role as Fund Administrator, the *Tittle* Actions, or the Settlement Fund. The ASA is wholly inapplicable to the dispute between Hewitt, on the one hand, and the Plan and the Administrative Committee, on the other hand.    Moreover, the Plan and the Administrative Committee are suing Hewitt for negligence and gross negligence in the performance of its role as Fund Administrator, and nowhere in the ASA is there any

9

provision that expressly obligates Enron to indemnify Hewitt for Hewitt's own negligence and misconduct. There is no basis for Hewitt to seek any indemnification from Enron, despite its demands.

32.    Therefore, a justiciable controversy exists between Enron and Hewitt regarding the inapplicability of the ASA.

## REQUEST FOR DECLARATORY RELIEF

33.    Enron requests that the Court enter a judgment declaring that (i) the ASA does not apply to the dispute between Hewitt, on the one hand, and the Plan and the Administrative Committee, on the other hand, pending in the United States District Court for the Southern District of Texas, Case No. 07-cv-0481 (consolidated with lead Case No. H-01-3913) and arising out of Hewitt's misallocation of the Settlement Fund; (ii) Enron is not obligated under the ASA, or any other document, to indemnify Hewitt for any losses Hewitt claims to have sustained as a consequence of its work under the Allocation Plan; (iii) Enron is not obligated to pay Hewitt any unrecovered balance of Hewitt's loan to the Plan; and (iv) Enron is not obligated to pay any expenses incurred by Hewitt in defense of Case No. 07-cv-0481, or any action involving Hewitt as Fund Administrator to the Plan.

34.    Enron further requests that the Court award Enron its attorneys' fees under Texas Civil Practice & Remedies Code § 37.001 *et seq.*

35.    Enron requests that the Court grant such other and further relief to which Enron is entitled.

Respectfully submitted,

John B. Strasburger
Attorney-in-Charge
State Bar No. 19358335
S.D. No. 11580
700 Louisiana, Ste. 1600
Houston, TX 77002
Tel.: (713) 546-5000
Fax: (713) 224-9511

**ATTORNEY FOR ENRON CREDITORS
RECOVERY CORP. F/K/A ENRON CORP.**

**OF COUNSEL:**

Scarlett Collings
State Bar No. 24001906
S.D. No. 22750
Weil, Gotshal & Manges LLP
700 Louisiana, Ste. 1600
Houston, TX 77002
Tel: (713) 546-5000
Fax: (713) 224-9511

Peter G. Rush
Bell, Boyd & Lloyd, LLP
70 W. Madison St., 31st Floor
Chicago, IL 60602
Tel: (312) 807-4352
Illinois (1989) ARDC# 6201818
Northern District of Illinois (1989);and
Northern District of Indiana (1985)
*Admitted Pro Hac Vice in Case No. 07-cv-0481*

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PAMELA M. TITLE, ET AL.,                    }
                                            }
                    Plaintiffs             }
                                            }
vs.                                         }        CIVIL ACTION NO.  H-01-3913
                                            }        CONSOLIDATED CASES
ENRON CORP., ET AL.,                        }
                                            }
                    Defendants             }

**ORDER GRANTING MOTION FOR APPROVAL OF MODIFICATIONS
TO SECOND SUPPLEMENTAL AMENDED PLAN OF ALLOCATION**

The Court has considered the Motion for Approval of Modifications to Second Supplemental Amended Plan of Allocation (the "Motion") filed by Enron Creditors Recovery Corp., formerly Enron Corp. ("Enron").  Plaintiffs are not opposed to the relief sought in the Motion.  For the reasons set forth in the Motion and in the arguments of counsel, if any, the Court grants Motions and **ORDERS** as follows:

**FINDINGS**

1.          On May 2,4 2005, and September 12, 2005, the Court entered orders of final judgment and dismissal in the above-captioned action and approved two partial settlements knows as the "$85 Million Settlement" and the "Enron Settlement." *See* Docket Nos. 987, 1075. The funds from those partial settlements were paid into a Settlement Trust approved by the Court.

2.          The Court retained continuing jurisdiction over the administration, implementation, and enforcement of the $85 Million Settlement and the Enron Settlement. *See* Docket No. 987 ¶¶ 28 & 30; Docket No. 1075 ¶¶ 30 & 32.

3.          For the purpose of, among other things, providing for the award and distribution of the Settlement Trust formed in this case, this Court approved the Second Supplemental Amended Plan of Allocation (the "Allocation Plan") filed by Plaintiffs on July 25, 2006. *See* Docket No. 1220.

4.          The terms of the Allocation Plan set forth the mechanism and process by which the funds of the Settlement Trust would be distributed to certain individuals who had been participants in the various Enron retirement plans (the "Claimants").

5.          Hewitt Associates, LLC ("Hewitt") acted as Fund Administrator pursuant to, and as defined in, the Allocation Plan. The Allocation Plan defined the Fund Administrator as the entity "who shall administer the Plan of Allocation and the distribution of the funds within the Plans," Allocation Plan, Definitions, 19, and directed that "the Fund Administrator shall calculate the Claimants' Settlement Claims based on the information described in Section II and according to the . . . Court approved methodology." Allocation Plan, § III, Introductory Paragraph.

6.          Substantial issues have arisen pertaining to the implementation of the Enron Settlement, the data required for the implementation of the $85 Million Settlement, as well as to the initial allocation of the award by Hewitt (the "Initial Allocation") and the distribution of the Settlement Trust. These issues include over-allocations and under-allocations to thousands of Claimants, and therefore impact the fair and orderly administration of the Settlements. The Court has jurisdiction to address this matter. *See In re Painewebber Ltd. Partnerships Litigation,* No. 94 CV 8547, 2003 U.S. Dist. LEXIS 12581 (S.D.N.Y. July 22, 2003).

## ORDER

7.    In order to protect the interest of the Claimants and minimize the risk, expense, delay and aggravation of any further misallocation with respect to the Initial Allocation, this Court ORDERS the implementation of the following Supplemental Allocation Process:

8.    Hewitt shall provide Enron with a statement showing the revised, corrected allocation for each Claimant who received any type of distribution or allocation pursuant to the Enron Settlement ("Revised Allocation Statement"). The Revised Allocation Statement shall state the correct amount of the allocation from the Enron Settlement due to the Claimant. The Revised Allocation Statements shall also include at least the following variables ("Input Variables"): the Claimants' opening account balance, the aggregate of all new investments by the Claimant, the aggregate of all new sales or dispositions by the Claimant, and the Claimants' closing account balance.

9.    Hewitt shall certify that it has used its best efforts to identify and rectify all flaws in its Initial Allocation, that Hewitt has used its best efforts to provide an accurate Revised Allocation Statement to each Claimant, and that Hewitt considers its Revised Allocation Statements true and correct. The information in this paragraph and the paragraph above shall be provided to Enron within 30 days of the date of this Order, unless Hewitt shows good cause for requiring additional time.

10.    Hewitt shall mail Revised Allocation Statements in the form attached hereto as Exhibit A to all Claimants. The mailing sent to each Claimant shall contain the postage prepaid postcard and postage prepaid Disputed Revised Allocation Form described below.

12.    For Claimants electing to accept the amount stated in their Revised Allocation Statement, within the same 90 day period, the Claimant can so indicate by returning an

enclosed postage prepaid response form. That acceptance, absent further Court Order, shall render their Revised Allocation for that Claimant final and binding on Enron and the Claimant 40 days thereafter. The Claimant's Revised Allocation shall be processed and distributed to the Claimant as soon as practicable upon resolution of al disputed calculations.

13.        As to Claimants who do not respond to their Revised Allocation Statement within 90 days, their Revised Allocation, absent further court Order, shall be final and binding upon Enron and the Claimant 40 days thereafter. The Claimant's Revised Allocation shall be processed and distributed to the Claimant as soon as practicable upon resolution of all calculations.

14.        For a Claimant electing to dispute their Revised Allocation Statement, within the same 90 day period, the Claimant shall return an enclosed postage prepaid Disputed Revised Allocation Form indicating what component of their revised Allocation statement the claimant disputes, along with all documentation that supports the Claimant's dispute. Such a request shall toll the 90 day dispute period from the date of the request to the date the requested material is provided.

15,        With respect to the Claimants disputing their Revised Allocation Statement, the Court will appoint a Special Master, the costs and expenses of which will be borne by Enron. The Special Master will review the Claimant's dispute as well as any calculations or materials submitted in response to the Claimant's dispute. Any response to the claimant's dispute must be submitted within 45 days of receipt of the dispute. The Claimant shall have the burden of establishing that any Input Variable used in the Revised Allocation is incorrect.

16.        The determination of the Special Master shall be final and binding with respect to the allocation due the Claimant. Claimants under-allocated in the Initial Allocation shall

be awarded the applicable interest on the amount under-allocated, and Claimants over-allocated in the Initial Allocation shall not be required to pay interest on the amount over-allocated.

17.    Enron, upon notice to the Special Master, may establish reasonable and consistent procedures and requirements for purposes of notice, signatures, recording receipts and delivery of communications to Claimants, and any such other procedures as may be necessary for the proper administration of the supplemental process.

18.    The Revised Allocations, as modified by the decisions of the Special Master, may be used to offset any future settlements in the above-captioned action to Claimants who received over-allocations in the Initial Allocation.

19.    None of the expense involved in determining the defective calculations and the extent thereof or the correction of such defective calculations, including the expense of implementing the processes outlined in this Order, shall be paid out of any of the ESOP or Savings Plan assets, by any Plan participant, or out of any of the Settlement Funds obtained in the above-captioned action.

Signed at Houston, Texas, this 27th day of July, 2007.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

Revised Allocation Statement

Prepared for: Example

| | Initial Allocation of Recovery | | | Revised/Corrected Allocation of Recovery | | |
|---|---|---|---|---|---|---|
| | Enron Corp. Savings Plan ("Savings Plan") | Enron Corp. Employee Stock Ownership Plan ("ESOP") | TOTAL BOTH PLANS | Enron Corp. Savings Plan ("Savings Plan") | Enron Corp. Employee Stock Ownership Plan ("ESOP") | TOTAL BOTH PLANS |
| A: Participant's Opening Account Balance Attributable to Enron Corp. Stock as of 1/1/98 | $48,117.4 | $363,269.82 | $411,387.24 | $48,117.42 | $151,087.23 | $199,204.65 |
| B: Aggregate of All New Investments/Purchases from 1/1/98 to 12/2/01 | $37,896.2 | $63,497.67 | $101,393.88 | $37,896.21 | $63,497.67 | $101,393.88 |
| C: Aggregate of All New Sales or Dispositions from 1/1/98 to 12/2/01 | ($236,294.94) | ($268,791.21) | ($505,086.15) | ($236,294.94) | ($268,791.21) | ($505,086.15) |
| D: Participant's Closing Account Balance Attributable to Enron Corp. Stock as of 12/2/01 | $0.0 | $232.82 | $232.82 | $0.00 | $232.82 | $232.82 |
| E: Participant's (Gain) or Loss | ($150,281.31) | $157,743.46 | $7,462.15 | ($150,281.31) | ($54,439.13) | ($204,720.44) |
| Proportion of Loss | | | 0.0006791 | | | 0.0000000 |
| Recovery Amount if Any | | | $606.78 | | | $0.00 |
| Difference: (Owed to Plan) / Owed to Participant | | | | | | ($606.78) |

Exhibit A – Page 1

Note: The Amended Supplemental Pl  1 of Allocation under the Tittle/DOL Settlement calculates loss using the formula:  A + B +C - D = E wherein:

Row "A" reflects the opening account t  ance attributable to Enron Corp. Stock as of 1/1/98 in either or both the Savings Plan and ESOP;

Row "B" is the aggregate of all new in  tments/purchases of Enron Corp. stock in either or both the Savings Plan and ESOP during the period 1/1/98 - 12/2/01;

Row "C" is the aggregate of all new sal  or dispositions of Enron Corp. stock in either or both the Savings Plan and ESOP during the period 1/1/98 - 12/2/01;

Row "D" reflects the closing account b  nce attributable to Enron Corp. Stock as of 12/1/01 in either or both the Savings Plan and ESOP; and

Row "E" reflects the loss or (gain) with  the participant's account; Recovery under this settlement is a result of net losses in this row.

