**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HEWITT ASSOCIATES, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 cv 3634 |
| | ) | |
| v. | ) | Judge Samuel Der-Yeghiayan |
| | ) | |
| ENRON CREDITORS RECOVERY CORP., f/k/a | ) | Magistrate Judge Cole |
| ENRON CORP., an OREGON Corporation | ) | |
| | ) | |
| Defendant, | ) | |

**PLAINTIFF HEWITT ASSOCIATES, L.L.C.'S OPPOSITION**
**TO DEFENDANT ENRON CREDITOR RECOVERY CORP.'S**
**REVISED MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)**

**Introduction**

Hewitt has the right to choose Illinois as the forum for a declaration of rights under its written contract with Enron. Enron's attempt to obscure that right is dishonest. To support its argument that transfer is in the interests of justice, Enron mischaracterizes the relationship of this case to other litigation pending in the Southern District of Texas. To support its argument for convenience of transfer to the parties, Enron manufactures a non-existent dispute over the applicability of the parties' contract, the amended Administrative Services Agreement (ASA).

On June 6, 2008, Plaintiff Hewitt Associates, L.L.C. (Hewitt), headquartered in Lincolnshire, Illinois, commenced this declaratory judgment action against Enron in the Circuit Court of Lake County, Illinois. Hewitt seeks a declaration of its and Enron's rights and responsibilities under the ASA. The declaration will resolve a dispute as to whether Enron must indemnify Hewitt for losses relating to its services under the ASA, and defend and indemnify Hewitt in connection with a lawsuit against Hewitt.

Enron responded to this suit by filing a mirror declaratory judgment action in the Southern District of Texas on June 13. Enron now improperly seeks to characterize its *subsequent* filing as a *prior action* rendering transfer appropriate in the interests of justice. The basis for this mischaracterization was the routine consolidation of Enron's mirror action, for pre-trial purposes, with various cases alleging fraud, breach of fiduciary duty and other misconduct by Enron and its officers and directors prior to and during Enron's much-publicized collapse in 2001. Hewitt is not a party to those cases. And almost all of those consolidated Enron cases have settled. The issues to be decided in this declaratory judgment action have no legal or factual overlap with those in the consolidated Enron cases.[1] Hewitt has moved to dismiss Enron's tactically responsive June 13 action based on the first-filed doctrine, and that motion is under advisement with Judge Harmon.

The only prior case pending in the Southern District of Texas that has any factual overlap with this case is an action that has been brought against Hewitt on behalf of the Enron Corp. Savings Plan (Plan). Hewitt has moved to dismiss that case for lack of federal subject matter jurisdiction because the Plan and Hewitt are both Delaware citizens for diversity purposes.[2] Beyond that, the only connection between this case and the consolidated Enron cases arises from

---

[1] The Order, attached to Enron's Revised Memorandum as Exhibit 1, was issued by Judge Harmon without argument or prior notice to the parties, purportedly pursuant to a December 12, 2001 Order of Consolidation. Ex. 1. The Order of Consolidation was entered by Judge Rosenthal on motion of Enron, Kenneth L. Lay, Jeffrey K. Skilling, Andrew S. Fastow, and other Enron officers and directors, "as to the many actions in this district arising from, or relating to, the financial difficulties of Enron Corporation." *Id.* at 17. Judge Rosenthal noted that the cases all arose from a common core of operative facts; were filed against common defendants; contained identical claims in many cases; involved overlapping legal issues; and would involve substantial common discovery. *Id.* It was entered "in order to ensure the orderly progress of these lawsuits and to avoid unwarranted duplication of discovery and motion practice." *Id.* The order further provided that "actions later filed in this district relating to the same core of operative facts and issues will also be consolidated in this court." Hewitt has not objected to Judge Harmon's procedural Consolidation Order with respect to Enron's defensive, later filed declaratory judgment action because it does not view it to affect the substance of its motion to dismiss under the first-filed doctrine. Nevertheless, neither of the parties' dueling declaratory judgment actions concerns the common issues, facts and discovery that would justify consolidation under Judge Rosenthal's Order of Consolidation.

[2] A copy of Hewitt's Motion to Dismiss and Supporting Memorandum filed in that case are attached at Exhibit 2.

a fortuity: the contract services provided by Hewitt to Enron were requested for a settlement allocation in one such case, the *Tittle* lawsuit.

Hewitt's choice to litigate in its home forum is entitled to substantial deference. As is set forth below, Enron has not shown that the transfer of this case to the Southern District of Texas will convenience the parties or further the efficient administration of justice sufficiently to overcome Hewitt's choice to litigate this action in Illinois.

## Relevant Background

Hewitt and Enron are parties to the ASA. Ex. 3. The ASA was amended in writing in 2005 (Ex. 4), and its term was extended again in July 2006, by a letter signed by Enron (Ex. 5). Pursuant to the terms of the ASA, Enron and Hewitt allocated between them financial responsibility for unrecoverable losses, costs, damages or expenses incurred by Enron or the Plan resulting from Hewitt's erroneous performance of services: absent gross negligence or willful, fraudulent or criminal misconduct, Hewitt's liability is limited to $1 million. Enron and Hewitt also agreed to indemnify and to defend the other in any third party claims, including specifically any Plan lawsuit against Hewitt. ASA §§ 2.5, 10.1, 10.4(b)-(c).

Hewitt was asked to and did perform services at Enron's request to assist in an allocation of a settlement fund for an ERISA class action known as the *Tittle* case before Judge Harmon in the Southern District of Texas. Declaration of Robert A. Dunlap (Dunlap Dec.), Ex. 6, ¶ 8. Enron authorized Hewitt, in writing, to calculate the allocation in accordance with an agreed work plan. *Id.* ¶¶ 10-11. An error was made as a result of certain incorrect information being retrieved from the database originally operated and maintained by a Northern Trust affiliate that previously acted as Enron's record keeper for the Plan. *Id.* ¶¶ 12-13. The data system, and the

Hewitt employee responsible for obtaining necessary data from it for use in the allocation, are and have always been in Atlanta. *Id.* ¶ 13.

Hewitt's services on the *Tittle* allocation were governed by the amended ASA. Enron has acknowledged this repeatedly. Soon after learning of the error, John Neslage, acting as counsel to the Administrative Committee of the Plan, wrote to Hewitt (in Illinois) as follows:

> As you are aware, Hewitt Associates has been providing services under an Administrative Services Agreement, dated June 1, 2001, as amended effective January 1, 2005 and as thereafter amended ("ASA"). In carrying out its duties under the ASA, Hewitt made a misallocation of funds received under the Settlement which caused an injury to Participants of over $21 million. Under the ASA, Hewitt is required to correct and/or re-perform any defective or non-conforming services. We hereby notify you of the Plan's demand that Hewitt honor Section 2.5 of the ASA.

Ex. 7 at 1. Mr. Neslage went on to invoke the ASA's dispute resolution process, opining that the "internal escalation step" had failed and suggesting "that we go directly to the mediation procedure contemplated in Schedule C to the ASA." Ex. 7 at 2.

Peter Ross of Hewitt responded to Mr. Neslage in writing on February 28, 2007. Ex. 8. Mr. Ross clarified in his letter that Hewitt was retained by Enron, not the Plan, to help determine the allocation of settlement proceeds. Ex. 8 at 1. He pointed out "that the Plan is not a party to our Administrative Services Agreement with Enron" and that therefore "we cannot accept a notice from you, representing the Plan, as an appropriate notice under the Agreement." Ex. 8 at 1. In response to Mr. Ross' letter, On March 6, 2007, Enron's Senior Director of Human Resources wrote to Mr. Ross. Ex. 9. She wrote:

> This letter adopts the statements and positions set forth in the February 21 letter of Mr. Neslage, including the demand that that Hewitt honor Section 2.5 of the Administrative Services Agreement in full and at once. Please indicate whether Hewitt continues to maintain that there is something lacking in the notice from Enron Corp. ("Enron").

Ex. 9 at 1. The letter went on to notify Hewitt that Enron had retained Peter Rush (a Chicago attorney) at Bell, Boyd and Lloyd, LLP to represent Enron's interests in the matter. Ex. 9 at 2.

By letter of March 27, 2007, Mr. Rush requested times to meet in furtherance of the ASA's dispute resolution process.  Ex. 10 at 2.

As alleged in the Complaint in this case, the Plan, Enron and Hewitt reached an agreement earlier this year whereby Enron and Hewitt made non-recourse loans to the Plan to ensure that the Plan will be able to rectify the misallocation of the *Tittle* settlement.  These loans total in excess of $11 million, a number arrived at to ensure that the corrected allocations will cover any shortfall between amounts that can be recovered from class members who received erroneous payments and amounts that must be paid to other class members in accordance with their respective entitlements.  In entering that interim agreement, Enron and Hewitt reserved all rights under the ASA.

## Argument

Enron has moved to transfer this case to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  Section 1404(a) does not give a defendant license to transfer whenever it would prefer to litigate elsewhere.  Transfer should be denied unless the defendant shows, by reference to specific circumstances, that the transferee forum is substantially more convenient.  *See In re Nat'l Presto Indus.*, 347 F.3d 662, 664 (7th Cir. 2003) quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"); *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986) (stating the movant "has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient"); *Sarantakis v. Gruttadauria*, 2003 U.S. Dist. LEXIS 4002, at *26-28 (N.D. Ill. Mar. 14, 2003)

(denying defendant's section 1404(a) motion to transfer because defendant failed to prove that the transferee forum was substantially more convenient). Enron has failed to meet this burden.

## I.     HEWITT'S CHOICE OF FORUM IS ENTITLED TO DEFERENCE.

The plaintiff's choice of forum is entitled to substantial weight under section 1404(a) and should rarely be disturbed. *Nat'l Presto Indus.*, 347 F.3d at 664; *Pava v. Drom Int'l Inc.*, 8 F. Supp. 1062, 1064-65 (N.D. Ill. 1998). The plaintiff's privilege of choosing the forum must be a paramount consideration in the disposition of any transfer request. *Shuttle v. Armco Steel Corp.*, 421 F.2d 22, 25 (3rd Cir. 1970); *Argos v. Orthotec*, 304 F. Supp. 2d 591, 598 (D. Del. 2004). Even greater deference is due when the plaintiff chooses to litigate in its home forum. *See Howell v. Joffe*, 478 F. Supp. 2d 1014, 1022 (N.D. Ill. 2006); *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1167 (N.D. Ill. 1995); *Gallery House, Inc. v. Yi*, 587 F. Supp. 1036, 1040 (N.D. Ill. 1984).

Hewitt's principal place of business is in Lincolnshire, Illinois. Lincolnshire is located within the Eastern Division of the Northern District of Illinois, and therefore Hewitt's choice to litigate in its home forum is entitled to deference. *See Howell*, 478 F. Supp. 2d at 1022; *Vandeveld*, 877 F. Supp. at 1167; *Gallery House, Inc.*, 587 F. Supp. at 1040. This is true even though this action was removed to federal court by Enron after Hewitt initiated this action in a Lake County, Illinois state court. *See Howell*, 478 F. Supp. 2d at 1022. Post-removal, Hewitt's choice of forum is considered the Northern District of Illinois, and its preference for this court is accordingly entitled to substantial weight under section 1404(a). *See id.*

## II.     ENRON HAS FAILED TO DEMONSTRATE THAT PRIVATE INTEREST FACTORS FAVOR TRANSFER.

Enron has failed to show that the Southern District of Texas is substantially more convenient for relevant witnesses than the Northern District of Illinois. As the party seeking

transfer, Enron must clearly specify key witnesses it intends to call and make at least a general statement of their anticipated testimony. *Heller Financial, Inc. v. Midwhey Powder Co. Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989); *Vandeveld*, 877 F. Supp. at 1167-68. In determining which venue is more convenient, courts should focus on the nature and quality of the witnesses' testimony, rather than conduct a cursory examination of which party has a longer list of potential witnesses. *Vandeveld*, 877 F. Supp. at 1168. When a party fails to provide sufficient information about the specific witnesses and testimony, courts should disregard the baseless argument that the convenience of the witnesses favors transfer. *See Aldridge v. Forest River, Inc.*, 436 F. Supp. 2d 959, 962 (N.D. Ill. 2006).

When moving parties make only general allegations that third-party witnesses reside in the transferee forum, courts have wisely refused to transfer. *See General Portland Cement Co. v. Perry*, 204 F.2d 316, 320 (7th Cir. 1953); *Aldridge*, 436 F. Supp. 2d at 962-63. In *Aldridge v. Forest River, Inc.*, the movant failed to name specific witnesses or explain the testimony potential witnesses would provide. *Aldridge*, 436 F. Supp. 2d at 962. Instead, the moving party offered only a conclusory affidavit stating that "numerous witnesses, including employees and business associates" were located in the transferee forum. *Id.* The court denied the defendant-movant's motion for transfer because it failed to meet its burden of demonstrating that the original forum was clearly less convenient. *Id.*

Like the movant in *Aldridge,* Enron does not specify which former employees it intends to call as third-party witnesses or give even a general statement of what relevant testimony any potential third-party witnesses could offer. Rather, Enron generally states that "[t]here are many former Enron employees who were involved in the negotiation and execution of the original ASA, the amendments and the Letter Agreement as well as the day-to-day interaction with

Hewitt on all aspects of the various services performed who continue to reside in Texas." *Revised Memorandum in Support of Defendant Enron Creditors Recovery Corp.'s Motion To Transfer Pursuant to 28 U.S.C. § 1404(a)*, at 11-12. This assertion is based on the Declaration of Robert W. Jones. Enron Ex. 3. But the Jones Declaration merely lists a litany of current and former Enron employees, primarily in Houston, involved in the creation of the ASA, its amendments, and the July 2006 letter of authorization. The Jones Declaration does not specify or explain the relevance of any expected testimony. Enron Ex. 3 ¶¶ 8, 12. Transfer should be denied because Enron has failed to provide specific information and has not met its burden of demonstrating that the convenience of the witnesses favors the Southern District of Texas. *See Aldridge*, 436 F. Supp. 2d at 962. As is set forth in the Affidavit of Robert Dunlap filed herewith, the basic terms of the ASA and the basic terms of the January 1, 2005 Amendment were prepared by Hewitt personnel located in Illinois. The Hewitt witnesses who would be in a position to testify regarding the error giving rise to this dispute are split between Atlanta and Houston, and they are Hewitt employees. Dunlap Dec. ¶¶ 13-14.[3]

Enron apparently will attempt to offer unspecified parol evidence from some of its employees to argue that the ASA does not govern and therefore does not limit Hewitt's liability. The Jones Declaration emphasizes that the ASA was amended in 2005 when Hewitt's services were scaled back. Enron Ex. 3 ¶¶ 13-16. But the Amendment itself unambiguously provides for Enron to request, and Hewitt to provide, "Additional Services" to be invoiced on a time and materials basis, as was the case with the allocation work at issue. Ex. 4 at 2; Dunlap Dec. ¶¶ 6-8. It therefore provides no support for the proposition that the ASA did not govern Hewitt

---

[3] The location of employee witnesses is given little weight for purposes of evaluating transfer. *See Images of the World, Inc. v. Continental Am. Indus., Inc.*, 2005 U.S. Dist. LEXIS 18879 at *19 (N.D. Ill. August 30, 2005). This should be especially so where Hewitt will bear any inconvenience in arranging for its employees' presence here.

allocation services.  In any event, as set forth in Mr. Dunlap's affidavit, Enron's principal

negotiator of that Amendment was Chris Rahaim in Enron's benefits department.  Dunlap Dec.

¶ 6.  Mr. Rahaim is incarcerated in federal prison in Arkansas, having been convicted of crimes

in his work at Enron.  Ex. 11.  He is apt to be equally available or unavailable regardless of the

venue of this case.

Similarly, Mr. Jones presents irrelevant parol evidence regarding the circumstances of the

July 2006 authorization letter, suggesting that Hewitt addressed it to the Administrative

Committee rather than Enron.  Enron argues from this that Hewitt's services regarding the *Tittle*

settlement were performed pursuant to a contract between Hewitt and the Plan, not governed by

the Amended ASA.  But again, Enron's characterization of an unambiguous document is beside

the point.  The letter, on its face, is directed to Mr. Jones at Enron, seeks Enron's authorization,

and was signed as "Enron Corp. Authorization."[4]

Most importantly, Enron's argument that the ASA does not apply is contrived.  There is

no genuine dispute regarding the applicability of the ASA to the services rendered by Enron and

thus no genuine suggestion that testimony regarding the circumstances under which it was

drafted or amended will be issues for trial.  Enron repeatedly acknowledged, in writing, that the

ASA applies and invoked the ASA against Hewitt in connection with the same error that gave

rise this case.  Exhibits 7-10.  Enron should not be permitted to gain procedural advantage in

upsetting Hewitt's choice of forum by presenting a contrary, disingenuous, argument.  *See*

*Vandeveld*, 877 F. Supp. at 1168-69 (court ignored irrelevant witnesses proposed by the

---

[4]  The letter's author, Robert Dunlap, categorically denies Mr. Jones' testimony that Hewitt typed the words "Administrative Committee" where Mr. Jones was to sign the letter.  Dunlap Dec. ¶¶ 10-11.  But the nomenclature on the signature block proves nothing of relevance.  The Administrative Committee is in fact a committee of Enron employees, Mr. Jones was Enron's Director of Employee Benefits, and the signature gives "Enron's Corp. Authorization."

defendant and weighed only the convenience of witnesses who could offer relevant testimony);

*The Tingstol Co. v. Rainbow Sales, Inc.*, 18 F. Supp. 2d. 930, 933-934 (N.D. Ill. 1998)

(discounting convenience of those whom the movant identified as likely witnesses on a matter of

contract construction not central to the case's resolution); *Avesta Sheffield, Inc. v. Olympic

Cont'l Res.,* 2000 U.S. Dist. LEXIS 1670, at *19 (N.D. Ill. Feb. 14, 2000) (discounting

convenience of potential witnesses because their testimony was not crucial to the determination

of the central issue in the case.).

## III.    PUBLIC INTEREST FACTORS DO NOT FAVOR TRANSFER.

Enron argues that public interest factors favor transfer because of the asserted

relationship of this case to lawsuits now pending in the Southern District of Texas and because,

according to Enron, the docket is less congested in the Southern District of Texas than here.

These arguments are wrong and materially misleading.

### A.    The Pending Actions in the Southern District of Texas Do Not Argue for Transfer of This Case.

Enron relies on three sets of cases pending in the Southern District of Texas: (1) the slew

of lawsuits that were initiated in 2001 against Enron and its officers and directors alleging

financial impropriety by Enron officers and directors; (2) the Plan's lawsuit filed against Hewitt

earlier this year alleging contract and tort claims against Hewitt in connection with the

misallocation; and (3) the declaratory judgment action filed by Enron that is the mirror image of

this case, which Enron filed in response to Hewitt's commencement of this action in Illinois.

First, the contractual rights and obligations of Enron and Hewitt to be litigated here relate

to the first set of lawsuits only by the mere fortuity that the services that Enron requested of

Hewitt under the ASA happened to relate to the allocation of a settlement in a case pending in

the Southern District of Texas.  Hewitt was and is not a party to that case.  That case and the

barrage of lawsuits alleging misconduct by Enron officers and directors in March of 2001 are what Judge Rosenthal considered in issuing the Order of Consolidation--not this case. Ex. 1. The operative facts in this case concern Hewitt's contractual services in 2006--not financial improprieties at Enron before 2001. Ex. 1 at 17. No ERISA or securities law claims are involved, and consolidating this case into the Enron cases pending in Houston would not serve to economize in discovery or motion practice. Ex. 1 at 17.

Second, the Plan's lawsuit against Hewitt does not justify transferring this action because the federal court in Houston has no subject matter jurisdiction over it. Hewitt has filed a motion to dismiss on that basis. Ex. 2. While Judge Harmon and not this Court will decide that motion, the burden of establishing the existence of subject matter jurisdiction is on Enron, and no interest of justice could conceivably be served by transferring this case to join it to a related case in another district until such time as federal jurisdiction is established.

Finally, the mirror declaratory judgment action filed by Enron after, and in response to, this case does not bolster its argument for transfer. *See Martin v. Graybar Elec. Co., Inc.*, 266 F.2d 202, 204 (7th Cir. 1959). Rather, this fact supports Hewitt's position that transfer is inappropriate because the party filing later should be barred from pursuing its duplicative litigation. *See id.*

**B.    Enron Has Not Established a Difference in Docket Congestion.**

Enron further argues that the interest of justice will be served by transfer because the docket of the Southern District of Texas is less congested than the docket of the Northern District of Illinois. This is an exaggeration and a manipulation of the available data. While the data that Enron cites do indicate a slightly faster median time from filing to trial for civil actions in the Southern District of Texas, the difference is far from dramatic and is not significant enough to

weigh in favor of transfer.  *See Hinc v. Lime-O-Sol Co.*, 231 F. Supp. 2d 795, 797 (N.D. Ill. 2002).  Further, the Federal Court Management Statistics Report cited by Enron indicates that median time from filing to *disposition* of civil cases is slightly *shorter* in the Northern District of Illinois (6.2 months in the Northern District of Illinois, compared to 6.6 months in the Southern District of Texas).  Thus, the congestion of the two federal dockets are not significantly different, and this factor does not support transfer.

<div align="center">

**<u>Conclusion</u>**

</div>

Hewitt is based in Illinois and legitimately seeks a declaration of rights under the ASA in this forum.  Transfer would not be in the interests of justice here, where Enron seeks to use its later-filed mirror action in the alternate forum to contrive an argument for judicial efficiency. Enron has utterly failed to establish that transfer will substantially convenience the parties and witnesses, instead manufacturing a non-existent dispute over the ASA's application that is contrary to its own clear admissions.  This case will require the Court to construe the ASA in view of evidence to be obtained primarily from Hewitt's own employees in different locations. Therefore, Hewitt's presumptively valid choice of forum should be respected, and Enron's motion should be denied.