Proportion of Loss reflects the percent  the participant's Loss, if any, of the sum of all calculated Losses among class participants.

Recovery Amount (if any) reflects the c  llar amount to be allocated, derived by multiplying the total allocable cash amount of the settlement by your Proportion of Loss.

Difference reflects the difference betwe  the Original Recovery Amount and the Corrected Recovery Amount. Amounts Owed to Plan are shown as (negative amounts). Amou  s the Plan owes the Participant are shown as positive amounts.

Please remember that any loans, rollover  or distributions from the Savings Plan or ESOP may have resulted in the liquidation of Enron Stock and are deemed as sales.

Further, transfers of Enron Stock from th  Savings Plan or ESOP to other investments, IRAs, mutual funds or brokerage accounts are deemed as sales under the allocation form  lla described in the Amended Supplemental Plan of Allocation and the value of Enron Stock at the time of those transfers was recorde  as a sale.

You may have incurred a loss in one of t  two referenced Plans and not the other; however the aggregate loss or gain is used for purposes of this allocation.

Finally, it is important to note that this al  cation does not cover any lost value attributable to Enron Stock that you may have personally held in an IRA or brokerage account outs  le of the Savings Plan or ESOP.

Exhibit A – Page 2

# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PAMELA M. TITTLE, et al., | No. H 01-CV-3913 |
| Plaintiffs, | |
| vs. | |
| ENRON CORP., et al., | |
| Defendants. | |
| ELAINE L. CHAO, Secretary of the United States Department of Labor, | No. H-03-2257 Consolidated with H-01-3913 |
| Plaintiff, | |
| vs. | |
| ENRON CORPORATION, et al., | |
| Defendants. | |

## SECRETARY OF LABOR'S MOTION FOR AN ORDER TO SHOW CAUSE WHY HEWITT SHOULD NOT BE HELD IN CIVIL CONTEMPT

Elaine L. Chao, Secretary of the United States Department of Labor ("the Secretary"),

respectfully requests that the Court issue an order requiring the initial Fund Administrator,

Hewitt Associates, L.L.C. ("Hewitt"), to show cause why it should not be held in civil contempt

for its failure to properly allocate funds held within the Settlement Trust as Ordered by the Court.

1

### Introduction

On July 24, 2006, this Court approved the Second Supplemental Amended Plan of Allocation ("the Allocation Plan") which required Hewitt, with Enron's assistance, "if necessary," to determine the approximate loss to each member of the settlement class and to allocate the settlement funds accordingly. The Allocation Plan mandated the use of a simple formula based on the dollar value of Enron stock held in each plan participant's account on the first day of the class period, the value of any subsequent stock purchases and sales, and the value of the stock on the last day of the class period. Accordingly, under the terms of the court-approved formula, each class member who was a plan participant on January 1, 1998 (the first day of the class period) should have received an allocation that reflected an opening account balance determined using Enron's share price of $41.56 as of that date.[1]

Hewitt did not comply with the Allocation Plan. In particular, it did not calculate or allocate all of the settlement funds based on "the dollar value, if any, of the account's investment in Enron stock valued on the first day of the Settlement Class Period," but instead allocated Settlement Trust funds based on an arbitrary starting price of $100 per share for the ESOP's holdings on January 1, 1998 – an inflated number that did not correspond to Enron's stock price on that date or on any other date in the Company's entire history.

As a result of Hewitt's failure to adhere to the terms of the Allocation Plan, the initial settlement distribution to plan participants misallocated approximately $22 million of the available settlement funds. Virtually every class member received an erroneous initial distribution, and the Settlement Fund now has insufficient funds to pay correct amounts to participants who received less than they should have received. According to Enron's estimates,

---

[1] A copy of the Allocation Plan is attached hereto as Exhibit A.

even after various recoupment and offset measures, the Settlement Fund will have $9.15 million less than it needs to pay Enron's workers, retirees, and beneficiaries the amounts to which they are entitled under the court-approved settlements and Allocation Plan.[2]

Hewitt's violation of the Allocation Plan did not stem from any misunderstanding of its terms or of the actual price of Enron stock. Hewitt understood the terms of the court-approved plan, knew the correct stock price, and specifically agreed to tell participants that it was allocating funds in accordance with that stock price ($41.56). Its understanding was reflected in a document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp." ("Implementation Agreement"), which Enron and Hewitt executed just a few days after the Court approved the Allocation Plan. The Implementation Agreement included a draft explanatory letter and "Question and Answer document" for plan participants that advised them on how their allocations would be calculated and told them that "the January 1, 1998 Enron stock price is based on the December 31, 1997 closing price of $41.56 per share." This same language, asserting that Hewitt used a January 1, 1998 Enron stock price of $41.56, was included in the final letter which went out to participants in 2006. Thus Hewitt's use of a $100 stock price was wholly inconsistent with the terms of the Allocation Plan, the Implementation Agreement, and Hewitt's representations to plan participants.

When the parties brought the misallocation issue before the Court on July 27, 2007, the Court ordered Hewitt to provide corrected calculations within thirty days and established a framework for notifying participants of the corrected amounts and for contesting those amounts. The Court's Order additionally provided that "[n]one of the expense involved in determining the

---

[2] The longer it takes to make the next distribution the larger this number becomes, as additional interest accrues on the principal amount of the shortfall. The Secretary seeks to require Hewitt to pay the amount necessary to fully fund the allocation - an amount that may already be in excess of $9.15 million.

defective calculations and the extent thereof or the correction of such defective calculations, including the expense of implementing the processes outlined in this Order, shall be paid out of any of the ESOP or Savings Plan assets, by any Plan participant, or out of any of the Settlement Funds obtained in the above-captioned action."

It has been more than a year since Hewitt violated the Allocation Plan and caused the misallocation of $22 million, and more than six months since the Court issued its Order requiring corrected allocation calculations. Even so, Hewitt has yet to make appropriate arrangements to ensure that every Enron plan participant receives the full benefit of the Enron settlements as contemplated by the Allocation Plan. At the July 27, 2007 hearing on Enron's *Motion for Approval of Modification to Second Supplemental Amended Plan of Allocation,* Hewitt acknowledged, with considerable understatement, that it had made a "mistake" as a result of a "defect in the system," and asserted that "we accept responsibility for that." The acceptance of responsibility to date, however, has been more rhetorical than real.

In fact, Hewitt has not "accepted responsibility" or stood behind its work in the sense that really counts – cleaning up the mess it has created and contributing the funds necessary to make underpaid participants whole for the injury it has caused. Although Hewitt has finally made the corrected calculations, the Settlement Fund still does not have the funds necessary to comply with the Allocation Plan or to avoid saddling the Enron pension plans or their participants with the expense of making underpaid participants whole. Absent a real commitment from Hewitt to fix the problem it created, or a quick judicial resolution, the plans' participants face the prospect of continued delay and injury, while they await the outcome of protracted litigation between

4

Hewitt and others.[3]  They have already waited long enough.  The participants' interest in the prompt payment of their retirement funds -- and this Court's interest in compliance with its orders – should not take a back seat to Hewitt's interest in continued delay.

This Court has ample authority to ensure compliance with its orders and the Plan of Allocation, including the power to order Hewitt to make participants whole for the losses caused by Hewitt's non-compliance.  Now that the corrected calculations are finally complete, Hewitt should be ordered to ensure that participants receive all of the funds that are due to them with interest.  Hewitt failed to abide by the court-approved Allocation Plan, that failure has not been corrected, and, therefore, a remedy for civil contempt of court is appropriate.

Accordingly, the Secretary asks the Court to find Hewitt in contempt and to order Hewitt to deposit immediately a sufficient sum in the Settlement Trust to ensure that all Enron employees, retirees and their beneficiaries will promptly receive all of the funds due to them.[4]

### Hewitt's Failure to Comply with the Court-Approved Allocation Plan

Between 2004 and 2006, the class action plaintiffs in Tittle (the "Plaintiffs") and the Secretary negotiated court-approved settlements, resulting in the recovery of hundreds of

---

[3]  On November 30, 2007, the Savings Plan and its Administrative Committee filed suit against Hewitt seeking to hold it liable for its admitted errors.  Case No. 04-04081, Docket No. 1 (S.D. Tex).

[4]  In addition to filing this Motion, the Department is conducting an investigation under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., to determine whether Enron, Hewitt, and the Administrative Committee for the Enron Corp. Savings Plan (Robert Jones, Wade Cline, and Robert Bingham) breached their fiduciary duties under ERISA, or knowingly participated in such breaches, with respect to the misallocation of settlement funds.  Nothing herein should be read to suggest that the Secretary has concluded that the contempt remedy is the sole possible remedy against any of these parties or that they have otherwise complied with their obligations under ERISA.

millions of dollars for the participants and beneficiaries of Enron's pension plans.[5] Under the

terms of the settlements, the parties placed the recoveries in a Settlement Trust for the benefit of

injured class members. The Court retained jurisdiction over the administration, implementation,

and enforcement of the settlements and the administration of the Settlement Trust:

> Without affecting the finality of this Order of Final Judgment and Dismissal in any way,
> this Court retains continuing jurisdiction over: (a) implementation of the Settlement; (b)
> any award or distribution of the Settlement Trust, including interest earned thereon; and
> (c) all other proceedings related to the implementation and enforcement of the
> Agreement.

See Case No. 01-3913, Docket Nos. 987 at 7 ¶ 28; 1075 at 8 ¶ 30; 1132 at 7 ¶ 25; 1219 at 7 ¶ 25.

Accordingly, the Plaintiffs obtained court approval for the disposition of the settlement

funds in a series of orders providing for the payment of the funds to Claimants pursuant to

specific plans of allocations. See Case No. 01-3913, Docket Nos. 987 at 3 ¶ 10; 1075 at 4 ¶ 11;

1132 at 3 ¶ 10; 1219 at 4 ¶ 10 (each referring to an "allocation plan"). These court-approved

plans established the precise distribution amounts to which class members were entitled. The

currently operative plan of allocation is the Second Supplemental Amended Plan of Allocation

("the Allocation Plan"), which the Court approved on July 24, 2006, as "fair, reasonable, and

adequate."[6] Case No. 01-3913, Docket No. 1219, p 4, ¶ 10.

The Allocation Plan gave the Enron pension plans authority to appoint a "Fund

Administrator" who was required to "administer the Plan of Allocation and the distribution of the

fund within the Plans" in accordance with the court-approved methodology. Allocation Plan,

---

[5]   See, Case No. 03-2257, Docket Nos. 19, 20, 21, 34, 59, 60 (Consent Decrees entered in
Secretary's action). Case No. 01-3913, Docket Nos. 987, 1075, 1132, and 1219 (settlements
filed in the Tittle class action).

[6]   Plaintiffs filed the Allocation Plan with the Court on July 17, 2006. See Case No. 01-3913,
Docket No. 1213. Eight days later, on July 25, 2006, Plaintiffs filed a second copy of the
Allocation Plan. See Case No. 01-3913, Docket No. 1220.