Dated: July 21, 2008                    Respectfully submitted,

                                        **HEWITT ASSOCIATES, L.L.C.**


                                        By:_____s/Mark J. Altschul_____
                                              One of Its Attorneys

Joel G. Chefitz
Mark J. Altschul
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois 60606

Telephone: (312) 372-2000
Facsimile: (312) 984-7700

Steven W. Kasten
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts 02109
Telephone: (617) 535-4000

CHI99 5004460-1.058123.0020

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that he caused true and correct copies of the foregoing Plaintiff Hewitt Associates, L.L.C.'s Opposition to Defendant Enron Creditor Recovery Corp.'s Revised Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) to be served upon:

Peter G. Rush
Dawn L. Johnson
Bell, Boyd & Lloyd LLP
70 West Madison Street, Suite 3100
Chicago, Illinois 60602

via the U.S. District Court for the Northern District of Illinois' CM/ECF Electronic Document Filing System, this 21st day of July, 2008.

s/Mark J. Altschul
Mark J. Altschul

# EXHIBIT 1



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

DEC 1 3 2001

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| MARK NEWBY, | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| ENRON CORP., *et al.*, | § | (Securities Suits) |
| Defendants. | § | |

---

| | | |
|---|---|---|
| SETH ABRAMS and STEVEN FRANK, Individually and On Behalf of All Others Similarly Situated, | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-01-3630 |
| ENRON CORP., *et al.*, | § | |
| Defendants. | § | |

---

| | | |
|---|---|---|
| ROBERT J. CASEY II and RUTH I. HORTON, Individually and On Behalf of All Others Similarly Situated, | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-01-3647 |
| ENRON CORP., *et al.*, | § | |
| Defendants. | § | |

---

*14*

FRANK WILSON, On Behalf of      §
Himself and All Others Similarly §
Situated,                        §
                                 §
            Plaintiff,           §
                                 §
VS.                              §      CIVIL ACTION NO. H-01-3652
                                 §
ENRON CORP., *et al.*,           §
                                 §
            Defendants.          §

---

J. MICHAEL GOTTESMAN,           §
Individually and on Behalf of    §
All Others Similarly Situated,   §
                                 §
            Plaintiff,           §
                                 §
VS.                              §      CIVIL ACTION NO. H-01-3660
                                 §
ENRON CORP., *et al.*,           §
                                 §
            Defendants.          §

---

AVIGAYIL GREENBERG,             §
Individually and on Behalf of    §
All Others Similarly Situated,   §
                                 §
            Plaintiff,           §
                                 §
VS.                              §      CIVIL ACTION NO. H-01-3670
                                 §
ENRON CORP., *et al.*,           §
                                 §
            Defendants.          §

---

112121128 F:\CASES\2001\01-3624\01-3624.a04

2

ROBERT CHRISTIANSON,                    §
Individually and on Behalf              §
of All Others Similarly Situated,       §
                                        §
              Plaintiff,                §
                                        §
VS.                                     §    CIVIL ACTION NO. H-01-3671
                                        §
ENRON CORP., *et al.*,                  §
                                        §
              Defendants.               §

---

ERNEST GOTTDIENER, Individually         §
and on Behalf of All Others Similarly   §
Situated,                               §
              Plaintiff,                §
                                        §
VS.                                     §    CIVIL ACTION NO. H-01-3681
                                        §
ENRON CORP., *et al.*,                  §
                                        §
              Defendants.               §

---

MURIEL P. KAUFMAN, IRA,                 §
Individually and on Behalf              §
of All Others Similarly Situated,       §
                                        §
              Plaintiff,                §
                                        §
VS.                                     §    CIVIL ACTION NO. H-01-3682
                                        §
ENRON CORP., *et al.*,                  §
                                        §
              Defendants.               §

---

JOHN F. MCCARTHY MONEY          §
PURCHASE PLAN, Individually and §
on Behalf of All Others Similarly §
Situated,                       §
                                §
            Plaintiff,          §
                                §
VS.                             §       CIVIL ACTION NO. H-01-3686
                                §
ENRON CORP., *et al.*,          §
                                §
            Defendants.         §

HENRY H. STEINER, Individually  §
and on Behalf of All Others     §
Similarly Situated,             §
                                §
            Plaintiff,          §
                                §
VS.                             §       CIVIL ACTION NO. H-01-3717
                                §
ENRON CORP., *et al.*,          §
                                §
            Defendants.         §

MICHAEL KOROLUK, Individually   §
and on Behalf of All Others Similarly §
Situated,                       §
                                §
            Plaintiff,          §
                                §
VS.                             §       CIVIL ACTION NO. H-01-3733
                                §
ENRON CORP., *et al.*,          §
                                §
            Defendants.         §

| | | |
|---|---|---|
| JAMES BRILL, on Behalf of Himself and of All Others Similarly Situated, | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3734 |
| | § | |
| ENRON CORP., *et al.*, | § | |
| | § | |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| ELMAR A. BUSCH, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3735 |
| | § | |
| ENRON CORP., *et al,*, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| WARREN PINCHUCK, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3736 |
| | § | |
| ENRON CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |

MAHIN S. MASHAYEKH,                    §
Individually and on Behalf of          §
All Others Similarly Situated,         §
                                       §
                Plaintiff,             §
                                       §
VS.                                    §    CIVIL ACTION NO. H-01-3737
                                       §
ENRON CORP., *et al.*,                 §
                                       §
                Defendants.            §

---

BARBARA D. LEE, Individually           §
and on Behalf of All Others            §
Similarly Situated,                    §
                                       §
                Plaintiff,             §
                                       §
VS.                                    §    CIVIL ACTION NO. H-01-3789
                                       §
ENRON CORP., *et al.*,                 §
                                       §
                Defendants.            §

---

DANIELLE M. KARCICH, *et al.*, on Behalf   §
of Itself and All Others Similarly Situated, §
                                       §
                Plaintiffs,            §
                                       §
VS.                                    §    CIVIL ACTION NO. H-01-3838
                                       §
ENRON CORP., *et al.*,                 §
                                       §
                Defendants.            §



NAOMI RAPHAEL, Individually and            §
on Behalf of All Others                    §
Similarly Situated,                        §
                                           §
                Plaintiff,                 §
                                           §
VS.                                        §    CIVIL ACTION NO. H-01-3839
                                           §
ENRON CORP., *et al.*,                     §
                                           §
                Defendants.                §

---

VICTOR RONALD FRANGIONE,                   §
on Behalf of Himself and All Others        §
Similarly Situated,                        §
                                           §
                Plaintiff,                 §
                                           §
VS.                                        §    CIVIL ACTION NO. H-01-3889
                                           §
ENRON CORP., *et al.*,                     §
                                           §
                Defendants.                §

---

PATRICIA D. PARSONS, On Behalf of          §
All Others Similarly Situated              §
                                           §
                Plaintiff,                 §
                                           §
VS.                                        §    CIVIL ACTION NO. H-01-3903
                                           §
ENRON CORP., *et al.*,                     §
                                           §
                Defendants.                §

---

JOHN and PEGGY ODAM, *et al.*,          §
                                        §
          Plaintiffs,                   §
                                        §
VS.                                     §          CIVIL ACTION NO. H-01-3914
                                        §
ENRON CORP., *et al.*,                  §
                                        §
          Defendants.                   §

---

FRANK ANTHONY CAMMARATA                  §
III, Individually and on Behalf          §
of All Others Similarly Situated,        §
                                         §
          Plaintiff,                     §
                                         §
VS.                                      §         CIVIL ACTION NO. H-01-3993
                                         §
ENRON CORP., *et al.*,                   §
                                         §
          Defendants.                    §

---

GEORGE NICOUD, on Behalf of              §
Himself and of All Others Similarly      §
Situated,                                §
                                         §
          Plaintiff,                     §
                                         §
VS.                                      §         CIVIL ACTION NO. H-01-4009
                                         §
ENRON CORPORATION, *et al.*,             §
                                         §
          Defendants.                    §

| | | |
|---|---|---|
| ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, INC., Individually and on Behalf of All Others Similarly Situated, | § § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-4071 |
| ENRON CORP., *et al.*, | § § § | |
| Defendants. | § | |

| | | |
|---|---|---|
| KENNETH FRANKLIN, Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-4106 |
| ENRON CORP., *et al.*, | § § § | |
| Defendants. | § | |

| | | |
|---|---|---|
| SUSAN COPLEY, on Behalf of Herself and of All Others Similarly Situated, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-4168 |
| KENNETH L. LAY, *et al.*, | § § § | |
| Defendants. | § | |

JAMES J. DALY, as Trustee of the        §
James J. Daly IRA Rollover and on       §
behalf of all others similarly situated,    §
                                        §
                Plaintiff,              §
                                        §
VS.                                     §    CIVIL ACTION NO. H-01-4189
                                        §
ENRON CORP., *et al.*,                  §
                                        §
                Defendants.             §

---

AMALGAMATED BANK, as Trustee            §
for the Longview Collective Investment  §
Fund Longview Core Bond Index           §
Fund and Certain other Trust accounts,  §
Individually and on Behalf of           §
All Others Similarly Situated,          §
                                        §
                Plaintiffs,             §
                                        §
VS.                                     §    CIVIL ACTION NO. H-01-4198
                                        §
KENNETH L. LAY, *et al.*,               §
                                        §
                Defendants.             §



PIRELLI ARMSTRONG TIRE
CORPORATION RETIREE MEDICAL
BENEFITS TRUST, Derivatively On
Behalf of ENRON CORPORATION,

       Plaintiff,

VS.

KENNETH L. LAY, et al.,

       Defendants,

   - and-
ENRON CORPORATION, an Oregon
Corporation,

       Nominal Defendant.

§ § § § § § § § § § § § § § §

CIVIL ACTION NO. H-01-3645
(Derivative Suits)

---

JOSEPH E. KASSOWAY , Trustee of
the Joseph E. Kassoway and Robert T.
Kassoway Trust,

       Plaintiff,

VS.

ANDREW S. FASTOW, et al.,

       Defendants.

§ § § § § § § § § §

CIVIL ACTION NO. H-01-3690

---

11

| | |
|---|---|
| DETECTIVES ENDOWMENT<br>ASSOCIATION ANNUITY FUND,<br>derivatively on behalf of Enron<br>Corporation,<br><br>        Plaintiff,<br><br>VS.<br><br>KENNETH L. LAY, *et al.,*<br><br>        Defendants. | § § § § § § § § § § § § | CIVIL ACTION NO. H-01-3892 |

| | |
|---|---|
| WILLIAM COY, Individually and<br>Derivatively and on Behalf<br>of All Others Similarly<br>Situated,<br><br>        Plaintiff,<br><br>VS.<br><br>ANDREW S. FASTOW, *et al.,*<br><br>        Defendants. | § § § § § § § § § § § | CIVIL ACTION NO. H-01-3995 |

| | |
|---|---|
| CANDY MOUNTER, *et al.,* Individually and<br>Derivatively, And on Behalf of All Similarly<br>Situated Stockholders of Enron Corp.,<br><br>        Plaintiffs,<br><br>VS.<br><br>JOINT ENERGY DEVELOPMENT<br>INVESTMENTS LP, *et al.,*<br><br>        Defendants. | § § § § § § § § § § § § | CIVIL ACTION NO. H-01-3996 |

SHIRLEY J. PRATZ, *et al.*, Individually and        §
Derivatively, And on Behalf of All Similarly        §
Situated Stockholders of Enron Corp.,               §
                                                    §
       Plaintiffs,    §
                                                    §
VS.                                                 §    CIVIL ACTION NO. H-01-3997
                                                    §
CHEWCO INVESTMENTS LP, aka                          §
Chewco Investments of Houston, *et al.*,            §
                                                    §
       Defendants.    §

---

FRED GREENBERG, derivatively on                     §
behalf of Enron Corp.,                              §
                                                    §
       Plaintiff,    §
                                                    §
VS.                                                 §    CIVIL ACTION NO. H-01-3998
                                                    §
ROBERT A. BELFER, *et al.*,                         §
                                                    §
       Defendants.    §

---

ENRON CORP. SAVINGS PLAN, an                        §
employee pension benefit plan                       §
appearing derivatively through                      §
Pamela M. Tittle, a participant                     §
of the plan,                                        §
                                                    §
       Plaintiff,    §
                                                    §
VS.                                                 §    CIVIL ACTION NO. H-01-4108
                                                    §
ENRON CORP., an Oregon                              §
Corporation, *et al.*,                              §
                                                    §
       Defendants.    §

---

PAMELA M. TITTLE, *et al.*, on behalf of   §
herself and a class of persons   §
similarly situated,   §
  §
          Plaintiffs,   §
  §
VS.   §  CIVIL ACTION NO. H-01-3913
  §  (ERISA suits)
ENRON CORP., an Oregon   §
Corporation, *et al.*,   §
          Defendants.   §

---

MICHAEL P. HARNEY, on Behalf of   §
Himself and All Others Similarly   §
Situated,   §
  §
          Plaintiff,   §
  §
VS.   §  CIVIL ACTION NO. H-01-4063
  §
ENRON CORP., an Oregon   §
Corporation, *et al.*,   §
  §
          Defendants.   §

---

GARY W. KEMPER, on behalf of himself   §
and All Others Similarly Situated,   §
and on behalf of the Enron Corporation   §
Savings Plan; *et al.*,   §
  §
          Plaintiff,   §
  §
VS.   §  CIVIL ACTION NO. H-01-4089
  §
ENRON CORPORATION, *et al.*,   §
  §
          Defendants.   §



BETTY J. CLARK, Individually and
on Behalf of All Others Similarly
Situated,

§
§
§
§

        Plaintiff,        §

                      §

VS.                     §   CIVIL ACTION NO. H-01-4125

                      §

ENRON CORP., *et al.*,     §

                      §

        Defendants.    §

---

DOROTHY RICKETTS, on Behalf
of the Enron Corp. Savings
Plan and its participants,

§
§
§
§

        Plaintiff,        §

                      §

VS.                     §   CIVIL ACTION NO. H-01-4128

                      §

ENRON CORPORATION, an Oregon
Corporation, *et al.*,

§
§

        Defendants.    §

---

RICHARD POTTRATZ and BRADLEY
DIEBNER, on Behalf of Themselves and
All Others Similarly Situated,

§
§
§
§

        Plaintiffs,      §

                      §

VS.                     §   CIVIL ACTION NO. H-01-4150

                      §

ENRON CORP., an Oregon
Corporation, *et al.*,

§
§

        Defendants.    §

---

CATHERINE STEVENS, *et al.,*    §
    §
    Plaintiffs,    §
    §
VS.    §    CIVIL ACTION NO. H-01-4208
    §
ENRON CORP., Savings Plan    §
Administrative Committee, *et al.,*    §
    §
    Defendants.    §

CITY OF BIRMINGHAM    §
RETIREMENT AND RELIEF PLAN    §
on Behalf of Itself and of All    §
Others Similarly Situated,    §
    §
    Plaintiffs,    §
    §
VS.    §    CIVIL ACTION NO. H-01-3940
    §    (Other suit)
ENRON CORPORATION, *et al.,*    §
    §
    Defendants.    §

## ORDER OF CONSOLIDATION

A number of defendants have moved to consolidate the pending

litigation concerning Enron Corporation in a single court. The motion to consolidate

has been filed by the outside directors of Enron Corporation,[1] Kenneth L. Lay,

Rebecca Mark-Jusbache, Jeffrey K. Skilling, Steven Kean, Lou Pai, Stanley Horton,

---

[1]    The "outside directors" of Enron Corporation are current and former directors that
have been named in many of the Enron-related lawsuits. They are Robert Belfer, Norman Blake, Jr.,
Ronnie C. Chan, John H. Duncan, Wendy L. Gramm, Robert K. Jaedicke, Charles A. Lemaistre,
John Mendelsohn, M.D., Paulo V. Ferraz Pereira, Frank Savage, John Wakeham, Joe H. Foy, Jerome
J. Meyer and Herbert Winokur.

Rick Buy, Richard Causey, Mark Frevert, and Andrew S. Fastow, Arthur Andersen LLP, and Enron Corporation itself. The consolidation is sought as to the many actions in this district arising from, or relating to, the financial difficulties of Enron Corporation. Some of the actions arise under the federal securities laws; other cases are actions filed derivatively on behalf of Enron against its present or former directors; and a third group of cases has been filed under the Employee Retirement Income Security Act on behalf of participants in various employee benefit plans maintained by Enron.

These cases all arise from a common core of operative facts. They are filed against common defendants. Many of the cases contain identical claims. The legal issues will overlap. Much of the discovery will be common to all the cases. In order to ensure the orderly progress of these lawsuits and to avoid unwarranted duplication of discovery and motion practice, the motion to consolidate the pending actions in one court is GRANTED, pursuant to Rule 42 of the Federal Rules of Civil Procedure and Local Rule 7.6 of the Southern District of Texas.

Pursuant to Rule 42 of the Federal Rules of Civil Procedure and Local Rule 7.6, and to serve the interests of justice, the actions involving or related to the financial difficulties of Enron Corporation, pending in the Southern District of Texas, are consolidated in the court in which the oldest related case was filed in this district,

which is Civil Action No. H-01-3624, *Newby v. Enron Corporation, et al.* Other actions later filed in this district relating to the same core of operative facts and issues will also be consolidated in this court.

       All actions filed in this district against any or all of the following will be automatically consolidated before this court: Enron Corporation, Andrew S. Fastow, Kenneth L. Lay, Jeffrey K. Skilling, Richard Causey, Mark Frevert, Cliff Baxter, Lou Pai, Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Wendy L. Gramm, Robert K. Jaedicke, Charles A. Lemaistre, John Mendelsohn, Paulo V. Ferraz Pereira, Frank Savage, John Wakeham, Herbert S. Winokur, Ken L. Harrison, Jerome J. Meyer, John A. Urquhart, Joint Energy Development Investments, L.P., Joint Energy Development Investments II, L.P., Chewco Investments, L.P., a/k/a Chewco Investments of Houston, L.P., Michael Kopper, LJM2 Co-Investment, L.P., Arthur Andersen LLP, Mary K. Joyce, Rebecca Mark-Jusbache, Ken Rice, Steven Kean, Stanley Horton, Richard Buy, Ben Glisan, Kristina Mordaunt or Northern Trust Company. If any such actions are subsequently filed in this district, counsel for defendants is directed to file a copy of this order along with a Notice of Consolidation in the action to be consolidated and to serve the same on counsel for plaintiffs. The Clerk of Court is directed to consolidate such action or actions before this court as follows:

The federal securities cases will be consolidated under Civil Action No. H-01-3624, *Newby v. Enron Corp., et al.*, as the lead case.

The derivative cases will be consolidated under Civil Action No. H-01-3645, *Pirelli Armstrong Tire Corp. Defined Benefit Plan, et al. v. Kenneth L. Lay, et al.*, as the lead case.

The employee benefit plan cases will be consolidated under Civil Action No. H-01-3913, *Tittle v. Enron Corp., et al.*, as the lead case.

If any party objects to the consolidation, that party must file an objection to consolidation with this court within 10 days of the filing of this Notice of Consolidation.

Scheduling orders will be issued separately.

SIGNED on December 12, 2001, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

112121128 P:\CASES\2001\01-3624\01-3624.a04                    19

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION, | MDL 1446 |
| PAMELA TITTLE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ENRON CORP., et al., <br><br> Defendants. | CIVIL ACTION NO. **H-01-3913** <br> CONSOLIDATED & COORDINATED CASES <br> (H-01-4060; H-01-4063; H-01-4089; H-01-4108 <br> H-01-4125; H-01-4128; H-01-4208; H-01-4209 <br> H-01-4299; H-01-4326; H-02-0267; H-02-0851 <br> H-02-1058; H-02-2160; H-02-3754; H-02-3942 <br> H-03-2257) |
| ENRON CORP SAVINGS PLAN, et al. <br><br> Plaintiffs, <br><br> VS. <br><br> HEWITT ASSOCIATES LLC, <br><br> Defendant. | CIVIL ACTION NO. H-07-4081 |

**HEWITT ASSOCIATES, LLC'S MOTION TO DISMISS PLAINTIFFS' FIRST**
**AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION**

Hewitt Associates LLC ("Hewitt") files this Motion to Dismiss for Lack of Subject

Matter Jurisdiction under Federal Rule of Civil Procedure 12(b)(1), because Hewitt and the

Enron Corporation Savings Plan (the "Enron Plan") are both citizens of Delaware and Plaintiffs

allege no federal law claims.

I.
**INTRODUCTION**

On November 30, 2007, the Enron Plan and the Administrative Committee of Enron

Corp. Savings Plan ("Enron Plan Committee") (collectively as "Plaintiffs") filed their Original

Complaint ("Complaint"), asserting only state law causes of action. *See* Complaint at ¶¶ 52-74. As the sole basis for this Court's jurisdiction, Plaintiffs state that complete diversity exists among the parties, and that the Court has jurisdiction under 28 U.S.C. §1332(a). *See* Complaint, at ¶ 6.

Hewitt filed its Motion to Dismiss for Lack of Subject Matter Jurisdiction on February 6, 2008. In this Motion, Hewitt argued that Plaintiffs' assertion of diversity jurisdiction was baseless under the uniform rulings of this District. Therefore, Hewitt asked the Court to dismiss Plaintiffs' Complaint.

Plaintiffs filed their First Amended Complaint ("Amended Complaint") on February 26, 2008. Plaintiffs' First Amended Complaint contains the same diversity jurisdictional allegations contained in the Complaint. Plaintiffs also include the following additional jurisdictional allegation:

> All of Plaintiffs' claims in this action arise out of the implementation of the Tittle Settlement and the role Hewitt played as Fund Administrator. As such, the resolution of this matter will affect the substance and timing of the Court's future orders in Tittle . . . . This Court therefore has jurisdiction over this matter pursuant to the doctrine of ancillary jurisdiction and the All Writs Act. 28. U.S.C. § 1651.

Plaintiffs' Amended Complaint, at ¶ 7.

## II.
## DISCUSSION

*A.*   *Relevant Facts*

The Enron Plan is a citizen of Delaware. *See* Amended Complaint, at ¶ 2; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 257 (7th Cir. 1998)(holding that, for diversity purposes, the citizenship of trust is citizenship of trustee). As admitted by Plaintiffs, Hewitt is a limited liability company. *See* Amended Complaint, at ¶ 5. Moreover, Plaintiffs further admit

that Hewitt is wholly owned by Hewitt Associates, Inc., and thus Hewitt Associates, Inc. is necessarily a member of Hewitt. *Id.* at p. 1, n.1.[1]

Hewitt Associates, Inc. is a Delaware corporation. *See* Amended Complaint, at p. 1; n 1; *see also* Hewitt Associates, Inc.'s 10K, attached hereto as Exhibit B. Accordingly, Hewitt and the Enron Plan are both citizens of Delaware. This common citizenship defeats complete diversity and fails to satisfy subject matter jurisdiction under 28 U.S.C. § 1332(a).

**B.    *Legal Standard***

Under §1332(a), the citizenship of a limited partnership is determined by the citizenship of all of its partners. *See Corfield v. Dallas Glen Hills LP*, 355 F.3d 853, 856 n.3 (5th Cir. 2003). The Fifth Circuit has not yet determined whether the rule on partnership citizenship applies to limited liability companies. *See Island Park Estates LLC v. Brack*, 2006 WL 3448624 *2 (S.D.Tex. 2006). Every other Circuit that has considered this issue, however, has concluded that the citizenship of a limited liability company under §1332(a) is determined by the citizenship of each of its members. *See Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 54-55 (1st Cir. 2006); *Handelsman v. Bedford Village Assocs. Ltd. Partnership*, 213 F.3d 48, 51-52 (2d Cir. 2000); *General Technology Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 120 (4th Cir. 2004); *Homfeld II, LLC v. Comair Holdings, Inc.*, No. 01-1151, 53 Fed.Appx. 731, 732-33, 2002 WL 31780184, at *1 (6th Cir. 2002); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998); *GMAC Commercial Credit LLC v. Dillard Dept. Stores, Inc.*, 357 F.3d 827, 829 (8th Cir. 2004); *Johnson v. Columbia Props. Anchorage, L.P.*, 437 F.3d 894, 899 (9th Cir. 2006); *Rolling Greens MHP, L.P. v. Comcast SCH Holdings LLC*, 374 F.3d 1020, 1022 (11th Cir. 2004).

---

[1] Plaintiffs' admission is corroborated by the Hewitt Associates LLC's Operating Agreement, which states that Hewitt Associates, Inc. is the sole owner and member of Hewitt Associates, LLC. *See* Hewitt Associates LLC Operating Agreement, attached hereto as Exhibit A.

3

The Texas district courts that have considered this issue have held uniformly that the citizenship of a limited liability company is determined by the citizenship of each of its members. *See Deep Marine Technology, Inc. v. Conmaco/Rector L.P.*, 515 F.Supp. 2d 760, 765 (S.D.Tex. 2007)(Werlein J.); *Kinder Morgan Liquids Terminals, LLC v. Ponns & Co., Inc.*, 2006 WL 3691192, at *2 (S.D.Tex. 2006)(Rosenthal J.); *Island Park Estates LLC v. Brack*, 2006 WL 3448624 *2 (S.D.Tex. 2006)(Jack J.); *Chesapeake Exploration, LLC v. Valence Operating Co.*, 2007 WL 3256260, *1 (S.D.Tex. 2007)(Miller J.); *Basurto v. Mervyn's LLC*, 2007 WL 390711 *1 (N.D.Tex. 2007)(Fish J); *Standard Aero v. Kelley Aviation Center, LP*, 2006 WL 504055 *3 (W.D.Tex. 2006)(Furgeson J).

In light of the overwhelming authority listed above, it is clear that this Court lacks diversity jurisdiction under §1332(a). The only member of Defendant Hewitt Associates LLC is Hewitt Associates, Inc., and Hewitt Associates, Inc. is a Delaware corporation. Thus, Defendant Hewitt Associates LLC is a citizen of Delaware. The Enron Plan also is a citizen of Delaware. Accordingly, complete diversity under §1332(a) does not exist.