Definitions, 19 (Case No. 01-3913, Docket No. 1213, p. 4).  As this Court has already

concluded, Hewitt was the Fund Administrator within the meaning of the Allocation Plan.  See

*Order Granting Motion for Approval of Modifications to Second Supplemental Amended Plan of*

*Allocation,* Case No. 01-3913, Docket No. 1334, p 2 ("Hewitt Associates, LLC ("Hewitt") acted

as Fund Administrator pursuant to, and as defined in, the Allocation Plan").

On July 31, 2006, Enron and Hewitt executed the Implementation Agreement which

authorized:

> Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds in
> accordance with the document entitled "Settlement Allocation(s) Plan Provisions and
> Requirements, Enron Corp.", dated July 31, 2006 and the terms of said Second
> Supplemental Amended Plan of Allocation.

A copy of the Implementation Agreement executed by Hewitt and Enron is attached hereto as

Exhibit B (and was also filed by Hewitt in 2007, *see* Case No. 01-3913, Docket No. 1316, Ex.

B).

The Implementation Agreement memorialized Hewitt's agreement to perform specific

calculations including a determination of "settlement allocation amounts."  Implementation

Agreement, Ex. B, p 1.11.[7]  In strict conformity with the Allocation Plan, the Implementation

Agreement required Hewitt, as the Fund Administrator, to calculate a "Loss" amount for each

current and former plan participant ("Claimant") based on a specific "Court approved

methodology" which considered the dollar value of Enron stock held in each participant's plan

account on the first day of the class period, the value of any subsequent stock purchases and

---

[7]  The Implementation Agreement also required oversight by Enron and others over Hewitt's
work, including that they: "sign-off" on Hewitt's work at specific steps, "confirm . . . data
elements," "confirm the final amount to be used in the Claimant allocation calculation" and other
actions.  Implementation Agreement, Ex. B, pp 1.5-1.9, 1.11, 1.12.  Whether Enron and the
Administrative Committee performed these tasks is one subject of the Department's current
investigation.

sales, and the value of the stock on the last day of the class period. See Exhibit A, Sections

III.A.1 and III.B.1. Each claimant was entitled to an allocation of the recoveries in proportion to

the amount of the Claimant's individual losses. Exhibit A, Section III.D.

It is undisputed that Hewitt failed to use the court-approved methodology in calculating

the Claimant's allocations in the First Allocation (involving approximately $89 million). Rather

than use "the dollar value, if any, of the account's investment in Enron stock valued on the first

day of the Settlement Class Period" as required by the Allocation Plan (Exhibit A, p 11), Hewitt

used an opening value of $100 for the ESOP's stock holdings, more than twice the actual value

of Enron stock on that date, January 1, 1998 ($41.56).[8]

Hewitt's use of an arbitrary $100 value was inconsistent with the express terms of the

Allocation Plan, the Implementation Agreement, and Hewitt's representations to Claimants.

Indeed, the Implementation Agreement, which was executed immediately after the Court

approved the Allocation Plan, specifically recited a $41.56 share price, and included a form letter

to participants reciting that their allocations were calculated with reference to the $41.56 share

price ("your loss was calculated by taking the dollar value of Enron stock in your account on

January 1, 1998 . . . the January 1, 1998 Enron stock price is based on the December 31, 1997

closing price of $41.56 per share . . . "). Exhibit B, Appx. D, ¶ 7. This same language was

included in a letter sent to all participants in the summer of 2006.

---

[8] Hewitt also appears to have erred by failing to comply with its obligations under the
Implementation Agreement to: "ensure data integrity," "confirm allocation calculations are
correct for sample example populations of Claimants," and use accurate historical net asset
values. Implementation Agreement, Exhibit B, pp 1.5, 1.11, 1.21. All of these quality checks, if
actually performed, should have immediately revealed the "mistake," since the $100 share value
assigned to 7,700 participants was not the correct value on January 1, 1998 or on any other date
(Enron's stock peaked at less than $91 in the summer of 2000). The Secretary understands that
Hewitt's mistakes were ultimately discovered by participants who themselves compared Hewitt's
calculations with the historical price of Enron stock.

As a result of Hewitt's failure to comply with the Allocation Plan, Hewitt caused the Settlement Trust to misallocate $22 million of the Settlement Trust's assets. Approximately 7,700 Claimants received over-allocations, while more than 12,600 Claimants received $22 million less than they were entitled to under the Allocation Plan. It may be possible to recover some of these overpayments through recoupment and offsets from funds which have not yet been distributed to overpaid plan participants, as Enron suggests. However, it is clear that such efforts will be insufficient to recapture enough money to make underpaid Claimants whole.[9]

On July 27, 2007, the Court issued an order requiring Hewitt to give corrected calculations to Enron within thirty days, and created a framework for notifying Claimants of the revised calculations and disputing them. *See* Case No. 01-3913, Docket No. 1334. The July 2007 Order found that Hewitt "acted as the Fund Administrator" with respect to the Allocation Plan (*Id.* at ¶ 5), and reaffirmed that the Court had jurisdiction over the matter. Additionally, the Order stated that "that [n]one of the expense involved in determining the defective calculations and the extent thereof or the correction of such defective calculations, including the expense of implementing the processes outlined in this Order, shall be paid out of any of the ESOP or Savings Plan assets, by any Plan participant, or out of any of the Settlement Funds obtained in the above-captioned action." *Id.* at ¶ 19.

At the July 27, 2007 hearing, Hewitt acknowledged that "[w]e're here because of a Hewitt mistake," and expressed Hewitt's concern for the "friends and relatives who worked at Enron" that had been injured by the miscalculation.[10]  Exhibit C, pp. 18 -20.  Similarly, Hewitt

---

[9]   Even after such recoupment actions, Enron estimates that there will be a $9.15 million shortfall. *Enron's Motion to Extend the Claimant Allocation Review Process to the Pending Second Allocation,* Case No. 01-3913, Docket No. 1346.

[10]  In this same vein, at the July 27 hearing, Hewitt stated that "A mistake was made. It was our mistake. We should do the work to fix the mistake." Transcript of 7/27/07 Proceedings, p. 19

indicated its willingness to "work to fix the mistake." *Id.* Despite such expressions of concern for the underpaid participants, however, Hewitt has failed to deposit or otherwise provide the funds necessary to ensure that Claimants will receive what they would have received if Hewitt had complied with the Allocation Plan. The Settlement Fund does not now have sufficient funds to correct the initial misallocation or to make the Second Allocation in the manner contemplated by the Court's orders.

More than a year has gone by since Hewitt first violated the Allocation Plan and caused the misallocation of $22 million, and more than six months have elapsed since the Court issued its Order requiring corrected allocations. Hewitt, while conceding that it caused the shortfall, has declined to stand behind its work and contribute the requisite funds. It should now be compelled to deposit sufficient funds to permit payment of the corrected allocations. As Enron noted in its *Motion to Require Initial Fund Administrator to Provide Funding for Upcoming Corrected Allocation,* "absent the proposed funding, the Plan and the Administrative Committee lack the financial resources to carry out the allocations provided for under the Allocation Plan or to fulfill this Court's Order of July 27, 2007." Case No. 01-3913, Docket No. 1346, p 7. As Enron also observed in its Motion, this Court has the inherent authority to enforce its orders and to ensure that the Settlement Fund is distributed in accordance with the provisions of the Allocation Plan. Accordingly, before the parties send Revised Allocation Statements to participants with the

---

(excerpts of which are attached hereto as Exhibit C). Hewitt explained the "mistake" this way: "What happened was that Hewitt's computer system – there was a flaw in old software; and rather than using the actual market price on January 1, 1998, the defect in the system took that price to what computer people call a default price, Your Honor. It's not the actual price. It goes to – in this case I think it was $100 price, which is a plug figure. Defect in the system. Our mistake. We accept the responsibility for that." Exhibit C, pp 19-20. Hewitt's acceptance of responsibility has not extended, however, to actually redressing the injury caused by its failure to comply with the Allocation Plan.

correct allocation amounts, Hewitt should provide the funds necessary to pay the correct amounts.

Enron's employees, retirees and beneficiaries have waited too long for their full recovery in this action. After Hewitt deposits the appropriate funds in the Settlement Fund for distribution to the Claimants it has injured, Hewitt remains free to fight with Enron over relative fault and its entitlement, if any, to indemnification from Enron for the funds deposited. These fights, however, should come only after all the Claimants get the full recovery which is past due to them. Accordingly, the Secretary asks the Court to Order Hewitt to Show Cause why it should not be held in contempt of this Court and ordered immediately to pay the amounts necessary to remedy the shortfall caused by its misconduct.

## Enforcement of the Court's Orders Through Civil Contempt

It is well-settled that "[i]f a federal court enters an order and it is disobeyed, to preserve the authority of the judicial branch of government, the court must compel obedience within the bounds of the law." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, No. 7:99-CV-025-X, 1999 WL 66188, at *1 (N.D. Tex. Feb. 13, 1999). Broadly speaking, "[a] party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citations omitted).

Under Fifth Circuit law, "[a] movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Industr., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992); *Petroleos*

11

*Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S. Ct. 497, 499, 93 L. Ed. 599 (1949)). "The movant must establish the elements by evidence 'so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.'" *See Travelhost, Inc.*, 68 F.3d at 961 (internal quotations and citations omitted).

Where a movant establishes by clear and convincing evidence that the respondent has failed to comply with a court order, a finding of civil contempt is appropriate. *See, e.g., F.D.I.C. v. LeGrand*, 43 F.3d 163, 170-71 (5th Cir. 1995) (affirming lower court's finding of civil contempt based on defendant's violation of court's order); *see also Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 726-728 (5th Cir. 2002) (affirming judgment of civil contempt and award of attorneys fees and costs founded on defendant's refusal to honor a court issued warrant).

In civil contempt proceedings, the only issue is the respondent's actual compliance with the court's order; neither intent nor willfulness is relevant. *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984) (citing *McComb*, 336 U.S. at 191); *see also Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987) (where consent order clearly and unambiguously required trustees to make restitution to plan, and they failed to do so on required dates, burden then fell on trustees to show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the consent order, and intent was irrelevant); *Transocean Offshore, Inc.*, 276 F.3d at 728 (good faith of employer who refused to honor an OSHA warrant to inspect workplace was not a defense to civil contempt); *Jim Walter Res. v. Int'l Union, United Mine Workers of Am.*, 609 F.2d 165, 168 (5th

12

Cir. 1980); *Am. Airlines, Inc. v. Allied Pilots Ass'n.*, 228 F.3d 574, 581 (5th Cir. 2000) ("The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order."); *Petroleos Mexicanos*, 862 F.2d at 401; *McComb*, 336 U.S. at 191("An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently.").

Hewitt has already admitted that it failed to comply with the Allocation Plan and distributed funds out of the Settlement Trust in a manner that did not comply with the court-approved methodology, which was the sole lawful basis for allocating settlement funds under this Court's orders. *See* Exhibit C, p 19  ("A mistake was made. It was our mistake. We should do the work to fix the mistake."). Even after coming before the Court last summer and admitting its mistake, Hewitt has still failed to substantially comply with the Allocation Plan or the court orders implementing its provisions. Additionally, despite the clarity of the July 27, 2007 Order, another six months have elapsed and participants have yet to receive Revised Allocation Statements; indeed, the Secretary understands that Enron has only recently received accurate calculations from Hewitt.