## III.
## THIS COURT DOES NOT HAVE JURISDICTION OVER THIS SERVICES CONTRACT DISPUTE UNDER THE ALL WRITS ACT OR THE DOCTRINE OF ANCILLARY JURISDICTION

Federal courts have limited jurisdiction. *See Owen Equipment and Erection Company v. Kroger*, 98 S. Ct. 2396, 2403 (1978). "The limits upon federal jurisdiction, whether imposed by the Constitution or Congress, cannot be disregarded or evaded." *Id.* This case does not arise under a federal statute or constitutional provision. It is a dispute between Delaware citizens over alleged liabilities arising from the performance of a professional services contract. It is a serious dispute, but without diversity of citizenship, it is a dispute for state, not federal, court.

4

Plaintiffs argue that even in the absence of diversity jurisdiction, this Court can assert jurisdiction over this contract dispute under the All Writs Act and the doctrine of ancillary jurisdiction, on the theory that the contract and tort claims they are pursuing against Hewitt are based on actions that have affected a settlement agreement in *Tittle v. Enron*. Plaintiffs misconstrue the All Writs Act and related doctrine of ancillary jurisdiction. Regardless of the effect of past conduct on the settlement, whether this case proceeds in federal or state court will have no conceivable impact on this Court's ability to enforce its orders in *Tittle*. In either case, the parties will present and defend their claims and counterclaims, and judgments will issue. The claims in this action are distinct from those that were litigated in *Tittle*. This Court's retention of jurisdiction plainly is not necessary to protect its jurisdiction or to enforce judgments in *Tittle*, and the Amended Complaint must be dismissed for lack of subject matter jurisdiction.

A.     *The All Writs Act Does Not Provide an Independent Basis for Federal Jurisdiction.*

The All Writs Act states that "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate to aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). A federal court is empowered Act to issue a writ "to effectuate and prevent the frustration of orders it has previously issued *in its exercise of jurisdiction otherwise obtained.*" *United States v. New York Telephone Company*, 98 S. Ct. 364, 372 (1977) (emphasis added). As the Fifth Circuit instructs: "Almost two hundred years of Supreme Court precedent establishes that the Act, originally enacted as part of the Judiciary Act of 1789, cannot serve as an independent basis of jurisdiction." *Texas v. Real Parties and Interest*, 259 F.3d 387, 392 (5th Cir. 2001).

In this case, the Plaintiffs have filed a lawsuit for breach of contract, negligence and gross negligence against Hewitt. Hewitt will defend the suit – in the proper forum – by raising Plaintiffs' failure to abide by the contract and their own negligence and gross negligence in

5

refusing timely to take the actions Hewitt recommended to remedy the effect of the computer error and misallocation of settlement funds. The case does not seek re-litigation of a prior federal court case, nor does it seek to set aside or undermine a prior federal court settlement. *Compare In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425 (2d. 1993) (All Writs Act provided federal court jurisdiction for removal of state court case that sought to re-litigate claims that were subject to a federal court settlement); *In re VMS Securities Litig.*, 103 F.3d 1317 (7th Cir. 1996) (All Writs Act supported removal of state court case in which plaintiffs alleged fraudulent inducement into accepting settlement of federal case to which they were parties). Rather, Plaintiffs seek an adjudication of state law causes of action with regard to who owes money to whom. The All Writs Act cannot confer upon this Court federal subject matter jurisdiction over what are merely state law contract and tort claims among non-diverse parties.

**B.**     *This Court Does Not Have Ancillary Jurisdiction Over This Dispute.*

Ancillary enforcement jurisdiction only exists when the claims alleged have their own basis for federal court jurisdiction. *Kokkonen v. Guardian Life Insurance Co. of America*, 114 Sup. Ct. 1673-1676 (1994).[2] Absent an independent basis for federal jurisdiction, the court lacks subject matter jurisdiction and the claims must be dismissed. *Owen Equipment and Erection Company v. Kroger*, 98 S. Ct. 2396, 2403 (1978).

Ancillary enforcement jurisdiction is authorized to   protect and enforce federal judgments, for example by the issuance of court attachments, mandamus, garnishments, and the prejudgment avoidance of fraudulent conveyances. *Peacock v. Thomas*, 160 S.Ct. 862, 867-68 (1996). The mere fact that the claims alleged and the claims in the main suit arise under a

---

[2] In *Kokkonen* the Supreme Court observed that supplemental jurisdiction arises to allow a court to dispose by a single case the claims that are "in varying respects and degrees, factually interdependent." 114 Sup. Ct. at 1673-1676. Ancillary jurisdiction enables the court to function successfully, i.e., "to manage its proceedings of any case it hears and effectuate its decrees." *Id.* This second category, which remains uncodified, is referred to as "ancillary enforcement jurisdiction." *See Hudson v. Coleman*, 347 F. 3d, 138-142 (6th Cir. 2003).

"common nucleus of operative facts" is irrelevant. *Id.* If that were the only test, then parties

could routinely evade the requirement of complete diversity among the parties. *Id.*[3]

Here, plaintiffs argue that ancillary jurisdiction may be exercised because (1) the Court

expressly retained jurisdiction, and (2) this case involves allegations about past conduct by

Hewitt having an impact on the ability of the parties to comply with the settlement in this case.

While the Court did retain jurisdiction, Plaintiff's argument is erroneous.  It has been the

established case law in this Circuit for more than a century that in order to exercise ancillary

jurisdiction over a claim against someone like Hewitt, who was not a party to the original

proceeding, "the enforcement proceeding must be a mere continuation of the prior proceeding

*and not an action based on new grounds.*" *Anglo-Florida Phosphate Co. v. McKibben*, 65 F.

529 (5th Cir. 1894)(emphasis added).  *McKibben* was cited with approval in the case on which

Plaintiffs purport to place principal reliance, *U.S.I Properties Corp. v. M.D. Construction Co.*,

230 F.3d 489, 497 (1st Cir. 2000).  There, the First Circuit emphasized that that a federal court's

ancillary enforcement jurisdiction is limited to effectuating the collection or enforcement of  a

judgment that already exists, and  cannot be used o create jurisdiction over a claim to establish

new liability. *Id.* at 499-500.  Because Plaintiffs are trying to establish new liability against

Hewitt, their must be a basis, independent of the *Tittle* action, for subject matter jurisdiction, and

there is not. *U.S.I* supports dismissal.

---

[3] Ancillary jurisdiction also may arise if the claims alleged are asserted in the form of an impleader, cross-claim, or counterclaim. Such claims often depend upon the resolution of the primary lawsuit. *Id.* at 2404; *Moore v. New York Cotton Exchange*, 46 S. Ct. 367.  They may also involve claims by a defending party or by a party whose rights would otherwise be lost if not brought in an ongoing action in federal court. *Kroger*, 98 S. Ct. at 2404; *Kenrose Mfg. Co. v. Fred Whitaker Co.*, 512 F. 2d 890, 894 (4th Cir. 1972).

7

## IV.
## CONCLUSION

Complete diversity among the parties does not exist.   Accordingly, the Court lacks subject matter jurisdiction.  Therefore, the Court should dismiss the Amended Complaint under Rule 12(b)(1).

Respectfully submitted,

By: _____
Gregory J. Casas
Texas Bar No. 00787213
S.D. Admission No. 16836
1000 Louisiana, Suite 1800
Houston, Texas 77002
Telephone: (713) 374-3561
Facsimile:  (713) 374-3505
ATTORNEY IN CHARGE FOR
HEWITT ASSOCIATES, L.L.C.

OF COUNSEL:

Allan Van Fleet
Texas Bar No. 20494700
S.D. Admission No. 527
Paul J. Brown
Texas Bar No. 24006913
S.D. Admission No. 26366
Greenberg Traurig, LLP
1000 Louisiana Street, Suite 1800
Houston, Texas 77002

McDERMOTT WILL & EMERY LLP
Joel G. Chefitz
Mark J. Altschul
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000

Steven W. Kasten
28 State Street
Boston, Massachusetts 02109
Telephone: (617) 535-4000

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing upon all parties via the Court's electronic filing system.

This 11th day of March 2008.

_____
Gregory J. Casas

9

# EXHIBIT 3



RECEIVED SEP 2 7 2001
2227
39 Q

# ADMINISTRATIVE SERVICES AGREEMENT

This Administrative Services Agreement (the "Agreement") effective the 1st day of June, 2001, by and between Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt").

**Recitals**

Whereas, Client is the sponsor of certain benefit Plans (as defined below); and

Whereas, Client has selected Hewitt to provide certain benefit plan administration services to the Plans and the Participants (as defined below) of such Plans and Hewitt is willing to provide such services upon the terms and conditions contained in this Agreement.

**Agreement**

Now, therefore, in consideration of the foregoing and the mutual promises and covenants contained herein, and other valuable consideration, the receipt, sufficiency and adequacy of which is hereby acknowledged, Client and Hewitt hereby agree as follows:

**Section 1: Definitions**

As used in this Agreement, the following terms shall have the meanings set forth below:

1.1 **"Agreement Year"** means the ongoing Services implementation period (regardless of duration) and thereafter each consecutive twelve (12) month period beginning October 1, 2001.

1.2 **"Authorized Representative(s)"** means, with respect to each party, one or more persons who are duly authorized by such party to address operational issues that may arise from time to time under this Agreement.

1.3 **"Change Order"** shall have the meaning set forth in Section 2.6(c).

1.4 **"Claim"** means any claim for which an Indemnitee is entitled to indemnification or defense from an Indemnitor under Section 10.

1.5 **"Client Content"** means all images, text and other content, whether owned or licensed by Client which Client makes available to Hewitt under this Agreement, for inclusion into (a) the portion of the Hewitt Web Site used in connection with the provision of the Services or (b) other materials prepared in connection with the Services.

1.6 **"Client Direction"** shall have the meaning set forth in Section 2.7(a).

1.7 **"Client Information"** means all data or information (in whatever form or media) (a) that is owned by, or licensed by third parties to, Client or (b) which is owned by Client (including Participant Data, Client Content and Client Marks) and that either (i) is supplied to Hewitt by, or on behalf of, Client hereunder, or (ii) Client makes accessible to Hewitt as a result of the Services contracted for or provided under this Agreement. Client Information does not include Hewitt Information.

---

1.8 **"Client Marks"** means collectively Client's corporate name and Client's trademarks, service marks, logos, and trade names, as such may change in appearance and/or style as Client may specify in its sole discretion, from time to time and as Client may make available to Hewitt under this Agreement for inclusion into (a) the portion of the Hewitt Web Site used in connection with the provision of the Services or (b) other materials prepared in connection with the Services.

1.9 **"Confidential Information"** shall have the meaning set forth in Section 8.1.

1.10 **"Cure Period"** shall have the meaning set forth in Section 9.4(c).

1.11 **"Default"** means the occurrence of any of the following events:

(a) The existence of any material representation or warranty made in this Agreement by either party that was materially false when made;

(b) Insolvency of a party; general failure of a party to pay its debts as they become due; entrance of a party into receivership or any arrangement or composition with creditors generally; filing of a voluntary or involuntary petition or other action or proceeding for bankruptcy or reorganization or dissolution or winding-up of a party; a general assignment for the benefit of creditors of a party; or a seizure or a sale of a material part of a party's property by or for the benefit of any creditor or governmental agency;

(c) An assignment or attempted assignment by either party in violation of Section 14.2 hereof;

(d) Payment Default; or

(e) A failure by either party to observe and perform any other material obligation, covenant, or condition under this Agreement.

1.12 **"Default Notice"** shall have the meaning set forth in Section 9.4(b).

1.13 **"Delivery Model"** shall have the meaning set forth in the Fee Schedule.

1.14 **"Disaster Recovery Plan"** means Hewitt's disaster recovery plan, as updated from time to time. A summary of the current Disaster Recovery Plan is attached hereto as **Schedule E.**

1.15 **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder.

1.16 **"Fee Schedule"** means the service and fee schedule attached to this Agreement as **Schedule A.**

1.17 **"Hewitt Content"** means all content, whether owned or licensed by Hewitt, which Hewitt includes in the Hewitt Web Site or other materials prepared in connection with the Services.

1.18 **"Hewitt Information"** means:

(a) All tangible materials and non-tangible information, other than Participant Data, provided by Hewitt to Client in connection with this Agreement, including, but not limited to, the Requirements Document, Delivery Model, IVR Script, and Plan Reference;

(b) Hewitt Software;

(c) The Hewitt Web Site (including the portion thereof used by Hewitt in the provision of the Services) and the look and feel thereof;

(d) All data, information or material resident on Hewitt's computer servers, except to the extent such data, information or material constitutes Client Information;

(e) Hewitt Content;

(f) Hewitt's responses to Client's requests for proposal or other proposal related documentation;

(g) Hewitt's standard materials and derivatives thereof, and other material related thereto; and

(h) Hewitt's generalized practices, techniques, business processes, and know-how regardless of whether developed in connection with the Services or engagements with other Hewitt clients.

1.19    "Hewitt Software" means any software (including underlying source and object code) owned or licensed to Hewitt or embedded and installed by Hewitt on Client's computers or otherwise used in connection with the provision of the Services, including software used in the operation of the Hewitt Web Site.

1.20    "Hewitt Web Site" means Hewitt's sites on the World Wide Web through which it is performing the Services and making related information and other content available to Client and Participants, including the site located at the following URL: http://resources.hewitt.com/[Client identifier].

1.21    "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and any regulations promulgated thereunder.

1.22    "Indemnitee" shall have the meaning set forth in Section 10.4(c).

1.23    "Indemnitor" shall have the meaning set forth in Section 10.4(c).

1.24    "IVR" means Hewitt's interactive voice response system employed in the provision of the Services.

1.25    "Losses" means unrecoverable losses, costs, damages or expenses resulting from Hewitt's performance of the Services.

1.26    "Participant" or "Participants" means the individual(s) participating in, eligible to participate in, or who previously participated in, one or more of the Plans, as described more specifically in the Fee Schedule.

1.27 **"Participant Data"** means the records and information pertaining to Participants and their benefits under the Plans and supplied by Client or Participants or created by Hewitt or its permitted subcontractors in the course of providing the Services.

1.28 **"Payment Default"** means Client's failure to make a timely payment to Hewitt when due under the terms of this Agreement.

1.29 **"Plan" or "Plans"** means Client's employee benefit plans as listed in the Fee Schedule and described more specifically in the Requirements Document.

1.30 **"Plan Documents"** shall have the meaning set forth in Section 3.2

1.31 **"Privacy Policy"** means the privacy policy statement found on the Hewitt Web Site, as amended, revised and supplemented from time to time.

1.32 **"Proprietary Rights"** shall mean any and all patent rights, copyright rights, trademark rights, trade secret rights, rights of publicity, rights of privacy, moral rights or other intellectual property or proprietary rights any where in the world.

1.33 **"Records Retention Policy"** means the records retention policy to be followed by Hewitt in connection with the provision of the Services and described on **Schedule B** to this Agreement.

1.34 **"Requirements Document"** means the document(s) listing the specifications and requirements of the Services, including, but not limited to, the manner in which the Services will be provided, as such document(s) may be modified and supplemented from time to time.

1.35 **"Services"** means the benefit plan administrative services to be performed by or on behalf of Hewitt as described generally in the Fee Schedule and in more detail in the Delivery Model and the Requirements Document.

1.36 **"Termination Notice"** shall have the meaning set forth in Section 9.1.

1.37 **"Y2K Defect"** shall have the meaning set forth in Section 6.3.

**Section 2: Services**

2.1 **Services.** Hewitt shall provide the Services in accordance with the terms of this Agreement and the Requirements Document.

2.2 **Requirements Document.** The Requirements Document is prepared by Hewitt and Client and, upon mutual agreement, the Requirements Document, or portions thereof, will be incorporated by reference into this Agreement. Amendments, updates and revisions to the Requirements Document will follow the procedure described in Section 2.6 of this Agreement. The Requirements Document is prepared by Hewitt after consulting with Client.

**2.3    Client Information.**

    **(a)    Provision of Data.** Client will submit to Hewitt all Client Information in Client's control necessary for Hewitt to perform the Services provided for in this Agreement. Participant Data will be submitted in accordance with the specifications set forth in the Requirements Document. If such data is not submitted in accordance with such specifications, or if Hewitt detects errors or omissions in the data submitted, Hewitt will promptly return such data to Client unless Client and Hewitt agree that Hewitt is to make corrections to the data. Services performed by Hewitt in correcting data will be billed as additional Services at Hewitt's then current billing rates, as such billing rates are generally described in the Fee Schedule. Client shall be solely responsible for the accuracy and appropriateness of Client Information. Hewitt may, but shall not be required to inquire into the genuineness or correctness of any Client Information.

    **(b)    License.** During the term of this Agreement, Client grants to Hewitt a non-exclusive, royalty free, non-transferable license to use Client Information solely in connection with Hewitt's performance of its obligations and exercise of its rights under this Agreement, subject to the provisions of Section 8.2 herein regarding the use of aggregated data.

**2.4    Project Management.**

    **(a)    Authorized Representatives.** Each party shall designate an appropriate person or persons (or designated alternates) as their respective Authorized Representatives. The initial list of Authorized Representatives is attached as **Schedule F.** Each party may supplement or otherwise modify its list of Authorized Representatives from time to time by written notice to the other party. Each party's Authorized Representatives shall have authority to issue, execute, grant or provide any approvals, requests, change requests, Change Orders, notices or other communications required hereunder or requested by the other party hereto.

    **(b)    Reports.** Hewitt shall provide Client with such reports as are required by the Requirements Document.

    **(c)    Stewardship Meetings.** Client's and Hewitt's Authorized Representatives, and other representatives as appropriate, shall meet on an annual basis, or more often as mutually agreed, to discuss the parties' performance under this Agreement and the timing of any fee adjustments, as contemplated in the Fee Schedule.

**2.5    Correction of Services.**

    **(a)    Hewitt Errors.** If Hewitt's performance of the Services does not comply in any material respect with the terms of this Agreement or the Requirements Document, Client may require Hewitt, at Hewitt's expense, to correct or re-perform any defective or non-conforming Services when such re-performance is reasonably necessary and practical under the circumstances. In addition, if Hewitt's non-compliance causes Losses to Client or the Plan(s), Hewitt will be liable to Client in accordance with Section 10.

    (b)    **Client or Third Party Errors.** To the extent Hewitt's failure to comply is attributable to Client's or a third party's failure to perform (including providing inaccurate or incomplete data or other information or instructions and/or providing such data, information or instructions to Hewitt untimely) as required in this Agreement, then Hewitt's corrections or re-performance of any Services shall be additional Services to be billed at Hewitt's then current billing rates, as such billing rates are generally described in the Fee Schedule.

2.6    **Change Order Procedure.**

    (a)    **Changes.** The parties may revise, amend, alter, or otherwise change the nature and scope of the Services provided under this Agreement from time to time by mutual agreement, including, but not limited to, changes relating to: (i) the addition of Services or plans; (ii) the termination of certain Services or Plans; (iii) the modification of Services; (iv) adding or reducing the number of Plans in which such Participants may participate; or (v) any other changes that alter the scope of this Agreement or the nature of the Services. All such changes shall be made in accordance with the procedures set forth in this Section 2.6 and the other terms of this Agreement.

    (b)    **Change Requests.** Either party may, from time to time, and at any time during the term of this Agreement, request a change in accordance with this Section 2.6. The party requesting the change shall prepare, at its expense, Part I of **Schedule D** attached hereto (Schedule D, including Part I thereto, or such other form or format as mutually agreed upon between the parties, shall hereinafter be referred to as a "Change Order"), setting forth in reasonable detail therein the nature of the change requested. As soon as practicable, after Part I of the Change Order has been completed, the Authorized Representatives of each party shall discuss the changes and, if necessary and desirable, determine the feasibility of proceeding with such changes, which such discussions may include a discussion, in general terms, of the impact of the changes on the Services, the Requirements Document, and the fees payable hereunder.

    (c)    **Change Orders.** If the Authorized Representatives mutually agree to proceed with the changes or with further discussions related to such changes, Hewitt shall complete Part II of the Change Order, describing the changes and setting forth the impact of the changes on the Services, the Requirements Document, and the fees payable hereunder and present Part II of the Change Order to the Authorized Representative of Client. If both parties mutually agree to implement such changes, each Authorized Representative shall execute the Change Order. Execution by the Authorized Representatives of both parties shall constitute an amendment to this Agreement and shall be binding on both parties. Change Orders may also trigger the need to update, amend, or otherwise revise the Requirements Document as described in Section 2.2.

    (d)    **DeMinimis Changes.** For changes which, in the reasonable estimates of the parties' respective Authorized Representatives, involve an increase of fees of less than $1,500.00, Hewitt may commence with providing the requested change in Services, for which Client shall be obligated to pay in accordance with this Agreement, prior to the execution of the corresponding Change Order based on receipt of direction from Client's Authorized Representative.

(e)  **Fee Impact.**  A change that is not otherwise compensated under this Agreement, unless the parties agree otherwise, shall be priced using Hewitt's then current standard billing rates, as such billing rates are generally described in the Fee Schedule.

**2.7  Client Direction.**

(a)  **General.** In the course of providing the Services, Hewitt may receive written or oral instructions or directions from Client's Authorized Representatives (hereinafter collectively referred to as a "Client Direction") concerning provision of the Services which do not constitute a Change Order under Section 2.6 or which by the nature of such Client Direction, may not be documented as a Change Order under Section 2.6 in a timely way. The types of issues that may be addressed by a Client Direction include, but are not limited to: (i) issues not addressed specifically in the Requirements Document; (ii) interpretation of any provision of the Plans; (iii) instructions concerning compliance with applicable laws and regulations; (iv) instructions concerning compliance with subpoenas or other legal processes; and (v) notices concerning adjudication of Participants' claims for benefits, provided however, in no case will Hewitt be responsible for adjudicating Participant appeals from a denial of benefits. Upon receipt of a Client Direction, Hewitt shall promptly indicate acceptance or rejection of the Client Direction and, in the event of rejection, notify Client in writing of such rejection and provide Client with a description of the reasons therefor.  Hewitt may, but shall not be required to, inquire into the genuineness or correctness of any Client Direction or require written confirmation thereof.

(b)  **Actions Based on Client and Participant Direction.** Hewitt may rely, in performing its obligations under this Agreement, upon any Client Direction or any information, data, document or instrument supplied by Client's Authorized Representatives or a Participant. If and to the extent that Hewitt, or any of its subcontractors, act or fail to act as a result of or based upon any such Client Direction or Participant direction, Hewitt shall be relieved of any liability arising therefrom and such act or failure to act shall not constitute a Default, breach or non-performance of any obligation of Hewitt contained in this Agreement; provided, however, that Hewitt shall be liable for any Claims arising out of or resulting from Hewitt's negligent, grossly negligent, fraudulent, willful or criminal acts in accordance with Section 10.  Hewitt shall be responsible for taking the initiative to resolve issues related to the Services under this Agreement in accordance with the provisions of this Agreement, but if Hewitt reasonably requests instruction or direction from Client and does not receive a Client Direction in a timely manner, Hewitt shall be protected and shall not be deemed to have breached this Agreement with respect to any act or failure to act undertaken in good faith relating to the instructions requested.

(c)  **Conflict with Agreement.** Notwithstanding any term or provision in this Agreement to the contrary, if any Client Direction is inconsistent with or conflicts with any provision of this Agreement, including the Requirements Document, the Fee Schedule or any Change Order, Hewitt may, at its discretion, require that such Client Direction be confirmed in a Change Order initiated by Client pursuant to Section 2.6.