Hewitt has not agreed to make up the shortfall caused by its violation of the Allocation Plan and the Settlement Trust has not received the funds necessary to make the corrected distributions contemplated by the Court's orders. While the Settlement Trust is finally (more than eighteen months after the Court first approved the Allocation Plan) in a position to send statements to class members that correctly describe the amount of each Claimant's entitlement, the Trust does not have the funds necessary to pay those corrected amounts. In light of Hewitt's failure to voluntarily remedy the shortfall, this Court should now compel Hewitt to remedy the

13

shortfall. Only in this manner can the Court vindicate its authority and protect the participants' interest in receiving the past-due amounts to which they are entitled.

Upon a finding of civil contempt, the court has complete discretion in assessing sanctions to protect the sanctity of its decrees and the legal process. *See Am. Airlines, Inc.*, 228 F.3d at 585 (5th Cir. 2000). "Civil contempt is remedial in nature and its purpose is to benefit the complainant." *Assoc. Bldrs. and Contractors of La., Inc. (Bayou Chapter) v. Sewerage & Water Bd. of New Orleans*, No. 95-3699, 1996 WL 117528, at *7 (E.D. La.); *see Star Brite Distrib. Inc. v. Ocean Bio-Chem, Inc.*, 746 F. Supp. 633, 643 (E.D. Miss. 1990) (citing *Whitfield*, 832 F.2d 909). "In a contempt proceeding, the need to ensure that the plaintiff is fully compensated and that the defendant is deterred, is acute." *Brine, Inc. v. STX, L.L.C.*, 367 F. Supp. 2d 61, 71 (D. Mass. 2005).

"The proper aim of judicial sanctions for civil contempt is full remedial relief, that such sanctions should be adapted to the particular circumstances of each case and that the only limitation upon the sanctions imposed is that they be remedial or coercive but not penal." *Florida Steel Corp. v. N.L.R.B.*, 648 F.2d 233, 239 (5th Cir. 1981) (internal quotations and citations omitted); *cf. R.A.J. v. Miller*, 590 F. Supp. 1310, 1319 (N.D. Tex. 1984) ("A federal court possesses a broad range of equitable powers available to enforce and effectuate its orders and judgments."); *South Suburban Hous. Ctr. v. Berry*, 186 F.3d 851, 854 (7th Cir. 1999). "Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance." *Am. Airlines, Inc*, 228 F.3d at 585-586 (holding that district court did not abuse discretion in ordering approximately $45.5 million in compensatory damages for losses during two days of work stoppage caused by union's civil contempt in violating TRO ordering that they take all reasonable steps within their power to end a "sick-

14

out"); *cf. also Vanderburg v. Nocona Gen. Hosp.*, Nos. 7:03-CV-008-KA, 7:02-CV-291-KA, 2008 WL 114846, at *1-7 (N.D. Tex. Jan. 10, 2008) (court orders attorneys who distributed settlement funds in an illegal manner and failed to inform the court of that distribution to pay damages measured by estimated harm to innocent parties).

Here, the record supports a finding of contempt, and an award of the relief sought by the Secretary: that Hewitt be ordered to pay immediately, in the form of an unsecured, non-interest bearing, non-recourse loan, an amount sufficient to make up the shortfall in the Settlement Trust so that all Claimants will receive the amount to which they are entitled.[11]   Enron's injured employees and retirees should not be asked to wait still longer to receive the full benefit of the settlements approved by this Court, and Hewitt should not be permitted to violate this Court's orders without consequence.

## Protections for Participants

Enron estimates that there will be a $9.15 million shortfall.  See Enron's *Motion to Require Initial Fund Administrator to Provide Funding for Upcoming Corrected Allocation*, Case No. 01-3913, Docket No. 1346.  Enron arrives at this number based on its estimate that it can recover all but $7.7 million of the overpayments by reducing allocations to overpaid Claimants in the Second Allocation and by recovering money mistakenly allocated to Claimants who "(i) made no distribution election, and for whom no IRA was established, (ii) made a

---

[11]   In its *Motion to Require Initial Fund Administrator to Provide Funding for Upcoming Corrected Allocation*, Enron suggests that the loan it contemplates may be "secured by any future recoveries from over-allocated Claimants." See Case 01-3913, Docket No. 1346, p 5. Such a loan would be inconsistent with the requirements of Prohibited Transaction Exemption ("PTE") 80-26, 45 Fed. Reg. 2845 (corrected at 45 Fed. Reg. 35040) (May 23, 1990) (requiring, among other things, that "[t]he loan or extension of credit be unsecured").  The Department has already proposed language to the parties consistent with the requirements of PTE 80-26.

15

distribution election however no IRA was established, or (iii) did not cash an issued check containing the mistaken allocation" (these efforts are referred to below as "initial recoupment efforts"). *Enron's Motion to Extend the Claimant Allocation Review Process to the Pending Second Allocation*, Case No. 01-3913, Docket No. 1345, ¶¶ 9-10. The Secretary agrees that these initial recoupment efforts are appropriate. Even after taking such actions, however, the resulting shortfall (plus interest on the entire misallocated amount) will be approximately $9.15 million. *Id.*

While the Secretary generally endorses Enron's proposal to allow such offsets as set forth in its Motions, the Secretary requests that any additional actions involving overpaid participants and any communications calling upon them to return any overpayments be made with care. Many participants may have reasonably relied upon representations that their allocations had been calculated correctly and, in particular, based upon a January 1, 1998 opening stock value of $41.56 per share.[12] Many are likely to have spent this money already (including any overpayments) and may now lack ready funds to repay the overpayment they innocently and unknowingly received.

Any steps taken to recover overpayments from participants must be conducted with caution. Collection actions against innocently overpaid participants could damage their credit ratings. Well-meaning participants could take out loans to repay the overpayments and suffer additional costs. Some participants may already have rolled over the money they received into tax deferred accounts, such as IRAs. If asked to return overpayments, these participants may expose themselves to the risk of additional taxes and penalties by withdrawing the money from

---

[12] "Tittle/DOL Settlement Allocation - Questions and Answers", No. 7: "your loss was calculated by taking the dollar value of Enron stock in your account on January 1, 1998 . . . the January 1, 1998 Enron stock price is based on the December 31, 1997 closing price of $41.56 per share . . . ". Exhibit B, Appx. D, ¶ 7

16

the IRAs. While it may be appropriate to hold participants responsible for returning overpayments to which they are not entitled, Enron participants may also have legitimate defenses or arguments against returning the entire amount of the overpayment they have received. They should not be asked or required to waive those defenses and arguments or otherwise incur additional expense or additional harm due to another entity's misconduct involving their pension funds.

Consequently, the Secretary asks the Court to include in any Order the requirement that no collection or repayment action (other than the initial recoupment efforts described above) be taken against any overpaid participant except as specifically permitted by later Court order.

WHEREFORE, the Secretary prays that this Court enter an Order requiring Hewitt to appear on a date certain to Show Cause why it should not be held in contempt and that:

1.    Hewitt be held in civil contempt for violating the Second Supplemental Amended Plan of Allocation and the Orders of the Court approving that Plan;

2.    Hewitt be held in civil contempt for violating this Court's Order of July 27, 2007;

3.    In the event Hewitt fails to show cause on the aforementioned date certain why it should not be held in contempt or has also not purged itself of its contempt of the aforesaid Orders, hold Hewitt subject to daily penalties of $10,000 for each day until it purges itself of contempt by:

A.    Restoring to the Settlement Trust and the Enron Corp. Savings Plan sufficient funds, in the form of an unsecured, non-interest bearing, non-recourse loan ("Plan Loan"), to allow the Settlement Trust to make full allocations to all Claimants of the amounts they would have received but for Hewitt's errors plus interest from the date that amount was determined,

17

subject to offsets resulting from deducting allocations to overpaid Claimants in the Second Allocation and by recovering money mistakenly allocated to Claimants who (i) made no distribution election and for whom no IRA was established, (ii) made a distribution election, however no IRA was established, or (iii) did not cash an issued check containing the mistaken allocation;

B.  Restoring to the Settlement Trust and the Enron Corp. Savings Plan all of the expenses and costs they incur in connection with the Plan Loan and compliance with any Order of the Court relating to Hewitt's contempt; and

C.  Restoring all expenses incurred by the Settlement Trust and the Enron Corp. Savings Plan in determining the defective calculations and the extent thereof, correcting the defective calculations, and implementing the processes outlined in the Allocation Plan and the July 27 Order and any further Orders of this Court relating to the defective calculations;

4.  Hewitt, Enron, and the Enron Plans be barred from all collection, repayment and other actions against any overpaid Claimant of the Settlement Fund, their dependents and their beneficiaries, the Settlement Fund, and the Enron Corp. Savings Plan except as specifically permitted by the Court;

5.  Hewitt be ordered to take any other and further steps adjudged as necessary by this Court to ensure that all the Claimants receive all of the funds that are due to them under the Settlement Fund, with interest; and

6.    Hewitt be subject to such further relief as this Court finds necessary and appropriate until such time as Hewitt purges itself of its contempt of this Court by fully complying with the July 27 Order of and the Allocation Plan.

Dated this 7th day of February 2008.

Respectfully submitted:

GREGORY F. JACOB
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor
Plan Benefits Security Division

MICHAEL SCHLOSS
Senior Trial Attorney
Attorney-in-Charge

By:

ROBIN SPRINGBERG PARRY
Senior Trial Attorney
ALLISON KRAMER
Trial Attorney
U.S. Department of Labor
Office of the Solicitor
(Mail Address)
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
(Delivery Address)
200 Constitution Ave., N.W.
Room N-4611
Washington, D.C. 20210
Phone: (202) 693-5600
Fax:    (202) 693-5610

**Attorneys for Plaintiff Secretary of Labor**

19

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ENRON CORP. SAVINGS PLAN and the ADMINISTRATIVE COMMITTEE OF ENRON CORP. SAVINGS PLAN | § § § § | |
| VS. | § § | CIVIL ACTION NO. 4:07-CV-04081 |
| HEWITT ASSOCIATES, LLC | § § | |
| PAMELA M. TITTLE, et al., | § § | AS CONSOLIDATED WITH |
| Plaintiffs, vs. | § § § | CIVIL ACTION NO. H01-3913 AND CONSOLIDATED CASES |
| ENRON CORP, et al., | § § § | |
| Defendants. | § | JURY TRIAL DEMANDED |

**JOINT DISCOVERY/CASE MANAGEMENT PLAN PURSUANT**
**TO FEDERAL RULE OF CIVIL PROCEDURE 26(f)**

Plaintiffs Enron Corp. Savings Plan and the Administrative Committee of the Enron Corp. Savings Plan (collectively the "Plan") and Defendant Hewitt Associates, LLC ("Hewitt") submit this Joint Discovery/Case Management Plan pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and this Court's Order for Conference and Disclosure of Interested Parties.

**1.   State where and when the meeting of the parties required by Rule 26(f) was held, and identify the counsel who attended for each party.**

The parties conferred as required by Rule 26(f) on June 5, 2008, at the offices of Baker Botts, LLP, 910 Louisiana Street, Houston, Texas 77002. Ty Buthod and Steven Mitby participated on behalf of the Plan, while Greg Casas of Greenberg Traurig, LLP, and Steve Kasten of McDermott Will & Emory participated on behalf of Hewitt.

2. **List the cases related to this one that are pending in any state or federal court with the case number and court.**

   *Tittle, et al. v. Enron, et al.,* Case No. H-01-3913; in the United States District Court for the Southern District of Texas, Houston Division.

   *Hewitt Associates, LLC v. Enron Creditors Recovery Corp.,* Case No. 08-MR-643, In the Circuit Court of Lake County, Illinois.