2.8     **Audit Rights.** Client, at its sole cost and expense, shall have the right during the term of this Agreement with reasonable advance notice to Hewitt and during normal business hours to review and audit Hewitt's records relating to the performance by Hewitt of the Services. Such review and audit may be conducted by Client's counsel, its internal staff or by independent third parties retained by Client. Hewitt will provide up to eight (8) hours of Hewitt assistance at no charge during each Agreement Year to assist Client with any such audit. Additional assistance will be provided as additional Services and will be billed at Hewitt's then current billing rates, as such billing rates are generally described in the Fee Schedule. Client agrees that any such review or audit shall be conducted in a manner reasonably designed to protect the confidentiality of Participant Data and Hewitt Confidential Information and to avoid interfering with Hewitt's business operations. Hewitt further acknowledges that governmental authorities may have the right to review and audit Hewitt's records pursuant to applicable law. Client agrees that any third party conducting such audit shall be subject to the Confidential Information provisions of Section 8 and may be required by Hewitt to sign a confidentiality and non-disclosure agreement in form and substance acceptable to Hewitt, a form of which is attached hereto as Schedule H, and further agrees that should any independent auditor be deemed by Hewitt to be a competitor of Hewitt, the parties shall mutually agree to the review and audit procedures prior to such review and audit.

## Section 3: Compliance with Law

3.1     **General.** Hewitt shall at all times during the term of this Agreement remain in material compliance with all applicable national, state and local laws and regulations, including any required licenses, permits or registrations, necessary for Hewitt to be able to perform the Services.

3.2     **Plan Compliance.** Client will maintain all documents relating to its association with, and Participants' participation in, the Plans (collectively "Plan Documents") in compliance with applicable law. Client represents that such documents are now in compliance with applicable law. Client agrees to notify Hewitt as soon as possible of any amendments or proposed amendments to the Plan Documents. Client will also: (a) verify that all procedures set out in the Requirements Document are consistent with the Plan Documents; and (b) interpret the Plans. The foregoing notwithstanding, Client acknowledges that the Trustee shall have no contractual relationship with Hewitt and Hewitt shall not be liable for the actions, or inactions, of such Trustee.

3.3     **Notice of Non-Compliance.** Hewitt shall use reasonable efforts to notify Client if Hewitt's Authorized Representatives learn that any Services do not comply with any applicable laws, rules, regulations or ordinances relating to the Services, including, but not limited to, provisions of ERISA or the Internal Revenue Code; provided, however, this Agreement shall not create any duty or liability on the part of Hewitt to seek out or discover such non-compliance, or to ensure compliance by Client or the Plans with any of the foregoing nor will Hewitt be liable for any Plan's or Client's failure to comply with such law, rule, regulation or ordinance.

3.4     **Changes.** Subject to Section 3.3, to the extent that any change in applicable laws, rules, regulations or ordinances relating to the Services would make a change to this Agreement (including the Requirements Document) necessary from a legal compliance standpoint, Hewitt shall notify Client thereof if, and to the extent, Hewitt's Authorized Representatives become aware of such matter. Any such changes shall be deemed made upon Client's

request or approval, subject to the Change Order provisions of Section 2 hereof. Changes to Hewitt's base system documentation and base system software resulting solely from the enactment of legislation or regulations will be considered as within the scope of the Services, provided that any such change applies generally to the services provided by Hewitt to its other clients uniformly and without customization. The base system documentation and the base system software is then made available to the Hewitt team serving the Client. In practice, most changes require further modification or tailoring at the client level based on interpretation, specific plan design, transition rules, and similar administrative and plan level characteristics. Such modifications and tailoring will be made in accordance with the Change Order provisions of Section 2. The parties agree that this Agreement will be amended, to the extent necessary, prior to the effective date of the privacy regulations promulgated under HIPAA in accordance and to comply with any and all requirements imposed by HIPAA relating to electronic data privacy and security.

## Section 4: Compensation

4.1    **General.** Compensation payable to Hewitt for the Services to be provided hereunder is specified in the Fee Schedule.

4.2    **Additional Services.** The Change Order provisions of Section 2 may result in adjustments to Hewitt's compensation hereunder. As described in Section 3.4, base system software updates required as a result of legislative or regulatory change are included in the fees described in the Fee Schedule, but the implementation of these updates within Client's environment may result in additional implementation fees. Similarly, the ongoing fees described in the Fee Schedule may be adjusted if there is an ongoing impact on the performance of the Services as a result of such change.

4.3    **Invoicing, Payment and Other Compensation Terms.** The Fee Schedule also sets forth the terms under which Hewitt's compensation payable hereunder will be invoiced, paid and adjusted from time to time.

## Section 5: Ownership of Materials and Work Product

5.1    **Client Information.** Client Information will remain the property of Client. Hewitt agrees it shall not remove any copyright notices therefrom or use such materials except internally for purposes of administering the Plans as contemplated in this Agreement, subject to the provisions of Section 8.2 regarding the use of aggregated data. Client and Client's subcontractors (with respect to proprietary property provided by such subcontractors) will have and retain all right, title and interest, including ownership of any Proprietary Rights in and to all tools, methodologies or other intellectual property (including the Client Information) that is supplied by Client or such third parties, including any enhancements, improvements or other derivative works thereof. Client represents that the uses of the Client Information contemplated in this Agreement will not infringe the Proprietary Rights of any third party and that Client has obtained all consents of any such third party, including that of all Participants, necessary for such uses of Client Information.

5.2    **Hewitt Information.** All Hewitt Information will remain the property of Hewitt, and Client agrees it shall not remove any copyright notices therefrom or use such materials except internally for purposes of administering the Plans as contemplated in this Agreement. Hewitt and Hewitt's subcontractors (with respect to proprietary property provided by such

subcontractors) will have and retain all right, title and interest, including ownership of any Proprietary Rights in and to all tools, methodologies or other intellectual property (including the Hewitt Information) that is supplied by Hewitt or such third parties in the performance of the Services, including any enhancements, improvements or other derivative works thereof developed in the course of Hewitt's performance under this Agreement. Hewitt retains the right to use its knowledge, experience, and know-how (including processes, ideas, concepts and techniques developed in the course of performing the Services hereunder) in any manner in the course of providing services to other clients.

5.3     **Hewitt Web Site.**

   (a)     **Hewitt Content.** The data, information, look and feel, user interface, tools, software (including Hewitt Software), trademarks, technologies, business processes, know-how and other intellectual property and proprietary information used in connection with, or displayed on, the Hewitt Web Site are the sole and exclusive property of Hewitt and its licensors, and are protected under U.S. and international copyright, trademark, other intellectual property, and related laws. In addition to Hewitt's and its licensors' Proprietary Rights in and to content elements presented within the Hewitt Web Site, Hewitt is the owner and hereby reserves all rights in and to the selection, coordination, arrangement and enhancement of such content. The terms of this Section 5.3 shall not impact Client's Proprietary Rights in Client Information, except as otherwise expressly provided in this Agreement.

   (b)     **Integration of Client Information.** Hewitt and Client shall work together to integrate the Client Information into the portion of the Hewitt Web Site through which Hewitt provides the Services, taking into consideration the overall look and feel of the Hewitt Web Site. Hewitt shall have sole control over the appearance and design of the Hewitt Web Site, including, without limitation, control over section titles and design pages relating to the Client Information. Client may notify Hewitt in writing if Client has a good faith objection to Hewitt's judgment in this regard and the parties will cooperate to reach a mutually acceptable resolution with respect thereto.

   (c)     **New Features.** Hewitt may, at any time, create new features and areas of the Hewitt Web Site (including the portion thereof used in the provision of the Services), and the operation and content of the Hewitt Web Site shall be under the sole control of Hewitt. Client shall cooperate with Hewitt in good faith to facilitate all updates and availability of all Client Information and the operation of the Hewitt Web Site.

5.4     **Intellectual Property.** This Agreement does not grant or otherwise give either party ownership in or any other right, title or interest to use any of the other party's Proprietary Rights, except as explicitly described herein.

**Section 6: Software**

6.1     **Non-exclusive License.** Subject to this Agreement, Hewitt grants to Client, and all of Client's wholly owned subsidiaries and wholly owned affiliates that have Participants for whom the Services are provided (including those affiliated companies, partnerships and other entities in which Client or its subsidiary or affiliated company has an ownership or equity interest and such subsidiary or affiliate adopts the Plans) a non-exclusive, non-sublicenseable, non-

transferable license to any Hewitt Software provided to Client or embedded or installed on Client's computers by Hewitt. Such license shall terminate and expire upon the termination or expiration of this Agreement. Client will not copy, and will cause any subsidiary or affiliate described above to not copy, such software, except for one copy for back-up or archival purposes (by Client only), nor will Client attempt, or permit any subsidiary or affiliate to attempt, to modify, reverse engineer, reverse compile, or disassemble such software or convert such software to another programming language. Client may not, and will cause any subsidiary or affiliated described above to not, market, distribute or transfer copies of the Hewitt Software to others. Client, nor any subsidiary or affiliate described above, may not rent, lease or loan the Hewitt Software. Client will cause any subsidiary or affiliate to be bound by the confidentiality provisions of this Agreement.

6.2     **Third Party Software.** If any third party software is separately provided by Hewitt to Client in connection with the Services, Client is responsible for complying with any supplier license terms and conditions which relate to such software.  Hewitt shall not be responsible for the functionality or performance of such software.

6.3     **Year 2000 Representations.** Hewitt shall use reasonable efforts to ensure that the current and any future releases of Hewitt Software used to provide Services to the Client under this Agreement will be free of any and all critical errors or defects relating to the year 2000 ("Y2K Defect"), and further agrees to use reasonable efforts to ensure that such software will process information, data and dates for the year 2000 and subsequent years in an accurate and complete manner including, but not limited to, date recognition, calculations that accommodate same century and multi century formulas and date values, as well as date data interface values that reflect the century. Hewitt shall use reasonable efforts to correct any Y2K Defect. This Section 6.3 is enforceable only if all date data supplied to Hewitt by, or on behalf of, Client contain four (4) digit years and all other software with which Hewitt must interface, but does not provide, is also so compliant.

**Section 7:  Protection and Retention of Information**

(a)     **Security.** Hewitt will take substantially similar measures to assure the security of Client's data on its computers as Hewitt takes to assure the security of its own data of similar importance, except where the parties agree otherwise.  Client will be responsible for retaining duplicate copies of Participant Data and other Client Information it sends to Hewitt and for taking other precautions as it deems necessary in case such data or information are lost or destroyed, regardless of cause or in case reprocessing is needed for any reason.

(b)     **Disaster Recovery.** Hewitt will maintain and follow the Disaster Recovery Plan, a copy of which is attached hereto as Exhibit E, during the term of this Agreement. Hewitt will test, from time to time, the Disaster Recovery Plan, and if necessary, will implement the provisions thereof applicable to any site at which the Services contemplated by this Agreement are then being performed. Hewitt will make reasonable efforts to maintain the Disaster Recovery Plan consistent with any reasonable changes that may be required by any regulatory authority.

(c)     **Records Retention.** Participant Data and other data records of Client Information will be maintained in accordance with the Records Retention Policy, a copy of which is attached hereto as Schedule B.



(d)     **Privacy Policy.** Hewitt will at all times adhere to the Privacy Policy, as described in Schedule I attached hereto.

## Section 8: Confidential Information

8.1     **Confidential Information.** For the purposes of this Agreement, "Confidential Information" includes: (a) the terms of this Agreement (including the Schedules attached hereto and other attachments to this Agreement); (b) for Client, Client Information; (c) for Hewitt, Hewitt Information; (d) oral and written information designated by a party as confidential prior to the other party obtaining access thereto; and (e) oral and written information which should reasonably be deemed confidential by the recipient whether or not such information is designated as confidential. Each party's respective Confidential Information will remain its sole and exclusive property.

8.2     **Treatment of Confidential Information.** Each party will use reasonable efforts, consistent with the terms of Section 7(a), to cause its respective agents, employees and representatives to minimize distribution and duplication, and prevent unauthorized disclosure, of the Confidential Information of the other party. Each party agrees that only its employees (and in Hewitt's case, any subcontractors through which Hewitt is performing the Services) who have a need to know the Confidential Information of the other party will receive such Confidential Information. No party will disclose the other party's Confidential Information to a third party without the prior written consent of the other party, which consent may be conditioned upon the execution of a confidentiality agreement reasonably acceptable to the owner of the Confidential Information. However, Hewitt may use aggregated Plan or Participant Data for any Hewitt purpose, provided that no data is identifiable by Participant or Client. Hewitt may also use Participant Data to the extent and for purposes authorized by the Participant whose data is being used. Client may disclose Confidential Information to a subcontractor retained by Client related to its respective Plans, provided however, that Hewitt consents in writing to any such disclosure and such consent shall not be unreasonably withheld.

8.3     **Exceptions.** Confidential Information does not include information or materials if and to the extent it:

(a)     is or becomes generally available or known to the public through no fault of the receiving party;

(b)     was already known by or available to the receiving party prior to the disclosure by the disclosing party;

(c)     is subsequently disclosed to the receiving party by a third party who is not under any obligation of confidentiality to the disclosing party;

(d)     is required by law to be disclosed as part of a judicial process, government investigation, legal proceeding or other similar process;

(e)     has already been or is hereafter independently acquired or developed by the receiving party without violating any confidentiality agreement with or other obligation to the disclosing party.

For purposes of this Section 8, the "disclosing party" is the party to this Agreement (Client or Hewitt) which owns or otherwise controls the disclosed Confidential Information, and the "receiving party" is the party to this Agreement which has received the disclosing party's Confidential Information.

8.4    **Required Disclosure.** If the receiving party is required to disclose Confidential Information as part of a judicial process, government investigation, legal proceeding or other similar process, such party will give prior written notice of such requirement to the disclosing party. Reasonable efforts will be made to provide this notice in sufficient time to allow the disclosing party to seek an appropriate confidentiality agreement, protective order or modification of any disclosure and the receiving party will cooperate in such efforts.

8.5    **Return of Confidential Information.** Upon the termination or expiration of this Agreement, the parties shall return or destroy all Confidential Information pursuant to Section 9.6.

8.6    **Injunctive Relief.** Each party acknowledges that any breach of any provision of this Section 8 by either party, or its agents, employees, representatives or subcontractors, may cause immediate and irreparable injury to the other party, and in the event of such breach, the injured party may be entitled to injunctive relief, and to any and all other remedies available at law or in equity.

## Section 9:  Term and Termination

9.1    **Initial Term; Renewal.** The initial term of this Agreement commences on the effective date first stated above and will end on September 30, 2006, unless terminated earlier as provided in this Section 9. Upon the expiration of the initial or any renewal term, this Agreement shall automatically renew for successive one (1) year terms unless either party provides the other party with a written termination notice ("Termination Notice") at least one-hundred and eighty (180) days prior to the end of the initial term or any renewal term.

9.2    **Termination For Convenience.** Client may terminate this Agreement at any time, without cause and for its convenience, by giving Hewitt at least one hundred eighty (180) days prior written notice of such termination. If prior to the end of the initial term, Client terminates Services (pursuant to this Section 9.2) which account for ten percent (10%) or more of the annual revenues payable under this Agreement (or Hewitt terminates this Agreement due to Client's Default under this Agreement pursuant to Section 9.4), then Client shall pay Hewitt an amount described in the Fee Schedule under the subheading "Termination for Convenience", such amount based upon the date of termination and the number of months elapsed since the Effective Date. In the event this Agreement is renewed, Client and Hewitt agree to negotiate a new termination schedule, provided however, that if a new termination payment schedule is not agreed upon, and either the Client terminates for convenience (or Hewitt terminates due to a default as described above), and the termination of Services accounts for ten percent (10%) or more of the annual revenues payable under this Agreement during such renewal period, Client shall pay Hewitt an amount equal to the sum of fifteen percent (15%) of the average monthly revenues related to such terminated Services for each full or partial month the Services are terminated prior to the end of such renewal term. The average monthly revenues will be determined using the twelve (12) months immediately preceding the effective date of such termination.

**9.3**     **Termination Prior to Commencement of Ongoing Services.** If Client terminates Services before ongoing Services commence, Client will pay for time incurred by Hewitt in implementing those Services at Hewitt's then current standard billing rates plus out-of-pocket expenses actually incurred, less any amounts already paid by Client for those implementation Services. If Client delays the commencement date of any of the Services but does not terminate the Services, applicable ongoing fees shall commence as originally scheduled. If Client delays commencement of the Services more than ninety (90) days after the date provided in the Fee Schedule, Hewitt shall be entitled to terminate this Agreement for Default under Section 9.4 upon giving the required notice, but there shall be no Cure Period.

**9.4**     **Termination for Default.**

(a)     **Termination.** Upon (i) the occurrence of a Default, (ii) the delivery of a Default Notice to the defaulting party as provided in Section 9.4(b), and (iii) the defaulting party's failure to cure the Default prior to the expiration of the applicable Cure Period specified in Section 9.4(c), the non-defaulting party shall have the right to terminate this Agreement on or after the last day of the Cure Period (or on a termination date selected by the non-defaulting party if no Cure Period applies and the non-defaulting party has the right to terminate) by delivering a Termination Notice to the defaulting party, thereby triggering the termination obligations described in Section 9.6.

(b)     **Notice of Default.** A Default shall not be deemed to have occurred unless the non-defaulting party has given written notice (a "Default Notice") to the defaulting party in accordance with the requirements of this Section 9.4(b). A Default Notice shall specify in reasonable detail the events which the non-defaulting party believes have occurred and which constitute or evidence a Default, the provisions of this Agreement (including any applicable provisions of the Requirements Document) which have not been performed or complied with, and the actions which, in the opinion of the non-defaulting party, would be required to fulfill the requirements of this Agreement and cure the Default.

(c)     **Cure Period.** The defaulting party shall have thirty (30) days (the "Cure Period") in which to take the actions reasonably necessary to cure its breach or non-performance and, in the case of Hewitt, to satisfy its obligations under Sections 2.5 and 10. All Cure Periods commence on the date the corresponding Default Notice is received. Except in the case of a Payment Default, any Cure Period may be extended for up to ninety (90) days (or for such longer period as the parties may agree in writing) if: (i) the defaulting party is making all reasonable efforts to promptly cure the non-performance; (ii) a cure cannot practically be achieved within the applicable Cure Period; and (iii) within the first thirty (30) days of the initial Cure Period, the defaulting party gives the non-defaulting party written notice of the defaulting party's need for an extension and of the actions it is taking to cure its breach or non-performance. As used in this Section 9.4(c), the term, "reasonable efforts" shall include the application of diligence and resources reasonably necessary to cure the non-performance in a businesslike fashion with due regard to the seriousness of the Default and its impact upon the non-defaulting party and those to whom the non-defaulting party may have legal or contractual obligations.

**9.5**     **Termination for Insolvency.** Notwithstanding anything herein to the contrary, either party may terminate this Agreement immediately upon notice if the other party files a petition in

bankruptcy or proceedings in bankruptcy are instituted against it and not dismissed within sixty (60) days, or any court shall assume jurisdiction of such party and its assets pursuant to proceedings under any bankruptcy or reorganization act or a receiver is appointed to such party's assets and is not dismissed within sixty (60) days, or if such party shall make an assignment for the benefit of creditors.

9.6     **Obligations upon Termination.** Upon termination or expiration of this Agreement:

(a)     **Return of Client Information.** A copy of all Participant Data, whether maintained on Hewitt's computers, hard copy, or other form, will be returned to Client within sixty (60) days in Hewitt's customary format, together with instructions concerning the format to access such data at no additional charge. At Client's request, Hewitt will return a copy of all Participant Data in such form as Client may reasonably request, subject to the change order provisions of Section 2.6 (including any additional time required as determined during the Change Order process). Hewitt may retain an archival copy of Client Information. Furthermore, Hewitt may continue to use Participant Data (i) in aggregate form as described in Section 8.2 and (ii) to the extent and for the purposes authorized by the Participant whose data is being used.

(b)     **Return of Hewitt Information.** All Hewitt Information and other Hewitt Confidential Information, together with any copies thereof, in Client's possession or control will either be returned to Hewitt or destroyed with written certification to Hewitt of such destruction by an executive officer of Client.

(c)     **Payment Obligations.** In addition to any payments that may be due under Section 9.2, in the event of termination of this Agreement for any reason, Client shall pay Hewitt all amounts payable under this Agreement for all Services rendered up to and including the effective date of the termination.

(d)     **Transition Services.** Hewitt will use reasonable efforts to cooperate with Client to formulate and execute a transition plan as soon as termination or expiration of this Agreement is certain. At the request of Client, Hewitt will use reasonable efforts to perform additional transition services that are within Hewitt's then current capacities and capabilities, including, but not limited to, providing consulting services to Client with respect to Hewitt's data format and conversion, data interfaces with Client and providers of services to the Plans, and methods of transferring responsibility for the Services with as little interruption as practicable to Client. Hewitt's obligation to provide any transition services shall be subject to Hewitt and Client agreeing on the scope of such transition services and the other terms under which they will be provided, including compensation payable to Hewitt for such transition services.

9.7     **Fee Adjustment.** If some, but not all Services under this Agreement are terminated, Hewitt and Client shall use reasonable efforts to reach an agreement related to Hewitt's compensation for the remaining Services to be provided under this Agreement, which will include an adjustment to reflect lost economies of scale resulting from such termination. If the parties fail to reach an agreement, the provisions of Section 11 shall apply.

**Section 10:  Liability and Indemnification**

10.1   **Limitation of Liability.** Hewitt will furnish services at no charge to identify, correct or re-perform any defective or non-conforming Service as described in Section 2.5.  In addition to its obligations under Section 2.5, if Client or the Plan(s) suffers Losses as a result of Hewitt's negligence, Hewitt will be liable for up to $1,000,000 of such Losses incurred by Client or the Plan(s) during any Agreement Year after the first $100,000 of such Losses.

10.2   **Exclusions from Limitation on Liability.** Notwithstanding anything to the contrary contained herein, the limitations on Hewitt's liability contained in Section 10.1 shall not apply to Losses arising from: (a) Hewitt's gross negligence or willful, fraudulent or criminal misconduct; (b) Hewitt's breach of the confidentiality provisions of this Agreement; (c) bodily injury, including death, or damage to tangible personal or real property arising from physical acts or omissions that constitute Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct; or (d) the infringement of the Proprietary Rights of a third party by the use of the Hewitt Information contemplated hereunder and/or Hewitt's provision of the Services.

10.3   **Consequential or Punitive Damages.** In no event will Hewitt or Client be liable to one another for incidental, consequential, special, punitive or special damages (including loss of profits, data, business or goodwill or government fines, penalties, taxes or filing fees) regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

10.4   **Indemnification.**

(a)   **By Hewitt.** Subject to Sections 10.1, 10.2 and 10.3, and 10.4(c), Hewitt shall indemnify, defend and hold Client and the Plans harmless from and against any Claims and shall pay all Losses (including reasonable attorneys' fees and expenses): (i) arising out of any breach by Hewitt of any of its material obligations, representations or warranties contained in this Agreement; (ii) arising out of Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct; (iii) arising from bodily injury, including death, or damage to tangible personal or real property arising from physical acts or omissions that constitute Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct; or (iv) arising out of the infringement of the Proprietary Rights of a third party by the use of the Hewitt Information contemplated hereunder and/or Hewitt's provision of the Services.

(b)   **By Client.** Client shall indemnify, defend and hold Hewitt harmless from and against any Claims and shall pay all losses and all related expenses (including reasonable attorneys' fees and expenses) suffered by Hewitt: (i) arising out of any breach by Client of any of its material obligations, representations or warranties contained in this Agreement; (ii) arising from Client's negligence, gross negligence or willful, fraudulent, or criminal misconduct; (iii) arising from bodily injury, including death, or damage to tangible personal or real property arising from physical acts or omissions that constitute Client's negligence, gross negligence or willful, fraudulent, or criminal misconduct; (iv) arising out of the infringement of the Proprietary Rights of a third party by the use of the Client Information provided to Hewitt hereunder; (v) arising from Losses for which Hewitt is not liable under this Section 10; or (vi)

arising from the acts or omissions of any third party provider of services to Client, the Plans and Participants.