3. **Specify the allegation of federal jurisdiction.**

   The Plan alleges that the Court has jurisdiction over the Plan's claims pursuant to 28 U.S.C. § 1332(a)(1), 28 U.S.C. § 1651, and the doctrine of ancillary jurisdiction. Hewitt maintains that this allegation fails to confer subject matter jurisdiction.

4. **Name the parties who disagree and the reasons.**

   Hewitt has filed a motion to dismiss the Plan's claims based upon lack of subject matter jurisdiction. The Plan disputes this motion and contends that this Court has jurisdiction.

5. **List anticipated parties that should be included, when they can be added, and by whom they are wanted.**

6. **List anticipated interventions.**

   None.

7. **Describe class-action issues.**

   None.

8.    **State whether each party represents that it has made the initial disclosures required by Rule 26(a). If not, describe the arrangements that have been made to complete the disclosures.**

The parties have not yet made initial disclosures pursuant to Rule 26(a). The parties disagree over whether discovery in this matter should proceed while Hewitt's Motion to Dismiss for Lack of Subject Matter Jurisdiction is pending.

9.    **Describe the proposed agreed discovery plan, including:**

A.    **Responses to all the matters raised in Rule 26(f).**

1. **What changes, if any, should be made to the timing, form, or requirement for disclosures under Rule 26(a).**

The parties disagree whether initial disclosures should be exchanged while Hewitt's Motion to Dismiss for Lack of Subject Matter Jurisdiction is pending.

2. **The subjects on which discovery may be needed, when discovery should be completed, and whether discovery should be conducted in phases or be limited to or focused on particular issues.**

Plaintiffs' Position:

The Plan intends to seek discovery regarding the facts and circumstances surrounding the misallocation of settlement funds to *Tittle* litigation plaintiffs, as well as any similar errors that Hewitt may have made in the past. Discovery will likely be complete on or before November 1, 2008.

Defendant's Position:

Hewitt has filed a motion to dismiss for lack of subject matter jurisdiction. Accordingly, it does not believe that any discovery should be conducted while the Court's jurisdiction is in question. The Plan disagrees.

If it is ultimately decided that the Court has subject matter jurisdiction, or should the Court require the parties to conduct discovery while the issue of subject matter jurisdiction is

pending, Hewitt responds as follows:    Hewitt will seek discovery regarding the facts and circumstances surrounding the Plan's actions that increased or failed to reduce any alleged damages suffered by the Plan and will also seek discovery as to whether the Plan has suffered any damages, and whether the Plan is a proper party in this suit, including whether the Plan is acting as a front for Enron and whether and to what extent Enron and the Plan have coordinated over the filing of this claim.

If the Court requires the parties to conduct discovery while the issue of subject matter jurisdiction is being decided, Hewitt agrees that discovery can be completed by November 1, 2008.

**3. Any issues about disclosure of electronically stored information, including the form or forms in which it should be produced.**

**4. Any issues about claims of privilege or of protection as trial-preparation materials, including—if the parties agree on a procedure to assert these claims after production—whether to ask the court to include their agreement in an order.**

If Hewitt is required to participate in discovery, Hewitt will seek a protective order with regard to responsive materials that contain confidential, proprietary and/or competitively sensitive information.

**5. What changes should be made in the limitations on discovery imposed under these Federal Rules or by local rule, and what other limitations should be imposed.**

If Hewitt is required to participate in discovery in this matter, the parties agree that discovery shall not be limited except in conformity with the Federal Rules of Civil Procedure.

**6. Any other orders that the court should issue under Rule 26(c) or under Rule 16(b) and (c).**

If Hewitt is required to engage in discovery in this matter, it will seek a protective order with regard to responsive materials that contain confidential, proprietary, and competitively sensitive information.

**B.     When and to whom the Plaintiffs anticipate they may send interrogatories.**

The Plan anticipates serving interrogatories on Hewitt and will likely serve such interrogatories before July 1, 2008.

**C.     When and to whom the Defendant anticipates it may send interrogatories.**

If Hewitt is required to engage in discovery, Hewitt anticipates serving interrogatories on the Plan. It will serve such interrogatories as soon as practicable after being ordered to engage in discovery by the Court.

**D.     Of whom and by when the Plaintiffs anticipate taking oral depositions.**

The Plan anticipates taking the deposition of (1) Hewitt employees or agents responsible for working with the Northern Trust Retirement Consulting System; (2) Hewitt employees or agents that worked on the allocation of settlement funds among *Tittle* class action plaintiffs; (3) Hewitt employees or agents that worked in a managerial or supervisory role over those working on the allocation of settlement funds among *Tittle* class action plaintiffs; and (4) any expert designated by Hewitt in this matter. Discovery may lead the Plan to seek additional discovery not anticipated at this time.

**E.     Of whom and by when the Defendant anticipates taking oral depositions.**

If Hewitt is required to engage in discovery, Hewitt will take the deposition of representatives of the Plan involved with the allocation of settlement funds among the *Tittle* class action plaintiffs, representatives of the Plan involved in the correction of any misallocation of

those funds, the representatives of the Plan with knowledge of the Plan's alleged damages, third party depositions of Enron and counsel to Enron and the Plan, and any experts designated by the Plan.   Also, discovery may lead Hewitt to seek additional discovery, including additional depositions, not anticipated at this time.

      **F.**     **List expert depositions the Plaintiffs anticipate taking and their anticipated completion date.**

      **G.**     **List expert depositions the Defendant anticipates taking and their anticipated completion date.**

      See Item 9E.

**10.**    **If the parties are not agreed on a part of the discovery plan, describe the separate view and proposals of each party.**

      As indicated above, Hewitt objects to engaging in discovery while Hewitt's Motion to Dismiss for Lack of Subject Matter Jurisdiction is pending.

**11.**    **Specify discovery beyond initial disclosures that has been undertaken to date.**

      None.

**12.**    **State the date the planned discovery can reasonably be completed.**

Plaintiffs' Position:

      The Plan expects that discovery will be complete by November 1, 2008.

Defendant's Position:

      Hewitt objects to engaging in discovery while the Court's subject matter jurisdiction is in question.   If required to engage in discovery by the Court while the Court's

subject matter jurisdiction is in question, Hewitt anticipates that discovery can be completed within five months of being so instructed by the Court.

**13.    Describe the possibilities for a prompt settlement or resolution of the case that were discussed in your Rule 26(f) meeting.**

**14.    Describe what each party has done or agreed to do to bring about a prompt resolution.**

On joint motion of the parties, this Court entered a March 13, 2008 order that stayed the case for 60 days to allow the parties to mediate. The mediation was held on May 13, 2008, before mediator and former United States District Court Judge Thomas Brett, and was attended by counsel and client representatives for Enron Corp., the Plan, and Hewitt. The parties discussed their respective positions at length and exchanged proposals for settlement, but were unable to resolve the matter.

**15.    From the attorneys' discussion with the client, state the alternative dispute resolution techniques that are reasonably suitable.**

Please see response to No. 14 above.

**16.    Magistrate judges may now hear jury and non-jury trials. Indicate the parties' joint position on a trial before a magistrate judge.**

The parties do not agree to a trial before a magistrate judge.

**17.    State whether a jury demand has been made and if it was on time.**

A timely demand for a jury trial has been made.

**18.    Specify the number of hours it will take to present the evidence in this case.**

The Plan expects trial of this matter to last approximately six or seven days. If the issue of subject matter jurisdiction is resolved in favor of jurisdiction, Hewitt agrees with the Plan's estimate for trial.

19. **List pending motions that could be ruled on at the initial pretrial and scheduling conference.**

        Hewitt's Motion to Dismiss for Lack of Subject Matter Jurisdiction is now pending before the Court and is ripe for decision.

20. **List other motions pending.**

        None.

21. **Indicate other matters peculiar to this case, including discovery, that deserve the special attention of the court at the conference.**

22. **List the names, bar numbers, addresses, and telephone numbers of all counsel.**

Tynan Buthod
S.D. Tx. No. 14036
State Bar No. 03513500
BAKER BOTTS L.L.P.
One Shell Plaza
Houston, Texas 77002-4995
(713) 229-1912
(713) 229-2712 (Fax)

John E. Neslage
S.D. Tx. No. 17243
State Bar No. 14923500
BAKER BOTTS L.L.P.
One Shell Plaza
Houston, Texas 77002-4995
(713) 229-1234
(713) 229-1522 (Fax)

Steven J. Mitby
S.D. Tx. No. 33591
State Bar No. 24037123
BAKER BOTTS L.L.P.
One Shell Plaza
Houston, Texas 77002-4995
(713) 229-1234
(713) 229-1522 (Fax)

Gregory J. Casas
S.D. Tx. No. 16836
State Bar No. 00787213
GREENBERG TRAURIG, LLP
1000 Louisiana, Suite 1700
Houston, Texas 77002
(713) 374-3561
(713) 374-3505 (Fax)

Joel G. Chefitz
Mark J. Altschul
McDERMOTT WILL & EMERY, LLP
227 West Monroe Street
Chicago, Illinois 60606
(312) 372-2000

Steven W. Kasten
McDERMOTT WILL & EMERY, LLP

Allan Van Fleet
S.D. Tx. No. 527
State Bar No. 20494700
Paul J. Brown
S.D. Tx. No. 26366
State Bar No. 24006913
GREENBERG TRAURIG, LLP
1000 Louisiana, Suite 1700
Houston, Texas 77002
(713) 374-3500

28 State Street
Boston, Massachusetts 02109
(617) 535-4000

Respectfully submitted,

BAKER BOTTS, L.L.P.

By: _Tynan Buthod /sxm_

Tynan Buthod
S.D. Tx. No. 14036
State Bar No. 03513500
BAKER BOTTS L.L.P.
One Shell Plaza
Houston, Texas 77002-4995
(713) 229-1912
(713) 229-2712 (Fax)

ATTORNEY-IN-CHARGE FOR PLAINTIFFS
ENRON CORP. SAVINGS PLAN AND THE
ADMINISTRATIVE COMMITTEE OF ENRON
CORP. SAVINGS PLAN

By: _Gregory Casas / by permission_

Gregory J. Casas
S.D. Tx. No. 16836
State Bar No. 00787213
GREENBERG TRAURIG L.L.P.
1000 Louisiana, Suite 1800
Houston, Texas 77002
(713) 374-3561
(713) 374-3505 (Fax)

ATTORNEY-IN-CHARGE FOR DEFENDANT
HEWITT ASSOCIATES, L.L.C.

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PAMELA M. TITTLE, et al., | |
| Plaintiffs, | No. H 01-CV-3913 |
| v. | (Consolidated Action) |
| ENRON CORP., et al., | |
| Defendants. | |

## SECOND SUPPLEMENTAL AMENDED PLAN OF ALLOCATION

### I. DEFINITIONS

For purposes of this Plan of Allocation, capitalized terms and phrases have the meanings provided below:

1. **"Active Cash Balance Plan Participant"** means an employee who is a participant in the Enron Cash Balance Plan and earning benefits during a specific period of time.

2. **"Actuarial Equivalent"** means the equivalent value of a stream of payments, calculated using 7% interest and the 1984 Unisex Pension Mortality Table.