(c)  **Defense of Third Party Claims.** Hewitt will defend all Claims brought against Client or Hewitt by any third party relating to this Agreement or the Services to the extent such Claims relate to or arise out of Losses described in Section 10.2(b)-(d). Client will defend all other Claims brought against Client or Hewitt by any third party relating to the Agreement or the Services. The party entitled to indemnification or defense under this Section 10 (an "Indemnitee") may select separate legal counsel in the event Indemnitee, in its sole discretion, deems its interests to be in conflict with those of Indemnitor. Liability for Losses and the costs of defense shall be allocated to and reimbursed by Hewitt or Client in accordance with their respective indemnification obligations under this Section 10. Included among third parties are the Plans, any trustees, the Participants and affiliates of Client. An Indemnitee may also participate at its own expense in the defense of any such third party Claims for which Indemnitee seeks defense and indemnification from the party obligated to indemnify or defend under this Section 10 (an "Indemnitor"), or an Indemnitee may assume the defense of such Claim, in which case the Indemnitor will not be liable to the Indemnitee in defending such action or Claim.

(d)  **Procedure.**

    (1)  **Claims.** If an Indemnitee desires to make a Claim against an Indemnitor, the Indemnitee shall give prompt written notice to the Indemnitor of the institution of a Claim at any time instituted against or made upon the Indemnitee in connection with which the Indemnitee could claim indemnification under this Section 10 and shall advise the Indemnitor in writing, to the extent known, of the amount and circumstances surrounding the same. The failure to give such prompt written notice shall not affect the indemnification provided hereunder except to the extent that the failure to give such notice shall have actually prejudiced the Indemnitor. The Indemnitee shall cooperate and shall cause its relevant employees to cooperate with the Indemnitor in connection with the Claim at no cost to the Indemnitor.

    (2)  **Settlement.** Either the Indemnitor or the Indemnitee may settle any Claim without the consent of the other only if (i) the settlement does not impose any financial or other obligation on or impair any right of the non-consenting party, and (ii) if the settling party is the Indemnitee, the Indemnitee releases the Indemnitor from any liability pursuant to this Section 10 for the settled Claim, other than for amounts paid or incurred prior to consummation of the settlement. Except as provided in the immediately preceding sentence, neither the Indemnitee (if the Indemnitor has agreed as to its responsibility to indemnify pursuant to this Section 10) nor the Indemnitor shall settle any Claim without the consent of the other.

    (3)  **Cooperation in Litigation.** In the event of any third party Claims made against either or both of the parties, the parties shall cooperate reasonably with one another in the investigation and defense of such Claims.




10.5   **Mitigation Efforts.** Both Hewitt and Client agree to use reasonable efforts to mitigate liability, damages, and other losses suffered in connection with this Agreement, including where any damages can be mitigated by lawfully pursuing recovery from Participants or other third parties, each of Hewitt and Client will conduct or permit diligent efforts to so recover.

10.6   **Insurance.**

    (a)   **Coverage.** Hewitt shall maintain, at all times during the term of this Agreement and for a period of two years after termination, the following minimum insurance coverages and limits, at its sole expense:

        (1)   Workers' compensation and employer's liability policy to comply with the laws of the state where the Services are performed (Workers' Compensation - Statutory; Employer's Liability -$500,000/$500,000/$500,000).

        (2)   Commercial general liability policy endorsed to provide for contractual liability, completed operations liability and broad form property damage with limits as follows:  Bodily Injury and Property Damage - General Aggregate Limit--$2,000,000,  Products/Completed  Operations  Aggregate  Limit--$1,000,000, Each Occurrence Limit--$1,000,000;

        (3)   Business automobile liability policy which shall include coverage for all owned, non-owned and hired vehicles, with limits as follows: (a) Bodily Injury and Property Damage - $1,000,000 Combined Single Limit Each Occurrence

        (4)   Errors and Omissions - $1,000,000 Each Occurrence/in Aggregate;

        (5)   Hewitt shall provide Client within ten (10) business days following the date of execution of this Agreement its evidence of same on a Certificate of Insurance.  Such Certificate shall provide evidence of all policies required herein.  Hewitt shall also use reasonable efforts to provide Client thirty (30) days' written notice prior to the cancellation of any policies required hereunder, unless such cancellation is pursuant to the issuance of a new policy (regardless if such policy is issued by the same insurance carrier, its successor, or another carrier) complying with the provisions of this Section 10.

    (b)   **Best Rating.** Insurance companies affording coverage hereunder must have a B+VII or better rating, as rated in the A.M. Best Key Rating Guide for Property and Casualty Insurance Companies.

**Section 11: Dispute Resolution**

Any dispute, controversy or Claim arising out of or relating to this Agreement or the Services shall be settled in accordance with the procedures set forth in **Schedule C.**

**Section 12: Delays**

Neither party will be in breach of this Agreement as a result of, nor will either party be liable to the other party for, liabilities, damages or other losses arising out of delays in performance caused by acts of God, government authority, strike or labor disputes, fires or other loss of facilities, breaches of contract by suppliers or others, telephone system, computer downtime, and other utility outages, equipment malfunctions, Internet service providers and similar occurrences beyond the reasonable control of the delayed party as long as such party is diligently attempting to correct the cause of the delay. During any such delay in performance, the delayed party will implement reasonable work-around plans, computer system disaster recovery (in Hewitt's case, the Disaster Recovery Plan), alternate sources or other commercially reasonable means to facilitate the performance of its obligations under this Agreement until the delay is corrected.

**Section 13: Relationship of the Parties**

13.1    **Independent Contractor.** The relationship between the parties is that of independent contractors. None of the provisions of this Agreement shall be construed to create an agency, partnership or joint venture relationship between the parties or the partners, officers, members or employees of the other party by virtue of either this Agreement or actions taken pursuant to this Agreement. Hewitt personnel will remain Hewitt's employees for all purposes, including, but not limited to, determining responsibility for all payroll-related obligations. Each party agrees to hold harmless and indemnify the other from any claims pertaining to employment asserted by independent contractors and/or temporary employees of the non-indemnifying party.

13.2    **Fiduciary Status.** Client and Hewitt understand and intend that Hewitt shall not be a fiduciary within the meaning of ERISA or any state law with respect to any Plan. Hewitt shall not have any discretion with respect to the management or administration of any Plan or with respect to determining or changing the rules or policies pertaining to eligibility or entitlement of any Participant in any Plan to benefits under such Plan. Hewitt also shall not have any control or authority with respect to any assets of any Plan, including the investment or disposition thereof. All discretion and control with respect to the terms, administration or assets of any Plan shall remain with Client or with the named fiduciaries under such Plan.

**Section 14: Subcontracting and Assignment**

14.1    **Subcontracting.** Hewitt may enter into subcontracts in connection with Services provided pursuant to this Agreement. Hewitt shall be responsible for the actions of any subcontractors with which it has a subcontracting relationship and shall retain any such liability and responsibility under this Agreement as if such subcontracted activities were performed by Hewitt. Notwithstanding the foregoing to the contrary, Hewitt's use in the ordinary course of business of third party services or products not dedicated to Client that are not material to any particular function constituting a part of the Service shall not constitute a delegation or subcontracting of Hewitt's responsibilities covered by this Section 14.1. If a subcontractor qualifies as a minority-owned or woman-owned business enterprise ("MWBE"), Hewitt shall cause contractor to provide Hewitt with a copy of its certification, provided however, that Client acknowledges that subcontractor is solely responsible for ensuring that it is an MWBE by an organization that provides such certification. If the subcontractor is not an MWBE, Hewitt shall attempt to subcontract with an MWBE and shall provide Client with the name of

such MWBE. Client may contact such MWBE's directly for the sole purpose of confirming the subcontracting relationship with Hewitt.

14.2   **Assignment.** This Agreement may not be assigned by either party, in whole or in part, by operation of law or otherwise, without the prior written authorization of the other party, provided however, that Hewitt may assign this Agreement without Client's consent to an affiliate entity controlling, controlled by or under common control with Hewitt and such transfer is part of (i) an overall plan by Hewitt or its affiliates to make an offering to the public of all, or a portion, of the interest in the equity of Hewitt, and (ii) as part of such plan, Hewitt's assignment shall be all, or substantially all, of the (a) personnel and operations that are used to provide the Services, and (b) assets used to provide the Services. Any assignment in violation of the preceding sentence shall be void and of no effect. Any assignee hereof shall, as a condition of the assignment, agree in writing with the other party hereto to abide by the terms and conditions hereof. This Agreement shall be binding on and inure to the benefit of the parties and their respective permitted successors and assigns.

## Section 15: Representations

15.1   **Hewitt's Corporate Authority and Due Execution.** Hewitt represents that: (a) it has the power and authority to execute, deliver and perform this Agreement and that the execution, delivery and performance of this Agreement by Hewitt have been duly authorized by all necessary action required by its operating agreement and other charter documents; (b) this Agreement has been duly executed and delivered by Hewitt and constitutes the legal, valid and binding obligation of Hewitt enforceable against Hewitt in accordance with its terms; and (c) it is not currently a party to any agreement with any third party that is in conflict with the terms of this Agreement.

15.2   **Client's Corporate Authority and Due Execution.** Client represents that: (a) it has the corporate power and authority to execute, deliver and perform this Agreement and that the execution, delivery and performance of this Agreement by Client have been duly authorized by all necessary corporate action; (b) this Agreement has been duly executed and delivered by Client and constitutes the legal, valid and binding obligation of Client enforceable against Client in accordance with its terms; (c) it has obtained all approvals with respect to any Plan committee, named fiduciaries or other parties that may be required pursuant to the provisions of the Plans; and (d) it is currently not a party to any agreement with any third party that is in conflict with this Agreement.

## Section 16: Notices

16.1   **General.** All notices, requests, demands and other communications required to be given hereunder shall be in writing and shall be deemed given when actually received and may be given by personal delivery, telephone facsimile, overnight delivery service, or certified or registered mail, return receipt requested, to the party for whom intended at the address specified in this Section. Either party may designate an alternate address for notices by giving written notice thereof in accordance with the provisions of this Section.

Notices to Client:

Enron Corp.
1400 Smith Street

Houston, Texas 77002
Attention: Director of Benefits
Phone: 713-853-6161

Notices to Hewitt:

Hewitt Associates LLC
100 Half Day Road
Lincolnshire, Illinois 60069
Attn: General Counsel
Telephone: (847) 295-5000
Fax: (847) 771-7906

## Section 17:  General Provisions

17.1 **No Third Party Beneficiaries.** This Agreement has been entered into for the sole benefit of the parties and their respective permitted successors and assigns. Except as specifically set forth in this Agreement, the parties do not intend the benefits of this Agreement to inure to any third party, and nothing contained herein shall be construed as creating any right, claim or cause of action in favor of any such third party against any party hereto. Furthermore, this Agreement shall not create any legal relationship, interest or right whatsoever between Hewitt and any individual, beneficiary, Participant, applicant or assignee under any Plan.

17.2 **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original for purposes of this Agreement.

17.3 **Survival of Obligations.** It is expressly understood and agreed that the parties' respective obligations under this Agreement which by their nature continue beyond the termination or expiration of this Agreement include, but are not limited to, those contained in Sections 2.7 (Client Direction), 4 (Compensation), 5 (Ownership of Materials and Work Product); 8 (Confidential Information), 9.6 (Obligations Upon Termination), 10 (Liability and Indemnification), 11 (Dispute Resolution), and 17 (General Provisions).

17.4 **Severability.** If any term or provision of this Agreement is held to be invalid or unenforceable, that term or provision shall be ineffective and severable to the extent of such invalidity or unenforceability and the remaining terms and provisions shall continue in full force and effect.

17.5 **Governing Law.** This Agreement shall be governed by and enforced in accordance with the laws of the State of Texas (excluding its conflicts of laws rules), except to the extent superceded or preempted by federal law, including, without limitation, ERISA.

17.6 **Attorney's Fees.** In the event of any action to construe or enforce this Agreement or any portion thereof, the prevailing party will be entitled to recover, in addition to any charges fixed by the court, its costs and expenses of suit, including reasonable attorney's fees and costs. A prevailing party shall be the party obtaining relief in respect of its Claims whether by way of final and non-appealable judgment or order, or an award or order which provides injunctive relief or an agreement to take or refrain from taking specific action.

17.7 **Entire Agreement.** Subject to the terms and conditions hereof: (a) this Agreement, together with the Schedules and other attachments, contain the entire understanding of the parties with respect to the provisions of the Services; (b) there are no expectations, restrictions, promises, warranties, covenants, or undertakings other than those expressly set forth herein; (c) this Agreement supersedes all prior agreements and understandings between the parties with respect to the Services; and (d) this Agreement unless otherwise specified herein, may be amended only by a written instrument duly executed by the parties hereto or their respective successors or assigns.

17.8 **No Contract of Insurance.** Nothing in this Agreement shall be construed as a contract of insurance. Hewitt shall be under no obligation to pay from its own funds or insure any benefits properly payable under the Plans.

17.9 **No Waiver.** A party's failure at any time to enforce any of the provisions of this Agreement or any right with respect thereto shall not be construed to be a waiver of such provision or right nor to affect the validity of this Agreement. The exercise or non-exercise by a party of any right under the terms or covenants herein shall not preclude or prejudice the exercising thereafter of the same or other rights under this Agreement.

17.10 **Publicity.** Each party shall submit to the other all advertising, written sales promotion, press releases, and other publicity matters relating to this Agreement in which the other party's name or mark is mentioned or language from which the connection of said name or mark may be inferred or implied, and neither party shall publish or use such advertising, sales promotion, press releases, or publicity matters without the prior written approval of the other party. Nevertheless, Hewitt is authorized to include Client on Hewitt's client lists, proposals and other communications not intended for general distribution.

17.11 **Interpretation.** The headings and captions in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to Sections or Schedules shall, unless otherwise provided, refer to Sections hereof or Schedules attached hereto, all of which Schedules are incorporated herein by reference. Words importing the singular include the plural and words importing the masculine include the feminine and vice versa where the context so requires. Use of the words "includes" or "including" will be construed without limitation to the generality of the preceding words. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.

IN WITNESS WHEREOF, the parties hereto have duly executed this Administrative Services Agreement effective as of the date first written above.

Enron Corp.                                           Hewitt Associates LLC

By: _____                        By: _____
        [Name and Title]                                  C. Lawrence Connolly, III, Principal
        Vice President

CONTRACT
SUPPORT
AW

Hewitt Associates          Sr Director Benefits          22                    09/2001.2227.Enron-39(7)
Confidential

# Schedule A

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

---

| **Plans Covered** | **Plan Effective Date** |
|---|---|
| Enron Corp. Savings Plan | July 1, 1999 |
| Enron Corp. Employee Stock Ownership Plan | January 1, 1999 |
| Enron Corp. 1994 Deferral Plan | |
| Enron Corp. 1998 Expatriate Plan | |

## Service Delivery Model

The fees provided in this Schedule assume Hewitt will provide the Services consistent with its Delivery Models for Defined Contribution, copies of which are attached as Exhibit A-1 (the "Delivery Model"). Certain of the Services and procedures discussed in the Delivery Model will be set out with greater specificity in the Requirements Document. If there are any conflicts between the Delivery Model and the Requirements Document, the Requirements Document will control.

| **Service Commencement Dates** | **Live Production Data Loaded** | **Benefits Center Open for Calls** |
|---|---|---|
| Defined Contribution (DC) Services | 10/31/2001 | 11/20/2001 |

## One Time Implementation Fees

| **Included Services** | **Fee Schedule** |
|---|---|
| Qualified Plan Setup | $125,000. |
| ESOP Plan Setup | $35,000. |
| Non-qualified Plan Set-up | $75,000. |
| Enron Oil & Gas Stock fund Setup | $7,500. |
| Brokerage Window Set-up | Fees waived for set-up of CSFB Brokerage Window. $50,000 if Brokerage Window set-up through Charles Schwab. |

**Implementation Fees includes:**

Requirements gathering;

TBA system set-up including Internet and IVR;

Data Conversion;

Benefit Center Training and Setup; and

and Standard Web Promotion for communicating the changes to Participants.

---

## Ongoing Fee Schedule

### Standard DC Services

| Included Services | Fee Schedule |
|---|---|
| **Qualified Plan Administration**<br>• Daily Plan processing<br>• Benefits Center Services | $60.00 per Participant per year. |
| • Loan Administration | $35.00 per new loan (charged directly to the Participant). |
| • ESOP Administration (as a separate plan) | $1.00 per Participant per month. |
| • Enron Oil and Gas Stock fund administration | $1,750 per month. |
| **Self-Directed Brokerage through:**<br>• CSFB | No per year charge. Fees charged only for trading in the Brokerage window. $20.00 per equity trade, charged directly to the Participant. |
| • Charles Schwab | $75.00 per Participant per year and fees (charged Participants directly by Charles Schwab) for trading in the brokerage window. |
| **Non-qualified Plan Administration** | $7,500 per month.<br><br>DC Participants include current and former employees with a balance in a Plan or any current or former employee eligible to participate in the Plan whose records are maintained on Hewitt's system. |

### Miscellaneous Ongoing Services-All Services

| | |
|---|---|
| • Compliance/Nondiscrimination Testing<br>• ADP/ACP nondiscrimination testing | Annual Testing and one mid-year projection testing included. Additional testing and or corrective action billed at time and materials. |
| • QDRO/QMCSO reviewed/qualified | $750 per QDRO/QMSCO reviewed or qualified assuming model orders. |
| • Signature Ready Form 5500 | $1,500 per Form 5500. |
| **Telephone Calls – All Service Areas** | |
| • Benefit Center (BC) | Included in fees for Standard Services. |

**Participant Self Service Access**

- Internet and IVR                                                    Included in fees for Standard Services.

- Client Access to TBA—Not Internet Access        $500 per month per location.
                                                                             $200 per month per user with access rights.

**Plan Sponsor Site**                                            Included in fees for Standard Services.

## Data Management—Participants

| Included Services | Fee Schedule |
|---|---|
| • Interfacing with payroll | Included in fees for Standard Services. |
| • Applying data updates to TBA | Included in fees for Standard Services. |
| • Data Management—Former Participants | $0.40 per month per individual (former Participant) maintained on Hewitt's system. |
| • Additional data Interfaces to and from Client to support up to four separate payroll systems using the standard data interfaces | $2000 per month. |

## Data Correction, Third Party Error and Change Order Billing Rates

Hewitt's current standard billing rates are provided as an example of Hewitt's current rates for fiscal year 2001. Hewitt's standard billing rates are subject to change from time to time, at Hewitt's sole discretion.

| Category of Staff | Hourly Rates |
|---|---|
| Administrative Assistant | $80.00 per hour. |
| Benefit Center Associates | $90.00 per hour. |
| Legal Compliance Associates | $240.00 per hour. |
| Technology Associates | $210.00 per hour. |
| Business Analyst | $130.00 per hour. |
| Administrative Specialists | $110.00 per hour. |
| Project Manager | $240.00 per hour. |

**The Defined Contribution Alliance™**

Hewitt, or its affiliate, Hewitt Financial Services LLC (member NASD/SIPC) will receive fees from certain investment fund organizations ("DC Alliance Funds") for subtransfer agency, shareholder servicing, and/or distribution services. The above DC Ongoing Fees assumes that all of the funds for which the Plan trustee is directing (at the Client's direction) shall pay Hewitt either one-quarter percent (0.25%) or one-tenth percent (0.10%), and that the average daily balance invested by the Plan in such funds is no less than $315,000,000 and $76,000,000, respectively, to serve an average of 14,500 Participants. In the event these minimums are not met, the fees will be increased to

compensate Hewitt for the difference between the actual revenue received and that which Hewitt would have received had these minimums been achieved.

## Service Assumptions

- Hewitt determines its one-time and ongoing fee schedules based on estimates for the time and resources it takes to deliver the Services under consideration. The initial one-time fees do not cover Hewitt's costs and reflect an investment Hewitt makes in a long-term relationship. The ongoing fees reflect Hewitt's experiences in delivering projects similar in size and scope, and the increasing cost efficiencies and productivity gains Hewitt expects to achieve.

- The number of Participants will be determined on the first day of each calendar month.

- Employees who have not met the waiting period for benefit eligibility are considered Participants to the extent they are maintained on Hewitt's system.

- Participants who receive a final payment from a Plan remain Participants through the period, which ends six (6) months after the final governmental reporting of the final payment from the Plan.

- Conversion data is provided in Hewitt's format and provided through a single electronic file transfer (EFT).

- The implementation and ongoing fees described above do not include the costs for employee/participant communications beyond the standard system-generated statements described in the Requirements Document.

- Ongoing data is provided in Hewitt's format; four Semi-monthly EFTs from Client and four semi-monthly EFTs to Client. Each additional interface is $500 per occurrence/invoiced as additional services.

- Data is of sufficient quality that processing can be performed without human intervention. Data research and correction, exception processing, and any manual processes resulting from missing or inaccurate data that result in more than eight hours per month are billed as additional services.

- The efficiencies gained (1) in having a single point of contact for payroll/HRIS/administrative follow-up, and (2) in using a common set of administrative rules, are reflected in the fee schedule.

- Ad hoc reporting is billed as additional services.

- Hewitt will offer IRA and other investment account types to Client's current employees and departing Plan Participants through Hewitt Financial Services via CSFB*direct*.

- Fulfillment processing and other mailings (e.g., SPDs, SARs, participant statements, enrollment kits, life event kits, special mailings, etc.) are billed as additional services. Fulfillment for routine (i.e., standard 8-1/2 x 11, computer-generated, without inserts or special instructions) individual confirmations, acknowledgments and follow-up notices, is included in the base fee.

- Supporting administrative changes requested by Client (e.g., plan changes, plan amendments, new plan offerings, changes in service providers or system interfaces, work related to acquisitions and divestitures), will often result in additional one-time fees and may result in changes to ongoing fees. Such changes shall be subject to the Change Order provisions of Section 2 of this Agreement.

- Internet and IVR are available 24 hours per day, 7 days per week, except on Sundays from 12:00 a.m. until 12:00 p.m., Central Time and periods of scheduled maintenance.

- Benefits Center hours of operation are from 8:30 am until 5:00 pm, Central Time, Monday-Friday, except for Holidays recognized by Hewitt.

### Termination for Convenience Schedule

| Number of Months Elapsed Since the Effective Date | $ Amount to Be Paid Hewitt | Number of Months Elapsed Since the Effective Date | $ Amount to Be Paid to Hewitt | Number of Months Elapsed Since the Effective Date | $ Amount to Be Paid to Hewitt |
|---|---|---|---|---|---|
| 1 | 750,000 | 21 | 500,000 | 41 | 250,000 |
| 2 | 737,500 | 22 | 487,500 | 42 | 237,500 |
| 3 | 725,000 | 23 | 475,000 | 43 | 225,000 |
| 4 | 712,500 | 24 | 462,500 | 44 | 212,500 |
| 5 | 700,000 | 25 | 450,000 | 45 | 200,000 |
| 6 | 687,500 | 26 | 437,500 | 46 | 187,500 |
| 7 | 675,000 | 27 | 425,000 | 47 | 175,000 |
| 8 | 662,500 | 28 | 412,500 | 48 | 162,500 |
| 9 | 650,000 | 29 | 400,000 | 49 | 150,000 |
| 10 | 637,500 | 30 | 387,500 | 50 | 137,500 |
| 11 | 625,000 | 31 | 375,000 | 51 | 125,000 |
| 12 | 612,500 | 32 | 362,500 | 52 | 112,500 |
| 13 | 600,000 | 33 | 350,000 | 53 | 100,000 |
| 14 | 587,500 | 34 | 337,500 | 54 | 87,500 |
| 15 | 575,000 | 35 | 325,000 | 55 | 75,000 |
| 16 | 562,500 | 36 | 312,500 | 56 | 62,500 |
| 17 | 550,000 | 37 | 300,000 | 57 | 50,000 |
| 18 | 537,500 | 38 | 287,500 | 58 | 37,500 |
| 19 | 525,000 | 39 | 275,000 | 59 | 25,000 |
| 20 | 512,500 | 40 | 262,500 | 60 | 12,500 |

A termination pursuant to Section 9.2 shall result in the payment by Client of the fees indicated based upon the number of months between the Effective Date and the date of termination. By way of example, if this Agreement is terminated pursuant to 9.2 fifty-five months after the Effective Date, Client shall pay Hewitt $75,000.