Page 1

3. **"Administrative Committee Settling Defendants"** mean: the Administrative Committees and the Administrative Committee Members, including James G. Barnhart, Philip J. Bazelides, Keith Crane, Enron Corp. Employee Stock Ownership Plan Administrative Committee, Enron Corp. Savings Plan Administrative Committee, William D. Gathmann, William J. Gulyassy, Rod Hayslett, John Does Nos. 1 – 100 Unknown Fiduciaries of the Enron Corp. Savings Plan or the Enron Corp. ESOP or the Enron Corp. Cash Balance Plan who were Administrative Committee members, Mary K. Joyce, Sheila Knudsen, Tod. A. Lindholm, Cindy K. Olson, James S. Prentice, Mikie Rath, Paula Riecker, and David Shields.

4. **"Authorized Cash Balance Plan Claimant"** means either a Participant Cash Balance Plan Claimant or a Former Participant Cash Balance Plan Claimant.

5. **"Authorized Claimant"** means either a Participant Claimant or a Former Participant Claimant whose Settlement Claim is twenty-five dollars ($25) or such other amount as may be reasonably determined by the Fund Administrator.

6. **"Cash Balance Plan Settlement Class"** means collectively: (a) all Participant Cash Balance Plan Claimants and (b) all Former Participant Cash Balance Plan Claimants.

7. **"Class Counsel"** means Lynn Lincoln Sarko, Esq. of Keller Rohrback, LLP and Steve W. Berman, Esq. of Hagens Berman Sobol Shapiro LLP.

8. **"Class Representative"** means the following persons: Pamela M. Tittle; Thomas O. Padgett; Gary S. Dreadin; Janice Farmer; John L. Moore; Betty J. Clark; Patrick Campbell; Fanette Perry; Charles Prestwood; Roy Rinard; Steve Lacey; Catherine Stevens; Roger W. Boyce; Wayne M. Stevens; Norman L. Young; Michael L. Mccown; and Dan Shultz.

9. **"Enron Cash Balance Plan"** means the Enron Corp. Cash Balance Plan, and any and all predecessors and successors to such plan.

10. **"Enron ESOP"** means the Enron Corp. Employee Stock Ownership Plan, and any and all predecessors and successors to such plan.

11. **"Enron Plans"** means, collectively, (a) the Enron Savings Plan, (b) Enron ESOP, and the (c) Enron Cash Balance Plan.

12. **"Enron Plan Trustees"** means Wilmington Trust Company, as Trustee for the Enron Savings Plan and for the Enron ESOP, and The Bank of New York, as Trustee for the Enron Corp. Cash Balance Plan, on behalf of themselves, on behalf of each of the respective Enron Plans and on behalf of such Plan's respective representatives, employees, participants, beneficiaries and alternate payees. The phrase "Enron Plan Trustees" shall include any and all of their predecessors and Successors-In-Interest.

13. **"Enron Savings Plan"** means the Enron Corp. Savings Plan, and any and all predecessors and successors to such plan.

14. **"Enron Settlement"** means the partial settlement preliminarily approved by the Court in *Tittle, et al. v. Enron, et al.*, Civil No. H-01-3913 on July 27, 2005,

15. **"Enron Settling Defendants"** means Enron and its debtor and non-debtor affiliates, subsidiaries, successors and assigns, as defined in the Settlement Agreement dated July 6, 2005.

16. **"ESOP Retirement Account"** means the segregated account within the Enron ESOP known as the Retirement Sub-Account which is used to offset the benefit earned in the Enron Cash Balance Plan.

17. **"Former Participant Cash Balance Plan Claimant"** means a separated vested participant in the Enron Cash Balance Plan who was an Active Cash Balance Plan Participant during some or all of the period January 1, 1987 to December 31, 1994 and earned a benefit from the Enron Cash Balance Plan during that period; provided, however, that such term shall not include any such person who was deceased as of January 1, 2001, with no continuing benefit to a beneficiary thereunder. The Former Cash Balance Plan Participant Claimant must also not have received a full distribution of his or her ESOP Retirement Account prior to January 1, 2001.

18. "**Former Participant Claimant**" means those Settlement Class members who are former participants in the Enron Savings Plan, and/or the Enron ESOP (recognizing that the Enron ESOP merged with and into the Enron Savings Plan effective August 30, 2002).

19. "**Fund Administrator**" means the person or entity appointed or retained by the Enron Plans who shall administer the Plan of Allocation and the distribution of the funds within the Plans set forth herein.

20. "**Independent Fiduciary**" means Consulting Fiduciaries, Inc., or its successor, solely in its capacity as independent fiduciary to the Enron Savings Plan, Enron ESOP and Enron Cash Balance Plan for the Tittle litigation.

21. "**Net Settlement Trust**" means the Settlement Amount, minus the Court approved amounts for attorneys' fees and expenses.

22. "**Northern Trust Settlement**" means the partial settlement preliminarily approved by the Court in *Tittle, et al. v. Enron, et al.*, Case No. H-01-CV-3913 on April 20, 2006 and given final judgment on _____, 2006.

23. "**Northern Trust Settling Defendants**" means The Northern Trust Company, individually, and in all capacities in which it provided services to any of the Enron Plans, and any current or former Affiliate of the Northern Trust Company (including, but not limited to, Northern Trust Corporation and Northern Trust Retirement Consulting, L.L.C.) and its and their predecessors, current and former Representatives, and Successors-in-Interest as those terms are defined in the Class Action Settlement Agreement dated April 13, 2006.

24. "**Officer and Director Settling Defendants**" means: Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, James V. Derrick, John H. Duncan, Joe H. Foy, Wendy L. Gramm, Kevin P. Hannon, Kenneth Harrison, Robert K. Jaedicke, Rebecca P. Mark-Jusbasche, Charles A. LeMaistre, John Mendelsohn, Jerome J. Meyer, Lou L. Pai, Paulo Ferraz Pereira, Frank Savage, Joseph W. Sutton, Jack Urquhart, John Wakeham, Charls E. Walker, Lawrence Greg Whalley, Bruce Willison, Herbert Winokur, Jr., Estate of J. Clifford Baxter, Richard B. Buy,

Richard A. Causey, Mark A. Frevert, Joseph M. Hirko, Stanley C. Horton, Steven J. Kean, Mark E. Koenig, Michael S. McConnell, Jeffrey McMahon, J. Mark Metts, and Kenneth D. Rice.

25. **"Order and Final Approval"** means the Order of Final Approval of Class Action Settlement and Bar Order contemplated under Section 2.4 of the $85 million Settlement Agreement, under Section 3.7 of the Enron Settlement, or such an Order under any other Settlement.

26. **"Participant Cash Balance Plan Claimant"** means a person who was actively employed by Enron on January 1, 2001, and who was an Active Cash Balance Plan Participant during some or all of the period January 1, 1987 to December 31, 1994 and earned a benefit from the Cash Balance Plan during that period. The Participant Cash Balance Plan Claimant must also not have received a full distribution of their ESOP Retirement Account prior to January 1, 2001.

27. **"Participant Claimant"** means those Settlement Class members who are currently participants in (a) the Enron Savings Plan, and/or (b) Enron ESOP.

28. **"Petition Date"** means December 2, 2001, as defined in the Enron Settlement.

29. **"Plaintiffs' Case Contribution Compensation"** means the amount of three-thousand dollars ($3,000) together with any additional amounts of any incentive awards granted by the Court to the Class Representatives, which shall be paid from the Settlement Fund to each Class Representative in recognition of their contributions to the Action.

30. **"Plan Actuary"** means Hewitt Associates, the actuary for the Cash Balance Plan as of January 1, 2001, or its successor.

31. **"Settlement"** means: a settlement to be consummated under a Settlement Agreement(s) pursuant to an Order of Final Approval and Bar Order.

32. **"Settlement Agreement"** means any Settlement Agreement filed with the Court in the Tittle Action.

33. **"Settlement Claim"** means the total dollar amount of each Authorized Claimant's Settlement Claims, as determined in Section III below.

34. "**Settlement Class**" means:

(1)     For the $85 million Settlement, collectively: (a) all Persons who were at any time participants in any of the Enron Plans during the period starting on January 1, 1995 through and including the Effective Date of Settlement; and (b) as to each Person within the scope of subsection (a) of Section 1.37 of the Settlement Agreement, his, her or its beneficiaries, alternate payee, Representatives, and Successor-In-Interest, provided, however, that the "Settlement Class" shall not include (1) any Defendant in the *Tittle Action*, or any of their immediate family members, beneficiaries, alternate payees, Representatives or Successors-In-Interest, except for spouses and immediate family members who themselves are or were Participants in any Enron Plan, who shall be considered members of the Settlement Class with respect to their own Enron Plan Accounts, and (2) shall not include the Defendant Releasees who were Administrative Committee Members or Enron Officers of Directors during the Class Period or any of their immediate family members, beneficiaries, alternative payees, Representatives or Successor-In-Interest, except for spouses and immediate family members who themselves are or were Participants in any Enron Plan, who shall be considered members of the Settlement Class with respect to their own Enron Plan Accounts.

(2)     For the Enron Settlement, collectively, (a) all Persons who were, at any time, participants in the Enron Plans during the period from January 1, 1998 up to and including the Petition Date and (b) as to each Person within the scope of subsection (a) of Section 1.3 (vv) of the Settlement Agreement, his, her or its beneficiaries, alternate payees (including spouses of deceased Persons who were Enron Plan participants), Representatives and Successors-In-Interest; provided, however, that the "Settlement Class" shall not include any Defendant in the Tittle Action, or any of their Immediate Family, beneficiaries, alternate payees (including spouses of deceased Persons who were Enron Plan participants), Representatives or Successors-In-Interest, except for spouses

and immediate family members who themselves are or were participants in any of the Enron Plans, who shall be considered members of the Settlement Class with respect to their own Enron Plan accounts.

(3)    For the Northern Trust Settlement, collectively:  (a) all Persons who were at any time participants in any of the Enron Plans during the period starting on January 1, 1995, through and including December 2, 2001; and (b) as to each Person within the scope of subsection (a) of Section 1.32, his, her or its beneficiaries, alternate payees, Representatives and Successors-In-Interest; provided, however, that the "Settlement Class" shall not include any Defendant in the Tittle Action, or any of their immediate family members, beneficiaries, alternate payees, Representatives or Successors-In-Interest, except for spouses and immediate family members who themselves are or were Participants in any Enron Plan, who shall be considered members of the Settlement Class with respect to their own Enron Plan Accounts.

(4)    For any other settlements, collectively: all of the persons, entities, participants, beneficiaries, alternate payees representatives, and successors-in-interest included in any such settlement classes and excluding all of the defendants and their immediate family, beneficiaries, alternate payees, representatives,  successors-in-interest, and others excluded from the settlement classes in any such settlements.

35. **"Settling Defendants"** means, collectively: (a) the Administrative Committee Settling Defendants, (b) the Officer and Director Settling Defendants (c) the Enron Settling Defendants; (d) the Northern Trust Settling Defendants; and (e) any other settling defendants pursuant to settlements approved by the Court.

36. **"Successor-In-Interest"** means a Person's estate, legal representatives, heirs, successors or assigns.

37. **"Settlement Custodian"** means the person or entity who shall serve as the escrow agent for the Settlement Fund, and who shall distribute the funds as directed by the Plan Administrator in the manner set forth herein.

38. **"Tittle Action"** means <u>Tittle, et al. V. Enron Corp. et al.</u>, Civil No. H 01-CV-3913 (Consolidated Action), an action pending in the United States District Court for the Southern District of Texas (Houston Division).

39. **"$85 Million Settlement"** means the partial settlement approved by the Court in *Tittle, et al. v. Enron, et al.*, Case No. H-01-CV-3913 on May 24, 2005 and given final judgment on June 9, 2005.