## Additional Services

From time to time, Client may request Hewitt to perform additional out-of-scope services subject to Hewitt's availability. Such service charges shall be subject to the Change Order provisions contained in Section 2 of this Agreement. Additional services shall include, but are not limited to:

- Data cleanup, data entry or reconciliation in excess of the hours included in the service assumption above relating to data research and correction, exception processing and manual processing.

- Conversions of paper files into electronic format.

- Services in support of ongoing retirement plan processing prior to the live date. Any services related to additional plans.

- Items designated in the Delivery Model as optional.

- Hardware acquisition costs, ongoing line access charges and assistance with support and maintaining the connection.

- Reengineering internal processes (i.e., those processes remaining after outsourcing).

- Training support for new or remaining staff on roles/responsibilities after outsourcing.

- Updating plan documents and SPDs.

- Meeting with internal/external auditors.

## Payment

One-time implementation fees will be paid as follows: $40,001 in June 2001, the remaining to be paid in three consecutive equal monthly installments of $53,333 beginning July 2001. Standard ongoing fees for Services such as the ESOP will be paid by wire transfer or Automated Clearing House (ACH) payment on a monthly basis on or prior to the first day of each month, commencing the first of the month in which live production data is processed by Hewitt. Assets in the DC Plan are expected to transfer to Hewitt Financial Services no later than October 1, 2001.

Fees for additional services shall be invoiced to Client on the last day of the month. Adjustments, reconciliations, or credits to the standard fees paid by Client will be included on the invoice. Fees for additional services are due and payable within thirty (30) days of the invoice date. Client will promptly notify Hewitt of any questions regarding invoices so that Hewitt can expect timely payment. Interest at nine percent (9%) per year will accrue after the due date until payment is received.

In addition to fees, Client is responsible for:

(a) Travel-related expenses.

(b) Postage; outside delivery services such as shipping, express mail, and messenger services; charges for data communication and related equipment.

    (c) Other outside suppliers including those used for records management, microfiche production, data telecommunications, and employee communications (e.g., designers, typesetters, printers, assemblers, and fulfillment houses). When Client requires Hewitt to make payments to such suppliers on behalf of Client, a ten percent (10%) service charge for associated administrative costs will be added to the amount due to such suppliers.

    (d) Any and all taxes, however designated, that are levied or based on this Agreement or on the charges stated herein, except for taxes based on the net income of Hewitt.

# Schedule B

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

| Hewitt Associates LLC |
|---|
| Records Retention Policy: Participant Outsourcing Records |
| Name of Client: Enron Corp. |

### Purpose:

The purposes of the following summary are to advise Client of Hewitt's general records retention policies with respect to Client and employee records and to provide Client with an opportunity to modify these policies.

Once approved, Hewitt will implement its retention policies to manage employee records of Client (including disposal) without soliciting further approval from Client. Client may request revisions to this policy respecting its records at any time during the course of the engagement. Such revisions, however, may necessitate additional fees.

### Basis for Hewitt's Records Retention Policy:

The Hewitt records retention policies are based on two main factors:

1.  Statutory and regulatory guidance; and

2.  Hewitt's judgment as to balancing the relative costs and benefits of maintaining specific records for its own business purposes.

Hewitt represents that it has reviewed laws concerning record retention which it understands may apply to employee records used or created in connection with the services that Hewitt has agreed to provide. Hewitt believes that its records retention policies comply with these laws. Client, however, is responsible for advising Hewitt of any special laws or other additional legal requirements applicable to its own business that may affect the records retention policies contained herein.

### Records Approach and Media for Retention:

Hewitt's general approach is to maintain employee records in electronic format. A historical record of all participant data as well as all activity affecting the data, including a record of all transactions involving any participant accounts, will be maintained electronically for the life of Hewitt's engagement with Client, at which time such records will be transferred to Client or Client's designee. Examples of the electronic media that may be used to convert or maintain these records include, but are not limited to, mainframe computer, LAN or PC hard-drive, image format, compact disc, and voice recording.

The primary reason for use of electronic media is that most of the records created during the course of the engagement will be created in this format (e.g., employee elections received telephonically over Interactive Voice Response, participant service center computer entry of elections).

Hewitt's policy recognizes that information and records used during the course of the engagement will also be received and sent in paper form. The following describes Hewitt's general retention approach with respect to paper communications:

*   Information contained in outgoing paper documents (e.g., system generated participant forms and confirmation statements) will be retained in electronic media. Paper copies of such documents will not be created, but can be produced from our electronic records.
*   Information in incoming paper documents (e.g., pre-engagement employee benefit plan records, incoming participant correspondence and forms) will be converted into an electronic record. The incoming paper document will then be destroyed.

Paper records will be maintained where legally required or where the paper original is necessary. Hewitt may also maintain records in non-electronic media (e.g., paper, fiche) in instances where retention on such media is more practical.

| Other Types of Records: | Retention Policy: |
|---|---|
| A. Incoming checks, i.e., loans, buybacks, rollovers, retiree medical repayments. | A. Maintain information on data base. Checks forwarded to third party. |
| B. Documents processed and transmitted to third party. | B. After processing, return paper to Client or other appropriate party. |
| C. Benefits Center voice recordings. | C. Destroy electronic recording after 16 months. |

| Exceptions to the Standard Retention Policy or Special Client Requirements: |
|---|
| |

---

# Schedule C

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

## Dispute Resolution Process

The following procedures shall be used to resolve any dispute, controversy or Claim arising out of or relating to this Agreement. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### Internal Escalation

The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between executives who have authority to settle the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Either party may give the other party written notice of any dispute not resolved in the ordinary course of business. Within fifteen (15) days after delivery of the notice, the party receiving the notice shall submit to the other a written response.

The notice and the response shall include: (1) a statement of each party's position(s) regarding the matter(s) in dispute and a summary of arguments in support thereof, and (ii) the name and title of the executive who will represent that party and any other person who will accompany that executive. Within thirty (30) days after delivery of the notice, the designated executives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other shall be honored in a timely fashion.

If the matter in dispute has not been resolved with sixty (60) days after delivery of the notice, or if the parties fail to meet within thirty (30) days, the dispute shall be referred to more senior executives who have authority to settle the dispute and who shall likewise meet in an attempt to resolve the matter in dispute. If the matter has not been resolved within thirty (30) days after it has been referred to the more senior executives, or if no meeting of such senior executives has taken place within fifteen (15) days after such referral, either party may initiate subsequent proceedings as contemplated herein.

All negotiations between the parties conducted pursuant to the dispute resolution process described herein (and any of the parties' submissions in contemplation hereof) shall be kept confidential by the parties and shall be treated by the parties and their respective representatives as compromise and settlement negotiations for purposes of the applicable court rules of evidence.

### Mediation Procedures

In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator will be designated by AAA. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted in Houston, Texas, U.S.A. as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

## Schedule D
**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

## Change Order Form

## Part I

**Control Number: YYYY-xxxx**

**Title:**

**Summary of Requested Change**
*(include sufficient detail to analyze requested change)*

**Requested Implementation Date:**

**Change Request Submitted by:**                    **Date:**

**Change Request Submitted to:**

**Approved for Impact Analysis by:**                 **Date:**

**Part II**

Impact of Change

    <u>What Needs to be Done (check those that apply)</u>

        ( )    Manage the Implementation
        ( )    Update Requirements Document and Delivery Model(s)
        ( )    Update/Create Employee Communications
        ( )    Code and Test TBA Software
        ( )    Modify TBA Database
        ( )    Code and Test Workstation Tools (e.g. Workflow, etc.)
        ( )    Update IVR
        ( )    Update Internet
        ( )    Update Interfaces (Internal and/or External)
        ( )    Manually enter/process data/activities
        ( )    Create Reports
        ( )    Review SPD
        ( )    Review Plan Documents
        ( )    Update PCSs
        ( )    Temporarily Increase Staff
        ( )    Permanently Increase Staff
        ( )    Provide Staff Training
        ( )    Update Benefits Manual
        ( )    Amend Administrative Services Agreement

        ( )    Other (detail below)

Priority of Change (high, moderate, low):

Timeline *(include Client deliverables)*

**Fees**

<u>Implementation Fee</u>

**Ongoing Fee**

Hewitt Associates
Confidential
        34
        09/2001.2227.Enron-39(7)

<u>Billing Impact</u>
When and how amounts will be billed (e.g. separate invoice, timing, etc.)

**Impact on Performance Measures**

Describe/quantify any proposed changes or suspensions, including time periods, to performance
standards.

**Risk Analysis (describe what could happen if this change is or is not made)**

**Hewitt Reviewer:**                    **Date:**

**Mark One:**                 \_\_\_\_ **Approved**           \_\_\_\_ **Denied**

**Client Reviewer:**                    **Date:**

This Change Order is incorporated into the Requirements Document upon approval of this Change
Order by Client.

## Schedule E
**Administrative Services Agreement Between**
**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

## Disaster Recovery Plan

### Information Security and Business Resumption at Hewitt

Hewitt maintains a comprehensive information security and business resumption program to meet all client service needs in the unlikely event of an unauthorized incident or catastrophic event. These programs are reviewed continuously to ensure that Hewitt provides the highest level of protection to its computer hardware, computer software and electronic data. In addition, the two programs undergo extensive auditing and the business resumption program undergoes extensive testing throughout the year.

### Physical Controls

All computing and communications equipment is located in restricted access areas. This includes enterprise and mid-range computers, peripheral and communications equipment, and local area network file servers. Restricted access is accomplished with a proximity badge reader system requiring both the possession of a photo ID card and entry of a personal identification number (PIN). Access is granted only to specific areas related to that user's job function and must be authorized by both the Information Security Manager and the Operations Services Manager.

### Information Security

The purpose of Hewitt's information security program is to protect data processing hardware, software, and computerized data from unlawful, unauthorized, or unintentional actions or events. There are two main security policies that direct the program: individual accountability and application/data ownership. Access to the Hewitt computing environment requires users to be identified with a unique user identification (userid) and authenticated with a personal password. Passwords are created and known only to their owners; are stored on the systems in an encrypted form; have an enforced minimum length; are forced to change on a regular basis; and are not reusable. The userid will be deactivated after repeated attempts to enter an incorrect password. Once access to a computer system has been established, users are only given access to the resources necessary to perform their job. All computerized information is considered restricted. Access to any system, software or data is prohibited unless specifically authorized by the application owner, who is defined as the business unit or practice leader responsible for the business functions supported by that application.

### Internet Security

Plan participants are identified by their unique participant ID and are authenticated by their personal identification number (PIN). The web servers, application servers, and Internet network components are physically located in restricted access areas. The application uses secured sockets layer (SSL) protocol to encrypt confidential information between the browser and web server. Hewitt's implementation of SSL supports both 40 and 128-bit encryption. The web server is configured such that standard search engines do not index it. The web application is designed such that each client company has a unique URL address. The web servers, application servers, business logic servers, and database servers cannot be accessed directly from the Internet. There is no participant data stored on the web server. Only transient data is stored on the application server. All production participant data is stored on an OS/390 system, in a relational database, secured by the database and the mainframe security system.

**Business Resumption**
The purpose of Hewitt's business resumption program is to plan for continued processing with minimal interruption of our client computer services due to partial or complete destruction of a data processing facility.

**Backup/Recovery and Off-site Storage**
The Hewitt backup/recovery program is designed to support both operational and disaster recovery. All online disk facilities are configured with real-time remote disk mirroring across two locations. Database transaction logs are simultaneously written to both locations. All application data files and operational software are backed up daily. The retention period will ensure that at least two copies of all critical files are stored on back-up media.

**Disaster Recovery**
Hewitt has implemented a state-of-the art dual data center for rapid and comprehensive recovery from a disaster. These data centers are located on separate Hewitt campuses at its global headquarters in Lincolnshire, IL. Both data centers are equipped with photoelectric smoke detectors for fire detection and a pre-action dry sprinkling system for fire suppression. Both building complexes, where the data center is housed, have two separate electrical power feeds. All computing and communications equipment and the office phone systems are connected to an uninterruptable power supply (UPS) battery backup system. Hewitt's production facility also has generator backup. In the event of a power failure on the primary electrical feed, the UPS system will keep the computing and communication system operational until the system is switched to the secondary supply. In the unlikely event that both power feeds were to fail, the UPS system would keep the computing and communications systems running until the electrical generators become operational at the production facility. Voice and data communication connections can be routed through multiple or alternative paths. Any single point of failure that could cause an interruption of critical application processing is kept to a minimum. All online storage is mirrored across the two facilities in real time. Central processor and tape resources are balanced across the locations but operated as a single configuration. All major network and Internet connections are configured to both locations. Production processing recovery is estimated to be within 4 hours of the declaration of a disaster.

As part of Hewitt's business resumption program, Hewitt routinely reviews and tests all aspects of the plan. Disaster recovery teams meet on a regular basis to review and modify the plan to reflect changes in its processing environment. Hewitt systems professionals enact a data center "disaster" at least once a year. In each test Hewitt verifies that all critical application processing elements are available and the data is current and consistent with Hewitt's expectations.

The Participant Services (PS) Business Continuity Plan documents the strategies, personnel procedures and resources that Participant Services will use to respond to any long-term disruption to its essential business functions. The goal of the PS Business Continuity Plan is to resume essential business operations within targeted recovery windows.

The strategy of the PS Business Continuity Plan is to relocate an impacted Benefits Center to a useable location within 48 hours of a disaster or emergency situation being declared. In a building-specific situation and in locations where there is more than one Hewitt building, the targeted recovery space is defined as one of the other local buildings. In an area-wide situation or in those locations where there is a single Hewitt real estate presence, Lincolnshire, IL has been designated as the targeted recovery space. Hewitt would relocate approximately 30% of the normal operating team in the event relocation is necessary. Testing of the PS Business Continuity Plan takes place at least once a year.

## Schedule F
**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

### Authorized Representatives

Client:

Cynthia Barrow – Qualified Benefits
Chris Rahaim – Qualified Benefits
Pam Butler – Non-Qualified Benefits
Renee Ratcliff - Non-Qualified Benefits

Hewitt:

Cathy Graham
Tom Langkamp

# Schedule G

Administrative Services Agreement Between

Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")

## Performance Standards

### General

The performance standards contained in this Schedule G apply to the Benefits Delivery Services that Hewitt provides. All measures are reported monthly unless noted otherwise. All financial calculations (fees at risk and incentive payments) are calculated quarterly (unless noted otherwise) using an average of the three months during the calendar quarter. Any credits shall be applied toward outstanding fees owed by client for such quarter and, if such credits exceed outstanding fees owed, the balance shall be paid to client within 30 days following the end of such quarter. Any incentive payments due to Hewitt shall be paid by Client within 30 days following the end of such quarter.

Notwithstanding the sum of the individual performance payments calculated below, the maximum penalty assessed in any Agreement Quarter shall not exceed 10% of quarterly per participant fees tied to this Agreement. Similarly, the maximum incentive assessed in any Agreement Quarter shall not exceed 5% of quarterly fees.

### Exclusions

The performance standards are waived for periods of significant or unanticipated events impacting the Services (e.g., monthly interaction minutes in excess of 120% of projected volumes, a major movement in the stock market, force majeure and a major announcement affecting Client employees, such as a plan change, etc.). During such period, Hewitt agrees to work with Client to identify and implement appropriate measures to mitigate the impact of such events.

### Commencement of Standards

The following performance standards will commence immediately; Benefit Center Availability, Interactive Voice Response Availability, Internet Availability, Call Abandonment, and Busy Signals.

The remaining standards commence in two phases:

For an initial three month transition period after the live date, penalty and incentive payments are calculated at 25% of the full amounts.

For a subsequent three month transition period, penalty and incentive payments are calculated at 50% of the full amounts.

Thereafter, all penalty and incentive payments are calculated at 100% of the full amounts.

Hewitt Associates

Confidential

39

09/2001:2227:Enron-39(7)

Performance Standards

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| **Channel Availability** | | | | Maximum fees at risk for this category: 2% | |
| Benefit Center Availability | Hewitt's Benefit Center is defined to be available if Benefit Center Representatives are able to take participant calls, access the TBA system, and submit transactions. | Availability is calculated as the number of hours the Benefit Center is available to receive participant calls divided by the total number of hours the Benefit Center is scheduled to be available. | The performance standard is 98%. | 0.1% of quarterly fees for each 0.1% below 98%. | N/A |
| Interactive Voice Response (IVR) System Availability | Hewitt's IVR system is defined to be available if a caller can access the IVR system, enter a valid ID, and access participant information. | IVR availability is calculated as the total number of hours Hewitt's IVR is available divided by the total number of hours it is scheduled for availability. | The performance standard is 98%. | 0.1% of quarterly fees for each 0.1% below 98%. | N/A |
| Internet Availability | Hewitt's Internet Service is defined to be available when the system is able to service requests for participant specific pages. | Internet availability is calculated as the total number of hours Hewitt's system is available divided by the total number of hours it is scheduled for availability. | The performance standard is 97%. | 0.1% of quarterly fees for each 0.1% below 97%. | N/A |

Hewitt Associates
Confidential

09/2001.2227.Euron-3N(7)

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| **Channel Accessibility** | | | | **Maximum fees at risk for this category: 2%** | |
| Blocked Calls | A blocked call is defined as a call where the caller receives a busy signal from Hewitt due to insufficient phone lines. | The measure is calculated as the total number of telephone calls with busy signals divided by the total number of telephone calls. | The performance standard is less than or equal to 2%. | 0.25% of quarterly fees for each 1% above 2%. | N/A |
| Call Abandonment | An abandoned call is defined as a call disconnected by the caller after more than 20 seconds from the time the call is transferred to the Automated Call Distribution (ACD) system. | This measure is calculated as the number of abandoned calls divided by the total number of telephone calls. | The performance standard is less than or equal to 5%. . | N/A | N/A |
| Wait Time | Wait time is defined as the amount of time a participant waits to speak with a Hewitt Benefit Center Representative, after the call is transferred to the ACD system. | Wait time is calculated from the time a caller requests to be transferred to a Hewitt Benefit Center Representative to the time the caller reaches a Representative.<br><br>The measure is communicated in terms of the percentage of calls that reach a live voice within 30 seconds, commonly called service level in the call center industry. | The performance standard is 80% of the calls are answered within 30 seconds. | 0.25% of quarterly fees for each 2% below 80%. | N/A |
| Internet Responsiveness | Internet responsiveness is defined as the time it takes to generate and send a participant requested page over the Hewitt controlled portion of the internet. | The measure is calculated as the number of participant requested pages generated and sent within five seconds divided by the total number of participant requested pages generated and sent. | The performance standard is 90%. | 0.10% of quarterly fees for each 1% below 90%. | |

41

09/2001.2227.Enron-39(7)

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| **Data Delivery** | | | | **Maximum fees at risk for this category: 2%** | |
| Timely Transmission of Third Party Interfaces | Timely processing is defined as Hewitt sending electronic interfaces within the agreed upon timeframe as defined in the Requirements Document. | Timeliness is calculated as the number of feeds that were sent on time divided by the total number of feeds. Interfaces that are sent late for reasons outside of Hewitt's control are excluded from any calculation of fees at risk. | The performance standard is 95%. | 0.1% of quarterly fees for each 1% below 95%. | N/A |
| **Transaction Accuracy** | | | | **Maximum fees at risk for this category: 2%** | |
| Transaction Accuracy | Accurate processing is defined as Hewitt processing transactions correctly the first time. An audit methodology will be used to determine accuracy. | The measure is calculated as the number of transactions processed correctly divided by the total number of transactions audited. Transactions that are processed in error for reasons outside of Hewitt's control are excluded from any calculation of fees at risk. | The performance standard is 98%. | 0.25% of quarterly fees for each 1% below 98%. | N/A |

Hewitt Associates
Confidential

09/2001.2227.Enron-39(7)

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| **Issue Resolution** | | | | Maximum fees at risk for this category: 2% | Maximum incentive payment for this category: 2% |
| First Contact Resolution | A participant's call is considered resolved on the first call when the participant is provided with information from a Benefit Center Representative without the need for follow-up. | The measure is calculated as the Hewitt reported total number of Benefit Center calls less the number of workflows started in the month divided by the total number of Benefit Center calls. | The performance standard is 90%. | 0.25% of quarterly fees for each 1% below 90%. | 0.25% of quarterly fees for each 1% above 94%. |
| Timely Close Out | A participant's issue will be considered a timely close out if the issue, including any follow-up if required, is resolved within five business days. | The measure is calculated as the number of issues with a timely close out divided by the total number of issues tracked through Hewitt's workflow system. Death workflows are excluded from the measure.<br><br>Issues that require follow-up outside Hewitt's control are excluded from any calculation of fees at risk. | The performance standard is 90%. | 0.25% of quarterly fees for each 1% below 90%. | 0.25% of quarterly fees for each 1% above 94%. |
| Final Close Out | A participant's issue will be considered a final close out if the issue, including any follow-up if required, is resolved within 30 days. | The measure is calculated as the number of issues with a final close out divided by the total number of issues tracked through Hewitt's workflow system. Death workflows are excluded from the measure.<br><br>Issues that require follow-up outside Hewitt's control are excluded from any calculation of fees at risk. | The performance standard is 98%. | 0.25% of quarterly fees for each 1% below 98%. | 0.25% of quarterly fees for each 1% above 98%. |

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| Event Turnaround Time | | | | Maximum fees at risk for this category: 1% | Maximum incentive payment for this category: 1% |
| Event Turnaround Time | Event turnaround is defined as the elapsed time needed to complete key events within the Hewitt system. Targets will be set for each event and will depend on process design and delivery frequency. Key events include: <br> • DC Force Out and Loan Defaults <br> • DC Enrollment <br> • DC Investment Election changes <br> • DC Contribution election changes <br> • DC Loans <br> • DC Final Distribution processing | The measure is calculated as the number of participant-initiated transactions processed within established timing (defined in the Requirements Document) divided by the total number of participant-initiated transactions for the measurement period. | The performance standard will vary based on the events identified. | 0.25% of quarterly fees for each 1% below 97%. | 0.25% of quarterly fees for each 1% above x%. |
| Interaction Reliability | | | | Maximum fees at risk for this category: 1% | Maximum incentive payment for this category: 1% |
| Interaction Reliability | Interaction reliability is defined as the accuracy, completeness and quality (customer experience) of a participant interaction with the Benefit Center. | Hewitt will score the customer interaction using a standard and trained customer service coaches. <br><br> The measure is calculated as the points scored as a percentage of total points. | The performance standard is 85%. | 0.25% of quarterly fees for each 1% below 85%. | 0.25% of quarterly fees for each 1% above 90%. |

Hewitt Associates

Confidential

09/2001.2227.Baroe-39(7)

| Category | Description | Measure | Standard | Penalty | Incentive |
|---|---|---|---|---|---|
| Customer Satisfaction | | | | Maximum fees at risk for this category: 3% | Maximum Incentive payment for this category: 3% |
| Participant Satisfaction | Participant satisfaction with the Hewitt Benefit Center is measured through Hewitt's standard satisfaction survey measuring the participant's satisfaction. | Throughout the year, randomly selected participants will be surveyed utilizing Hewitt's standard customer satisfaction survey. Performance is measured through the percentage of participants' agreement that the service is of high quality. | The acceptable performance standard will be set based on the services being delivered. | The penalty for failing to meet the performance standard is 1% annually if the actual result is less than 75% but greater or equal to 65%. The penalty is 3% annually if the actual result is below 65%. | The bonus for exceeding the performance standard is 1% annually if the actual result is greater than 85% and less than 90%. The bonus is 3% annually if the actual result is 90% or greater. |

Hewitt Associates

Confidential

09/2001.2227.Enron-39(7)

# Schedule H

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

## Form of Confidentiality Agreement

## Confidentiality Agreement

This Confidentiality Agreement ("Agreement") is made this ___ day of _________, 200_ ("Effective Date") by and between ______________________________ ("[Name]"), a corporation incorporated under the laws of _______________ with an office at ______________________________, and Hewitt Associates LLC ("Hewitt"), an Illinois limited liability company with an office at 100 Half Day Road, Lincolnshire, IL 60069.