## II. THE SETTLEMENT TRUST

Unless otherwise ordered by the Court or agreed to by the Settling Parties, within ten (10) days of a Settlement becoming Unconditional, the Settlement Custodian shall pay to Class Counsel, or retain for payment upon application by Class Counsel, the attorneys fees and expenses or other reserves as approved by the Court in the Order(s) of Final Judgment and Dismissal. For the $85 million Settlement, in no event shall the Settlement Custodian pay or retain attorneys fees greater than $17 million in principal, together with accrued interest on any such amount awarded or retained for attorneys fees, or litigation expenses greater than $2.915 million in principal, together with accrued interest on any such amount awarded or retained for expenses. For all other Settlements, the Settlement Custodian shall pay or retain all attorneys' fees and litigation expenses, together with accrued interest on any such amount, as Ordered by the Court. The Settlement Custodian shall also have paid or retained as reserves the amounts necessary to pay all taxes on the Settlement Trust due and owing through the date of the payment or retention of such fees and expenses and all expenses relating to such preparation and payment of such taxes pursuant to the Settlement Agreement(s). Following payment or retention of the specified fees and expenses, the Net Settlement Fund, together with accrued interest on the principal amount of that Net Settlement Fund, but less all amounts paid or retained by the

Settlement Custodian for the payment of taxes on the Settlement Trust and expense related to payment of such taxes, shall be provided to the Enron Plans which shall then be responsible for administering and allocating the Net Settlement Fund and all expenses and costs for its administration and allocation, through the Fund Administrator in the following manner:

      A.    The Fund Administrator shall determine the amount of expenses that will be incurred in connection with the administration of executing the Plan of Allocation in Section II below.

      B.    The Fund Administrator shall provide Class Counsel and the Independent Fiduciary with written notice of the amount of expenses to be incurred in the administration of the Plan of Allocation and Class Counsel and the Independent Fiduciary shall promptly review the same. If the expenses are reasonable, Class Counsel and the Independent Fiduciary shall approve the expenses and such expenses shall be deemed appropriate as a Plan expense and shall be paid from the Net Settlement Trust.

      C.    If necessary, the Fund Administrator may request the assistance of the Plans' Trustees and/or record keepers in identifying Participant Claimants, Former Participant Claimants and Authorized Cash Balance Plan Claimants ("Claimants"), calculating the Loss for claimants, and distributing the Net Settlement Fund to all Claimants in accordance with the Plan of Allocation and the Enron Savings Plan. To the extent any expenses are incurred in connection therewith, the Fund Administrator shall include notice of such expenses to Class Counsel and the Independent Fiduciary. If Class Counsel and the Independent Fiduciary deems such expenses to be reasonable, Class Counsel and the Independent Fiduciary shall approve such expenses and they shall be deemed appropriate as a Plan expense and shall be paid from the Net Settlement Trust.

      D.    The Fund Administrator shall be solely responsible for all communications with Claimants regarding their claims. However, the Fund Administrator shall provide drafts of intended communications to the Independent Fiduciary and to Class Counsel for review and

comment at least five business days prior to the delivery of such communications. To provide communications and give effect to the Plan of Allocation, within ten (10) days of the Settlement(s) becoming Unconditional, the record keeper for the Plan shall provide the Fund Administrator with the following information concerning the Enron Savings Plan or Enron ESOP account of each member of the Settlement Class:

- The name, last known address, and Social Security number;

- The dollar value of the account balance invested in Enron stock at the beginning of the Settlement Class;

- The dollar value of purchases of Enron stock during the Settlement Class;

- The dollar value of sales of Enron stock during the Settlement Class period;

- The dollar value of the account balance as of the end of the Settlement Class;

- Whether the Claimant is a current Participant in the Enron Savings Plan or Enron ESOP as of the most recent date for which such information is reasonably available.

If precise data is not readily available, the Fund Administrator shall confer with Class Counsel and the Independent Fiduciary regarding the data that will be used.

E.    As soon as practicable after the calculation of the Plan of Allocation in Section III, the Fund Administrator shall direct the payment of the Net Settlement Fund, minus attorneys' fees and expenses, and administration expenses to the trustee of the Enron Savings Plan, Enron ESOP and the Enron Cash Balance Plan, and provide to each such trustee as well as to the record keeper for each Plan a detailed summary of the allocations to be made to the accounts of Authorized Claimants of the Enron Savings Plan and Enron ESOP. For each Authorized Cash Balance Plan Claimant, such allocations shall be made to their Enron Savings Plan accounts or such other appropriate account.

## III. THE ALLOCATION

### Enron Savings Plan and ESOP Allocation

Within ten (10) days of the Settlements becoming Unconditional and the Fund Administrator receiving approval from the Independent Fiduciary and Class Counsel of reasonable administration expenses, the Fund Administrator shall calculate the Claimants' Settlement Claims based on the information described in Section II and according to the following Court approved methodology:

A.    For Participant Claimants, the Fund Administrator, with the assistance of Enron, or others, if necessary, shall determine the approximate loss ("Loss") for each member of the Settlement Class as follows: Loss = A + B - C - D, where, for each member's Account in the Enron Savings Plan and/or Enron ESOP:

      1.    A = the dollar value, if any, of the account's investment in Enron stock valued on the first day of the Settlement Class Period;

      2.    B = the dollar value, if any, of all of subsequent investments of such Account in Enron stock during the Settlement Class Period, valued as of the time of purchase(s);

      3.    C = the dollar value, if any, of all liquidations of the account's investment in Enron stock during the Settlement Class Period, valued as of the time of the sale(s); and

      4.    D = the dollar value, if any, of the account's investment in Enron stock, valued on the last day of the Settlement Class Period.

B.    For Former Participant Claimants, the Fund Administrator, with the assistance of Enron, or others, if necessary, shall determine the approximate loss ("Loss") for each member of the Settlement Class as follows: Loss = A + B - C - D, where, for each member's Account:

      1.    A = the dollar value, if any, of the account's investment in Enron stock valued on the first day of the Settlement Class Period;

2.    B = the dollar value, if any, of all of subsequent investments of such account in Enron stock during the Settlement Class Period, valued as of the time of purchase(s);

3.    C = the dollar value, if any, of all liquidations of the account's investment in Enron stock during the Settlement Class Period, valued as of the time of the sale(s); and

4.    D = the dollar value, if any, of the account's investment in Enron stock, valued on the last day of the Settlement Class Period.

Such Loss calculations for Former Participant Claimants shall only include the portion of the accounts invested in Enron Stock to the extent vested as of the time the Former Participant Claimants' employment with Enron ended.

C.    The Losses of the Claimants as calculated in Sections A and B will be totaled to yield the Loss of each of the Enron Savings Plan and Enron ESOP as a whole over the Class Period (the "Plan's Loss").

D.    The Fund Administrator shall calculate for the Account of each Claimant in the Enron Savings Plan and Enron ESOP an amount which is the same percent of the Net Settlement Fund as his or her Loss bears to the respective Plan's Loss.

E.    The Administrators shall identify all Claimants whose Settlement Claim is less than twenty-five dollars ($25) or such other amount designated by the Fund Administrator ("De Minimis Amounts"). All such Claimants whose Settlement payment is De Minimis shall not receive an award from the Net Settlement Trust. The remaining Claimants shall become Authorized Claimants.  The De Minimis Amounts shall then be allocated to the Authorized Claimants on a pro rata basis based on each Authorized Claimant's Loss, and such amounts shall be added to the Settlement Claim for each Authorized Claimant.

F.    In light of the manner in which the data is kept and the ease with which it can be manipulated, it may be appropriate for the Fund Administrator, with Class Counsel's consent, to

Page 12

simplify some of the features of these calculations without further approval by the Court. Such simplifications shall be acceptable as long as the two basic features of the distribution are preserved: (1) that, with respect to each of the Enron Savings Plan and Enron ESOP, all members of the Settlement Class receive their share of the Net Settlement Fund based approximately on the decline in the value of Enron stock in which their Accounts were invested over the Settlement Class Period in comparison the total decline in the value of Enron Stock held by each respective Plan as a whole for the same period; and (2) that the distribution take place through the Plan as an entity so as to maximize the tax advantages of investment in the Plan.

G.    Subject to the approval of the Court, Plaintiffs in the Tittle Action who served as Class Representatives will receive an additional payment of $3,000 each, together with the amounts of any other incentive awards approved by the Court, as compensation for their contributions to the successful prosecution and partial resolution of this action.

H.    *Authorized Claimants: Allocation within Plans*

As promptly as possible after deposit of the Net Settlement Trust into the Trust, the Fund Administrator shall allocate the Net Settlement Trust in accordance with the Plan of Allocation above. For deposits into the Enron Savings Plan, the Fund Administrator shall cause the amounts allocated to each Authorized Claimant's Plan account to be invested in accordance with the existing investment elections in effect for such account and such amounts shall be treated thereafter for all purposes under the Plan as plan assets credited to the Authorized Claimant's account under the Plan, and shall thereafter be distributed only in accordance with the applicable Plan provisions. Each Authorized Claimant who is a Former Participant and does not have an Account in the Plan shall have his or her Settlement Claim invested in a suitable short term investment vehicle the primary purpose of which is the preservation of assets. The Fund Administrator, or their agents, shall report and remit such distributions and any applicable tax withholdings to the Former Participant Claimants, the Internal Revenue Service, and applicable state revenue agents under the Employer Identification Number generally used for distributions

from the Plan, and shall provide a copy of such reports to the Class Counsel in a form acceptable to the Class Counsel.

I.    The Fund Administrator shall make available to Enron, the record keepers of the Plans, the Independent Fiduciary, and Class Counsel any and all summaries, compilations, calculations, or tabulations of the claims and amounts described in this Section, upon the request of Enron, the record keepers of the Plans, the Independent Fiduciary, Class Counsel, or the Court.

**Cash Balance Plan Allocation**

Within ten (10) days of the Settlements becoming Unconditional and the Fund Administrator receiving approval from Class Counsel of reasonable administrative expenses, the Fund Administrator shall calculate the Claimants' Settlement Claims based on the information described in Section I and according to the following Court approved methodology:

A.    For both Participant Cash Balance Plan Claimants and Former Participant Cash Balance Plan Claimants, the Fund Administrator, with the assistance of Enron or others, shall determine the approximate loss (Loss) for each member of the Cash Balance Plan Settlement Class as follows: Loss = A x B, where for each Cash Balance Plan Claimant:

1.    A = the estimated accrued benefit earned during the period January 1, 1987, to December 31, 1994, in the Cash Balance Plan, offset by the ESOP Arrangement (excluding any Special Sub Account ESOP), payable as a single life annuity, as determined by the Plan Actuary. When appropriate, this amount will be adjusted to reflect the early retirement provisions of the Plan including any Former Participant Cash Balance Plan Claimant's benefit commencement date, if benefits were commenced prior to January 1, 2001.

2.    B = the present value factor determined as the Actuarial Equivalent (using the assumptions adopted by the Plan Actuary)of the stream of single life monthly annuity payments determined as of January 1, 2001 beginning at the age on Janurary 1, 2001 of

Page 14

any Former Participant Cash Balance Plan Claimant who has commenced benefits prior to January 1, 2001 and the later of the claimant's 55th birthday or their age on January 1, 2001 for all other claimants.

B.    The Losses of the Cash Balance Plan Claimants as calculated in Section A above will be totaled to yield the Loss of the Cash Balance Plan as a whole.

C.    The Fund Administrator shall calculate for the Account of each Cash Balance Plan Claimant an amount which is the same percent of the Net Cash Balance Settlement Fund as his or her Loss bears to the respective Cash Balance Plan's Loss.