As ___________ provides services **[describe services]** to **[Client's Name]** ("Client") in connection with **[describe project]** ("Project"), ___________ will be exposed to certain confidential and proprietary information of Hewitt as defined below. It is the intention of the parties to work cooperatively in providing their respective services to Client, but Hewitt wishes to protect its Confidential Information. For good and valuable consideration, the receipt and sufficiency of which is acknowledged by each party, this Agreement sets out ___________'s obligations with respect to the Confidential Information.

1. **Confidential Information**
   "Confidential Information" includes the existence and terms of this Agreement and any business or technical information or processes, whether or not stored in any medium, relating to Hewitt's business (and/or those of its suppliers and customers), including, but not limited to: equipment; software; designs; technology; technical documentation; product or service specifications or strategies; marketing plans; pricing information; financial information; information relating to existing, previous, and potential suppliers, customers, and contracts; inventions; trade secrets; trademarks; intellectual property; applications; methodologies; and other know-how which is identified as confidential at the time of disclosure or that a reasonable person would consider, from the nature of the information and circumstances of disclosure, is confidential to Hewitt. Confidential Information includes original information supplied by Hewitt, as well as all paper and electronic copies.

2. **Limited Access and Use**
   (a) ___________ agrees to treat the Confidential Information as confidential to and as the property of Hewitt and agrees to use an appropriate degree of care (which, in any case, will not be less than a reasonable degree of care) to prevent disclosure of the Confidential Information.

   (b) Confidential Information will be kept separate and will not be included within the general files of ___________.

(c) Confidential Information will not be used by _____ in furthering or developing its own services or systems, except for providing services in connection with and for the sole purpose of completing the Project. If _____ acquires access to Hewitt's pricing for particular services to be provided to Client, _____ will not bid on providing such services to Client for a period of at least two (2) years after the Term (as defined herein). _____ will not disclose the Confidential Information to any third party or individual without the prior written consent of Hewitt, except _____ may disclose the Confidential Information to its employees who have a need to know such Confidential Information for the purpose of carrying out this Agreement and who have been advised of the obligations of confidentiality and are obligated to keep the Confidential Information confidential and to Client's employees who have a need to know such Confidential Information for purposes of the Project.

(d) _____ will not copy or reproduce the Confidential Information except as reasonably required for the purposes contemplated in this Agreement and will ensure that any confidentiality or other proprietary rights notices on the Confidential Information are reproduced on all copies.

(e) Information, observations, or conclusions about the Client/Hewitt relationship and terms of agreement will not be published or otherwise disclosed in any public forum by _____.

(f) Confidential Information will be returned to Hewitt by _____ or destroyed by _____ upon the request of Hewitt at any time. An authorized representative of _____, if requested by Hewitt, shall certify in writing on behalf of _____ that all such Confidential Information has been returned or destroyed, as applicable. _____ may retain one (1) copy of the Confidential Information for archival purposes or to defend its work product, provided however, such Confidential Information remains subject to the terms and conditions of this Agreement.

3. **No License**

_____ acknowledges and agrees that all rights to the Confidential Information, except for the specific rights to use the Confidential Information described herein, are reserved by Hewitt. No license, express or implied, under any trade secret right, trademark, patent, copyright, or other proprietary right or applications which are now or may hereafter be owned by Hewitt, is granted by the disclosure of Confidential Information under this Agreement. Nothing in this Agreement is to be construed as granting _____ any title, ownership, license, or other right or interest with respect to the Confidential Information.

4. **Loss of Status**

This Agreement does not apply to or restrict _____ from using or disclosing Confidential Information:

(a) which is or becomes public other than through a breach of this Agreement;
(b) already known to _____ prior to the date of this Agreement and with respect to which _____ does not have an obligation of confidentiality;
(c) which is independently developed by _____;

(d) which is disclosed to _____ by a person or entity not party to this Agreement and who is entitled to disclose such information without breaching an obligation of confidentiality; or

(e) required to be disclosed by law, whether under an order of a court, government tribunal, or other legal process. If _____ is required to disclose Confidential Information as part of a judicial process, government investigation, legal proceeding, or other similar process, _____ will give prior written notice of such requirement to Hewitt. Reasonable efforts will be made to provide this notice in sufficient time to allow Hewitt to seek an appropriate confidentiality agreement, protective order, or modification of any disclosure, and _____ will reasonably cooperate in such efforts.

5.  **Term**
    This Agreement shall remain effective for a period (the "Term") beginning on the Effective Date and ending the later of one year from the Effective Date or the date on which the Project is completed or terminated. Subject to Section 4, all Confidential Information disclosed during the Term shall continue to be governed by the terms and conditions of this Agreement after expiration of the Term or other termination of this Agreement.

6.  **Future Relationship**
    Nothing in this Agreement shall be construed as obligating any party to: (a) continue any discussions, (b) enter into a business relationship, or (c) provide any services.

7.  **Injunctive Relief**
    _____ acknowledges that the unauthorized use or disclosure of the Confidential Information could cause irreparable harm to Hewitt. Accordingly, _____ agrees that Hewitt has the right to obtain an immediate injunction, without bond or other security, against any breach or threatened breach of this Agreement as well as the right to pursue any and all other rights and remedies available at law or in equity for such breach or threatened breach. In addition, _____ agrees that should _____ be found by a court of law to be in breach of this Agreement, then _____ shall reimburse Hewitt for any legal or other expenses reasonably incurred by Hewitt in connection with the enforcement of Hewitt's rights under this Agreement.

8.  **Notice**
    Notices delivered in connection with this Agreement must be in writing and delivered to the address set out in the first paragraph of this Agreement to the attention of the individual representing each party under this Agreement or as changed by the parties by written notice delivered to each other from time to time in accordance with this Agreement.

9.  **Severability**
    In the event that any provision of this Agreement shall be determined illegal or otherwise unenforceable, such provision shall be severed and the balance of this Agreement shall continue in full force and effect.

10. **Waiver**
    The failure of either party to enforce any rights granted under this Agreement or to take action against the other party in the event of a breach shall not be deemed a waiver by that party as to subsequent enforcement of rights or subsequent actions in the event of future breaches.

---

## 11. Entire Agreement and Amendments

This Agreement binds the parties and their respective successors and permitted assigns (provided that neither party may assign this Agreement without the prior written consent of the other party, such consent not to be unreasonably withheld, except Hewitt may assign this Agreement without _____'s consent in the event an assignment is necessitated by an internal business reorganization) and constitutes the entire understanding between the parties with respect to its subject matter, superseding any prior oral or written agreement or understanding relating hereto, and cannot be amended, changed, or terminated except by a written instrument executed by a duly authorized representative of each party.

## 12. Applicable Law and Jurisdiction

This Agreement is governed by the laws of the State of Illinois and applicable laws of the United States of America and the parties agree to the non-exclusive jurisdiction of the courts of the State of Illinois in relation to this Agreement.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date written above.

**Hewitt Associates LLC**                                    **[Name]**


By:_____          By: _____

Name: _C. Lawrence Connolly, III_____          Name:_____

Title:  _Principal_____          Title:_____

## Schedule I

**Administrative Services Agreement Between**

**Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt")**

### Privacy Policy

The attached Privacy Policy, as described in Section 1.31, is subject to change from time to time, as Hewitt's sole discretion.

As the provider of administrative services for your program(s), Hewitt has received information such as your name, age, address, telephone number, Social Security Number, and email address from the program sponsor. Hewitt may share updates to this information with the program sponsor and/or _____. Additionally, various activities on our Site request users to give us contact and profile information. You have the opportunity to provide us with information regarding your interest in certain programs in connection with your use of tools on our Site. We may track this information provided to us in the selection tools. We will not, however, share any personally identifiable information you provide to us with any third parties unless you authorize it at the time you enter the information.

### How Secure Is My Information?

This Site takes precautions to maintain the privacy and security of your information. For example, you're required to enter a valid user ID and password (PIN) before any personal or financial information can be displayed. This Site also encrypts all of the information exchanged between its server and your browser. Also, if there's no activity on a page for an extended period of time, the Site automatically logs you off. When that happens, you need to log in again with your user ID and password (PIN).

### Why Are Cookies Important?

This Site uses a common technique called "HTTP-header cookies" to identify one page request from another. The cookies this Site creates do not contain any personal information. They inform the Site if a page request comes from someone who has already logged on. Your browser may be set up to warn you whenever a site sends your browser a cookie. If an edit message pops up asking you to accept or reject the use of cookies, you should accept it. This Site will **not** work without them.

### What Is Encryption?

Encryption is a mathematical process that transforms a message to conceal its meaning. Encryption is used to protect messages from eavesdropping, tampering, or forgery over the Internet.

### How Is Encryption Used By This Site?

This Site is designed to encrypt the transmission of all personal or financial information transmitted between our server and your browser. The security standard Secure Sockets Layer (SSL) is used to implement this policy. SSL is the leading standard for securing World Wide Web transmissions. It's also supported by the leading browser.

**Confidential**




### How Can I Tell That SSL Is in Effect?

If the URL of a secure document begins with "HTTPS://," the additional "S" on the end of the familiar HTTP indicates a secure channel to the server. Also, in Netscape Navigator 4.02 and Microsoft Internet Explorer 4, the security icon is a padlock.

**Note:** The padlock will be closed once a secure channel is established.

### How Secure Is SSL?

SSL uses public-key encryption. This technology can use keys of various sizes. The larger the key length and the greater the number of possible keys, the more difficult the decryption challenge and the more secure the message. Browsers generally have one of 2 key sizes--40 bit or 128 bit. Messages encrypted with a 128-bit key are $3 \times 10^{26}$ (3 followed by 26 zeros) times harder to break.

This Site provides the maximum level of encryption supported by your browser. When you use the Site at work, only the browsers provided or authorized by _____ should be used. When you use the Site at home, you can maximize the security of your Web activities by obtaining a browser with 128-bit encryption. These browsers are available for downloading at home from either Netscape or Microsoft at no cost other than telephone time. US law limits the availability of these browsers to US and Canadian citizens or permanent residents only. This secure Site only accepts browsers using 128-bit encryption. When you use this Site at work, only the browsers provided or authorized by _____ should be used. When you use this Site at home, you can download browsers with 128-bit encryption from either Netscape or Microsoft at no cost other than telephone time. US law limits the availability of these browsers to US and Canadian citizens or permanent residents only.

### Why Do I Need to Use a Particular Browser?

To maximize the privacy of your information and provide a consistent visual presentation, a relatively current and capable browser is required. For example, the browser must support JavaScript, Cookies, and Secure Sockets Layer (SSL), an encryption standard for browsers. For enhanced security, we recommend using a browser version that uses 128-bit SSL encryption.

The browser requirement for this Site is Netscape Navigator 4.02, Netscape Navigator/Communicator 4.02 and above, or Microsoft Internet Explorer 4.0 and above. Other browsers may work if they have the required browser features. However, this Site has not been tested or certified for other browsers.

**Note:** If you're an AOL user, you must use one of the minimum required browsers mentioned above.

# EXHIBIT 4

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

This Amendment ("Amendment"), effective as of January 1, 2005, is made and entered into by and between Enron Corp. ("Client") and Hewitt Associates LLC (together with its subsidiaries and affiliates, "Hewitt").

### Recitals

**Whereas,** Client and Hewitt have previously entered into an Administrative Services Agreement effective as of June 1, 2001 (as amended, the "ASA") pursuant to which Hewitt provided certain benefits administration services to Client as described therein (the "Administrative Services");

**Whereas,** effective as of December 31, 2004, Client terminated the Administrative Services; and

**Whereas,** Client has requested and Hewitt has agreed to continue to provide ongoing maintenance and assistance to Client with respect to the Client data maintained by Hewitt on its internal systems as further described herein, upon the terms and conditions contained herein.

### Agreement

**Now, therefore,** in consideration of the foregoing and the mutual promises and covenants contained herein, and other valuable consideration, the receipt, sufficiency and adequacy of which is hereby acknowledged, Client and Hewitt hereby agree to amend the ASA as follows:

1.     Section 1.35 is deleted in its entirety and replaced with the following:

   "Services" means the services to be performed by or on behalf of Hewitt from time to time upon Client's request, primarily consisting of providing information to Client related to Participant data which Hewitt has maintained on its proprietary systems, to the extent Hewitt maintains such information."

2.     Section 2.1 of the ASA is deleted in its entirety and replaced with the following:

   "The Services shall be limited as follows:

   (a)     Upon receiving an information request from Client, Hewitt will perform the Services on a timely basis; however, depending on the circumstances, Hewitt may take up to thirty calendar days to respond to any inquiry, unless otherwise agreed upon between the parties.

   (b)     Hewitt shall respond to requests from Client's Authorized Representatives, or such other persons as the parties may agree upon from time to time, provided however, that the parties agree that Hewitt is not obligated to respond to inquiries from Participants, and the parties intend that Hewitt shall not respond to such inquiries.

   (c)     Hewitt will not maintain a call center, interactive voice response system or web site with respect to the Services, and shall not provide for any other access, except as provided for herein.

   (d)     Hewitt may, in its sole discretion, change the telephone number for inquiries and the Hewitt contact person or persons.

(e)     Hewitt's response shall be in its customary format, unless agreed otherwise agreed upon.

(f)     Hewitt will permit access by Client to Hewitt's system through an interface commonly referred to as GUI, provided that such access may result in monthly access fees as agreed by the parties.

3.     Sections 2.4(b) and (c) of the ASA are deleted in their entirety and replaced with "Intentionally Omitted."

4.     Section 4.1 of the ASA is deleted in its entirety and replaced with the following:

"**General.** Client shall pay Hewitt a base fee of $10,000 per month during the term of this Agreement. Base fees will be paid by wire transfer or Automated Clearing House (ACH) payment on a monthly basis on or prior to the first day of each month. Additional Services that exceed the reasonable ongoing support contemplated by the parties shall be billed on a time and materials basis based on Hewitt's then current billing rates. Fees for additional services shall be invoiced to Client on the last day of the month. Adjustments, reconciliations, or credits to the standard fees paid by Client will be included on the invoice. Fees for additional services are due and payable within thirty (30) days of the invoice date. Client will promptly notify Hewitt of any questions regarding invoices so that Hewitt can expect timely payment. Interest at nine percent (9%) per year will accrue after the due date until payment is received."

5.     Section 6.3 of the ASA is deleted in its entirety and replaced with "Intentionally Omitted."

6.     Section 9.1 of the ASA is deleted in its entirety and replaced with the following:

"The initial term of this Agreement commences on the effective date first stated above and will end on September 30, 2006, unless terminated earlier as provided in this Section 9. Either party may terminate this Agreement (or all or any portion of the Services) at any time, without cause and for its convenience, by giving the other party at least one hundred eighty (180) days' prior written notice of such termination. Upon the occurrence of a Default, the non-defaulting party shall have the right to terminate this Agreement on thirty (30) days notice, unless the event giving rise to the default has been cured to the satisfaction of the non-defaulting party.

7.     Terminated Services. Each party agrees that the other party's obligations with respect to the Administrative Services described in the ASA have been fullfilled, except for those that survive termination as described therein.

8.     Schedules A and G to the ASA are deleted in their entirety and replaced with "Intentionally Omitted."

9.     The provisions of the ASA not amended, revised or supplemented by this amendment will remain in full force and effect. This Amendment constitutes the entire agreement of the parties and supersedes all previous oral or written negotiations and agreements relating to the subject matter. There have been no representations or statements, oral or written, that have been relied on by any party hereto except those expressly set forth herein.

[Signature Page to Follow]

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment to Administrative Services Agreement effective as of the date first written above.

**Enron Corp.**                                              **Hewitt Associates LLC**

By: _____              By: _____
            [Name and Title]                                      C. Lawrence Connolly, III, Secretary

            Robert W Jones
            MD, HR

# EXHIBIT 5

# Hewitt

*2227*
*amd*

Hewitt Associates LLC
100 Half Day Road
Lincolnshire, IL 60069
Tel (847) 295-5000
Fax (847) 295-7634
www.hewitt.com

Argentina
Australia
Austria
Belgium
Brazil
Canada
Channel Islands
Chile
China
Czech Republic
France
Germany
Greece
Hong Kong
Hungary
India
Ireland
Italy
Japan
Malaysia
Mauritius
Mexico
Netherlands
Philippines
Poland
Puerto Rico
Singapore
South Africa
South Korea
Spain
Sweden
Switzerland
Thailand
United Kingdom
United States
Venezuela

July 25, 2006

Enron Corp.
1400 Smith Street
Houston, Texas 77002
Attention: Mr. Robert W. Jones

Dear Mr. Jones:

The purpose of this letter is to amend the Administrative Services Agreement between Enron Corp. ("Client") and Hewitt Associates LLC ("Hewitt") dated June 1, 2001 and the amendment between Client and Hewitt dated January 1, 2005 (collectively, "Agreement") to extend the term of the Agreement. Rather than asking you to sign a new agreement, we will incorporate the changes into the Agreement though this letter amendment. Capitalized but undefined terms will have the meanings ascribed to them in the Agreement.

1. The effective date of this amendment is July 1, 2006.

2. Section 9.1 of the ASA is deleted in its entirety and replaced with the following:

> "The initial term of this Agreement commences on the effective date first stated above and will end on September 30, 2007, unless terminated earlier as provided in this Section 9. Upon the expiration of the initial or any renewal term, this Agreement shall automatically renew for successive one-year terms unless either party provides the other party with a written termination notice ("Termination Notice") at least one hundred eighty (180) days prior to the end of the initial term or any renewal term. Upon the occurrence of a Default, the non-defaulting party shall have the right to terminate this Agreement on thirty (30) days notice, unless the event giving rise to the default has been cured to the satisfaction of the non-defaulting party."

3. The provisions of the Agreement not amended, revised or supplemented by this amendment will remain in full force and effect. The Agreement as supplemented by this letter amendment constitutes the entire agreement of the parties and supersedes all previous oral or written negotiations and agreements relating to the subject matter. There have been no representations or statements, oral or written, that have been relied on by any party hereto except those expressly set forth herein.

If the terms of this letter amendment are acceptable, please have an authorized representative sign the two (2) enclosed amendments and return one and retain the other for your files. Thank you for your cooperation.

HOU01:983998.2

# Hewitt

Enron Corp.
Page 2
July 25, 2006

**IN WITNESS WHEREOF**, the parties hereto have duly executed this letter amendment effective as of the date first written above.

Hewitt Associates LLC

By: _C.L. Connolly III_

Name: C. Lawrence Connolly, III

Title: _SECRETARY_

Enron Corp.

By: _[signature]_

Name: _Robert W Jones_

Title: _MD & Chief Admin Officer_

**EXHIBIT 6**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HEWITT ASSOCIATES, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 cv 3634 |
| | ) | |
| v. | ) | Judge Samuel Der-Yeghiayan |
| | ) | |
| ENRON CREDITORS RECOVERY CORP., f/k/a | ) | Magistrate Judge Cole |
| ENRON CORP., an OREGON Corporation | ) | |
| | ) | |
| Defendant, | ) | |

## DECLARATION OF ROBERT A. DUNLAP

I, Robert A. Dunlap, hereby declare under the pains and penalties of perjury, and of my own personal knowledge, as follows:

1.     I am a Principal and Account Executive at Hewitt Associates L.L.C. (Hewitt).  I have been employed by Hewitt since 1986.

2.     I am authorized to make this Declaration in support of Hewitt's opposition to Enron Creditors Recovery Corporation's (Enron) Motion to Transfer Pursuant to 28 U.S.C. § 1404(a).

3.     Hewitt is a member-owned limited liability company.  Its sole member, Hewitt Associates, Inc., is incorporated under the laws of Delaware.  Both entities are headquartered in Lincolnshire, Illinois.

4.     In 2001, Enron Corp. retained Hewitt to serve as the record keeper of certain employee benefits plans (Plans).  The relationship between Enron and Hewitt was governed by an Administrative Services Agreement (ASA) that became effective on June 1, 2001 (Exhibit 3).  These services were described and defined in a Service Delivery Model attached as Schedule A

to the ASA, and a separate Requirements Document describing the extensive record-keeping services to be provided.

5.      The highly-publicized financial collapse of Enron led to a number of class action suits by participants in the Enron Plans. Those actions were consolidated in United States District Court for the Southern District of Texas and are collectively referred to as the *Tittle* Action. Hewitt is not a party to any of those actions, nor did it have any role in negotiating the Plans of Allocation that the parties to the *Tittle* Action devised to distribute settlement funds.

6.      On January 1, 2005, Enron and Hewitt amended the ASA in view of the fact that many Enron plans had been subsumed by other company plans and full-scale recordkeeping services provided by Hewitt were no longer required. Hewitt and Enron executed an Amendment (Exhibit 4) effective January 1, 2005. I was involved in negotiating the Amendment, but the basic terms of the ASA and the basic terms of the January 1, 2005 Amendment were prepared by Hewitt personnel located in Illinois. The Enron employee principally responsible for negotiating the Amendment was Christian Rahaim, Enron's Director of Benefits. In 2006, Mr. Rahaim pled guilty to wire fraud in connection with post-bankruptcy filing theft from Enron, and is serving a 63 month sentence in Arkansas.

7.      The Amendment to the ASA provided that Hewitt would be available to perform certain services requested by Enron, mainly providing routine information relating to Participant data maintained on Hewitt's proprietary systems, in exchange for a set monthly fee. It also provided for Enron to request additional services to be separately billed by Hewitt on a time and expenses basis each month.

8.      In late 2005 Enron requested Hewitt's assistance with the allocation of settlement funds from the *Tittle* Action. This involved the collection and merging of data from numerous recordkeeping databases. Hewitt assisted with that work, billed Enron on a time and materials

basis, and was paid. Hewitt's work and budget were described in detail in a settlement allocation Requirements Document finalized in late July of 2006 and approved by Enron in a letter of authorization dated July 28, 2006. As the Amendment was set to expire before the estimated completion date of Hewitt's assistance with the *Tittle* allocation, Hewitt and Enron executed a second amendment to the ASA, effective July 1, 2006, extending its term. See Exhibit 5.

9.     Like the first ASA Amendment, the second ASA Amendment stated that "[t]he provisions of the Agreement not amended, revised or supplemented by this amendment will remain in full force and effect." The second ASA Amendment did not amend, revise, or supplement any provision of the original ASA that relates to the indemnity and liability provisions.

10.     I have read Robert Jones' Declaration in this case. His assertion that Hewitt prepared the July 28, 2006 authorization letter "in its entirety" is misleading, and his assertion that Hewitt included the typed notation in the sign-off block as "Administrative Committee," is false.

11.     Rather, on July 26, 2006, Darrel Folkert of Hewitt, who was in charge of Hewitt's work with respect to the Enron allocation project, forwarded to Mr. Jones by e-mail a draft authorization letter written by me. (Exhibit A hereto). The letter was directed to Enron and sought Enron's authorization, and the signature block was entitled "Enron Corp. Authorization." The following day, attorney Neslage returned the letter, wrote in the name "Robert W. Jones" next to the word "Name" in the signature block, and attorney Neslage proposed additional handwritten changes to the body of the authorization letter (Exhibit B hereto). On July 28, I e-mailed to Mr. Jones a revised authorization letter which incorporated Mr. Neslage's proposed changes, so that Mr. Jones could again attach his signature. (Exhibit C hereto). Subsequently, we received a fax from Enron with the final signed letter of authorization, still signed as "Enron

Corp. Authorization," but with Mr. Jones' name and "Administrative Committee" typed on the signature block. (Exhibit D hereto). These were new markings made after the revised document was e-mailed to Enron for signature.