## IV.  APPLICATION OF THE SETTLEMENT AMOUNT AND OTHER RECOVERIES TO EACH PLAN – BAR ORDER OFFSETS.

After this Plan of Allocation is fully implemented by the Plan Administrator, the Plan Administrator shall report to the Independent Fiduciary and Class Counsel the gross amount allocated to each of the Enron Plans. In the event a judgment is subsequently entered against one or more of the Non-Settling Defendants in the ERISA action, then any offset credit due under the Settlement Bar Order shall be allocated to each Enron Plan's claims in proportion to the gross settlement amount that ultimately was allocated to each of the Enron Plans under the Plan of Allocation. In no event shall the offset credit applied against any particular Enron Plan exceed the amount actually allocated to such Enron Plan under this Plan of Allocation.

Respectfully submitted this _11_ day of _July_ 2006.

CAMPBELL HARRISON & DAGLEY LLP

w/ permission

Robin L. Harrison
State Bar No. 09120700
Justin Campbell
Southern District No. 4556
4000 Two Houston Center
909 Fannin Street
Houston, TX  77010
Phone:  (713) 752-2332
Fax:  (713) 752-2330

Liaison Counsel for Plaintiffs

**KELLER ROHRBACK, L.L.P.**
Lynn Lincoln Sarko
Britt Tinglum
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Fax: (206) 623-3384

HAGENS BERMAN LLP
Steve W. Berman
Clyde Platt
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Fax: (206) 623-0594

**Co-Lead Counsel for Plaintiffs**

# EXHIBIT 10

# Hewitt

## Where We Work—The Woodlands



Hewitt Associates
The Woodlands Campus
2601 Research Forest Drive
The Woodlands, TX 77381
(281) 363-0456

**From George Bush
Intercontinental Airport**
Exit the airport by following the airport
exit signs to I-45/Hardy Toll Road. Exit to
the Hardy Toll Road by staying in the right
lane (pay toll). Travel north on the Hardy
Toll Road (pay toll before Aldine Westfield/
East Louetta exit); continue on the Hardy
Toll Road until it ends at I-45 North. Proceed
to enter I-45 North; take the Research
Forest Drive/Tamina Road exit 77. Turn
left (west) under the freeway and onto
Research Forest Drive. Continue on Research
Forest Drive, crossing the bridge over
Lake Woodlands (1.2 miles). At the next
light after the bridge (Hewitt Drive), turn

left. You are entering the Hewitt campus.
Travel down Hewitt Drive to a stop sign.
Past the stop sign, Building 7 (WD7) is
immediately on the right, and Building 3
(WD3) is on the left. For access to any
building, please check in with Security at
the reception desk in Building 3, just
inside the glass doors.

**Building 6—WD6**
(9012 New Trails Drive)

Building 6 is at the corner of North
Crescent Ridge Drive and New Trails Drive.

Proceed from Building 3 by way of Hewitt
Drive toward Research Forest Drive. Turn
left on North Crescent Ridge Drive before
reaching the light at Research Forest. As
you travel on North Crescent Ridge Drive,
Building 6 will be on the right (the last
building before the corner).

# Hewitt

## Where We Work—The Woodlands (continued)

### Building 8—WD8
(8401 New Trails Drive)

Building 8 is located approximately 1.5 miles northeast from Building 3.

Exit the Woodlands Campus via Hewitt Drive to Research Forest Drive; turn left onto Research Forest Drive. Proceed west; turn right onto New Trails Drive (northeast); Building 8 is approximately one mile and on your left.

### Returning to George Bush Intercontinental Airport

Exit the Woodlands Campus onto Research Forest Drive; travel east to I-45. At the I-45 freeway, turn right (south) onto the I-45 frontage road. Merge onto I-45 South. Stay in the right lane to access the Hardy Toll Road (pay toll). Continue on the Hardy Toll Road to the airport exit (pay toll). Take the Hardy Toll Road airport exit and follow the signs to airline terminals and rental car returns.

© 2006 Hewitt Associates LLC

# EXHIBIT 11

Hewitt Associates, The Woodlands photo - Jyothi Karthik Raja photos at pbase.com                    Page 1 of 1

**Jyothi Karthik Raja** | **all galleries** >> **Thumbnail views** >> **Around the World... in a lifetime** >> **Across the U.S.A** >> Houston, The W

previous | next



28-MAR-2007                                                                                          Jyothi Kartl

# Hewitt Associates, The Woodlands
*Canon EOS 300D Digital Rebel*
**1/160s f/8.0 at 18.0mm iso100 full exif**

other sizes: small medium original

previous | next

**All photos are copyrighted. See Profile page for contact details.**

**post a comment**

http://www.pbase.com/yardbird/image/76326640                                                        6/24/2007

[PDF] The **Woodlands** Office Location
File Format: PDF/Adobe Acrobat
Where We Work—The **Woodlands**. **Hewitt** Associates. The **Woodlands** Campus ... Exit
the **Woodlands** Campus via **Hewitt**. Drive to Research Forest Drive; turn left ...
www.**hewittassociates**.com/Lib/MBUtil/AssetRetrieval.aspx?guid=1364D7BA-1D83-4801-
8252-0C9FCEB5E9C6 - Similar pages

# EXHIBIT 12

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **ILLINOIS NORTHERN** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
| OVERALL CASELOAD STATISTICS | Filings* | | 8,422 | 8,093 | 9,056 | 10,584 | 11,126 | 11,135 | U.S. | Circuit |
| | Terminations | | 7,929 | 8,255 | 8,805 | 11,461 | 10,888 | 10,709 | | |
| | Pending | | 8,091 | 7,711 | 7,914 | 7,706 | 8,699 | 8,587 | | |
| | % Change in Total Filings | Over Last Year | | 4.1 | | | | | 27 | 2 |
| | | Over Earlier Years | | | -7.0 | -20.4 | -24.3 | -24.4 | 81 | 6 |
| | Number of Judgeships | | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | Vacant Judgeship Months** | | 15.8 | 5.7 | 12.0 | 9.6 | 22.1 | 17.8 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 382 | 367 | 412 | 481 | 505 | 506 | 62 | 4 |
| | | Civil | 346 | 330 | 369 | 437 | 461 | 459 | 36 | 3 |
| | | Criminal Felony | 24 | 26 | 34 | 32 | 38 | 39 | 93 | 7 |
| | | Supervised Release Hearings** | 12 | 11 | 9 | 12 | 6 | 8 | 77 | 6 |
| | Pending Cases | | 368 | 351 | 360 | ·350 | 395 | 390 | 48 | 3 |
| | Weighted Filings** | | 462 | 443 | 485 | 512 | 526 | 525 | 39 | 3 |
| | Terminations | | 360 | 375 | 400 | 521 | 495 | 487 | 66 | 5 |
| | Trials Completed | | 11 | 11 | 13 | 12 | 12 | 14 | 86 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 14.7 | 13.9 | 12.9 | 10.3 | 9.9 | 10.3 | 90 | 7 |
| | | Civil** | 6.2 | 6.5 | 6.9 | 5.9 | 5.5 | 5.5 | 7 | 2 |
| | From Filing to Trial** (Civil Only) | | 29.7 | 26.4 | 27.0 | 28.4 | 26.0 | 26.0 | 65 | 5 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 456 | 500 | 388 | 337 | 442 | 461 | | |
| | | Percentage | 6.5 | 7.4 | 5.6 | 5.0 | 5.6 | 6.0 | 65 | 6 |
| | Average Number of Felony Defendants Filed Per Case | | 1.7 | 1.8 | 1.9 | 1.9 | 1.7 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 45.20 | 45.07 | 51.46 | 39.36 | 45.57 | 43.63 | | |
| | | Percent Not Selected or Challenged | 31.8 | 30.9 | 36.9 | 31.0 | 37.3 | 34.8 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7620 | 118 | 150 | 701 | 53 | 55 | 1504 | 902 | 563 | 428 | 1614 | 23 | 1509 |
| Criminal* | 527 | 1 | 152 | 59 | 43 | 107 | 80 | 13 | 6 | 17 | 11 | 11 | 27 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

Judicial Caseload Profile Report

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **TEXAS SOUTHERN** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 13,345 | 13,469 | 14,887 | 15,102 | 13,487 | 12,762 | | |
| | Terminations | | 13,068 | 14,632 | 14,413 | 14,082 | 12,862 | 12,340 | | |
| | Pending | | 9,085 | 8,757 | 10,054 | 9,634 | 8,589 | 7,904 | | |
| | % Change in Total Filings | Over Last Year | | -.9 | | | | | 44 | 5 |
| | | Over Earlier Years | | | -10.4 | -11.6 | -1.1 | 4.6 | 25 | 4 |
| | Number of Judgeships | | 19 | 19 | 19 | 19 | 19 | 19 | | |
| | Vacant Judgeship Months** | | .0 | 3.8 | .3 | .0 | .0 | 14.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 703 | 709 | 783 | 794 | 709 | 672 | 7 | 3 |
| | | Civil | 339 | 340 | 377 | 433 | 408 | 405 | 39 | 6 |
| | | Criminal Felony | 274 | 277 | 326 | 295 | 254 | 220 | 3 | 2 |
| | | Supervised Release Hearings** | 90 | 92 | 80 | 66 | 47 | 47 | 4 | 1 |
| | Pending Cases | | 478 | 461 | 529 | 507 | 452 | 416 | 20 | 5 |
| | Weighted Filings** | | 543 | 536 | 600 | 629 | 609 | 585 | 18 | 5 |
| | Terminations | | 688 | 770 | 759 | 741 | 677 | 649 | 6 | 3 |
| | Trials Completed | | 26 | 23 | 25 | 27 | 32 | 41 | 24 | 2 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 5.0 | 4.9 | 4.7 | 4.5 | 4.6 | 4.8 | 4 | 1 |
| | | Civil** | 6.6 | 8.6 | 9.8 | 6.8 | 7.2 | 7.1 | 10 | 1 |
| | From Filing to Trial** (Civil Only) | | 20.3 | 18.8 | 15.3 | 19.5 | 20.8 | 18.9 | 25 | 5 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 180 | 229 | 176 | 61 | 65 | 99 | | |
| | | Percentage | 4.1 | 5.0 | 3.3 | 1.1 | 1.2 | 1.9 | 40 | 6 |
| | Average Number of Felony Defendants Filed Per Case | | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 43.45 | 44.39 | 48.14 | 55.44 | 49.36 | 47.25 | | |
| | | Percent Not Selected or Challenged | 33.2 | 37.4 | 36.6 | 42.7 | 40.8 | 41.7 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 6434 | 156 | 331 | 1647 | 126 | 148 | 309 | 1610 | 654 | 295 | 556 | 7 | 595 |
| Criminal* | 5186 | 494 | 502 | 3628 | 174 | 195 | 30 | 22 | 10 | 19 | 34 | 47 | 31 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that she caused true and correct copies of

the foregoing **Revised Memorandum in Support of Defendant Enron Creditors Recovery**

**Corp.'s Motion to Transfer Pursuant to 28 U.S.C. § 1404(a)** to be served upon:

> Joel G. Chefitz
> Mark J. Alschul
> McDermott Will & Emery LLP
> 227 West Monroe Street
> Chicago, Illinois  60606
> Fax: (312) 984-7700
>
> Steven W. Kasten
> McDermott Will & Emery LLP
> 28 State Street
> Boston, Massachusetts  02109
> Fax: (617) 535-3800

via first class U.S. mail, postage prepaid, this 8th day of July, 2008.


                                    /s/ Sara E. Robinson
                                  Sara E. Robinson