      12.     Hewitt proceeded to calculate the settlement allocation as authorized and directed by Enron. After the first distribution of Plan funds from the *Tittle* Settlement, an error was discovered and investigated. It became apparent that opening account balance information retrieved from the recordkeeping system of a Northern Trust affiliate, NTRC, which served Enron as the Plan's recordkeeper during the 1990s, a necessary element for calculating the settlement allocation, was incorrect, causing the calculation to be incorrect.

      13.     Andrew Ross, a Hewitt employee who works in Hewitt's Atlanta, Georgia office, was the person who retrieved the erroneous information from the Northern Trust database. That database was no longer in active use and the information therein is accessible only on a mainframe screen in Atlanta. Hewitt obtained access to the database by virtue of an unrelated transaction in which it acquired certain businesses of NTRC.

14.    All of Hewitt's work on the allocation was performed at Enron's behest as additional services under the amended ASA. When the allocation error first became known, there was significant correspondence between Enron and Hewitt in which Enron invoked the ASA (and appropriately so), and Hewitt performed corrective work as it was obligated to do under Section 2.5 of the ASA. The correspondence, which is attached as Exhibits 7-10 to Hewitt's Opposition Memorandum, makes clear all parties' understanding and acknowledgement that Hewitt's services were provided pursuant and subject to the ASA.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 20, 2008.

Robert A. Dunlap

BST99 1582046-1.058123.0020





**Darrel Folkert**
HRO Benefits Operations
The Woodlands/Bldg 3-6N
Ext  36361

07/26/2006 07:18 PM

To:      robert.w.jones@Enron.com
cc:      Dinah.Sultanik@enron.com
        Bob Dunlap
        (bcc: Client Records Distribution Mailbox)
Subject: Enron Authorization Letter and Documents (tracked and final)
Client: Enron Corp  (02227) Line of Business:  HRO Benefits
Confidential: No                    Record Type:
Correspondences

Robert,

Attached below are two copies of the Settlement Plan Provisions and Requirements (dated 7-26-06) and an Authorization Letter for us to proceed with the Settlement allocation project work. The Plan Provisions and Requirements documents contain what we believe to be the final operating requirements for the first Settlement Allocation project.

The first document below contains changes (tracked) from the draft version that was sent on July 21, 2006.  The second document has all of the changes incorporated as well, but all have been accepted - it is a cleaner copy.  Please review the document you feel is easiest to work with and let me know if you have any questions

                              

Enron Settlement Plan ProvisionsTrckedChgs7-26-06 doc   Enron Settlement Plan ProvisionsFinal7-26-06 doc

The Authorization Letter attached below will need to be signed and faxed to my attention after your review of the Plan Provisions and Requirements dated   July 26, 2006.  We can proceed with the first Settlement allocation (based on those final provisions and requirements) after that has been completed.  I will also be sending the two documents above to the group that originally received the July 21,2006 draft copy.



Allocation Settlement ltr 072606 doc

As mentioned, if you have any questions, please let me know.


-Darrel


Darrel Folkert
Hewitt Associates
Phone: (281)/882-6763
Fax: (281)/363-9049
darrel.folkert@hewitt.com
http://www.hewitt.com

"Hewitt Associates (http://www.hewitt.com) is a global human resources outsourcing and consulting firm It provides services from offices in 38 countries."

# Hewitt

Hewitt Associates LLC
1901 Research Forest Drive
The Woodlands TX 77381
Tel (281) 363-0156
Fax (281) 363-9049
www.hewitt.com

Argentina
Australia
Austria
Belgium
Brazil
Canada
Channel Islands
Italy
Ivory
Czech Republic
France
Germany
Greece
Hong Kong
Hungary
India
Ireland
Italy
Japan
Malaysia
Mauritius
Mexico
Netherlands
Philippines
Poland
Costa Rica
Singapore
South Africa
South Korea
Spain
Sweden
Switzerland
Thailand
United Kingdom
United States
Venezuela

July 26, 2006

Private and Confidential

Mr. Robert W. Jones
Enron Corp.
Post Office Box 1188
Houston, TX 77251-1188

Dear Robert:

At Enron's direction, Hewitt has been preparing since December 2005 to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other plans based on the terms of the Supplemental Amended Plan of Allocation for action No. H01-CV-3913 approved by plaintiff's counsel in the United States District Court for the Southern District of Texas, Houston Division, and subsequently approved by U.S. bankruptcy court.

Enron's authorization is needed in order for Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds based on the document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp.", dated July 26, 2006. Please execute in the space provided below and send a facsimile copy to the attention of Darrel Folkert at 281-363-9049. The original copy can follow via regular mail.

Sincerely,

Hewitt Associates LLC


Robert A Dunlap

RAD:cgb
cc: Mr. Darrel Folkert, Hewitt Associates


Enron Corp. Authorization

By: _____

Name: _____

Title: _____

# B



john.neslage@bakerbotts.com
07/27/2006 08:30 AM

To:        Darrel Folkert/The Woodlands/Hewitt
Associates@Hewitt Associates NA
cc:        robert.w.jones@enron.com
wade.cline@enron.com
sharon.butcher@enron.com
Subject:  JEN comments to Authorization letter
Client:  Enron Corp. (02227)Line of Business:  HRO Benefits
Confidential: No                              Record Type:
Correspondences

Darrel:

Please incorporate these changes and resend to Robert.

Thanks,
John

John E. Neslage
BAKER BOTTS L.L.P.
910 Louisiana
Houston, Texas 77002
voice: 713.229.1342
direct fax: 713.229.7742
email: john.neslage@bakerbotts.com

This message and any attachments contain privileged and confidential
information, intended solely for the use of the addressee(s) named
above. If you received this message in error, please advise the sender
by immediate reply and delete the original message. Thank you.
 <<JEN comments to Authorization letter.pdf>>


IRS Circular 230 Disclaimer:  Under applicable Treasury regulations, this
advice is not intended or written to be used, and cannot be used, for the
purpose of avoiding any penalties.  If you would like an opinion upon which
you can rely to avoid penalties, please contact the sender to discuss.



JEN comments to Authorization letter.pdf

# Hewitt

itt Associates LLC
1 Research Forest Drive
Woodlands, TX 77381
(281) 363-0456
(281) 363-9049
.v hewitt com

ntina
tralia
tria
zium
zil
ada
nnel Islands
e
na
ch Republic
rce
many
ece
g Kong
gary
a
ind

n
ysia
ritius
ico
erlands
ppines
nd
to Rico
apore
h Africa
h Korea
in
den
zerland
land
ed Kingdom
ed States
zuela

July 26, 2006

Private and Confidential

Mr. Robert W. Jones
Enron Corp.
Post Office Box 1188
Houston, TX 77251-1188

Dear Robert:        *related*

*Second*        *adopted and approved by counsel for plaintiffs pursuant to the partial settlement approved by the Court in Tittle et al. V. Enron, et al. CASE NO. H-01-CV-3913*

At Enron's direction, Hewitt has been preparing since December 2005 to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other plans based on the terms of the Supplemental Amended Plan of Allocation ~~for action No. H-01-CV-3913 approved by plaintiff's counsel in the United States District Court for the Southern District of Texas, Houston Division, and subsequently approved by U.S. bankruptcy court.~~

*in accordance with*

Enron's authorization is needed in order for Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds ~~based on~~ the document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp.", dated July 26, 2006. Please execute in the space provided below and send a facsimile copy to the attention of Darrel Folkert at 281-363-9049. The original copy can follow via regular mail.

*and the terms of said Second Supplemental Amended Plan of Allocation.*

Sincerely,

Hewitt Associates LLC

Robert A Dunlap

RAD:cgb
cc: Mr. Darrel Folkert, Hewitt Associates

Enron Corp. Authorization

By: _____

Name: *Robert W. Jones*

Title: _____



| | | |
|---|---|---|
| Bob Dunlap/The Woodlands/Hewitt Associates HRO Ben Sales & Accounts The Woodlands/Bldg 6-1E Ext. 61330 07/28/2006 03:55 PM | To<br>cc<br><br>bcc<br><br>Subject | robert w jones@enron com<br>dinah sultanik@enron com, Darrel Folkert/The Woodlands/Hewitt Associates@Hewitt Associates NA<br>Chalanda Butler/The Woodlands/Hewitt Associates@Hewitt Associates NA<br>Settlement Process Authorization Letter, Revised Version |

Robert:

Here is a revised version incorporating changes from John for your review and signature. Darrel will be forwarding the revised requirements document shortly. I think we're just about ready for takeoff.



Allocation Settlement ltr 072806.doc

Bob Dunlap
Account Executive
Hewitt Associates
Bob.Dunlap@Hewitt.com
Direct:   (281) 882-6902
Main:    (281) 363-0456
Fax:      (281) 363-9049

Hewitt Associates (www.hewitt.com) is a global human resources outsourcing and consulting firm. It provides services from offices in 38 countries

# Hewitt

Hewitt Associates LLC
601 Research Forest Drive
The Woodlands, TX 77381
Tel (281) 363-0156
Fax (281) 363-9049
www.hewitt.com

Argentina
Australia
Austria
Belgium
Brazil
Canada
Channel Islands
UK
China
Czech Republic
France
Germany
Hong Kong
Hungary
India
Ireland
Italy
Japan
Malaysia
Mauritius
Mexico
Netherlands
Philippines
Poland
Puerto Rico
Singapore
South Africa
South Korea
Spain
Sweden
Switzerland
Thailand
United Kingdom
United States
Venezuela

July 28, 2006

Private and Confidential

Mr. Robert W. Jones
Enron Corp.
Post Office Box 1188
Houston, TX 77251-1188

Dear Robert:

At Enron's direction, Hewitt has been preparing since December 2005 to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other related plans based on the terms of the Second Supplemental Amended Plan of Allocation adopted and approved by counsel for plaintiffs pursuant to the partial settlement approved by the court in Tittle, et al., v. Enron, et al., Case No. H-01-CV-3913.

Enron's authorization is needed in order for Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds in accordance with the document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp.", dated July 31, 2006 and the terms of said Second Supplemental Amended Plan of Allocation. Please execute in the space provided below and send a facsimile copy to the attention of Darrel Folkert at 281-363-9049. The original copy can follow via regular mail.

Sincerely,

Hewitt Associates LLC


Robert A Dunlap

RAD:cgb
cc: Mr. Darrel Folkert, Hewitt Associates


Enron Corp. Authorization

By: _____

Name: _____

Title: _____



**Bob Dunlap**
HRO Ben Sales & Accounts
The Woodlands/Bldg 6-1E
Ext 61330

07/31/2006 11:11 AM

To:    Darrel Folkert/The Woodlands/Hewitt
Associates@Hewitt Associates NA
cc:    (bcc: Client Records Distribution Mailbox)
Subject: A fax has arrived that says to Hit the Button
Client: Enron Corp (02227)Line of Business: HRO Sales
and Accounts
Confidential: No                                    Record Type:
Correspondences

Bob Dunlap
Account Executive
Hewitt Associates
Bob.Dunlap@Hewitt.com
Direct:  (281) 882-6902
Main:   (281) 363-0456
Fax:    (281) 363-9049

Hewitt Associates (www.hewitt.com) is a global human resources outsourcing and consulting firm  It
provides services from offices in 38 countries
----- Forwarded by Bob Dunlap/The Woodlands/Hewitt Associates on 07/31/2006 11:10 AM -----

    **WDL Fax Mailbox**

Sent by: Leilani Anderson

07/31/2006 11:05 AM

To  Bob Dunlap/The Woodlands/Hewitt Associates@Hewitt
Associates NA
cc

Subject  Re: A fax has arrived from remote ID '7136468540'

&lt;rightfax@hewitt.com&gt;



&lt;rightfax@hewitt.com&gt;
07/31/2006 10:36 AM

To:    WDLFAX@HEWITT COM
cc:
Subject: A fax has arrived from remote ID '7136468540'

```
A fax has arrived from remote ID '7136468540'.
-------------------------------------------------------------
Time: 7/31/2006 10:35:27 AM
Received from remote ID: 7136468540
Inbound user ID 39128, routing code 39128
Result: (0/352;0/0) Successful Send
Page record: 1 - 1
Elapsed time: 00:36 on channel 6
```

B0001BF6.TIF

# Hewitt

Hewitt Associates LLC
2601 Research Forest Drive
The Woodlands, TX 77381
Tel (281) 363-0456
Fax (281) 363-9049
www.hewitt.com

Argentina
Australia
Austria
Belgium
Brazil
Canada
Channel Islands
Chile
China
Czech Republic
France
Germany
Greece
Hong Kong
Hungary
India
Ireland
Italy
Japan
Malaysia
Mauritius
Mexico
Netherlands
Philippine
Poland
Puerto Rico
Singapore
South Africa
South Korea
Spain
Sweden
Switzerland
Thailand
United Kingdom
United States
Venezuela

July 28, 2006

Private and Confidential

Mr. Robert W. Jones
Enron Corp.
Post Office Box 1188
Houston, TX 77251-1188

Dear Robert:

At Enron's direction, Hewitt has been preparing since December 2005 to assist in the allocation of settlement proceeds to former participants in the Enron Savings Plan and certain other related plans based on the terms of the Second Supplemental Amended Plan of Allocation adopted and approved by counsel for plaintiffs pursuant to the partial settlement approved by the court in Tittle, et al., v. Enron, et al., Case No H-01-CV-3913.

Enron's authorization is needed in order for Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds in accordance with the document entitled "Settlement Allocation(s) Plan Provision and Requirements, Enron Corp.", dated July 31, 2006 and the terms of said Second Supplemental Amended Plan of Allocation. Please execute in the space provided below and send a facsimile copy to the attention of Darrel Folkert at 281-363-9049. The original copy can follow via regular mail.

Sincerely,

Hewitt Associates LLC



Robert A Dunlap

RAD:cgb
cc: Mr. Darrel Folkert, Hewitt Associates


Enron Corp. Authorization

By: _____

Name: _____Robert W. Jones_____

Title: _____Administrative Committee_____

**EXHIBIT 7**

**BAKER BOTTS** LLP

| | |
|---|---|
| ONE SHELL PLAZA | AUSTIN |
| 910 LOUISIANA | DALLAS |
| HOUSTON, TEXAS | DUBAI |
| 77002-4995 | HONG KONG |
| | **HOUSTON** |
| TEL +1 713.229.1234 | LONDON |
| FAX +1 713.229.1522 | MOSCOW |
| www.bakerbotts.com | NEW YORK |
| | RIYADH |
| | WASHINGTON |

February 21, 2007

076489.0106

John E. Neslage
TEL  +1 713.229.1342
FAX +1 713.229.7742
John.neslage@bakerbotts.com

*By Email and Certified Mail*

Mr. Rohail Ahmed Khan
North America Benefits Leader
Hewitt Associates LLC
100 Half Day Road
Lincolnshire, Illinois  60069

Re:    Disbursement of Funds to Enron Corp. Savings Plan Participants and
       Beneficiaries

Dear Mr. Khan:

As you know this firm represents the Administrative Committee of the Enron Savings Plan  ("the Plan").  I am writing to follow up on your letter directed to John Ray, President and Chairman of Enron Corp., dated February 16, 2007.  In that letter you set forth a response to Mr. Ray's contact with Hewitt CEO Russ Fradin.  Based on that letter, I understand that you have reviewed the Department of Labor's February 12, 2007 letter to me.  In addition, you have reviewed the letter from the independent fiduciary to the Plan, Consulting Fiduciaries, Inc. ("CFI"), to me, dated February 15, 2007.

I was reassured to read of Hewitt Associates' commitment to fulfill its obligations under its agreement with Enron Corp. and in the best interest of the Plan's participants and beneficiaries.  I am also pleased Hewitt has acknowledged its duty to ensure  that all of the Plan's participants receive their prescribed allocation of the settlement funds as set forth in the Settlement Agreements entered into on July 6, 2005, in connection with the settlement of the consolidated cases of *Pamela A. Tittle, et al. v. Enron Corp., et al.* and *Elaine L. Chao v. Enron Corp., et al.* (collectively the "Settlement Agreement").  As you are aware, Hewitt Associates has been providing certain services under an Administrative Services Agreement, dated June 1, 2001, as amended effective January 1, 2005 and as thereafter amended ("ASA").  In carrying out its duties under the ASA, Hewitt made a misallocation of funds received under the Settlement which caused an injury to Participants of over $21 million.  Under the ASA, Hewitt is required to correct and/or re-perform any defective or non-conforming services.  We hereby notify you of the Plan's demand that Hewitt honor Section 2.5 of the ASA.  Please advise how Hewitt intends to make such corrections as necessary to remedy the misallocation.

HOU02:1095441.4

**BAKER BOTTS** LLP

Mr. Rohail Ahmed Khan         - 2 -         February 21, 2007

        Further, our understanding of the misallocation indicates that Hewitt Associates hypothetically created a "default" of $100 per share value for Enron stock as of the initial date of the settlement period under the Settlement Agreement (January 1, 1998). Inasmuch as such shares were trading at approximately $41.00 on this date and never traded as high as $100, there can be no doubt that Hewitt's use of a $100 share value amounted to a breach of contract and gross negligence that directly caused over $21 million in harm. On behalf of the Plan, we fully intend to hold Hewitt responsible. Moreover, Hewitt is obliged to take all necessary steps to mitigate the harm resulting from its misallocation, and the Department of Labor has impressed this upon us on several occasions. Please advise us as soon as possible of all the steps Hewitt intends to take to mitigate the injury, including the steps to recover the misallocated monies.

        In the fourth full paragraph of your letter, you indicate that Hewitt recommended an "audit of the calculations prior to distribution." Please provide us with evidence which supports your statements and also indicate when, and to whom, Hewitt recommended this audit.

        Also, I am concerned about the representations in your letter that "deliberate steps" are appropriate to avoid "further problems." This statement, when combined with your indication that absent a third party audit the Hewitt calculations cannot be relied upon, leaves the Administrative Committee with little choice but to insist that Hewitt provide us and any third party we might choose with access to all data, databases, workpapers and programs pertaining to the plans and allocation services provided in order that they may be subjected to an immediate third party review. Please advise us to whom we should speak to facilitate this immediate access and review.

        While your letter purports to rely upon a limitation of liability, we do not believe any such limitation is applicable to the situation at hand. As you know, the limitation of liability provision of Section 10.1 of the ASA does not apply in several circumstances including losses arising from Hewitt's gross negligence; clearly the case in the instant situation. If we are unable to reach an agreement with Hewitt which would make the Plan and its members whole, we will pursue all remedies available under the ASA, applicable statutory and common law in order to hold Hewitt liable for its breach of the ASA and its gross negligence in causing the misallocation.

        As you know, the ASA contains a dispute resolution process which contemplates a good faith attempt to resolve any dispute arising out of the ASA. I appreciate your efforts in that regard to reach a prompt resolution of this matter. Please accept this letter as a formal written notice of the dispute set forth in prior correspondence from DOL, Mr. Kaplan on behalf of CFI and your letter to Mr. Ray of February 16, 2007. Based on the nature of the communications to date and the amount in controversy, the "internal escalation" step has already failed. Instead, I suggest that we go directly to the mediation procedure contemplated in Schedule C to the ASA.

HOU02:1095441.4

**BAKER BOTTS** LLP

Mr. Rohail Ahmed Khan                      - 3 -                      February 21, 2007


       Finally, consistent with the request we received from DOL, please confirm that you have taken all necessary steps to safeguard all documents, computer data, or materials of any kind relating to Hewitt Associates' services to the Plan. I am sure your General Counsel's office is familiar with the steps needed in order to effect a "litigation hold" on materials to safeguard against their destruction or loss. Please confirm at your earliest convenience that such steps have been undertaken and that a "litigation hold" is in place.

       I look forward to hearing from you at your earliest convenience regarding my proposal for a prompt mediation as contemplated under the ASA.

       Yours very truly,

       John E. Neslage
       Counsel to Plan Administrator

JEN:0664

cc:    Mr. John Ryan (*By Certified Mail*)
       Chief Legal Officer
       Hewitt Associates LLC
       100 Half Day Road
       Lincolnshire, Illinois 60069

**EXHIBIT 8**

# Hewitt

Hewitt Associates LLC
100 Half Day Road
Lincolnshire, IL 60069
Tel (847) 295-5000
Fax (847) 295-7634
www.hewitt.com

Argentina
Australia
Austria
Belgium
Brazil
Canada
Channel Islands
Chile
China
Czech Republic
France
Germany
Greece
Hong Kong
Hungary
India
Ireland
Italy
Japan
Malaysia
Mauritius
Mexico
Netherlands
Philippines
Poland
Puerto Rico
Singapore
South Africa
South Korea
Spain
Sweden
Switzerland
Thailand
United Kingdom
United States
Venezuela

February 28, 2007

Mr. John E. Neslage
Baker Botts LLP
One Shell Plaza
910 Louisiana
Houston, TX 77002-4995

Dear Mr. Neslage:

Re: Disbursement of Funds to Enron Corp's Plan Participants and Beneficiaries

This letter is to respond to your letter of February 21, 2007. We request that you pass this letter to your client and to others interested in the distribution. As you will note, we have copied Mr. Ray on our letter as the corporate representative of our client, Enron Corp.

With regard to your request for information about our efforts with respect to correction of information, it is our understanding that our client team located in the Woodlands, TX is continuing to work with their Enron benefits contacts with respect to the reallocation of benefit amounts. We understand that you are aware of those efforts, and as always, our associates assigned to this project continue to work at the direction of the client.

A few points in your letter call for a brief response. First, as an initial clarification, Hewitt Associates was retained by Enron Corp. to help determine the allocation of settlement proceeds in the matters noted in your letter. Hewitt is neither the plan trustee nor a plan fiduciary. Hewitt's responsibility was, and continues to be, the calculation of the allocation amounts based on the available information as directed by Enron and plan officials and providing such information to the plan fiduciary. We believe that your descriptions that Hewitt "made a misallocation of funds" and "hypothetically created a 'default' of $100 per share value for Enron stock as of the initial date of the settlement period" incorrectly describes our services to Enron.

We believe a sharing of information will, of course, be critical to the resolution of this process. With that in mind, we want to be sure that Enron Corp., the plan and the plan fiduciaries have each taken all steps to retain their records, memorandums, emails and other documents with respect to the allocation project.

Although we certainly recognize that the plan is a critical party to involve in discussions regarding this matter, we wish to point out that the plan is not a party to our Administrative Services Agreement with Enron. As such, we cannot accept a notice from you, representing the plan, as an appropriate notice under the Agreement.

# Hewitt

Mr. John E. Neslage
Page 2
February 28, 2007

We have retained McDermott, Will & Emery to represent our interests with respect to this matter. You should expect to receive a call from our counsel, Bill Boies, next week to discuss next steps. John Ryan, our Chief Legal Officer, is out of the country on business, but he will return next week and be available as well.

Of course, discussions among lawyers focused on Hewitt's relative legal exposure in this matter are not a substitute for acts that the plan and its fiduciaries should be taking to correct the present situation. Hewitt is of course ready to assist the plan in mitigating this situation, including assisting the plan in seeking reimbursement from participants who received payments they should not have. Please understand that Hewitt will continue to fulfill its obligations under its agreement with Enron. Of course, we cannot take the place of the plan and its fiduciary committee in determining the process for seeking reimbursement from participants.

We look forward to working with you on this matter.

Sincerely,

Hewitt Associates LLC

*Peter E Ross*

Peter E. Ross

PER:slf

cc:    Mr. John Ray, Avidity Partners
       Mr. Rohail Khan, Hewitt Associates
       Mr. Wilber H. Boies, McDermott, Will & Emery
       Mr. John M. Ryan, Hewitt Associates